## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |  |
|---|---|---|
| **AG der Dillinger Hüttenwerke** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| **v.** | ) | **Ct. No. 17-00158** |
| | ) | |
| **United States** | ) | |
| | ) | |
| **Defendant.** | ) | |

## COMPLAINT

On behalf of AG der Dillinger Hüttenwerke ("Dillinger"), we hereby bring this civil action and allege the following:

### Parties

1. Dillinger is an integrated producer of carbon and alloy steel plate located in Dillingen, Germany.

2. Defendant is the United States of America, acting by and through the United States Department of Commerce (the "Department").

### Jurisdiction

3. This action is brought pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (B)(i) to contest the final determination by the Department under 19 U.S.C. §1673d in its antidumping investigation of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany: Final Determination of Sales at Less Than Fair Value*, 82 Fed. Reg. 16360 (Apr. 4, 2017) ("Final Determination"); *see also* accompanying Issues and Decision

Memorandum (March 29, 2017).

4.  The final affirmative determination by the Department resulted in the publication of an antidumping duty order on May 25, 2017 that subjects CTL plate produced by Dillinger in Germany to antidumping duty deposits and to potential assessments of antidumping duties. *See Certain Carbon and Alloy Steel Cut-To-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 Fed. Reg. 24096 (May 25, 2017).

5.  Accordingly, this Court possesses jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## Standing

6.  Dillinger is a foreign producer and exporter of CTL plate and participated in the investigations resulting in the contested determinations. Accordingly, plaintiff is an interested party that participated in the underlying administrative proceedings within the meaning of 19 U.S.C. §§ 1516a(d) & (f)(3) and 1677(9)(A).

7.  In addition, because the Department made a final determination that was not lawful, or, otherwise overstated plaintiff's antidumping duty margins, plaintiff has been adversely affected or aggrieved by agency action within the meaning of Section 702 of Title 5 of the United States Code. Therefore, plaintiff has standing to bring this action under 28 U.S.C. § 2631(c).

## Timeliness

8.   An antidumping duty order resulting from the Department's unlawful determination was published in the *Federal Register* on May 25, 2017.  Plaintiff filed a summons instituting this action within 30 days thereafter on June 23, 2017.  Plaintiff served notice of the action upon all other participants in the investigations on the same date.  Plaintiff is filing this complaint within thirty days after filing the aforementioned summons.  Plaintiff has thus commenced this action within the time limits specified in 19 U.S.C. § 1516a(a)(2)(A), 28 U.S.C. § 2636(c) and Rule 3 of the Rules of this Court.

### Facts

9.   On May 5, 2016, the Department published a notice of initiation of less-than-fair value investigations on certain carbon and alloy steel cut-to-length plate from Austria, Belgium, Brazil, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, the People's Republic of China, South Africa, Taiwan and the Republic of Turkey in the *Federal Register*.  81 Fed. Reg. 27089 (May 5, 2016).

10. In the investigation concerning Germany, Dillinger was chosen as one of two mandatory respondents and was sent a questionnaire dated May 25, 2016.

11. On June 8, 2016, within 14 days of issuance of this initial questionnaire, Dillinger informed the Department of various difficulties it had in collecting and reporting certain information requested in the questionnaire pursuant to section 782(c) of the Tariff Act of 1930, as amended, (19 U.S.C. § 1677m(c)) and as directed in the questionnaire itself.  *See* letter from Judith L. Holdsworth, *deKieffer & Horgan*, to the Secretary, *U.S. Department of Commerce* (June 8, 2016).

12. With respect to downstream sales made by Dillinger's affiliated service centers in the home market, Ancofer Stahlhandel GmbH ("Ancofer") and Jebens GmbH ("Jebens"), Dillinger explained that it would have difficulties in reporting all of the transactions in the level of specificity requested by the Department because plate purchased from Dillinger may be commingled with plate from other manufacturers in the service centers' warehouses and one shipment of plate from a supplier may be used by a service center to fulfill various orders from different customers, with quantities being as small as one discrete plate or piece of plate. This resulted in the service centers' computerized sales records not always being able to track full information for each piece of plate.

13. In this investigation, the Department identified 12 product characteristics for model-matching purposes. As first in the order of importance, the Department set the "Quality" characteristic, which listed various groups of steel qualities such as high speed steel, heat resisting steel, *etc*. The listed quality groups were obviously not exhaustive and in the description to the Quality field listed in the questionnaire, the Department specially directed respondents to "[u]se additional number codes for each additional Quality you propose."

14. In response to the directions in the questionnaire, Dillinger added four additional quality codes for steel types that were not adequately covered by the quality groups listed in the questionnaire. These codes were code 475 for chromium-vanadium steels, code 759 for pressure vessel steel adapted to sour service conditions, code 764 for military grade armor plate and code 771 for steels designated specifically for transport of petroleum products in sour service.

15. Dillinger provided transaction-specific price and cost data covering each of these

additional codes as well as extensive product standards, customer information and other documentation showing the differences in the actual physical properties with respect to the additional codes and those codes already provided in the questionnaire.

16. Prior to issuance of its final determination at the very end of the investigation, the Department never noted any deficiency in the information supplied by Dillinger on the additional quality codes; nor did the Department request any additional information.

