UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Leo M. Gordon, Judge

| | | |
|---|---|---|
| AG DER DILLINGER HUTTENWERKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | Consol. Ct. No. 17-00158 |
| Defendant, | ) | |
| | ) | |
| and | ) | **NONCONFIDENTIAL VERSION** |
| | ) | |
| NUCOR CORPORATION, *et. al.*, | ) | Confidential information deleted |
| | ) | from pages 22 & 26-30 |
| | ) | |
| Defendant-Intervenors. | ) | |

**REPLY BRIEF ON BEHALF OF
<u>PLAINTIFF AG DER DILLINGER HÜTTENWERKE</u>**

Marc E. Montalbine
Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*
*AG der Dillinger Hüttenwerke*

Dated: August 22, 2018

**Table of Contents**

Page

I.    Improper Rejection of Dillinger's Reported Quality Codes Used to Identify
      Identical Merchandise. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      A.    The Model-Match Methodology Used in this Investigation Was Struck
            Down By the Court on July 9, 2018 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

      B.    The Final Product Characteristics Expressly Permitted Respondents
            to Include Additional Quality Codes . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

      C.    The Department's Rejection of Dillinger's Reported Quality Codes
            Violates the Express Provisions of the Antidumping Statute. . . . . . . . . . . . . . 4

            1.    Differences in Physical Characteristics . . . . . . . . . . . . . . . . . . . . . . . . . 5

            2.    Commercially Significant . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Differential Pricing Methodology. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

      A.    Application of Differential Pricing Methodology to Facts of This Case . . . . . . . 8

      B.    Pattern Requirement . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      C.    Zeroing . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

      D.    T-to-T Method  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

III.  Shifting of Costs Incurred in Production of Non-Prime Plate to Prime Plate  . . . . . . . 13

IV.   Improper Increase in Blast Furnace Coke Costs. . . . . . . . . . . . . . . . . . . . . . . . . . . 17

V.    Improper Adjustment to Charges for Services Dillinger Provided to Its Affiliates
      ROGESA and ZKS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.   Improper Addition of Interest Expenses to Dillinger's Reported G&A Expenses. . . . . 28

VII.  Adverse Facts Available . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

VIII. Conclusion and Prayer for Relief . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

## Table of Authorities

Page

**Cases**

Apex Frozen Foods Private Ltd. v. United States,
862 F.3d 1322 (Fed. Cir. 2017) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Bohler Bleche GmbH & Co KG v. United States,
2018 Ct. Intl. Trade LEXIS 95*, Slip Op. 18-86 (CIT 2018). . . . . . . . . . . . . . . . . . . . . . 1-6

Chevron  U.S.A., Inc. v. Natural Resources Defense Council, Inc.,
467 U.S. 837 (1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Corus Staal BV v. United States,
502 F.3d 1370 (Fed. Cir. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Gerber Food (Yunnan) Co. v. United States,
387 F. Supp. 2d 1270 (CIT 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

IPSCO, Inc. v. United States,
965 F.2d 1056 (Fed. Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-17

Krupp Thyssen Nirosta GmbH v. United States,
24 CIT 666 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Mid Continent Nail Corp. v. United States,
113 F. Supp. 3d 1318 (CIT 2015). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

Nippon Steel Corp. v. United States,
337 F.3d 1373 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31-33

Pesquera Mares Australes Ltda. v. United States,
266 F.3d 1372 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 5

PSC VSMPO-Avisma Corp. v. United States,
688 F.3d 751 (Fed. Cir. 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

Stanley Works (Langfang) Fastening Sys., Ltd. v. United States,
2017 Ct. Intl. Trade LEXIS 157, Slip Op. 17-156 (CIT 2017). . . . . . . . . . . . . . . . . . . . . 12

Tension Steel Indus. Co. v. United States,
179 F. Supp. 3d 1185 (CIT 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-16

Union Steel v. United States,
   836 F. Supp. 2d 1382 (CIT 2012) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

Universal Restoration, Inc. v. United States,
   798 F.2d 1400 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Zhejiang Dunan Hetian Metal Co. v. United States,
   652 F.3d 1333 (Fed. Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

**Statutes**

19 U.S.C. § 1677(16)(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6

19 U.S.C. § 1677b(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19 U.S.C. § 1677b(e) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19 U.S.C. § 1677b(f)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

19 U.S.C. § 1677b(f)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

19 U.S.C. § 1677b(f)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

19 U.S.C. § 1677e(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

19 U.S.C. § 1677f-1(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11, 12

19 U.S.C. § 1677m(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

**Regulations**

19 C.F.R. § 351.407(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

26 C.F.R. § 1.482-1(f)(2)(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**Other Authorities**

Statement of Administrative Action accompanying the Uruguay Round Agreements Act,
H.R. No. 103-316, vol. 1 (1994), reprinted in 1994 U.S.C.C.A.N. 4040 . . . . . . . . . . . . . . . . . . . 9

*United States – Antidumping and Countervailing Measures on Large Residential Washers from Korea*, Report of the Appellate Body, WT/DS464/AB/R (Sept. 7, 2016) . . . . . . . . . . . . . . 12

Pursuant to this Court's scheduling order of January 23, 2018, as amended, and Rule 56.2(d) of the Rules of this Court, AG der Dillinger Hüttenwerke ("Dillinger") submits this brief in reply to the response briefs filed in this proceeding by the Defendant Untied States and the Defendant-Intervenor Nucor Corporation.[1]

## I.  Improper Rejection of Dillinger's Reported Quality Codes Used to Identify Identical Merchandise

Defendant's response brief does little more than repeat the text of the Issues & Decision Memorandum ("IDM") and makes no significant attempt to respond to the arguments raised by Dillinger in its initial brief concerning the Department's errors in disregarding Dillinger's reported Quality codes.

### A.  The Model-Match Methodology Used in this Investigation Was Struck Down By the Court on July 9, 2018

As an initial matter, it is important to note that the Court struck down the model-match methodology used in this investigation in its opinion in *Bohler* on July 9, 2018.  Bohler Bleche GmbH & Co KG v. United States, 2018 Ct. Intl. Trade LEXIS 95 *, Slip Op. 18-86 (CIT 2018). *Bohler* involved the Department's final determination in the companion investigation of cut-to-length plate from Austria.  The model-match methodology used in the Austrian investigation is precisely the same as the methodology used in this investigation, and the Department in fact conducted the comment phase on the product characteristics jointly in all 12 related investigations.

In *Bohler*, the Court found that the Department's model-match methodology failed to account for commercially significant physical differences in alloy content and was therefore

---

[1] Citations to Dillinger's initial 56.2 brief in this proceeding are designated as "Pl. Br."  Citations to the response briefs of Defendant and Defendant-Intervenor are designated as "Def. Br." and "Def-Int. Br.," respectively.

neither reasonable, supported by substantial evidence on the record nor otherwise in accordance with the law.  Id. at 14.  Thus, the Court remanded the matter back to the Department with the order "to amend its model-match methodology in this investigation . . . to better account for the commercially significant differences in physical characteristics among Plaintiffs' products owing to alloy content."  Id.  As it did in *Bohler*, the Court should also remand the issue of the model-match methodology in this case and order the Department to accept the additional Quality codes for sour service pressure vessel steel (Quality code 759) and sour service line pipe steel (Quality code 771) reported by Dillinger in its sales and costs data during the underlying investigation.

**B.    The Final Product Characteristics Expressly Permitted Respondents to Include Additional Quality Codes**

Defendant's continued assertion that Dillinger's additional Quality code for sour service pressure vessel steel was untimely because it was made after the initial comment period for product characteristics, completely ignores the fact that both the proposed product characteristics issued May 19, 2016 and the final product characteristics issued June 10, 2106 expressly directed respondents to "{u}se additional number codes for each additional Quality you propose." Proposed Product Characteristics at 7 (PD92); Final Product Characteristics at Attachment I, p. 8 (PD129).  While all of the other product characteristics (*i.e.*, fields 3.2 through 3.13) specifically state: "Do not create any additional reporting codes for this field,"  field number 3.1 for Quality does not contain this language.  *See* Final Product Characteristics at Attachment I (PD129). Rather, field number 3.1 explicitly states that respondents may use additional Quality codes.  Id. at Attachment I, p.8.  No interested party raised any objection to this language.

