**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON, JUDGE**

| | |
|---|---|
| AG DER DILLINGER HUTTENWERKE,<br><br>Plaintiff,<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH,<br><br>Consolidated Plaintiffs,<br>and<br><br>THYSSENKRUPP STEEL EUROPE AG and FRIEDR. LOHMANN GMBH<br><br>Plaintiff-Intervenors,<br>v.<br>UNITED STATES,<br><br>Defendant,<br>and<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>Defendant-Intervenors. | Consol. Court No. 17-00158 |

**REPLY IN SUPPORT OF CONSOLIDATED PLAINTIFFS' RULE 56.2 MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

David E. Bond
Richard G. King
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

August 22, 2018

# TABLE OF CONTENTS


I. INTRODUCTION .......... 1

II. ARGUMENT .......... 1

A. Salzgitter Complied With the Standard Set Forth in *Nippon* and *Maverick* With Respect to Responding to Requests for Information and Cooperating to the Best of Its Ability .......... 3

B. Substantial Evidence Does Not Support the Department's Conclusion that Salzgitter Should Have Had the Data for all Sales Available in Electronic Format .......... 8

C. The Department Had Verified Information to Fill the Gap, Which It Disregarded Without Justification .......... 10

III. CONCLUSION AND RELIEF SOUGHT .......... 11

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Hyundai Steel Co. v. United States*,
No. 16-00228, slip op. 18-80 (Ct. Int'l Trade June 28, 2018) ....................6

*Maverick Tube Corp. v. United States*,
857 F.3d 1353 (Fed. Cir. 2017)....................3, 7, 8

*Nippon Steel Corp. v. United States*,
337 F.3d 1373 (Fed. Cir. 2003).................... passim

## STATUTES AND REGULATIONS

19 U.S.C. § 1677e(a)....................2

19 U.S.C. § 1677e(b)(1)(A) ....................2

## ADMINISTRATIVE DETERMINATIONS

*Certain Carbon and Alloy Steel Cut-to-Length Plate from France*,
82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017),
And Accompanying Issues and Decision Memorandum....................9

*Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*,
64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999) .................... 9-10

## I. INTRODUCTION

Consolidated Plaintiffs Ilsenburger Grobblech GmbH ("ILG"), Salzgitter Mannesmann Grobblech GmbH ("MGB"), Salzgitter Flachstahl GmbH ("SZFG"), and Salzgitter Mannesmann International GmbH ("SMID") (collectively, "Salzgitter") reply to Defendant United States' Response to Plaintiffs' Rule 56.2 Motions for Judgment Upon the Administrative Record ("Def. Resp. Br.") and Defendant-Intervenor Nucor Corporation's ("Nucor") Response Brief ("Nucor Resp. Br."). For consistency of reference, we continue to refer to the underlying documents from the administrative record using the abbreviated document names set forth in Salzgitter's Amended Memorandum of Points and Authorities in Support of its Rule 56.2 Motion for Judgment upon the Agency Record ("Salzgitter Br.").

## II. ARGUMENT

Ultimately, the outcome of this appeal turns on whether the Court determines that Salzgitter was obligated to expend an estimated 4,667 hours to conduct a manual review of documents in an attempt to identify the manufacturer for 28,000 home-market sales made through Salzgitter affiliate, Salzgitter Mannesmann Stahlhandel GmbH ("SMSD"), after Salzgitter had already made its best efforts to reconfigure the electronic systems used by SMSD in the ordinary course of business and successfully identified the manufacturer for 77,000 sales. *See* Salzgitter Br. at 4-7. For the reasons discussed in Salzgitter's Brief and below, Salzgitter was not obligated to do so.

First, contrary to Defendant's and Nucor's claims, *see* Def. Resp. Br. at 57-58; Nucor Resp. Br. at 3-5, 9-10, 13-15, neither the law nor relevant precedent required Salzgitter to go to such extraordinary lengths in responding to the Department's requests. To act to the best of its ability, a respondent is not required to achieve perfection. *See Nippon Steel Corp. v. United*

*States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). A respondent need only "do the maximum it is able to do." *Id.* Substantial evidence does not support the conclusion that Salzgitter failed to meet this standard. Rather, substantial evidence shows that Salzgitter made its best efforts to provide the information requested within the time frame of the investigation by optimizing the electronic systems used in the ordinary course of business. And, where the manufacturer could not be identified in this way for certain sales, Salzgitter provided a detailed explanation of why it could not provide the information in the time available and three alternatives for calculating an accurate dumping margin.