17. In its questionnaire responses, Dillinger reported four different levels of trade representing four different stages in the marketing of CTL plate (*i.e.*, LOT 1.1, 1.2, 2.0 and 3.0). LOT 1.1 represented direct sales from the mill to end-users. LOT 1.2 represented direct sales from the mill to distributors (*i.e.*, stockists and service centers). LOT 2.0 represented sales by affiliated service centers and the Heavy Fabrication Division to their downstream customers, and LOT 3.0 represented sales of non-prime merchandise.

18. Dillinger is an integrated steel producer and its reported costs of production included the full costs of all stages of production, including costs incurred by its affiliates ROGESA Roheisengesellschaft Saar mbH ("ROGESA") and Zentralkokerei Saar GmbH ("ZKS") with respect to the production of pig iron and blast furnace coke, respectively. Neither, ROGESA nor ZKS have any personnel. Rather, their entire workforce is provided by Dillinger.

19. Dillinger's reported general and administrative (G&A) expenses also included a full allocation of expenses from all relevant affiliates, including the holding company SHS Stahl-Holding-Saar GmbH & Co. KGaA ("SHS-Holding").

20. On November 14, 2016, the Department published notice of its preliminary

determination in the *Federal Register*.  81 Fed. Reg. 79446 (Nov. 14, 2016).

21. In its memorandum concerning the preliminary determination margin calculation for Dillinger, the Department stated that it refused to recognize Dillinger's additional quality codes and reassigned the reported sales using those codes as follows: code 475 to code 480 for mold steels, code 759 to code 760 for general pressure vessel steels, code 764 to code 782 for shipbuilding steels and code 771 to code 772 for steels for the transport of general petroleum products.

22. The only reason given by the Department for rejecting Dillinger's addition quality codes was "[b]ecause Dillinger reported quality code values in product characteristic field 3.1 (QUALITYH) that were not included in the Department's Questionnaire." *See* Preliminary Determination Margin Calculation Memorandum for Dillinger at 2 (Nov. 4, 2016).  The Department did not note any deficiency in the price, cost or product information submitted by Dillinger with respect to its additional quality codes; nor did the Department acknowledge that the questionnaire specifically directed Dillinger to use additional quality codes for the additional qualities it proposed.

23. In November and December 2016, the Department conducted verification of the sales and COP data reported by Dillinger.

24. On April 4, 2017, the Department published notice of its final determination in the *Federal Register*.  82 Fed. Reg. 16360 (April 4, 2017).

25. In its final determination, the Department applied its differential pricing methodology to Dillinger and disregarded the positive margins on non-dumped sales, a practice known as

"zeroing."

26. In its final determination, the Department recognized that the additional quality code 764 applied to military grade armor plate that was excluded from the scope of the investigation and removed these transactions from its margin calculations. The Department however rejected Dillinger's other three additional quality codes, claiming for the first time that Dillinger had not provided sufficient information in support of these codes. With respect to code 759 for pressure vessel steel adapted to sour service conditions and code 771 for steels designated for transport of petroleum products in sour service, the Department continued to reassign these codes in the same manner as in the preliminary determination. With respect to code 475 for chromium-vanadium steels, the Department reassigned the code to code 785 for simple structural steel rather than to code 480 for mold steels as it had done in the preliminary determination.

27. In its final determination, the Department also made certain sudden and unsupported changes in its cost calculation methodology all with the effect of improperly inflating Dillinger's cost of production and its antidumping duty margin. These sudden changes were based upon unsubstantiated claims made for the first time in petitioner Nucor's case brief. These sudden changes in methodology included (1) the use of historic inventory values for coke purchased prior to the period of investigation in order to increase Dillinger's reported costs of blast furnace coke purchased during the period of investigation and (2) increases to Dillinger's cost of manufacture for inputs and services to affiliates erroneously based upon a conclusion that Dillinger double-counted the costs of these inputs and services in calculating its G&A expense

7

ratio.

28. On May 25, 2017, the Department published notice of an amended final determination relating to the calculation of Dillinger's antidumping duty rate in the *Federal Register*.  82 Fed. Reg. 24096 (May 25, 2017).

<u>**COUNT I**</u>

29. The allegations of paragraphs 1 through 28 are restated and incorporated herein by reference.

30. The Department's reassignment of Dillinger's reported quality codes used in creating matching control numbers ("CONNUM") in the Department's final determination and related margin programs is not supported by substantial evidence on the administrative record and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

31. Section 773(a) of the Tariff Act of 1930, as amended, (19 U.S.C. § 1677b(a)) requires that a "fair comparison" be made between the export price and normal value.  In addition, section 777A(d)(1) of the Act (19 U.S.C. § 1677f–1(d)(1)) requires that the comparison be based upon "comparable merchandise."   The Department's prior practice and prior court precedent require the Department to account for commercially significant characteristics in its model-matching methodology.  *See, e.g.*, <u>Union Steel v. United States</u>, 836 F. Supp. 2d 1382, 1387-90 (CIT 2012).  It is therefore crucial that the Department's product characteristics are precise enough to provide for an "apples-to-apples" comparison of products and to account for differences in value unrelated to dumping.  By disregarding the additional quality codes reported by Dillinger, the Department violated the statutory mandate to ensure a fair comparison between the export price

and normal value.

32. The questionnaire issued by the Department specially directed Dillinger to "[u]se additional number codes for each additional Quality you propose" in reporting information for the field QUALITYH/U.