Therefore, Defendant's claim of untimeliness is in direct conflict with the Department's own explicit questionnaire directions, and Defendant makes no attempt in its response brief to address this conflict.  *See* Def. Br. 9-11.  Whatever the Department's practice has been in other

2

investigations, the procedure it established in this investigation was that while respondents could not add to the reporting codes for fields 3.2 through 3.12, respondents could add reporting codes to field number 3.1 for Quality.  By ignoring its own explicit directions and barring Dillinger from using additional Quality codes, the Department has acted contrary to law.  The Department cannot simply arbitrarily disregard the explicit directions contained in its own questionnaire.

The timeliness of Dillinger's proposed additional Quality codes is also supported by the decision in *Bohler* where the Court specifically found that the plaintiffs proposed additions to the Department's model-match methodology were not untimely even though they were made after the initial comment period had expired and the Department had issued its final product characteristics.  *See* Bohler, Slip Op. 18-86 at 11.  The Court specifically stated that this was "a case where 'the interests in fairness and accuracy outweigh the burden upon Commerce' presented by having to consider Plaintiffs' concerns about the model-match methodology."  Id. at 11-12 (citation omitted).  Here it is important to understand that the additions to the model-match methodology requested by the plaintiffs in *Bohler* related to adding entirely new fields to the model-match methodology.  *See* id. at 5.  If such significant additions to the model-match methodology cannot properly be considered untimely, then the limited addition of a Quality code for sour service pressure vessel steel as specifically permitted by the questionnaire instructions can certainly not be considered untimely.[2]

---

[2] Dillinger did raise the issue of sour service steels in its initial June 2, 2016 comments on the proposed product characteristics.  Dillinger Product Characteristics Comments at 2-3 & App. 1 (PD107).  Although, at that time, Dillinger only discussed an additional Quality code for sour service line pipe steel, it specifically stated that, as expressly permitted by the directions to the Quality field, Dillinger would propose additional Quality codes as needed when submitting its questionnaire responses.  Id. at 3.  Moreover, the 74-page presentation on the *Requirements for Steel Plate in Sour Service* submitted as Appendix 1 to Dillinger's June 2, 2016 comments specifically discusses both line pipe plate and pressure vessel plate.  Id. at App. 1.  The problem of the corrosive effects of hydrogen sulfide is the same for both line pipe plate and pressure

3

Like the plaintiffs in *Bohler*, Dillinger raised its concerns that the Department's model-match methodology did not sufficiently differentiate between standard and sour service steels. *See* Bohler, Slip Op. 18-86 at 12.  On no less than four occasions, Dillinger raised the issue of sour service steels, not counting Dillinger's case and rebuttal briefs.  *See, e.g.*, Dillinger Product Characteristics Comments (June 2, 2016) (PD107); Section B Response at B-15 to B-16 (July 15, 2016) (PD194); Supplemental Section B & C Response at 11-12 (Sept. 20, 2016) (PD323); Second Supplemental Section A, B & C Response at 8-10 (Oct. 20, 2016) (PD400).  The Department simply ignored Dillinger's information as well as the express directions in the questionnaire that specifically permitted respondents to use additional Quality codes.  In fact, the sole reason given by the Department in its November 4, 2016 preliminary determination for disregarding the additional quality codes reported by Dillinger was "{b}ecause Dillinger reported quality code values in product characteristic field 3.1 (QUALITYH) that were not included in the Department's Questionnaire."  Preliminary Sales Calculation Memo at 2 (PD443).  It was not until its April 4, 2017 final determination, at the very end of the proceeding, that the Department ever claimed any insufficiency in the evidence supplied by Dillinger.  Once again, Defendant's response brief fails to provide any explanation concerning these issues.

### C.     The Department's Rejection of Dillinger's Reported Quality Codes Violates the Express Provisions of the Antidumping Statute

Defendant does not dispute that merchandise can only be treated as identical under 19 U.S.C. § 1677(16)(A) if it has either (1) no differences in physical characteristics or (2) the differences are only minor and "not commercially significant."  *See* Def. Br. 7 (quoting Pesquera

---

vessel plate and the solution of drastically reducing the levels of phosphorus and sulfur in the steel is the same.  Therefore, the additional Quality code for sour service pressure vessel steel was simply a natural extension of the model-matching concerns for sour service steels already raised during the initial product characteristic comment period.

<u>Mares Australes Ltda. v. United States</u>. 266 F.3d 1372, 1384 (Fed. Cir. 2001)).

### 1.    Differences in Physical Characteristics

As explained in Dillinger's initial brief, both sour service pressure vessel steel and sour service line pipe steel are used with "sour" petroleum products containing high amounts of hydrogen sulfide ($H_2S$).  Pl. Br. 6.  Sour service pressure vessel steel is used to make containers such as tanks and sour service line pipe steel is used to make pipelines.  Because hydrogen sulfide is extremely corrosive, steels used for sour service must be specially manufactured with extremely low levels of phosphorus (P) and sulfur (S) to withstand these corrosion effects.  <u>Id</u>. Because phosphorus and sulfur appear naturally in the pig iron and scrap used to produce steel, sour service steel must be "cleaned" through different processes of desulfurization, dephosphorization and vacuum degassing.  <u>Id</u>.  The cleanliness of the steel must also be guarded throughout the casting process in order to avoid any resulfurization or reoxidization.  <u>Id</u>.

For both sour service pressure vessel steel and sour service line pipe steel, Dillinger provided steel specifications showing that the maximum amount of phosphorus and sulfur permitted for these steels was far below that of standard pressure vessel and line pipe steel. Pl. Br. 6-7 & 11.  The substantially lower levels of phosphorus and sulfur in sour service pressure vessel and line pipe steel represent physical differences between these products and standard pressure vessel and line pipe steels.  Defendant therefore errs in claiming that Dillinger "primarily relies on the cost and price differences between these products and their non-sour service counterparts as justification for a separate product code" rather than "physical differences."  <i>See</i> Def. Br. 11.  Defendant's same argument was rejected in <i>Bohler</i> were the Court stated:

> Plaintiffs consistently point to material composition—a bona fide physical characteristic—that <i>results</i> in significant variances in costs and prices.  By no

means do Plaintiffs rely on costs "in and of themselves."

<u>Bohler</u>, Slip Op. 18-86 at 13.

The same is true in this case. Dillinger's additional Quality codes are based upon actual physical differences in the products, and nowhere in their response briefs do Defendant or Defendant-Intervenor dispute the existence of these physical differences in the levels of phosphorus and sulfur. Thus, under 19 U.S.C. § 1677(16)(A), the Department can only treat sour service pressure vessel and line pipe steel as identical to standard pressure vessel and line pipe steel if these physical differences in the levels of phosphorus and sulfur are only minor and not commercially significant.

## 2. Commercially Significant

As detailed in Dillinger's initial brief, Dillinger provided the Department with substantial evidence demonstrating that the physical differences in phosphorus and sulfur are commercially significant under all of the criteria traditionally used by the courts and the Department in determining commercial significance (*e.g.*, cost and price differences, end use differences and marketing differences). *See* <u>Union Steel v. United States</u>, 836 F. Supp. 2d 1382, 1389 (CIT 2012) (holding that differences in costs, prices, end use and marketing support a finding that differences in physical characteristics are commercially significant); <u>Bohler</u>, Slip Op. 18-86 at 8 (stating that "end use is plainly a commercially significant factor"). In its response brief, Defendant ignores this information and simply repeats the text of the Department's IDM.