Second, substantial evidence does not support the Department's conclusion that Salzgitter should have anticipated that SMSD would be required to identify the manufacturer for each of the tens of thousands of sales made each year and, therefore, to configure its systems to provide such information all at once. Rather, substantial evidence supports the conclusion that SMSD reasonably configured its systems to meet its actual business needs, enabling it to identify the manufacturer for individual sales when required, including for purposes of addressing the occasional quality claims that arose. In this regard, it is critical to emphasize that this appeal relates to an original investigation, not an annual review, and Salzgitter did not have notice that it would be asked to respond to the Department's questionnaire. Furthermore, substantial evidence demonstrates that other major European steel distributors operated similar systems and likewise could not electronically identify the manufacturer of sales on the massive scale required to respond to the Department's questionnaire.

In sum, the Department's findings that Salzgitter failed to provide requested information under 19 U.S.C. § 1677e(a), and that Salzgitter did not cooperate to the best of its ability under 19 U.S.C. § 1677e(b)(1)(A), were not supported by substantial evidence. The Department had

verified information available on the record, which should have been used in the *Final Determination* to fill the gap with respect to the home-market sales for which the manufacturer could not be identified. *See* Salzgitter Br. at 13-15. The Department erred by not using this information and, instead, using an adverse inference to fill the gap.

**A. Salzgitter Complied With the Standard Set Forth in *Nippon* and *Maverick* With Respect to Responding to Requests for Information and Cooperating to the Best of Its Ability**

Salzgitter fully met the reporting and cooperation requirements under *Nippon*, as reiterated in *Maverick Tube Corp. v. United States*, 857 F.3d 1353 (Fed. Cir. 2017). A respondent's efforts "do{} not require perfection." *Nippon Steel Corp.*, 337 F.3d at 1382. Instead, respondents must give their "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Id.* Not providing data that was practically impossible to gather in the time frame requested, even after SMSD optimized the electronic systems used in the ordinary course of business to identify the manufacturer, does not indicate that Salzgitter failed to meet the requirements of *Nippon* and *Maverick*. Instead, asking Salzgitter to expend approximately 4,667 hours to identify manually the manufacturer was mandating a "perfect" response.[1]

Nucor maintains that Salzgitter failed to meet the standard in *Nippon* because it did not do the "maximum it is able to do," including "conducting 'comprehensive investigations of all relevant records' and 'look{ing} beyond records immediately available.'" Nucor Resp. Br. at

[1] Nucor incorrectly claims that "Salzgitter's questionnaire responses confirm that it never put forth a real effort to obtain the{} data or to consider other means through which the data could be identified," citing only that Salzgitter provided its estimate of the time required in the *Fifth Supplemental B/C Questionnaire Response*. Nucor Resp. Br. at 14. Salzgitter provided an estimate of the time required that Nucor does not (and cannot) refute. Nucor also provides no evidence for its contention that the Department "considered . . . and ultimately disagreed with" Salzgitter's estimate. Nucor Resp. Br. at 17. There is no such finding by the Department in the record.

14. Contrary to Nucor's claims, Salzgitter fully met this standard. First, Salzgitter looked beyond records immediately available, linking together two systems (SAP and CMS) in a manner not done in the normal course of business in order to meet the Department's request. *See First Supplemental B/C Response*, PD 312, 314/CD 173, 174, at 4-5, Exhibit Supp. B-2 (Sept. 15, 2016). Through this linkage, Salzgitter successfully identified the manufacturer of all of SMSD's US sales and 77,000 of SMSD's home-market sales. *See* Salzgitter Br. at 6. For SMSD sales for which the manufacturer could not be identified through the linked systems, Salzgitter further investigated how long it would take to do so manually and found that this would not be possible within the time available, because it would take two people more than two years (4,667 hours) to perform the work. *See Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 3-4 (Nov. 25, 2016).[2]

Thus, Salzgitter ***did not refuse*** to provide requested information. Rather, Salzgitter advised the Department that it was not possible to provide the information in the time available after maximizing its electronic systems and studying the feasibility of complementing the information extracted from its electronic systems through a manual review. Moreover, both Defendant and Nucor ignore the enormous amount of work performed simultaneously by Salzgitter and its affiliates, including SMSD, to respond to the Department's data requests. In particular:

[2] Defendant argues that the "amount of time required to compile these records is a problem of Salzgitter's own making by not fully responding to Commerce's questionnaire in the first instance." Def. Resp. Br. at 58; *see also* Nucor Resp. Br. at 8 ("Thus, Commerce found that 'Salzgitter would have been able to provide this information if it had made the appropriate effort when it first received the Department's antidumping duty questionnaire . . . .'"). In fact, Salzgitter was unable to identify the manufacturer of the 28,000 SMSD sales when responding to the original questionnaire, and, indeed, could not do so in the time frame of the antidumping investigation. *See* Salzgitter Br. at 7, 10.