33. In response to the directions in the questionnaire, Dillinger added four additional codes and provided the Department with detailed, transaction-specific price, cost and product information for each additional code as well as extensive documentation on the differences in the actual physical properties with respect to the additional codes and those codes already provided in the questionnaire.   Dillinger also explained the placement of the additional codes for matching purposes within the Quality code hierarchy.

34. Despite issuing numerous supplemental questionnaires, the Department never noted any deficiencies in the information supplied by Dillinger supporting these additional quality codes or requested any additional information.  In fact, it was not until its final determination at the very end of the proceeding, that the Department ever claimed any insufficiency in the evidence supplied by Dillinger.  By contrast, in its preliminary determination, the sole reason given by the Department for disregarding the additional quality codes reported by Dillinger was "[b]ecause Dillinger reported quality code values in product characteristic field 3.1 (QUALITYH) that were not included in the Department's Questionnaire."  *See* Preliminary Determination Margin Calculation Memorandum for Dillinger at 2 (Nov. 4, 2016).

35. Pursuant to section 782(d) of the Act (19 U.S.C. § 1677m(d)), if the Department determines that a response to a request for information does not comply with the request, it "shall

promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency."

36. The Department's failure to note any deficiencies in this information or request additional information concerning the additional quality codes during the investigation and then claiming a deficiency in Dillinger's information for the first time in the final determination is contrary to section 782(d) of the Act, which requires the Department to "promptly inform" the respondent of the nature of the deficiency and provide it with an opportunity to remedy or explain the deficiency, is not only contrary to law but is also arbitrary, capricious and an abuse of discretion.

37. The Department's determination that Dillinger failed to provide sufficient information in support of its reported additional quality codes is not supported by substantial evidence on the administrative record. For each of its transactions, Dillinger provided detailed price, cost and product information including the precise specification to which the product was made and various physical and mechanical characteristics such as minimum specified carbon content, minimum specified chromium content, minimum specified nickel content and minimum specified yield strength. Dillinger also provided extensive product standards and customer information for the additional quality codes it proposed. The commercial significance of the additional quality codes is also demonstrated by the impact the codes have upon the dumping margin.

38. The Department's reassignment of quality codes 475 for chromium-vanadium steels,

759 for pressure vessel steel adapted to sour service conditions and 771 for steels designated for transport of petroleum products in sour service is not supported by substantial evidence and otherwise not in accordance with law because there are commercially significant differences between the characteristics of the products covered by these additional codes and those of the quality code groups to which the Department reassigned these transactions.

39. The level of evidence demanded by the Department in order for Dillinger to justify the additional quality codes is arbitrary and capricious, an abuse of discretion and otherwise not in accordance with law. The Department has stated no objective and generally applicable standard for identifying commercially significant characteristics but rather has applied to Dillinger a *post hoc* arbitrary standard that whatever information was provided regardless of its nature and quantity was insufficient. Moreover, there is no evidence that the Department required the same level of documentation from the domestic producers in establishing the original quality codes listed in the questionnaire. The Department also impermissibly ignores the impact the additional codes have on the results of its margin calculation.

40. The Department's apparent contention that additional quality codes could not be proposed by respondents after the comment period on product characteristics expired and the final list of product characteristics was issued is arbitrary and capricious, an abuse of discretion and not supported by substantial evidence on the administrative record. While the final list of product characteristics issued by the Department on June 10, 2016 stated for many of the product characteristic fields that additional reporting codes should not be created, for the Quality field, the final product characteristics specifically stated that the respondent was to "[u]se additional

number codes for each additional Quality you propose." This statement in the list of final product characteristics, itself, unequivocally demonstrates that the use of additional quality codes by respondents was permitted after the original comment period.

41. The Department's calculations used in determining the weighted-average costs of manufacture for the CONNUMs involving the reassigned quality codes have not been properly and fully explained and such calculations suffer from computational and methodological errors.

## COUNT II

42. The allegations of paragraphs 1 through 41 are restated and incorporated herein by reference.

43. The Department's collapsing of all of Dillinger's reported home market channels of distribution into one level of trade is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

44. Section 773(a)(1)(B)(i) of the Act (19 U.S.C. § 1677b(a)(1)(B)(i)) directs that the comparison between the export price and the normal value be made at the same level of trade. Similarly, pursuant to 19 C.F.R. § 351.412(c)(2), the Department "will determine that sales are made at different levels of trade if they are made at different marketing stages (or their equivalent)."

45. In its questionnaire responses, Dillinger substantiated four different levels of trade representing four different stages in the marketing of CTL plate. Included in these levels of trade was a separate level of trade for sales made by related service centers who purchase CTL plate from Dillinger and other producers, stock it and sell it to unrelated customers in various

quantities, shapes and sizes.

46. Sales by resellers who stock the merchandise or sell it in further-processed form are at a different marketing stage than direct sales by the mill to end customers. With sales through resellers, the plate passes through two distinct marketing stages. First, the plate is sold from the mill to the reseller with the corresponding sales and marketing, freight and delivery and warranty and technical support being performed on those sales. Then the reseller performs inventory maintenance and warehousing of the plate until it is sold to an end customer. When the reseller sells the plate to an end customer, the reseller then performs additional sales and marketing, freight and delivery and warranty and technical support with respect to that second sale. Therefore, it is clear that the level and intensity of selling activities on sales through resellers is significantly different than that related to direct sales by the mill. Indeed, the Department's consistent prior practice has been to recognize separate levels of trade for direct sales from the mill and sales through resellers or service centers. *See, e.g.,* Notice of Final Determination of Sales at Less than Fair Value: Certain Cold-Rolled Steel Flat Products from the United Kingdom, 81 Fed. Reg. 49929 (July 29, 2016) and accompanying Issues and Decisions Memorandum at Comment 1, p.8 & n.21 (noting that the Department has "made similar determinations in other cases with similar fact patterns"). Therefore, the Department's failure to recognize a separate level of trade for sales made by Dillinger's affiliated service centers is contrary to law and the Department has not properly explained its departure from prior practice.