It is not true, as claimed in Defendant's response brief, that Dillinger failed to provide the Department with any relevant information on the prices and costs of sour service line pipe and pressure vessel steel during the investigation. *See* Def. Br. 12. Dillinger reported all of its sales and costs data to the Department using separate Quality codes that distinguished between sour

service pressure vessel steel and standard pressure vessel steel and between sour service line pipe steel and standard line pipe steel.  The Department therefore had detailed information on all of these cost and price differences and there is not one digit in Tables 1 & 2 of Dillinger's initial brief that does not directly come from information provided to the Department during the underlying investigation.  *See* Pl. Br. at 7 & 12.  The Department simply ignored this information and deleted the distinct codes for sour service pressure vessel steel and sour service line pipe steel reported by Dillinger, replacing them with the codes for standard pressure vessel and line pipe steel.

In their response briefs, Defendant and Defendant-Intervenor similarly ignore the record evidence concerning the commercially significant physical differences between sour service pressure vessel and line pipe steel and standard pressure vessel and line pipe steel.  As detailed in Dillinger's initial brief, there is a clear difference in the end use of sour service and standard steels.  Standard pressure vessel and line pipe steel cannot be used with sour petroleum products because of the danger of cracking through corrosion with catastrophic consequences (*e.g.*, the bursting of a pipeline or pressure vessel with the danger of explosion, loss of life and damage to the environment).  Pl. Br. 5-15.  Sour service pressure vessel and line pipe steels are made according to separate standards and specifications, which drastically reduce the allowed levels of phosphorus and sulfur.  These products are marketed under separate product and trade names, and there is an industry-wide test for identifying those steels having the low levels of phosphorus and sulfur required to resist the corrosive effects of sour petroleum products.  Id.

All of these undisputed facts demonstrate that the physical differences between sour service pressure vessel and line pipe steel and standard pressure vessel and line pipe steel are commercially significant.  Therefore, the Department's treatment of these products as "identical"

7

is contrary to law and not supported by substantial evidence on the administrative record.[3]

## II.     Differential Pricing Methodology

### A.     Application of Differential Pricing Methodology to Facts of This Case

Neither the Defendant nor the Defendant-Intervenor provide any meaningful response to Dillinger's arguments concerning the improper application of the differential pricing methodology ("DPM") to the facts of this case.  As detailed in Dillinger's initial brief, all of Dillinger's sales are made-to-order pursuant to specific agreements with individual customers, and prices are individually negotiated with each specific customer based upon normal market considerations and the customer's unique specifications, *etc*.  Pl. Br. 28.  It is therefore in no way unusual that there may be price differences between different customers or even between different orders for the same customer, and these price differences by themselves do not constitute a pattern; nor do they identify targeted or masked dumping.

Moreover, due to its made-to-order business, Dillinger produces a myriad of different grades and specifications.  The Department's model-match methodology however collects many different products into broad baskets.  Therefore, any one CONNUM will contain different products that are seen as technically and commercially different within the market and therefore result in different pricing.  The DPM does not account for the differences in product mix within a specific CONNUM when comparing across different purchasers, regions or time periods.

Defendant's only response to these arguments is to state:

---

[3]  Defendant also provides no valid justification as to why the Department applied such vastly different evidentiary requirements to Nucor and Dillinger with respect to making changes in the model-match methodology.  *See* Def. Br. 14-15.

> Of course, companies respond to economic, legal, business, and other forces; thus,
> differences in prices demonstrate a company's priorities through its pricing
> behavior.

Def. Br. 23.

In essence, the Department simply applies its DPM as an irrebuttable presumption without regard to the particularities of a respondent's product or sales practices.  As the Federal Circuit stated in *Universal Restoration*, an "irrebuttable presumption of fact violates due process."  Universal Restoration, Inc. v. United States, 798 F.2d 1400, 1406 (Fed. Cir. 1986) (citation omitted).  It is also clear from the SAA that Congress did not intend the targeted dumping provisions to be applied as an irrebuttable presumption.  The SAA expressly states that, "in determining whether a pattern of significant price differences exist, Commerce will proceed on a case-by-case basis, because small differences may be significant for one industry or one type of product, but not for another."  SAA at 843.

In this case, it is not disputed that all of Dillinger's products are produced on a made-to-order basis subject to individual price negotiations or that the U.S. CONNUMs are not each limited to an individual product but rather a mix of different products.  For example, each CONNUM contains numerous different products with varying steel grades, specifications, dimensions and chemical content based upon the ranges of each product characteristic comprising the CONNUM.  Each of these different products has different prices and therefore price differences between these individual transactions and the mean U.S. net price for the CONNUM as a whole do not reflect targeted dumping but rather differences in the products being grouped within the same CONNUM.

In must be remembered that the DPM was first developed in proceedings involving nails. *See* Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1322, 1328 (Fed. Cir. 2017).

There is a significant difference between a simple commodity product like nails and a complex made-to-order product like CTL plate.  Because a product like nails has few variations in grade and is not individually produced according to specific customer orders, the CONNUMs for such a product can be tightly drawn to contain a unique commercial product.  Moreover, because of the commodity nature of a product like nails, one would not expect any naturally occurring variations in the price of a specific type of nail among purchasers, regions or periods of time.  A specific type of nail sold to a customer in one region is exactly the same as that type of nail sold to a different customer in a different region.  By contrast, each of Dillinger's sales transactions involves individually made-to-order products.  The price of each order is separately negotiated with the customer based upon the unique customer specifications and the prevailing market conditions at the time of the price negotiations.  Because the cost of raw materials such as alloys can change many times throughout the year, negotiated prices, even for the same product at different times during the year, will vary.

Therefore in determining whether price differences among purchasers, regions or periods of time are "significant" and form a "pattern" as required by the statute, the Department, when dealing with complex made-to-order products, must consider whether any perceived price differences are due instead to differences in product characteristics or changes in the cost of production.  The Department cannot simply apply its DPM as an irrebuttable presumption and thereby ignore the facts and circumstances concerning particular products in individual cases.

Defendant's assertion that Dillinger had an opportunity to comment on control numbers is without merit.  *See* Def. Br. 23.  First, Dillinger did timely request changes to the product characteristics for building CONNUMs, and the Department refused to make any of Dillinger's suggested changes.  *See* Dillinger Product Characteristics Comments at 2 (PD107).  Second, the

10

PUBLIC VERSION

issue of defining CONNUMs for purposes of price comparisons between normal value and U.S. price is distinct from the issue of whether the mean U.S. net price for any individual CONNUM is influenced by product differences.

The fundamental purpose of defining CONNUMs in an antidumping proceeding is in order to make a fair comparison between the normal value in the foreign home market and the U.S. price.  By contrast, the DPM uses the CONNUM in a completely different manner.  The DPM does not consider normal value in the foreign home market at all.  Rather, it looks exclusively to the U.S. market and the U.S. net price of the transactions covered by the specific CONNUM.  It then looks to whether the net price of each specific transaction differs from the mean U.S. net price for that CONNUM.  For this purpose, differences in physical characteristics such as grade can have a significant effect.

These variations in the price of different products within a CONNUM normally do not have a significant effect because, under the standard A-to-A method, both positive and negative dumping margins are given full effect and therefore balance out the variations in intra-CONNUM product differences.  However, the DPM is utilized in order to justify an exception to the normal A-to-A method when there is a pattern of export prices that differ significantly among purchasers, regions or periods of time.  Therefore, when using the CONNUMs for purposes of the DPM, price differences due to intra-CONNUM product differences are not automatically offset, and the Department must therefore make sure that its determination concerning fulfillment of the requirements for application of the targeted dumping exception in section 1677f-1(d) is not based upon differences in merchandise rather than differences in purchasers, regions or periods of time.