> Ten Salzgitter companies responded to the *Questionnaire* (eight in Germany and two in the United States). *Sections B, C, and E Responses*, PD 200, 211/CD 108, 115, at B-2, C-1 (July 15, 2016). Among the German companies, three were CTL plate manufacturers and five were resellers of steel products. SMSD was one of the German resellers that responded. *Id.* at B-2 (PD 200/CD 108). SMSD sold CTL plate manufactured by Salzgitter and unaffiliated steel mills to both the United States and in Germany. *Section A Response*, PD 179/CD 59, at A-5 (June 29, 2016).

Salzgitter Br. at 5; *see also Rebuttal Case Brief*, PD 518/CD 757, at 3-4 (Feb. 21, 2017) (explaining the extensive reporting from Salzgitter, its many affiliates, and other entities on home-market and US sales, further manufactured sales, and costs of production).

Nucor also misquotes and truncates the "best of its ability" standard in *Nippon*: "{t}he relevant standard is whether the information is such that 'a reasonable importer should be called upon to produce.'" Nucor Resp. Br. at 15. The Federal Circuit explained in *Nippon* that

> While the {best of its ability} standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping. It assumes that importers are familiar with the rules and regulations that apply to the import activities undertaken and requires that importers, to avoid a risk of an adverse inference determination in responding to Commerce's inquiries: ***(a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should anticipate being called upon to produce***; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so.

*Nippon Steel Corp.*, 337 F.3d at 1382 (emphasis added).

There is no evidence that SMSD had inadequate record keeping. Rather, the evidence demonstrates that SMSD took "reasonable steps to keep and maintain full and complete records." *Id*. SMSD's records comply with the rules and regulations that apply to its commercial activities. SMSD keeps records which enable it, when requested by ***a*** customer, to identify the manufacturer of the steel products that it sells. SMSD is familiar with all of the records it

maintains. And, the record shows that, during the investigation, SMSD conducted a prompt, careful, and comprehensive investigation of all relevant records and fully used them to satisfy the Department's requests. *See* Salzgitter Br. at 4-10.

Further, Defendant cites *Nippon* for the proposition that Salzgitter should have "anticipated being required to provide {manufacturer information} to its customers for quality assurance and warranty claims." Def. Resp. Br. at 58. Initially, we note that no such requirement or quote exists in *Nippon* (indeed, the identification of the manufacturer was not at issue). Nevertheless, and as discussed in Section II.B of this reply brief, Salzgitter demonstrated that SMSD's recordkeeping was sufficient for its activities in the ordinary course of business, including identification of the manufacturer when required for quality assurance claims. No record evidence indicates otherwise. Rather, substantial evidence supports the conclusion that SMSD's systems were consistent with industry norms. *See* Salzgitter Br. at 18-19.

Finally, the facts underlying both *Nippon* and *Maverick* are distinguishable from the facts in this case.[3] In *Nippon*, the respondent, NSC, initially refused to provide a requested conversion factor to convert steel sold on a theoretical weight basis to actual weight, claiming that the Department did not "need" it. *Nippon Steel Corp.*, 337 F.3d at 1377. NSC then claimed that the factor was unavailable. *Id.* at 1378. NSC finally (and untimely) provided the factor, admitting

---

[3] Nucor also cites to *Hyundai Steel Co. v. United States*, No. 16-00228, slip op. 18-80, at 27-28 (Ct. Int'l Trade June 28, 2018), where a respondent "did not put forth its maximum effort to obtain information from an affiliated party when it 'explained that its affiliate had declined to provide the documentation due to confidentiality concerns.'" Nucor Resp. Br. at 14. *Hyundai Steel* is distinguished from this case because Salzgitter never "declined to provide the documentation due to confidentiality concerns." Rather, Salzgitter took significant steps to procure the requested information, namely creating an electronic link between manufacturer information and sales information, and studying whether it would be possible in the time available to determine the manufacturer for the remaining sales through a manual review of the documents kept in the ordinary course of business. *See* Salzgitter Br. at 5-6.

that "it never asked the actual factories for the information." *Id.* at 1383. Commerce therefore refused to verify the factor. *Id.* at 1378.