47. The Department's refusal to recognize the admitted difference in inventory maintenance and warehousing functions performed on sales by resellers but not direct mill sales

13

as a substantial difference in selling activities warranting a separate level of trade is similarly contrary to law, arbitrary, capricious and an abuse of discretion.

48. The Department's refusal to consider service center operations such as cutting, sawing, *etc.*, as relevant selling functions is contrary to prior practice and results in a determination that does not make proper allowance for differences in the level of trade. The Department's disregarding of these service center functions is therefore contrary to law and the Department has failed to give an adequate explanation for its departure from prior practice.

49. The Department's contention that the information supplied by Dillinger was insufficient to establish substantial differences in selling activities is not supported by substantial evidence on the administrative record and is otherwise not in accordance with law. The information supplied by Dillinger, including the organizational charts detailing the number of employees performing the various selling functions, fully demonstrated substantial differences in selling activities requiring the recognition of separate levels of trade in the Department's antidumping duty calculations.

## COUNT III

50. The allegations of paragraphs 1 through 49 are restated and incorporated herein by reference.

51. The Department's use of adverse facts available for certain sales by Dillinger's home market affiliated service centers is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

52. Pursuant to section 782(c) of the Act (19 U.S.C. § 1677m(c)), if an interested party

promptly notifies the Department after receiving a request for information that it is "unable to submit the information requested in the requested form and manner," then the Department "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."

53. Dillinger complied with the statutory provision when it informed the Department of the difficulties it had in providing full information on sales made by its affiliated resellers.

54. The Department's conclusion that Dillinger did not act to the best of its ability in reporting the downstream sales of its affiliated service centers is not supported by substantial evidence on the administrative record. The record clearly shows that Dillinger fully reported all of the relevant downstream sales made by its affiliated resellers, and it reported full product and price information for each of these transactions. The Department has not identified any non-reported transactions or any transactions that did not have full and complete pricing information. Rather, the only information missing for a very few of the reported transactions is the identity of the producer of the underlying plate.

55. In its questionnaire responses, Dillinger fully explained the difficulties in tracing the producer for these transactions due to the fact that plate from various producers is co-mingled in the warehouse and that when plate is further processed and the remaining pieces are put back into inventory, the producer information is not always recorded for that piece. Therefore, the Department's assertion that Dillinger withheld information in its possession is not supported by substantial evidence on the administrative record.

56. The Department's decision to assign the highest non-aberrational net price among Dillinger's downstream home market sales to all of the sales for which the manufacture could not be identified is contrary to law. The purpose of facts available is to replace missing information needed for the investigation. Here the missing information is limited to the identity of the plate producer. The pricing information for each transaction was full and complete and there is therefore no need for the Department to alter or replace this information in any manner.

57. The missing manufacture information is needed only for the Department to identify whether the plate was produced by Dillinger, and therefore relevant to the margin calculation, or by a non-affiliated producer, and therefore not relevant to the margin calculation. Therefore, as to the missing manufacture information, the Department must only decide whether to attribute the relevant transactions to Dillinger and include them in the margin calculation or attribute them to third-party producers and exclude them from the margin calculation.

58. In its final determination, the Department not only treated the transactions for which the manufacture could not be identified as transactions attributable to Dillinger, it also altered the prices for those transactions by replacing the valid reported price with the highest non-aberrational net price among all of the downstream home market sales made by Dillinger's affiliated service centers. This price alteration by the Department is contrary to law because the prices for those transactions were properly and correctly reported.

59. The Department's determination of the so-called "highest non-aberrational net price" has not been properly and fully explained and it is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

## COUNT IV

60. The allegations of paragraphs 1 through 59 are restated and incorporated herein by reference.

61. The Department's application of its differential pricing methodology to Dillinger in this investigation is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

62. On May 4, 2007, the Department published notice in the *Federal Register* of its determinations under section 129 of the Uruguay Round Agreements Act that it was implementing the findings of the WTO Panel in *US—Zeroing (EC)* that prohibited disregarding the positive margin on non-dumped sales in investigations involving average-to-average transactions, a practice known as "zeroing." 86 Fed. Reg. 25261 (May 4, 2007).

63. Despite the clear findings in the WTO dispute settlement proceeding and the Department's section 129 proceedings, the Department used zeroing to calculate Dillinger's antidumping duty margin in this investigation. By the Department's own admission, had it not applied zeroing to Dillinger in this investigation, Dillinger's antidumping duty margin would have been *de minimis*. Final Determination Margin Calculation Memorandum for Dillinger at 4 (March 29, 2016).