11

### B.    Pattern Requirement

Neither Defendant nor Defendant-Intervenor claim that the DPM identifies a "pattern" in

addition to simply calculating "significant price differences."  Rather, Defendant continues to

claim that the statute requires it only to calculate significant price differences and that it is not

required to determine that the significant price differences form any perceivable pattern.  *See*

Def. Br. at 21-22.  Contrary to Defendant's claim, the question of whether the statute requires the

Department to determine that any significant price differences form a pattern is not "nearly

identical" to any of the arguments raised in *Stanley Works*.  *See* id. at 22.  Nor is Dillinger's

counsel aware of any other court action in which this specific argument has been raised.

As explained in Dillinger's initial brief, the issue is one of statutory interpretation.  Pl. Br.

27-28.  The common meaning of the word "pattern" is "a regular and intelligible form or

sequence discernible in certain actions or situations."  Korean Washers, para. 5.23 & n.108

(citing Oxford Dictionaries online, definition of "pattern").  Because the Department's

interpretation of the statute renders the term "pattern" meaningless and superfluous and fails to

give this term its plain meaning, the Department's interpretation fails to comport with the clear

language of the statute and must be rejected under the first prong of *Chevron*.  Pl. Br. 27-28.

### C.    Zeroing

Defendant's claim that Dillinger failed to exhaust its administrative remedies with respect

to the argument that the statutory exception in section 1677f-1(d)(1)(B) applies only to

significant differences for the same product is without merit.  *See* Def. Br. 26-27.  During the

administrative proceeding, Dillinger specifically challenged the use of zeroing and argued that

the provisions of section 1677f-1(d)(1)(B) did not permit the use of zeroing in this case.

Dillinger's statements concerning inter-product zeroing are part and parcel of that same

argument.  Pl. Br. 32-33.  Therefore, Dillinger did not fail to exhaust its administrative remedies with respect to this argument.

In any event, application of the doctrine of exhaustion is discretionary and the courts have recognized many exceptions to its application.  *See* Corus Staal BV v. United States, 502 F.3d 1370, 1378-81 (Fed. Cir. 2007).  Because Dillinger's argument is based upon a pure question of interpretation of the statute, it would qualify for the exception related to pure legal questions.  Dillinger's argument would also qualify for the exception of futility.  In all the decades that the Department and the courts have been dealing with the issue of zeroing, the Department has not once found that anything in the antidumping statute prevented it from using zeroing or restricted the application of zeroing in any respect.  The only change in the Department's zeroing practice has come from implementation of decisions by the WTO Dispute Settlement Body.

### D.    T-to-T Method

With respect to the argument in Dillinger's initial brief that the Department was required to provide an explanation as to why any relevant price differences could not be accounted for using the T-to-T method, Dillinger's counsel acknowledges that the Court in *Mid Continent* accepted as reasonable the Department's interpretation of the statute in this regard.  Mid Continent Nail Corp. v. United States, 113 F. Supp. 3d 1318, 1325-26 (CIT 2015).

### III.   Shifting of Costs Incurred in Production of Non-Prime Plate to Prime Plate

In their response briefs, neither the Defendant nor the Defendant-Intervenor dispute that the costs reported by Dillinger for non-prime plate represented the actual full costs of producing that plate.  Nor do they dispute that the Department's adjustment in reducing the reported costs of Dillinger's non-prime plate to the plate's sales value and transferring the excess amount to the

reported costs of Dillinger's prime plate has the effect of reporting the cost of non-prime plate at less than the actual full cost incurred in producing that merchandise and reporting the cost of production for prime plate at an amount greater than the actual cost incurred in producing that merchandise. Defendant and Defendant-Intervenor also do not dispute that both prime and non-prime plate meet the definition of subject merchandise in this investigation.

As explained in Dillinger's initial brief, the shifting of costs from non-prime to prime merchandise based upon the market value of the non-prime merchandise was specifically struck down by the Federal Circuit in *IPSCO*. Pl. Br. 33-34 (citing IPSCO, Inc. v. United States, 965 F.2d 1056 (Fed. Cir. 1992)). Neither the Defendant nor the Defendant-Intervenor make any meaningful effort to distinguish or even address the Federal Circuit's decision in *IPSCO*. Defendant expends only one sentence on the topic stating that, since the *IPSCO* decision, the Department's practice has "evolved" and its current practice has been sustained by the Court. *See* Def. Br. 31 (citing Tension Steel Indus. Co. v. United States, 179 F. Supp. 3d 1185, 1196-97 (CIT 2016)). However, Defendant provides no details on how the Department's practice has "evolved" or how this evolution brings the practice outside the scope of *IPSCO*.

It is also incorrect to state that *Tension Steel* sustained the Department's practice challenged by Dillinger in this case. This case involves the Department's action of writing down the actual costs of production of one grade of subject merchandise to its sales value and transferring the excess costs to another grade of subject merchandise. This is precisely the action that was stuck down in *IPSCO*. In that case, the court stated that the terms of the statute expressly cover "actual production costs" and that the cost of subject merchandise, even of a non-prime quality, must be reported based upon actual costs and not the merchandise's selling price. IPSCO, 965 F.2d at 1059-60. The court specifically distinguished the reporting of costs

for subject merchandise from the situation of valuing "by-products," which the court defined as "secondary products not subject to investigation." Id. at 1059 (citation omitted). By contrast, *Tension Steel* dealt with the issue of the valuation of a non-prime product that was not subject merchandise and that was specifically found to be a "by-product."[4] Tension Steel, 179 F. Supp. 3d at 1194-96 (stating that the "downgraded product differs from subject merchandise" and that the "non-prime pipe is properly classified as a by-product").

This distinction between the reporting of the cost of production for subject merchandise on the one hand and the valuation of a non-subject by-product on the other hand is crucial. As stated in *IPSCO*, the purpose of reporting costs of production under the antidumping statute is to determine whether the price of home market sales are below the "cost of producing the merchandise" and in appropriate cases to provide an alternative basis for calculating normal value by using constructed value. IPSCO, 965 F.2d at 1060. According to the court, reducing the reported cost of production to a product's selling price results in an "unreasonable circular methodology" whereby the selling price of the product becomes a basis for measuring the fairness of the product's selling price. Id. at 1061. The court concluded that this "circular reasoning contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." Id.

This is a clear situation of methodology "creep." The Department has taken a methodology that has been approved in one context (*i.e.*, valuing non-subject by-products) and used it in an entirely different situation (*i.e.*, reporting the cost of production for subject

---

[4] The Defendant's reliance upon the *PSC* decision is similarly without merit. *See* Def. Br. 28. That case involved the valuation of a non-subject product that was "split-off" during the production of the subject merchandise. PSC VSMPO-Avisma Corp. v. United States, 688 F.3d 751, 764-65 (Fed. Cir. 2012).

merchandise).  In doing so, it has violated the clear wording of the antidumping statute and the Federal Circuit's holding in *IPSCO*.

The only attempt made by Defendant-Intervenor to distinguish *IPSCO* is to state that *IPSCO* is based upon 19 U.S.C. § 1677b(b) & (e) and that, since the decision in *IPSCO*, section 1677b(f) was added to the statute directing the Department to base costs on a respondent's normal books and records.  *See* Def-Int. Br. 24.  However, neither section 1677b(b) nor section 1677b(e) was in any way altered by the addition of section 1677b(f).  Nothing in section 1677b(f) states that a respondent may base its reported costs upon sales value rather than actual costs of production.  To the contrary, this provision stresses that in all cases the reported cost must "reasonably reflect the **costs** associated with the production and sale of the merchandise." 19 U.S.C. § 1677b(f)(1)(A) (emphasis added).