In contrast, Salzgitter did not *refuse* to provide any information. Nor did it claim that the Department did not "need" the information. Nor did it claim that the information requested was wholly unavailable. From the outset, Salzgitter responded to the Department's requests to the maximum extent possible. This included identifying the manufacturer for 77,000 of SMSD's sales based on the linkage between SAP and CMS that it had created specifically to meet the Department's request. Salzgitter also studied the feasibility of a manual review and, when requested by the Department, explained that identifying the manufacturer for the 28,000 remaining SMSD sales would have required a manual exercise that could not be completed in the time frame of the antidumping investigation, particularly when taking into account all of the other work that was being performed to meet the Department's myriad requests. *See First Supplemental B/C Response*, PD 312/CD 173, at 3-5 (Sept. 15, 2016). And, unlike NSC's untimely submission of the conversion factor, Salzgitter timely provided the Department with a database of the sales for which the manufacturer could not be identified after that data was requested for the first time in the *Fifth Supplemental B/C Questionnaire*.[4] *See* Salzgitter Br. at 9.

In *Maverick*, the respondent, Borusan, refused to provide the information of two affiliated suppliers, arguing that it would be too "burdensome" to do so. *Maverick Tube Corp.*, 357 F.3d at 1356. Borusan never claimed that it was unable to provide the information. *Id.* at 1360. Indeed, Borusan admitted that the information could be provided, and offered to do so, if granted several additional weeks. *Id.* at 1356. Furthermore, Borusan never offered an alternative to the

[4] Salzgitter first offered to provide such a database in its *First Supplemental B/C Response*. *See First Supplemental B/C Response*, PD 312/CD 173, at 4 (Sept. 15, 2016).

Department to fill the gap in the record caused by the missing information. *Id.* at 1361. It simply declined to report the information. *Id.*

Nucor claims that, as in *Maverick*, Salzgitter withheld requested information, claimed only that it would be "burdensome" to provide the information, and failed to provide "any alternative reporting." Nucor Resp. Br. at 10. However, in sharp contrast to Borusan, the record shows that Salzgitter informed the Department on multiple occasions that it was not able to identify the manufacturer for the 28,000 SMSD sales based on electronic records. *See* Salzgitter Br. at 7-9 (summarizing Salzgitter's responses to the First, Third, and Fifth Supplemental B/C Questionnaires). Finally, and perhaps most importantly, unlike Borusan, Salzgitter provided three alternatives that the Department could have used to fill the gap for the missing manufacturer information – based on information that was specifically requested and verified by the Department. *See* Salzgitter Br. at 14. This point is discussed in greater detail below in Section II.C of this reply.

**B. Substantial Evidence Does Not Support the Department's Conclusion that Salzgitter Should Have Had the Data for all Sales Available in Electronic Format**

Neither Defendant or Nucor, nor the Department in its *Final Determination*, point to a general requirement under any law, regulation, steel industry specification, or other, relevant steel industry standard that SMSD was obligated to maintain manufacturer information in a manner that it could be electronically gathered for all sales made during a year. In particular, Salzgitter explained that manufacturer information is not normally needed in the ordinary course of business, *see* Salzgitter Br. at 18, and certainly not for all sales, all at once. And, the Department verified that Salzgitter's statement regarding the limitations of its systems were accurate. *See* Salzgitter Br. at 12-13 (citing *SMSD Sales Verification Report*, PD 504/CD 742, at 5 (Feb. 1, 2017)). Without notice that Salzgitter would be subject to an antidumping

investigation requiring electronic information for all sales during the POI, Salzgitter had no reason to adapt its electronic systems beyond what was needed in the ordinary course of business.

In addition, the Department's experience with European steel distributors, including Plaintiff Dillinger in both the underlying investigation and its affiliated reseller in the CTL investigation in France, shows that SMSD's record keeping was consistent with standard record keeping practices. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from France*, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) (Final Determination), accompanying *Issues and Decision Memorandum*, at 47 (Mar. 29, 2017).

Defendant maintains that "{t}he identity of the manufacturers of CTL plate resold by Salzgitter's affiliate, SMSD, is the type of information that a respondent should have reasonably 'anticipated being required to provide to its customers for quality assurance and warranty claims.'" Def. Resp. Br. at 58 (quoting *Final I&D Memo* at 33). Defendant fails to acknowledge the obvious and substantial difference between manually identifying the manufacturer for a single sale versus manually identifying the manufacturer for 28,000 sales. One cannot reasonably extrapolate from the former to the latter. Thus, there is no evidentiary support for the conclusion that SMSD's systems were not reasonably suited to the purposes for which they were used in the ordinary course of business.