64. The only stated reason by the Department for applying zeroing to Dillinger in this investigation is that it applied the average-to-transaction method to calculate Dillinger's antidumping duty rate. However, application of the average-to-transaction method does not dictate or justify the use of zeroing. Under both the average-to-average and the average-to-

transaction methods, zeroing suffers from the same legal deficiencies. This is evidenced by numerous rulings by the WTO Dispute Settlement Body, with the most recent being the September 7, 2016 WTO Appellate Body report in *US – Washing Machines (Korea)*, finding that the Department's differential pricing methodology ("DPM") is "inconsistent 'as such' with Article 2.4.2 of the Anti-Dumping Agreement." *United States – Antidumping and Countervailing Measures on Large Residential Washers from Korea*, Report of the Appellate Body, WT/DS464/AB/R (Sept. 7, 2016).

65. The Department's interpretation of the U.S. antidumping statute in a manner that conflicts with the international obligations of the United States under the WTO Agreements violates the *Charming Betsy Doctrine* established by the U.S. Supreme Court and is therefore contrary to law. Murray v. Schooner Charming Betsy, 6 U.S. (2 Cranch) 64, 81, 2 L. Ed. 208 (1804) (stating that "an act of Congress ought never to be construed to violate the law of nations if any other possible construction remains"); *see also*, Federal Mogul Corp. v. United States, 63 F.3d 1572, 1581 (Fed. Cir. 1995) (stating, "Absent express Congressional language to the contrary, statutes should not be interpreted to conflict with international obligations"). There is no express Congressional language that would require the Department to reach an interpretation that conflicts with the WTO Agreements on this matter.

66. Section 777A(d)(1) of the Act (19 U.S.C. § 1677f-1(d)(1)) permits the Department to use the average-to-transaction method only when (1) there is a "pattern of export prices (or constructed export prices) for comparable merchandise that differ significantly among purchasers, regions, or periods of time" and (2) the administering authority explains why such

differences cannot appropriately be taken into account by the use of the average-to-average or the transaction-to-transaction method. However, even in situations where the Department may use the average-to-transaction method, there is nothing in the statute that states that zeroing, which may not be used when applying the average-to-average method, may be used when applying the average-to-transaction method.

67. The Department's determination that the requirements of section 777A(d)(1)(B) of the Act (19 U.S.C. § 1677f-1(d)(1)(B)) for use of the average-to-transaction method to calculate Dillinger's antidumping duty rate have been met is not supported by substantial evidence on the administrative record and contrary to law.

68. The information relied upon by the Department shows only certain differences in export prices. It does not show a "pattern." Price differences by themselves do not constitute a pattern. All of Dillinger's sales are made-to-order pursuant to specific agreements with individual customers. Prices are individually negotiated with each specific customer based upon normal market considerations such as supply, demand, production costs, capacity utilization, *etc*. Accordingly, it is in no way unusual that there may be price differences between different customers or even between different orders for the same customer. Such differences are normal and are based upon ordinary, ever-changing market conditions. These normal price differences do not evidence the "masking of dumping," the combatting of which is the stated purpose of the Department's differential pricing methodology. It is therefore necessary that the Department's methodology properly differentiate between normal price differences and "patterns" evidencing the masking of dumping.

69. The Department's differential pricing methodology also does not properly distinguish between differences among purchasers, regions and time periods. Rather, the methodology lumps differences related to each of these three elements into the same group and again no clear "pattern" can thereby be identified.

70. The Department's methodology also does not review whether the differences in export prices relate to rising or falling prices or the relationship of those price differences to the cost of production or the normal value of comparable merchandise. For example, the methodology does not properly distinguish between prices that higher than the normal value of comparable merchandise and those that are lower than the normal value of comparable merchandise.

71. The methodology also does not have a control price or set of prices for comparison purposes. Rather, under its methodology, the Department simply compares all prices within a group to all other prices within that same group.

72. The Department's differential pricing methodology also fails to properly compare export prices for "comparable merchandise" as required by the statute. Due to its made-to-order business, Dillinger produces a myriad of different grades and specifications. The Department's model-match methodology however collects many different grades into broad quality baskets. Therefore, any one CONNUM will contain many different grades that are seen as technically and commercially different within the market and therefore result in different pricing. The Department's differential pricing methodology does not account for these differences in the grade mix within a specific CONNUM when comparing across different purchasers, regions or time

periods.

73. The Department's differential pricing methodology also did not account for differences in Dillinger's reported levels of trade or price differences related to customer categories such as distributers and end users.

74. Before using the average-to-transaction method, the statute also requires that the prices "differ significantly." Under the Department's methodology it looks at the significance of a difference in purely mathematical terms (*i.e.*, the size of the difference). However, the idea of significance with respect to combating the masking of dumping requires a more probative analysis. The significance of differences in export prices can only be seen with respect to their relationship to the development of the normal value and cost of production of comparable merchandise. The significance of a price difference also depends upon the quality of the price comparison itself with respect to comparing products and transactions which are actually comparable. In addition, the notion that one mathematical difference applies no matter what product may be the subject of the antidumping duty investigation is arbitrary and capricious. It would stand to reason that the more differences in product and selling terms there are, the larger the difference would need to be in order to reasonably be considered "significant."

75. The Department has also failed to adequately explain why the price differences it has identified cannot appropriately be taken into account by the use of the average-to-average or the transaction-to-transaction method as required by the statute.

76. By its own admission, the Department has not explained why it could not account for the price differences using the transaction-to-transaction method. Its statement that it is not

required to do so is in direct conflict with the explicit wording of the statute.