Defendant's claim that Dillinger values non-prime plate at the likely selling price in its normal accounting books and records is simply incorrect and ignores the record evidence cited by Dillinger in its initial brief.  *See* Def. Br. 30.  As explained in its initial brief, Dillinger's normal books and records report all actual costs related to the production of heavy plate in the same cost account without any distinction between prime and non-prime merchandise, and the amount booked to this account is used as the basis for reporting inventory values and manufacturing costs in both the financial and cost accounting systems.  Pl. Br. 35-36.  The fact that the inventory values on the balance sheet may later be reduced under the lower of cost or market ("LCM") rule, in no way changes the actual costs of production as recorded in the profit and loss statement.[5]

---

[5] The Court's decision in *Tension Steel* confirms that the LCM rule relates to the valuation of a company's "inventory accounts on the balance sheet."  <u>Tension Steel</u>, 179 F. Supp. 3d at 1195.

A product's actual cost of production does not decrease simply because the product's market value declines, and it has been the Department's consistent practice not to include inventory write-downs in a respondent's cost of production.  Pl. Br. 36.  Therefore, as explained in Dillinger's initial brief, the Department's reduction of the actual cost of non-prime merchandise to account for its sales value directly conflicts with this long-standing practice.  Id. Defendant provides no response to this argument other than to state without any explanation that it "is an issue separate from whether Commerce properly adjusted the reported costs for non-prime CTL plate."  *See* Def. Br. 30.  It is indeed the same issue.  Because the write-down in the value of non-prime plate is related to the sale of the plate, the write-down should not be treated as an increase to the cost of prime plate in the same way that the Department would exclude inventory write-downs attributable to any other finished goods.

Defendant's claim that the reduction in the reported costs of non-prime plate is justified because non-prime plate can only be used in applications that do not require a "certification of grade, type, or chemistry" is without merit.  *See* Def. Br. 29.  First, the word "certification" in this context means warranty.  *See*, Section A Response at A-13 (PD170) (stating that non-prime plate is "sold without any warranty as to type, grade, specification or chemistry").  The issue concerning the reporting of costs for products sold without warranty was specifically addressed in *IPSCO*.  In that case, the court found that the reported cost of production for limited-service OCTG pipe should not be reduced based upon its lower value, even though the limited-service OCTG did not meet the standards of prime merchandise and was sold without a warranty. IPSCO, 965 F.2d at 1058.

## IV.    Improper Increase in Blast Furnace Coke Costs

The Department's application of the major input rule in this case and Defendant's

attempts to justify it in its response brief are convoluted at best.  The application of the major

input rule is actually a straight-forward comparison dictated directly by statute and regulation.

Under these legal authorities, the Department values the affiliated major input at the highest of

the following three items:

> (1) the transfer price paid by the respondent to the affiliated input supplier,
>
> (2) the amount usually reflected in sales of the major input by unaffiliated
> suppliers, or
>
> (3) the cost of production of the affiliated input supplier.

*See* 19 C.F.R. § 351.407(b).

In order to determine unaffiliated market prices for the major input, the Department's

standard section D questionnaire requires respondents to report the volume and value of the input

purchased from unaffiliated parties during the cost calculation period (*i.e.*, the period of

investigation ("POI")).  *See* DOC Questionnaire at D-4 (PD102).  In response to this question,

Dillinger provided the Department with a full list of purchases of blast furnace coke from

unaffiliated third-parties during the POI.  Second Supplemental Section D Response at App. SD-

36 at 2 (CD507).  This list showed the monthly purchases of blast furnace coke by country of

origin on both a wet and dry weight basis.  Id.  This table was fully examined by the Department

at the verification, and the Department found no discrepancies.  Cost Verification Report at 24

(CD740).  In fact, the Department used the information from this table in applying the major

input rule for the preliminary determination, in line with its universal practice of determining

market prices by looking at purchases of the input from unaffiliated suppliers during the POI.

Preliminary COP Memo at Attachment 2 (Nov. 4, 2016) (CD506).

It is therefore astounding that, after having requested information on purchases of blast

furnace coke from unaffiliated suppliers during the POI, verifying this information and using the

information for the preliminary determination, the Department suddenly refused to use any of this information in its final determination and instead resorted to a newly created concept ("consumption value") that is found nowhere in the antidumping statute, regulations or any prior determination by the Department or ruling by the courts.

In its IDM, the Department admits that it normally uses unaffiliated purchase prices in applying the major input rule. Final-IDM at 92-93. In fact, neither the Defendant nor the Defendant-Intervenor can point to one instance where the Department has departed from this universal practice and instead applied consumption values. The whole point of the major input rule is to compare the reported transfer price and costs of production with purchases made from unaffiliated suppliers, and both 19 C.F.R. § 351.407(b) and 19 U.S.C. § 1677b(f)(2) specifically require the Department to look at the "amount usually reflected in sales" of the major input. Therefore, the Department's refusal to base application of the major input rule in this case upon "sales" of the major input made during the POI conflicts with the clear wording of the antidumping statute and regulations and must therefore be rejected as contrary to law.

Defendant's claim that the unaffiliated sales prices to be used under the major input rule do not have to relate to sales made during the POI finds no support in the antidumping statute or regulations. As explained above, 19 C.F.R. § 351.407(b) lists three items of equal weight that must be compared with each another: (1) the transfer price paid by the respondent to the affiliated input supplier, (2) the amount usually reflected in sales of the major input by unaffiliated suppliers and (3) the cost of production of the affiliated input supplier. From the very nature of an antidumping investigation and the information requested by the Department in its questionnaire, there can be no doubt but that items (1) and (3) are limited to the relevant period of investigation. It therefore makes no sense to act as if item (2) in the list of factors is

disconnected from the period of investigation. Indeed, the Department itself has always

interpreted the major input rule as requiring it to collect information on the prices of major inputs

from unaffiliated suppliers **during the relevant period of investigation**. *See* DOC

Questionnaire at D-4 (PD102).

The Department's regulation on the major input rule is meant to be a regulatory

interpretation of 19 U.S.C. §§ 1677b(f)(2) & (3). The regulation is therefore limited by the

explicit language of those statutory provisions. Under section 1677b(f)(2), a transaction between

affiliated parties may only be disregarded if it "does not fairly reflect the amount usually

reflected in sales of merchandise under consideration in the market under consideration." It

cannot be disputed that the "sales of merchandise under consideration" are sales made during the

POI. As further stated in section 1677(b)(f)(2), the whole point of making the comparison

between affiliated sales prices and unaffiliated sales prices is to determine "what the amount

would have been if the transaction had occurred between persons who are not affiliated."

Therefore, this comparison can only properly be done if the affiliated and unaffiliated sales cover

the same time period.

There is no dispute that the price of blast furnace coke fluctuates over time. The record

clearly shows large differences in the monthly prices of blast furnace coke from unaffiliated

suppliers during the POI and large differences between the prices paid to unaffiliated suppliers

during the POI and the prices paid to unaffiliated suppliers before the POI. *See* Dillinger Case

Brief at App. 4 (CD750); Final COP Memo at Attachment 2.2 (CD767). Therefore, in

determining what the price of blast furnace coke purchased from the affiliated supplier ZKS

during the POI would have been had the transactions occurred between persons who were not

affiliated as required by section 1677(b)(f)(2), the Department must look at unaffiliated sales

20

during the POI.[6]

In its response brief, Defendant makes the astounding assertion that the Department used "consumption values" as the "best available information on the administrative record." *See* Def. Br. 31 & 36-37. Nowhere in the Department's IDM did it claim that it was using consumption values as the best available information, and there is no basis for resorting to consumption values as best available information. In its Section D questionnaire, the Department requested that Dillinger report its purchases of blast furnace coke from unaffiliated suppliers during the POI. Dillinger provided this information, this information was verified by the Department and the Department used this information in its preliminary determination. Defendant provides no explanation as to why this verified information on unaffiliated purchases of blast furnace coke during the POI could not be used in the final determination. Defendant states only that the petitioner had argued for use of consumption values in its rebuttal case brief. *See* Def. Br. 37 (citing Nucor Rebuttal Brief at 41-45 (CD758)).