Moreover, Defendant's and Nucor's attempts to distinguish *Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan*, 64 Fed. Reg. 73,215 (Dep't Commerce Dec. 29, 1999) (Final Determination) from this case based on differences in recordkeeping between 1999 and today should be rejected. *See* Def. Resp. Br. at 58; Nucor Resp. Br. at 18. While there unquestionably have been advances in technology in the last 19 years, the evidence shows that

Salzgitter took such technological advancements in electronic recordkeeping as far as they would go by linking its SAP and CMS systems to successfully identify the manufacturer of 77,000 of SMSD's home-market sales. *See SMSD Sales Verification Report*, PD 504/CD 742, at 5 (Feb. 1, 2017); *see also* Salzgitter Br. at 12. Having done so, the practical impossibility of manually identifying the manufacturer for the remaining 28,000 sales was the same as in 1999 when *Certain Cut-To-Length Carbon-Quality Steel Plate Products from Japan* was issued.

**C. The Department Had Verified Information to Fill the Gap, Which It Disregarded Without Justification**

Contrary to Nucor's claim, Nucor Resp. Br. at 11, Salzgitter timely provided the Department with the SMSD sales data it requested: a complete separate database with the 28,000 sales for which it was not able to identify the manufacturer. *See* Salzgitter Br. at 9 (citing *Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 1, Exhibit 5th Supp. BC-1 (Nov. 25, 2016)).[5] And the Department verified the sales and expense information in the Separate Database confirming that it was complete and accurate. Salzgitter Br. at 13 (citing *SMSD Sales Verification Report*, PD 504/CD 742, at 14-15 (Feb. 1, 2017)). Salzgitter further provided the Department with three options on how to use none, some, or all of the data, including instructions on how to implement those options. *See* Salzgitter Br. at 14-15. Yet, the Department simply ignored that information.

Nucor argues that Salzgitter "misse{d} the point" in providing alternative methods to use the sales without manufacturer information because the identity of the manufacturer is important

[5] Contrary to claims from Defendant and Nucor, Salzgitter did not "fail{} to provide" information requested in the *Fifth Supplemental B/C Questionnaire*. Def. Resp. Br. at 57; Nucor Resp. Br. at 7. The Department requested that Salzgitter "{r}eport in a separate database all of the resales by SMSD during the period of investigation . . . for which Salzgitter is unable to identify the original manufacturer of the CTL plate." *Fifth Supplemental B/C Questionnaire*, PD 444, at 2 (Nov. 8, 2016). In response, Salzgitter timely submitted a database for the 28,000 sales, as requested by the Department.

for calculating a dumping margin. Nucor Resp. Br. at 12. However, Nucor ignores that Salzgitter had reported the manufacturer for more than 94 percent of Salzgitter's home-market sales and that, using any of the alternative methods, the dumping margin "would have been ***nil***." Salzgitter Br. at 15 (emphasis added). Nucor also ignores the fact that Salzgitter had filled the gap of missing SMSD sales information and that the Department verified that information. Given the limited number of affected sales (about six percent of all Salzgitter home-market sales, by volume), and given that under any of the three alternatives – including none, some, or all of the sales in the Separate Database in the calculation – the evidence demonstrated that the missing manufacturer information was immaterial. *See Hearing Transcript*, PD 522, at 26:15–26:18 (Mar. 8, 2017). In short, the Department did not have a valid basis for disregarding that information – it was the best information available and should have been used in the *Final Determination*.

## III. CONCLUSION AND RELIEF SOUGHT

For the reasons discussed in Salzgitter's Brief and above, Consolidated Plaintiffs respectfully request that the Court:

1) Enter judgment in favor of Consolidated Plaintiffs;

2) Hold and declare that the 22.90 percent dumping margin assigned by the Department to Salzgitter in the *Final Determination* on the basis of partial AFA is unsupported by substantial evidence and otherwise not in accordance with law;

3) Remand this matter to the Department for reconsideration and to issue a revised final determination in conformity with the Court's decision; and

4) Grant Consolidated Plaintiffs such additional relief as the Court may deem just and proper.

Respectfully submitted,

WHITE AND CASE LLP

/s/ David E. Bond

David E. Bond
Richard G. King
Ron Kendler*
Allison Kepkay
WHITE AND CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

Counsel to Consolidated Plaintiffs

Date: August 22, 2018

* Not engaged in the practice of law in the District of Columbia. Work performed under the supervision of principals of the firm who are members of the District of Columbia Bar. Licensed only in the Commonwealth of Massachusetts and in the State of New York.

CERTIFICATE OF COMPLIANCE

I, David E. Bond, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures and in the Court's January 23, 2018 Scheduling Order (ECF No. 32). The word count for Salzgitter's Reply Brief, as computed by the White & Case word processing system (Microsoft Word 2016), is 3,602.

/s/ David E. Bond
David E. Bond