77. Similarly, the Department's explanation with respect to the average-to-average method is deficient because the only difference between application of the average-to-average method and the average-to-transaction method is the use of zeroing. The price differences and the dumping margins for each CONNUM, both positive and negative, would be the same regardless of whether the average-to-average or the average-to-transaction method were used. The only difference is that when using the average-to-transaction method, the Department applies zeroing and sets all positive margins to zero in calculating the antidumping duty rate. The difference in result is not due to the comparison method being used but rather the difference is solely and completely due to the use of zeroing.

78. The Department has also not explained why applying the average-to-average method using shorter averaging periods as permitted by 19 C.F.R. § 351.414(d)(3) would not take the differences into account. All of the transaction-specific pricing information necessary to determine whether using shorter averaging periods would take the differences into account is already on the administrative record, and the Department's assertion that it lacks the necessary information is therefore not supported by substantial evidence on the administrative record.

## COUNT V

79. The allegations of paragraphs 1 through 78 are restated and incorporated herein by reference.

80. The Department's adjustment to Dillinger's reported costs of production by shifting costs incurred in the production of non-prime plate to prime plate is not supported by substantial

evidence on the administrative record and otherwise not in accordance with law.

81. Pursuant to section 773(b)(3) of the Act (19 U.S.C. § 1677b(b)(3)), the reported cost of production for a product should correspond to the full costs of producing that product including "the cost of materials and of fabrication or other processing of any kind employed in producing" the product.

82. The Department therefore acted contrary to law when it shifted costs incurred for one class of subject merchandise (*i.e.*, non-prime merchandise) to another class of subject merchandise (*i.e.*, prime merchandise).

83. Non-prime plate cannot be identified until the end of production and therefore undergoes the exact same production steps as prime plate. Non-prime plate does not become less costly simply because it cannot be sold at full price. The Department's decision to reduce the actual costs incurred in producing non-prime plate to the sales price of such merchandise and to shift the excess costs to prime plate is contrary to law.

84. The Department's action has the effect of reporting the cost of non-prime plate at less than the full cost incurred in producing that merchandise and reporting the cost of production for prime plate at an amount greater than the actual cost incurred in producing that merchandise. The Department's statement that assigning full cost to non-prime merchandise "would be unreasonable" is contrary to law and not supported by substantial evidence on the administrative record. The Department gives no explanation as to why reporting the full costs of a product that is within the scope of the investigation would be unreasonable; nor does the Department give any legal justification permitting its deviation from the explicit language of the statute.

85. The Department's apparent conclusion that Dillinger's normal books and records recorded the cost of production of non-prime plate at its sales value is not supported by substantial evidence on the administrative record. Dillinger's records kept in accordance with generally accepted accounting principles (GAAP) do not record a reduction in the cost of production for losses on the sale of non-prime plate. The only adjustment that is made is the normal write-down of finished goods inventory values based upon the lower of cost or market principle. It is the Department's long standing practice to exclude such inventory write-downs from a respondent's cost of production because they are more closely related to the sale of merchandise than to its production. *See* Issues and Decision Memorandum for Final Determination at 100 (March 29, 2017). Thus, the Department's decision in this case to increase the reported cost of production for prime plate based upon a write-down of the value of non-prime plate to its sales value is in direct conflict with this established practice.

86. The Department's statement that its decision to shift costs incurred in the production of non-prime plate to prime plate is justified because the non-prime merchandise cannot be used in the same general applications as the prime merchandise is contrary to law. Both the reported non-prime and prime merchandise are within the scope of the investigation. Therefore, under the statute, the actual costs incurred in producing that merchandise must be reported. The use of a product and whether it has the same general applications as another product has nothing to do with the costs actually incurred to produce the product, and the statute provides no basis for the shifting of actual costs from one product to another.

87. The Department's calculation of its adjustment for non-prime plate revaluation suffers

from computational and methodological errors.  The Department's calculation and the figures used therein are also not properly and fully explained.

<h2 style="text-align:center"><u>COUNT VI</u></h2>

88. The allegations of paragraphs 1 through 87 are restated and incorporated herein by reference.

89. The Department's adjustment to Dillinger's reported costs for blast furnace coke is not supported by substantial evidence on the administrative record and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

90. By its explicit terms, the major input rule contained in section 773(f)(3) of the Act (19 U.S.C. § 1677b(f)(3)) applies only when "the administering authority has reasonable grounds to believe or suspect that an amount represented as the value of such input is less than the cost of production of such input."  Thus, the major input rule applies only when a respondent reports a value for the input that is below the actual cost of production.

91. In this investigation, Dillinger's reported costs of production included the full costs of production related to blast furnace coke.  The Department therefore acted contrary to law in using the major input rule to increase the value of blast furnace coke above its actual cost of production during the period of investigation.

92. Pursuant to the transactions disregarded rule contained in section 773(f)(2) of the Act (19 U.S.C. § 1677b(f)(2)), a transaction between affiliated persons may only be "disregarded if, in the case of any element of value required to be considered, the amount representing that element does not fairly reflect the amount usually reflected in sales of merchandise under

consideration in the market under consideration." In deciding to increase the value of blast furnace coke above the actual cost of production as reported by Dillinger, the Department failed to make any analysis as to whether the reported value for blast furnace coke fairly reflected the amount usually reflected in sales of CTL plate in the German market and therefore acted contrary to law.