While it is not uncommon for petitioners to raise fanciful arguments in their case briefs to see what might "stick," the Department is not obliged to follow these arguments. Rather, the Department has an obligation to objectively assess the legal and factual support for such arguments. In this case, there is no evidence showing that the information on unaffiliated purchases of blast furnace coke during the POI was in any way deficient or that the

---

[6] It is a cardinal principle of the arm's length rule that the affiliated and unaffiliated transactions being compared must be made under comparable conditions, and one of the prime conditions is that the transactions must be contemporaneous. Pl. Br. 39. For example, the Internal Revenue Service regulations on the arm's length standard explicitly state that when comparing affiliated and unaffiliated transactions (*i.e.*, controlled and uncontrolled transactions), both the affiliated and unaffiliated transactions should cover the same taxable year. *See* 26 C.F.R. § 1.482-1(f)(2)(iii)(A). In the exceptional case that multiple year data is used, both the affiliated transactions and the unaffiliated transactions must cover "a comparable period of time" for consistency. Id. at §§ 1.482-1(f)(2)(iii)(C) & (E)(Example 1).

"consumption values" used by the Department were in any way a better indication of what the price of the affiliated blast furnace coke purchases from ZKS would have been had the parties been unaffiliated.  In fact, the record indisputably shows that the use of "consumption values" instead of actual purchases made during the POI is markedly worse.

First, the consumption values are based upon the historic inventory values for blast furnace coke purchased prior to the beginning of the POI, and there is no indication as to exactly when this inventory was purchased.  Second, the consumption values include freight expenses, and the Department has not properly adjusted the consumption values for these expenses.  As explained in Dillinger's initial brief, the Department's freight adjustment is based upon the average cost of shipping blast furnace coke from [

] and then applied to blast furnace coke purchased prior to the POI from countries as far away as [                    ].  *See* Pl. Br. 40-41.  It is not reasonable to assume, as the Department does, that the costs of shipping blast furnace coke from [    ] to Germany is the same as shipping blast furnace coke from [    ] to Germany.  Once again, Defendant simply ignores these arguments in its response brief and baldly asserts that the Department "adjusted the unaffiliated consumption values to reflect freight-exclusive values."  *See* Def. Br. 38.

Defendant also provides no meaningful response to the fact that the freight factor it used in attempting to adjust the consumption values is on a wet-weight basis while the consumption values are on a dry-weight basis.  *See* Pl. Br. 42.  Defendant states simply that the reported coke consumption values used by the Department "are on the same weight basis."  *See* Def. Br. 39.  This is true.  The coke consumption values are all on a dry-weight basis.  The problem is that the freight factor used by the Department is on a wet-weight basis and must therefore be converted to a dry-weight basis before it can be used to adjust the consumption values.

The verified information reported by Dillinger on its purchases of blast furnace coke from unaffiliated suppliers during the POI suffers from none of these deficiencies.  As requested by the Department, this information covers the POI and is therefore contemporaneous with the affiliated purchases of blast furnace coke from ZKS.  This information has also been fully adjusted for all freight expenses.  Therefore any claim that this verified, contemporaneous information, which was specifically requested by the Department, is somehow inferior to the consumption values used by the Department in its final determination is not supported by any evidence on the administrative record.

Defendant also gives no support for its conclusory statement that consumption values "were a reasonable reflection of market prices."  *See* Def. Br. 35.  As explained above, the historic cost of blast furnace coke purchased prior to the POI is not a reasonable reflection of market prices for blast furnace coke during the POI.  Furthermore, Defendant's claim that the consumption values are "in line" with how Dillinger and its affiliates reported their cost of production information demonstrates a confusion as to the three clearly defined factors listed in the major input regulation (*i.e.*, affiliated transfer price, affiliated costs of production and unaffiliated sales prices).  Dillinger's reported costs of production properly include the costs of all blast furnace coke consumed during the POI.  This point is not in dispute.  The purpose of the major input rule is to compare the transfer price and cost of production for the input purchased from affiliated suppliers with the price of sales from unaffiliated suppliers to determine whether the affiliated transfers represent market prices.

Defendant also obfuscates the clear errors in the Department's application of the major input rule as detailed in Dillinger's initial brief.  Rather than directly responding to Dillinger's argument that the cost increases made by the Department in Attachment 3 of its Cost Calculation

Memorandum are nowhere reflected in its comparison of costs and market values in Attachment 2.1 of that memorandum, Defendant simply states that the Department "accounted for an omitted credit note." *See* Def. Br. 38.  However, Dillinger's argument has nothing to do with the omitted credit note.  Rather, it is a foundational argument that when the Department compares unaffiliated sales prices with the affiliated cost of production under the major input rule, it must use the final affiliated cost of production after all of the other adjustments made by the Department.  *See* Pl. Br. 41-42.  It is clear from a plain reading of the Department's Cost Calculation Memorandum that the adjustments made in Attachment 3 were not reflected in its application of the major input rule detailed in Attachment 2.1, and that the reported POI cost of manufacture (COM) used to allocate the adjustments in Attachment 3 does not reflect the adjustments made under the major input rule in Attachment 2.1.  Therefore, rather than obfuscating this clear calculation error, Defendant should have simply requested the Court for a voluntary remand to correct the error.

Similarly, Defendant fails to provide any meaningful response to Dillinger's argument that, when applying the major input rule, the Department should compare unaffiliated sales prices to the affiliate's full cost of production including G&A expenses and interest expenses (INTEX).  *See* Pl. Br. 41.  This is required to put the unaffiliated sales prices and the affiliated costs of production on the same basis.  The unaffiliated sales prices necessarily cover all costs of production and expenses.  Therefore, the affiliated party's costs must be the full cost of production, including G&A expenses and interest expenses.  It is not sufficient to simply use the total cost of manufacture (TOTCOM) because these costs do not reflect the full cost of

production.  *See* DOC Questionnaire at I-5 (PD102).[7]

Defendant's only response to Dillinger's argument is to state without explanation that the

Department's "use of consumption values as a basis for comparison obviated the need to make

Dillinger's suggested adjustments to G&A and interest expenses."  *See* Def. Br. 39.  The use of

consumption values in no way obviated the need to use the full cost of production in the

Department's comparisons under the major input rule.  The consumption values are based upon

the historic prices paid for the inventory at the time it was purchased.  Therefore, these "values"

include the unaffiliated parties' full cost of production including all expenses, even freight

expenses.  These values cannot properly be compared to an affiliated party's costs that are

limited to only material, fabrication and processing costs without any inclusion of G&A

expenses and interest expenses.  Again, Defendant's failure to provide any explanation for its

conclusory statements leaves those statements without any support in law or the evidence on the

administrative record.

**V.    Improper Adjustment to Charges for Services Dillinger Provided to Its Affiliates
         ROGESA and ZKS**

Once again Defendant obfuscates the arguments made by Dillinger in its initial brief,

giving the appearance that the Department's adjustment was extremely complex.  In reality, the

mechanics of the Department's adjustment and the underlying facts are simple and

straightforward, as are the arguments raised by Dillinger against the adjustment.  Defendant

simply fails to give straightforward responses to Dillinger's arguments.

It is undisputed, that Dillinger provides the workforce to its affiliates ROGESA and ZKS

---

[7] Defining cost of production as "the sum of: (1) material, fabrication, and other processing costs, (2) selling, general and administrative expenses, and (3) the cost of containers and other packing expenses").  By contrast, the cost of manufacture includes only the elements listed in item (1) (*i.e.*, material, fabrication and other processing costs).  Id.

needed for the production of blast furnace coke and pig iron because these companies do not have their own workforce.  *See* Pl. Br. 42-43.  Furthermore, the Department does not dispute that the transfer price charged by Dillinger to ROGESA and ZKS for the services and inputs fully covered the total costs for these items.  Id. at 43.  Thus, these companies pay Dillinger for the labor services, and the costs, in turn, are included in the cost of production for the blast furnace coke and pig iron.  It is a closed circuit with any amount charged by Dillinger for these services ultimately flowing through fully to the pig iron supplied to make steel products.