93. There is no evidence that the affiliation between Dillinger and ZKS had the effect of reducing the value of blast furnace coke below that usually reflected in sales of CTL plate in the German market. First, the uncontroverted evidence on the administrative record demonstrated that, although ZKS is organized as a separate company, it does not have any personnel. Rather, its entire workforce is provided by Dillinger. The mere fact that Dillinger has placed the coke-producing assets in a separate company does not change the economic essence of the transaction. Blast furnace coke is produced entirely for internal consumption and all costs related to this production are fully passed on to the finished end product. Whether Dillinger owns the coke-producing assets and operates them as an internal business unit or the productive assets are held by a subsidiary and Dillinger provides the labor to operate them has no effect on the value of the blast furnace coke.

94. Second, the uncontroverted evidence on the administrative record demonstrated that all of the blast furnace coke produced by ZKS is transferred to ROGESA for the production of pig iron. This blast furnace coke is transferred to ROGESA at the full cost of production and, because ZKS does not make any sales to third parties, these costs of production cannot be offset by the profit on sales to third parties.

95. Third, the uncontroverted evidence on the administrative record demonstrated that over 90% of the blast furnace coke used by ROGESA is purchased from ZKS. ROGESA only purchased small amounts of coke on the spot-market to supplement for the coke that could not be covered by ZKS' production.

96. The Department's revaluation of over 90% of the blast furnace coke used in the production of pig iron based upon the price of small amounts of coke purchased on the spot market is contrary to law and not supported by substantial evidence on the administrative record. Small quantities of blast furnace coke purchased on the spot market do not properly represent the market value of large, consistent purchases of blast furnace coke under a long-term agreement.

97. The Department acted in an arbitrary and capricious manner and abused its discretion when it completely changed its methodology for valuing blast furnace coke in its final determination based only upon arguments raised by the petitioner Nucor for the first time in its case brief filed at the end of the investigation. Because of this sudden shift in methodology, the Department lacked full and complete information to evaluate the appropriateness of the new methodology and make precise and correct adjustments in its calculations. The sudden change in the Department's methodology for valuing blast furnace coke has the effect of an adverse inference applied against Dillinger in an unlawful manner.

98. The Department's use of historic inventory values for coke purchased prior to the period of investigation as the "market value" of blast furnace coke during the period of investigation is contrary to law and not supported by substantial evidence on the administrative

record.  The historic purchase price of coke purchased at unidentified times before the beginning of the period of investigation cannot be used as evidence of the market price of blast furnace coke during the period of investigation because there is a lack of contemporaneity and no evidence that the transactions are comparable as to product, quantity or the other circumstances of sale.

99. The Department's use of historic inventory values for input materials purchased prior to the period of investigation to revalue affiliated major inputs represents a drastic departure from the Department's prior practice, and the Department has provided no adequate explanation for this departure.

100.    The Department did not properly adjust for transportation costs in its calculation of the net price paid for unaffiliated coke purchases.  The Department used a weighted-average transportation cost for coke purchased from suppliers in neighboring countries during the period of investigation and improperly applied that value to coke transported over much farther distances and transported before the period of investigation.

101.    The Department did not properly adjust for G&A and interest expenses in its calculation of the adjusted cost of coke from ZKS.  In Dillinger's reported costs, ZKS' and ROGESA's costs of production are increased by Dillinger's G&A expense and INTEX ratios. The Department failed to account for these increased costs in the calculation of its adjustment to the cost of manufacture (COM) for blast furnace coke.  The Department also failed to take account of revisions it made to Dillinger's G&A expense ratio.

102.    The Department's calculation of its adjustment to COM for blast furnace coke

suffers from computational and methodological errors.  The Department's calculation and the figures used therein are also not properly and fully explained.

<u>**COUNT VII**</u>

103.    The allegations of paragraphs 1 through 102 are restated and incorporated herein by reference.

104.    The Department's adjustment to Dillinger's reported costs related to inputs and services Dillinger provided to its affiliates ROGESA and ZKS is not supported by substantial evidence on the administrative record and is arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law.

105.    The Department's adjustment to Dillinger's cost of manufacture for inputs and services to affiliates is based upon the erroneous conclusion that Dillinger double-counted the costs of these inputs and services in calculating its G&A expense ratio and is therefore not supported by substantial evidence on the administrative record.  The cost reconciliation and other information submitted by Dillinger show that the cost of the inputs and services Dillinger provided to ROGESA and ZKS were not double-counted in the G&A expense ratio calculation.  These documents were fully verified by the Department, and the Department noted no relevant errors or discrepancies.

106.    The Department did not allege at any time prior to its final determination that there was a double-counting of the costs of these inputs and services in Dillinger's G&A expense ratio calculation.  The Department's precipitous change in the treatment of these inputs and services for the first time in its final determination without any prior allegations of double-

counting is arbitrary, capricious and an abuse of discretion, which prevents Dillinger from providing additional information or explanation clarifying this issue.

107.    The inputs and services provided by Dillinger to the affiliates ROGESA and ZKS relate in large part to providing labor for these affiliates' operations since these two companies do not have their own personnel.  As the Department confirmed at verification, the transfer prices for these services and materials included in Dillinger's cost of production exceeded their cost and included a small mark-up.  *See* Cost Verification Exhibit 6.  Dillinger therefore properly reported its costs of production, and the Department's subsequent increase in these reported costs is contrary to law and not supported by substantial evidence on the administrative record.