For the first time in the final determination, the Department came up with the idea that it would increase Dillinger's charges to ROGESA and ZKS by Dillinger's G&A expense ratio. This adjustment increased the costs to ROGESA by some [          ] Euros and the costs to ZKS by some [          ] Euros.  *See* Cost Calculation Memorandum at Attachment 3.  What the Department ignores is that this same [          ] Euro total increase in the amount of the costs paid by the affiliates for Dillinger's labor services would have resulted in an equal amount of income to Dillinger for those services.  As explained by Dillinger in its initial brief, this additional income to Dillinger would be used as an offset to G&A expenses under the Department's long-standing practice.  *See* Pl. Br. 43.  Therefore, the Department cannot increase the costs charged for Dillinger's labor services to ROGESA and ZKS without also recognizing the additional income to Dillinger as an offset to G&A expenses.

Defendant makes no attempt to discuss the Department's prior practice of off-setting G&A expenses with other income in its response brief.  Rather, Defendant states only that "Dillinger's earnings on other activities simply do not relate to the cost of producing subject merchandise."  *See* Def. Br. 41.  This statement is untrue.  The labor services provided by Dillinger to ROGESA and ZKS are directly related to the production of pig iron and blast

furnace coke and have been included in Dillinger's reported costs of production.  Therefore, any

income earned on providing these labor services to ROGESA and ZKS are, by definition,

activities directly related to the cost of producing subject merchandise.

Defendant also provides no response to the argument that its adjustment results in an

improper multiplication of G&A expenses by having Dillinger charge itself its own G&A

expenses and then having these expenses flow into the total cost of manufacture (TOTCOM) for

the end product, which is again charged with G&A expenses.  *See* Pl. Br. 43.

Similarly, Defendant does not dispute that the only reason given by the Department for

making this adjustment was the mistaken belief that the cost of services provided by Dillinger to

ROGESA and ZKS was included "twice" in the G&A expense ratio denominator.  *See* Pl. Br.

43-44 (quoting Final-IDM at 96).  As explained in Dillinger's initial brief, there has been no

double-counting of the cost of Dillinger's labor services to ROGESA and ZKS in the G&A

expense ratio denominator.  Rather, the administrative record clearly shows that only [      ]% of

ROGESA's production of pig iron during the POI was consumed by Dillinger, and portions of

this pig iron were used in the production of non-subject merchandise such as slabs and forgings.

*See* Pl. Br. 43-44.  The remaining pig iron was consumed by a different company, Saarstahl AG,

to make non-subject merchandise.  Id. at 44.

Defendant simply ignores this indisputable fact in its response brief.  While Defendant

claims that the adjustment "only included the percentage of operations related to pig iron used in

the manufacture of subject merchandise," a simple review of the Department's Cost Calculation

Memorandum reveals that it did not account for the fact that more than half of the pig iron and

coke went into the production of non-subject products.  *See* Def. Br. 42.  For example, on the

third line of Attachment 3 to the Cost Calculation Memorandum, the Department lists

[          ] Euro as the adjustment for the labor services Dillinger provided to ROGESA. This

is based upon 100% of the labor services provided by Dillinger to ROGESA and is not in any

way reduced to reflect the fact that more than half of ROGESA's pig iron was used in non-

subject products. In the fourth line, the Department calculates a "Percentage of Operations

Related to the Production of Pig Iron." However, this percentage only shows that [          ]% of

ROGESA's total sales related to pig iron, with the rest relating to non-pig iron products or other

operating income. This calculation does not take into account the fact that of these pig iron

sales, less than half were consumed in the production of subject CTL plate. The Department is

therefore taking the entire amount of the adjustment related to pig iron sales, which it calculates

to be [          ] Euros (*i.e.*, [          ] x [          ]%), and applying it exclusively to subject

CTL plate. The rate of [          ]% used by the Department on the fifth line of Attachment 3 also

does not adjust for the fact that most of the pig iron was used in non-subject products. Rather,

this rate simply indicates the percentage of the total cost of CTL plate that is accounted for by

pig iron. The calculation for ZKS follows the same pattern and does not adjust for the pig iron

and coke consumed in the production of non-subject merchandise.

　　　　None of the facts detailed above could possibly be disputed by the Department, and it is

regrettable that Defendant did not engage in a more candid discussion of the issues in its

response brief. In light of these legal and calculation errors, the Department's adjustment to the

cost of the labor services Dillinger provided its affiliates must be struck down as contrary to law

and not supported by substantial evidence on the administrative record.

## VI.　　Improper Addition of Interest Expenses to Dillinger's Reported G&A Expenses

　　　　Once again, Defendant simply fails to respond to the arguments made by Dillinger in its

initial brief. None of the following facts and arguments detailed in Dillinger's initial brief have

been disputed in any way by Defendant or Defendant-Intervenor:

- Dillinger's reported G&A expenses included a full allocation of **all the operating expenses** incurred by the holding company SHS-Stahl-Holding-Saar GmbH & Co. KGaA ("SHS-Holding"). Pl. Br. 44-45.

- The entire amount of the [          ] Euros that the Department has characterized as an "unrecovered loss" and allocated to Dillinger as additional G&A expenses relates not to SHS-Holding's operating expenses but **solely to interest expenses**. Pl. Br. 45.

- The [          ] Euros in interest expenses that the Department has characterized as an "unrecovered loss" is more than offset by the nearly [          ] Euros in income from shareholdings earned by SHS-Holding so that SHS-Holding did not have a loss from operations but rather a net income of [          ] Euros. Pl. Br. 46.

- Under the Department's long-standing and uniform practice, interest expenses are not included in G&A expenses. Rather, the G&A expense ratio and the interest expense ratio are calculated separately based upon different and distinct methodologies and reported in separate fields in the cost file (*i.e.*, the fields GNA and INTEX). Pl. Br. 45.

- Unlike G&A expenses, interest expenses are calculated based upon the "consolidated audited fiscal year financial statements of the highest consolidation level available." Pl. Br. 45 (citing DOC Questionnaire at D-14 (PD102)). Dillinger properly reported its interest expenses upon this basis, and the Department fully verified this information finding no deficiencies. SHS-Holding's interest expenses were properly not included in Dillinger's reported interest expense ratio because Dillinger is not consolidated with SHS-Holding. Pl. Br. 45-46.

Defendant has provided no explanation for the Department's departure from its universal prior practice of not including interest expenses in G&A expenses and separately calculating interest expenses based upon the highest-level of corporate consolidation. Defendant simply asks this Court for deference. *See* Def. Br. 45-46. However, such an unexplained departure from consistent prior practice is entitled to no deference.

The Department also simply arbitrarily picks out [          ] Euros in interest expenses from SHS-Holding's profit and loss statement without acknowledging that these interest expenses are more than offset by [          ] Euros in income from shareholdings. Here, Defendant simply repeats the statement from the IDM that "investment-related activities are a

separate profit-making activity not related to the company's normal operations." *See* Def. Br. 46. Thereby, Defendant simply ignores the argument made in Dillinger's initial brief that holding investments is the normal operation of a holding company and therefore it cannot be treated as a profit-making activity not related to the company's normal operations. *See* Pl. Br. 46.

Defendant also ignores the argument that even if the shareholding activities were treated as a separate profit-making activity, why should none of SHS-Holding's expenses be allocated to this profit-making activity? While almost [     ] of SHS-Holding's total income is derived from shareholdings, the Department's adjustment assigns none of SHS-Holding's expenses to this activity. Pl. Br. 46-47. It is simply unreasonable for the Department to assume that a holding company, whose main purpose is to hold investments, has no expenses related to those activities.