108.    The Department's adjustment also serves to improperly double-count Dillinger's G&A expenses.  ROGESA's and ZKS' costs of production already include their own G&A expenses and the full pig iron and coke costs are included in Dillinger's reported TOTCOM.  Because Dillinger's full G&A ratio is applied to TOTCOM, including additional G&A expenses to the transfer price of pig iron and coke based upon Dillinger's G&A expense ratio results in double-counting these expenses.

109.    The Departments' calculation of its adjustment also disregards the fact that any increase in the transfer price of inputs and services provided by Dillinger to the affiliates ROGESA and ZKS would result in income to Dillinger that should then be used to offset Dillinger's G&A expenses.  The production process is a closed circuit with all costs flowing into the final product.  All of the coke produced by ZKS and all of the prig iron produced by ROGESA are used internally for the production of steel, and any cost increase caused by

increasing the transfer price of services and materials supplied by Dillinger would be offset by the income earned by Dillinger on those services and materials.

110.     The Department's calculation of its adjustment to COM for inputs and services to affiliates suffers from computational and methodological errors.  The Department's calculation and the figures used therein are also not properly and fully explained.

## COUNT VIII

111.     The allegations of paragraphs 1 through 110 are restated and incorporated herein by reference.

112.     The Department's adjustment to Dillinger's reported general and administrative expenses (G&A) to include certain costs incurred at the holding company level is not supported by substantial evidence on the administrative record and otherwise not in accordance with law.

113.     Dillinger's reported G&A expenses included a full allocation of operating expenses incurred by SHS-Holding and Dillinger's G&A expense calculation was fully reviewed by the Department at verification.

114.     The Department's calculation of so-called "unrecovered costs" at the SHS-Holding level results entirely from interest expenses.  Interest expenses are already separately reported in the INTEX field based upon financial expenses at the consolidated group level, and the Department has noted no deficiencies in Dillinger's reported interest expenses.  It is contrary to law for the Department to increase Dillinger's total cost of manufacture by including additional interest expenses in the guise of calling them G&A expenses.

115.     The Department's inclusion of interest expenses in G&A represents a dramatic

departure from its prior practice, and the Department has provided no adequate explanation for this departure from its prior practice that could be in accordance with law.

116.    The Department's calculation of so-called "unrecovered costs" also results from its refusal to take into account income from shareholdings and income from other investments held as financial assets at the SHS-Holding level.  The only reason given by the Department for disregarding this income is that "[i]nvestment activities are a separate profit-making activity not related to the company's normal operations."  This statement is not supported by substantial evidence on the administrative record and is contrary to law.

117.    SHS-Holding is a holding company and its main activity relates to its investments and financial operations.  Therefore, in determining what portion of SHS-Holding's operating expenses can properly be considered as G&A for the production of CTL plate, it is necessary to consider SHS-Holding's investment activities.  It is contrary to law to treat all of SHS investment income as a separate profit-making activity not related to the production of CTL plate and then treat all of its expenses relating to its investment activities as if they applied solely to the production of CTL plate.

118.    The Department's inclusion of "other services" in its calculation of so-called "unrecovered costs" is also not supported by substantial evidence on the administrative record and contrary to law.  The other services noted by the Department are not part of the group allocation made by SHS-Holding.  Rather, these services are directly charged to Dillinger and already included in its G&A calculation.  Therefore, including these other services in the Department's calculation serves to double-count these G&A expenses and distort the

Department's calculation of so-called "unrecovered costs."

119. The Department's calculation of its adjustment to Dillinger's G&A expense ratio for so-called "unrecovered costs" at the SHS-Holding level suffers from computational and methodological errors. The Department's calculation and the figures used therein are also not properly and fully explained.

## Prayer for Relief

**WHEREFORE**, plaintiff respectfully requests that the Court enter judgment in its favor and against the defendant by:

(1) Declaring the Department's reassignment of Dillinger's reported quality codes for chromium-vanadium steels, pressure vessel steel adapted to sour service conditions and steels for transport of petroleum products in sour service was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(2) Declaring the Department's collapsing of all of Dillinger's reported home market channels of distribution into one level of trade and failing to recognize separate levels of trade for direct sales by the mill and sales through affiliated resellers and service centers was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(3) Declaring the Department's use of adverse facts available for certain sales by Dillinger's home market affiliated service centers and its choice of information as facts available was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(4) Declaring the Department's application of its differential pricing methodology to

Dillinger in this investigation and its use of zeroing was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(5) Declaring the Department's adjustment to Dillinger's reported costs of production by shifting costs incurred in the production of non-prime plate to prime plate was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(6) Declaring the Department's adjustment to Dillinger's reported costs for blast furnace coke was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(7) Declaring the Department's adjustment to Dillinger's reported costs related to inputs and services Dillinger provided to its affiliates was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(8) Declaring the Department's adjustment to Dillinger's reported G&A expenses to include financial expenses incurred by SHS-Holding was not supported by substantial evidence on the administrative record and otherwise not in accordance with law;

(9) Remanding to recalculate Dillinger's antidumping duty margin in light of the above; and

(10)    Granting plaintiff such other and further relief as the Court may deem appropriate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine
Gregory S. Menegaz
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410

Washington, D.C. 20005
Tel:    (202) 783-6900
email: montalbine@dhlaw.com

Counsel for Plaintiff

Date:  July 24, 2017