## VII.   Adverse Facts Available

Neither the Defendant nor the Defendant-Intervenor dispute that Ancofer and Jebens reported full and complete price information for all of their home market sales transactions, including those transactions for which they were not able to report the manufacturer of the underlying plate. Defendant also concedes that the only purpose for the information on the manufacturer of the underlying plate was to determine whether the transaction should be included in the margin calculation or not. *See* Def. Br. 54. The Department already used adverse facts available with respect to the missing manufacturer information by treating all of the transactions for which the manufacture could not be identified as if they were produced by Dillinger and therefore included all of them in the margin calculation. Final-IDM at 62. This fully resolved the issue of the missing manufacturer information.

There is no legal authority that would permit the Department to take the additional step of

rejecting the fully reported prices for these transactions and applying a second adverse inference

by replacing all of these prices with partial-AFA.  This double adverse inference and rejection of

fully reported price information is clearly punitive, and Defendant and Defendant-Intervenor fail

to cite any legal authority or prior practice justifying the use of partial-AFA in this manner.  As

fully explained in Dillinger's initial brief, the use of partial facts available, regardless of whether

it is based upon an adverse inference or not, is limited to filling "informational gaps."  Pl. Br. 21-

22.  Thus, regardless of whether or not the Court determines that the Department was justified in

using an adverse inference, the statute does not permit the double adverse inference and rejection

of fully reported information applied by the Department in this case.  *See* Zhejiang Dunan Hetian

Metal Co. v. United States, 652 F.3d 1333, 1348 (Fed. Cir. 2011) (stating that, "under the plain

language of § 1677e(a), it is clear that Commerce can only use facts otherwise available to fill a

gap in the record"); *see also* Gerber Food (Yunnan) Co. v. United States, 387 F. Supp. 2d 1270,

1288 (CIT 2005) (stating that because "Commerce is empowered to use adverse inferences only

in 'selecting from among the facts otherwise available,' it may *not* do so in disregard of

information of record that is not missing or otherwise deficient").

In any event, the Department's determination that Dillinger did not "put forth its

maximum effort" to provide the Department with requested information is not supported by

substantial information on the administrative record.  *See* Final-IDM at 63-64.  First, the "best of

its ability" standard outlined by the Federal Circuit in *Nippon* "does not require perfection."  *See*

Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Moreover, Dillinger,

Ancofer and Jebens did all of the things listed by the court in *Nippon* in order to avoid the risk of

an adverse inference determination.  They took reasonable steps to keep and maintain full and

complete records documenting the information that a reasonable importer should anticipate being

called upon to produce. They had familiarity with all of the records they maintained in their possession, custody or control, and they conducted prompt, careful and comprehensive investigations of all relevant records. *See* Nippon, 337 F.3d at 1382.

Dillinger, Ancofer and Jebens began reviewing their records and collecting information immediately upon receiving the Department's initial questionnaire. Within 14 days of receiving that questionnaire, Dillinger already wrote the Department and informed it of the difficulties it had in collecting all of the information concerning Ancofer's and Jebens' sales. Pl. Br. 19-20. Dillinger received no less than seven requests for information from the Department during this investigation and provided complete and timely responses not only for its factory in Germany but also for Ancofer and Jebens. At the same time, Dillinger assisted the personnel at its French factory to respond to the myriad requests for information in the companion investigation of cut-to-length plate from France. With respect to the collection of information regarding Ancofer's and Jebens' home market sales, Dillinger engaged not only the staff of Ancofer and Jebens but also the staff at Dillinger's headquarters. Dillinger also engaged the support and assistance of a U.S. law firm and a consulting firm.

In total, Dillinger provided the Department with thousands of pages of information covering its own sales, costs and operations and those of Ancofer and Jebens. In all this information, the only thing the Department claims is not fully reported is the identity of the plate manufacturer for a small number of transactions. Pl. Br. 20. Far from showing that Dillinger failed to put forth its maximum effort to provide the Department with information, the record shows that Dillinger expended Herculean efforts to provide the Department with all the information it requested.

The judgment as to whether "maximum" efforts have been put forth cannot be based on some theoretical standard involving unlimited time, resources and manpower and no other activity than to search for the missing information. To do so would be to require "perfection" in contravention of *Nippon*. Rather, the review must be based upon a fair appraisal of the time given for the response, the other information contemporaneously requested by the Department and the manpower and resources that could reasonably be dedicated to the task.

The task of reporting Ancofer's and Jebens' home market sales alone required them to report over 100 fields of information for each transaction. In addition, because any one transaction may involve pieces of plate supplied by different manufacturers, Ancofer and Jebens had to split up the quantity of each separate transaction and trace the manufacturer of each individual piece of steel. Despite all of this complexity and the short time periods given for responding to the Department's requests, Ancofer and Jebens were able to provide full information for all fields on all transactions except for the one field for the plate manufacturer on a small number of transactions.

When cut-to-length plate is received from the factory it has an identification number stamped in one corner of the plate. However, pieces cut from the plate bear no identification stamp and can only be traced to the original plate if the plate identification is properly recorded into the inventory and further-processing systems. As successive pieces are cut from the plate and the unused portions of plate are placed back into inventory, the risk grows that the traceability of each individual piece cut from the plate may not be maintained. Third Supplemental Section B & C Response at 2-3 (PD434, CD490).

It is very difficult to maintain 100% traceability of the manufacturer on small pieces of plate, and this is not required by the customer purchasing these small pieces. Therefore, simply

identifying the mill certificate for the original plate does not mean that all pieces subsequently

cut from that plate can be traced back to the original plate.  There simply is no evidence that

Ancofer and Jebens withheld information from the Department concerning the plate

manufacturer on their sales or that they failed to conduct the necessary investigation of their

records to provide information that was in their possession, as claimed by the Department.  *See*

Final-IDM at 63.

        In addition, Defendant provides no response to Dillinger's argument that the

Department's failure to explain why the information it has chosen as partial-AFA is "non-

aberrant, rationally related to sales, and indicative of customary selling practices" requires

remand pursuant to this Court's decision in *Krupp*.  *See* Pl. Br. 24 (citing Krupp Thyssen Nirosta

GmbH v. United States, 24 CIT 666, 669 (2000)).  The Department's failure to comply with the

requirements set out by the Court in *Krupp* means that its determination cannot be sustained.

        Defendant also provides no response to Dillinger's argument that the Department's

failure to make any response to Dillinger's letter relating to difficulties in reporting Ancofer's

and Jebens' home market sales militates against the Department's application of adverse facts

available pursuant to 19 U.S.C. § 1677m(c).  *See* Pl. Br. 24.  While Defendant-Intervenor states

that Dillinger's letter did not specifically state a suggested alternative form for the requested

information, Ancofer and Jebens did fully report all requested price information and the gap in

the manufacturer information was filled by the Department using the adverse inference that all of

these transactions involved Dillinger-produced plate.  Therefore, Dillinger's timely notification

of difficulties pursuant to section 1677m(c) should, at minimum, have prevented the Department

from applying a double adverse inference and rejecting all of the properly reported price

information.

**PUBLIC VERSION**

## VIII.   Conclusion and Prayer for Relief

Accordingly, we respectfully request that the Court find that the Department's final determination is not supported by substantial evidence on the administrative record and not in accordance with the law and remand this case to the Department for redetermination.

Respectfully submitted,

 /s/ *Marc E. Montalbine*
Marc E. Montalbine
Gregory S. Menegaz
Alexandra H. Salzman
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*
Date: August 22, 2018                 *AG der Dillinger Hüttenwerke*

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court and this Court's scheduling order of January 23, 2018, the undersigned certifies that this brief complies with the word limitations set forth therein.[8] Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **10,862** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Marc E. Montalbine*
Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to Plaintiff*
*AG der Dillinger Hüttenwerke*

Date: August 22, 2018

---

[8] The Court's January 23, 2018 scheduling order set the page limit for Dillinger's reply brief at "40% of Def. and Def.-Intervenors' Response Briefs."  Scheduling Order at 2 (Jan. 23, 2018) (ECF No. 32).  This results in a page limit for Dillinger's reply brief of 10,864 words (*i.e.*, 40% x (17,204 + 9,956)).