Slip Op. 19 - 87

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HUTTENWERKE,<br><br>        Plaintiff,<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH,<br><br>        Consolidated Plaintiffs,<br>and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>        Plaintiff-Intervenor,<br><br>v.<br><br>UNITED STATES,<br><br>        Defendant,<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>        Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 17-00158 |

**OPINION and ORDER**

[Considering Commerce's Final Determination on the application of partial adverse facts available.]

Dated: July 16, 2019

    Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC for Plaintiff AG der Dillinger Hüttenwerke and Consolidated Plaintiff Friedr. Lohmann GmbH.

    David E. Bond, Richard G. King, Ron Kendler, and Allison J. Kepkay, White and Case LLP, of Washington, DC, for Consolidated Plaintiffs Ilsenburger Grobblech GmbH,

Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH.

  Robert L. LaFrankie, Crowell & Moring LLP, of Washington, DC, for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

  Vito S. Solitro, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for Defendant United States. With him on the brief were Joseph H. Hunt, Assistant Attorney General, Jeanne E. Davidson, Director, and Tara K. Hogan, Assistant Director. Of counsel was Natan P. L. Tubman, Attorney, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance, of Washington, DC.

  Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP, of Washington, DC, for Defendant-Intervenor Nucor Corporation.

  Gordon, Judge:  This action involves the final affirmative antidumping duty investigation of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Dep't of Commerce Mar. 29, 2017), available at http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

  Before the court are the motions for judgment on the agency record filed by Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") and Consolidated Plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann International GmbH (collectively, "Salzgitter"), and Friedr, Lohmann GmbH  (all, together with Dillinger, "Plaintiffs"). See Pl. Dillinger Mem. in Supp.

of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40[1] ("Dillinger Br."); Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 43 ("Salzgitter Br."); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"). Plaintiff-Intervenor thyssenkrupp Steel Europe AG ("thyssenkrupp") has also filed a brief in support of Plaintiff Salzgitter's Rule 56.2 Motion. See Pl.-Intervenor's Memorandum of Law in Support of Pl. Salzgitter's Rule 56.2 Mot., ECF No. 41 ("thyssenkrupp Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2012),[2] and 28 U.S.C. § 1581(c) (2012).

This opinion addresses Plaintiffs' claims regarding the application of partial adverse facts available ("AFA") by the U.S. Department of Commerce ("Commerce") for certain home market CTL plate sales made by their respective affiliates. The remaining issues, which are raised only by Dillinger, will be addressed in a separate opinion.

## I. Background

In its initial questionnaire, Commerce asked respondents Dillinger and Salzgitter to provide, among other things, the identity of the manufacturer of each CTL plate sold

---

[1] All citations to parties' briefs and the agency record are to their confidential versions unless otherwise noted.
[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

during the period of investigation ("POI") (April 1, 2015, through March 31, 2016), along with its respective price, in their respective United States' and German sales databases. See Salzgitter Questionnaire at B-25, C-31; Dillinger Questionnaire at B-25, C-31. Commerce sent multiple supplemental questionnaires to Dillinger and Salzgitter requesting additional information covering various subjects, including the identity of the manufacturer(s) of certain home market CTL plate sales that they claimed could not be provided without inordinate difficulty.

Dillinger and Salzgitter made sales during the POI in the home market to affiliated parties, as defined in 19 U.S.C. § 1677(33). Commerce accordingly tested those sales to determine whether they were made at arm's-length prices. See 19 C.F.R. § 351.403(c).

Commerce preliminarily found that Dillinger's reported sales to two affiliated resellers did not pass the arm's-length test. Id. Because of gaps in the reported downstream sales of those affiliates, Commerce preliminarily treated all of their sales as being Dillinger-produced CTL plate. Id. Commerce then requested additional information from Dillinger for consideration of these sales for the final determination. Dillinger's affiliates were eventually able to gather some of the missing CTL plate manufacturer information. See Dillinger's Third Supplemental Section B&C Questionnaire Response at 5, PD 434.

Salzgitter, for its part, responded to Commerce's initial questionnaire by stating that certain downstream sales by its affiliated reseller were not being reported because it could not identify the original manufacturer of the CTL plate sold without performing a burdensome manual check. See Certain Carbon and Alloy Steel Cut-to-Length Plate from

the Federal Republic of Germany, 81 Fed. Reg. 79,446 (Dep't of Commerce Nov. 14, 2016) and accompanying Preliminary Decision Memorandum at 12, PD 436, available at http://ia.ita.doc.gov/frn/summary/germany/2016-27313-1.pdf (last visited this date). Salzgitter specifically noted that "while it is able to do so for customers upon request, its accounting system does not track merchandise by manufacturer once placed into inventory and, thus, it would be 'unreasonably burdensome' to obtain the requested information." Id. Commerce requested in two separate supplemental questionnaires that Salzgitter provide these unreported sales in case the sales to the affiliated reseller failed the arm's-length test. Commerce preliminarily found that Salzgitter was able to report these sales but chose not to identify all of its affiliated reseller's sales of Salzgitter-produced merchandise, therefore Commerce applied facts available, in part, with an adverse inference to account for the affiliated reseller's unreported downstream sales. Id. Commerce indicated that it intended to examine the issue further at verification before coming to a conclusion in the final determination. See id.

In the end, Commerce found both Dillinger's and Salzgitter's efforts insufficient to complete identification of the manufacturer and applied partial AFA to those CTL plate sales when determining the applicable dumping margins. See Decision Memorandum at 27–34, 61–64. For Dillinger, because its sales to its home market affiliate failed the arm's-length test and exceeded five percent of Dillinger's total reported home market sales during the POI, Commerce continued to include all affiliate transactions of CTL plate of unidentified manufacturers but substituted for Dillinger's reported prices the "highest non-aberrational net price among Dillinger's downstream home market sales." For

Salzgitter, Commerce included all of Salzgitter's affiliates' downstream home market CTL plate sales with unidentified manufacturers, but applied the highest non-aberrational net price among those sales to all such sales.

## II. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2019). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action

"was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2019).

### III. Discussion

#### A. Resort to "Facts Available"

"The manufacturer information is critical for the Department's margin analysis because the Department matches sales by, among other criteria, manufacturer." Decision Memorandum at 32. Without the identity on the record of the manufacturers of all CTL plate transactions sold in the home market, Commerce faced the dilemma of how to treat those sales in the margin calculation. The sole issue for the purpose of this opinion is whether, as a solution to that problem, Commerce's resort to "facts otherwise available" (or "facts available") with an adverse inference in its selection is reasonable (supported by substantial evidence).

Dillinger first challenges Commerce's determination by arguing that it notified Commerce of its difficulty in tracing the CTL plate manufacturer for some transactions and requested accommodation pursuant to 19 U.S.C. § 1677m(c)(1) and contending that Commerce never properly responded to that notification. Dillinger Br. at 20 (citations omitted). However, as explained in Dillinger France S.A., v. United States, 42 CIT ___, ___, 350 F. Supp. 3d 1349, 1364 (2018), a § 1677m(c)(1) notice to Commerce must include "a full explanation and suggested alternative forms in which" the information could be provided. Dillinger's notification to Commerce in the underlying proceeding here did not suggest any alternative form(s) of information that Commerce could use in place of the missing information. Dillinger's notification lacked the required "suggested"

alternatives, and therefore did not trigger Commerce's obligations under § 1677m(c). By contrast, Commerce properly alerted Dillinger and Salzgitter of their deficiencies in providing the identities of all the manufacturers of all CTL plate sold by their affiliates. See 19 U.S.C. § 1677m(d) (upon receipt of non-compliant response to request for information, Commerce required to inform respondent promptly about "the nature of the deficiency").

Whenever information necessary to a determination is missing from the record, Commerce must rely on other facts of record as an appropriate surrogate. 19 U.S.C. § 1677e(a)(1). Subsection 1677e(a)(2) specifies that whenever an interested party or other person (A) "withholds," or (B) "fails" to provide requested information by the deadlines set for its submission and in the form and manner requested, or (C) "significantly impedes" the proceeding, or (D) provides requested information that cannot be verified, Commerce must resort to facts available. 19 U.S.C. § 1677e(a)(2).

A § 1677e(a)(2)(B) "failure" generally covers, but is not limited to, the process of responding to and providing requested information. Such a "failure" is subject to the notification to Commerce of difficulties in responding, discussed above. See 19 U.S.C. § 1677m(c). It is also subject to 19 U.S.C. § 1677m(e), which provides that Commerce "shall not decline to consider" necessary "information" if (1) the submission is timely, (2) the information is verifiable, (3) it is "not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination," (4) the interested party "acted to the best of its ability" to provide it, and (5) the information can be used without undue difficulties. 19 U.S.C. § 1677m(e).

Consol. Court No. 17-00158                                                                                     Page 9

Plaintiffs argue that their submissions in response to Commerce's questionnaires met all of these criteria. However, the "information" to which § 1677m(e) refers, in the context of this proceeding, is the missing manufacturer information, not the remainder of "the information" that Plaintiffs submitted. Plaintiffs acknowledge that the identity of the CTL plate manufacturers is relevant to whether home market transactions should or should not be included in margin calculations, and that they did not identify all of them. Plaintiffs thus cannot escape the conclusion that they failed to satisfy § 1677m(e) with respect to that information. In short, Plaintiffs' reliance upon § 1677m(e) is misplaced.

As noted, Commerce disagreed with Plaintiffs that there was no "gap" in the record. Plaintiffs argue, however, that the affected transactions were "small," and they attempt to minimize the lack of full information on the identities of the CTL plate manufacturers and that information's relevance by arguing that there were no "gaps" in their respective, verified, affiliate home market price databases. See Salzgitter Br. at 4–16; Dillinger Br. at 20–22, 24.

However, the price data for those transactions were not the problem. Indeed, they were irrelevant to solving Commerce's conundrum of an incomplete record. The real problem for Commerce was that it could not determine whether to include or exclude the CTL plate transactions from Dillinger's and Salzgitter's margin calculations because of the missing manufacturer information. Accordingly, Commerce reasonably determined that it must resort to "facts available" pursuant to 19 U.S.C. § 1677e(a).

## B. Adverse Inference

Having determined that it had to resort to facts available to substitute for the missing CTL plate manufacturer information, Commerce then faced the related question of whether the circumstances called for an adverse inference. Commerce concluded that the responsibility for the dilemma before it rested with respondents Dillinger and Salzgitter, who had failed to provide the necessary information. Cf. QVD Food Co. v. United States, 658 F.3d 1318, 1324 (Fed. Cir. 2011) (adequacy of record).

19 U.S.C. § 1677e(b) provides that if Commerce finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information, it "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." This standard "requires the respondent to do the maximum it is able to do." Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003). "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." Id. Pursuant to this standard, it is irrelevant whether the respondent was intentionally evasive, or whether respondent thought it had a valid legal basis for withholding the requested information. See Nan Ya Plastics Corp. v. United States, 810 F.3d 1333, 1347 (Fed. Cir. 2016) ("Congress decided what requirements Commerce must fulfill in reaching its determinations, § 1677e(b), and we do not impose conditions not present in or suggested by the statute's text").

Respondents are required to "(a) take reasonable steps to keep and maintain full and complete records documenting the information that a reasonable importer should

anticipate being called upon to produce; (b) have familiarity with all of the records it maintains in its possession, custody, or control; and (c) conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of the importers' ability to do so." Nippon Steel, 337 F.3d at 1382. Applying these standards, Commerce explained that "[t]he information in question . . . is the type of information that a large steel manufacturer such as Dillinger should reasonably be able to provide, in order to provide its customers with the mill test certificates for the CTL plate they purchase." Decision Memorandum at 64. Commerce presumed that Dillinger was "familiar with all of the records" maintained by its affiliates and that those affiliates "possessed information about the manufacturers of the CTL plate at issue, yet reported the producers of only some of the CTL plate, but not all." Id. Commerce found that "Dillinger's failure to report the requested manufacturer information, accurately and in the manner requested, using the records over which it maintained control, indicates that Dillinger did not act to the best of its ability to comply with our requests for information." Id.

Commerce reasoned similarly as to Salzgitter that the identity of the manufacturers of the CTL plate resold by its affiliate "is the type of information that a respondent should have reasonably anticipated being required to provide to its customers for quality assurance and warranty claims[,]" and at verification "Salzgitter was able to identify the manufacturer of a sale in the [separate] sales database when it attempted to obtain that information." Decision Memorandum at 33.

Commerce stressed that it provided Dillinger and Salzgitter "multiple" opportunities to remedy the deficiencies in their affiliates' downstream sales, and that Plaintiffs did not remedy those deficiencies. Id. at 33–34, 64. Because the additional requested information was not forthcoming, Commerce determined that Dillinger and Salzgitter had not cooperated to the best of their ability by providing the necessary information to determine how to attribute the transactions with unknown manufacturers.

Plaintiffs vigorously contest this determination. They argue that they exerted their best efforts to comply with Commerce's requests for information, and that there was no need or justification for imposing an adverse inference upon resort to facts available. Both Plaintiffs contend that it was unreasonable for Commerce to determine that they "withheld" information or "failed" to (fully) respond because Nippon Steel does not require perfection.

Dillinger argues that it exerted considerable efforts in complying with Commerce's information requests, and that "[f]ar from showing that Dillinger failed to put forth its maximum effort to provide the Department with information, the record shows that Dillinger expended Herculean efforts to provide the Department with all the information it requested." Dillinger Reply at 30–32. Dillinger also maintains that the very fact that Commerce treated all the transactions for which a manufacturer could not be identified as if they had been produced by Dillinger and included all of them in the margin calculation implies that this "fully resolved" the issue of the missing manufacturer information. Id. Dillinger's conclusion, though, is not apparent from the record. The record does not disclose whether attribution of the manufacture of all downstream sales of CTL plate in

Consol. Court No. 17-00158                                                                                          Page 13

the home market to Dillinger and inclusion of unadjusted prices for all such sales in the margin calculation would have been adverse, neutral, or beneficial. Dillinger's best efforts arguments are therefore unpersuasive.

Salzgitter, for its part, emphasizes that it "did not refuse" to provide requested information. It contends that its affiliate's record-keeping systems during the POI complied with the rules and regulations that apply to its commercial activities, and that a manual search for the missing information was only theoretically possible. Further, Salzgitter argues that Commerce "verified," based on the 10-minute turnaround time it took to locate and match one CTL plate manufacturer at that time, that it would have taken 4,667 hours for Salzgitter to provide the missing manufacturer information by manually correlating its two disparate financial accounting and mill certificate management systems. See Salzgitter Reply at 4–5 (citations omitted).

Nevertheless, whether that single incident amounts to verification of the time and effort involved to "resolve" the missing manufacturer information for the affected CTL plate transactions, it neither excuses nor resolves the problem that Commerce still faced as to whether to include or exclude those transactions in Salzgitter's margin calculation. Salzgitter reiterates that in response to one of Commerce's requests, it submitted a "separate database" of CTL plate sales pertaining to transactions with missing manufacturer data. Salzgitter proposed three options to Commerce for using this "separate"/revised database in its margin calculation, namely, that Commerce could (1) treat all such sales as if they were not Salzgitter-manufactured plate, (2) treat all such sales as if they were Salzgitter-manufactured plate, or (3) treat some of the sales in the

separate database as if they were Salzgitter-manufactured plate based on the ratio of plate purchased from Salzgitter affiliates versus other mills during the period of investigation, and that if any of these proposals had been adopted the dumping margins "would have been nil." Salzgitter Br. at 14–15; Salzgitter Reply at 10.

Commerce interpreted Salzgitter's proposals as arguing for "neutral" facts available to substitute for the missing CTL plate manufacturer information. See Decision Memorandum at 31. Commerce, at verification, highlighted that Salzgitter "was able to identify the manufacturer of a sale in the additional SMSD sales database when it attempted to obtain that information" for the final determination. Decision Memorandum at 32 (footnote omitted). Commerce further found that Salzgitter's three proposals lacked the type of "connectivity" or indication that any of these proposals would reasonably reflect the missing CTL plate manufacturer information for the relevant transactions.

The court cannot understand why Salzgitter did not just simply conduct a statistical analysis of the 28,000 CTL plate sales with missing manufacturer information, using a sufficient and randomized sample size that was then manually matched to the missing manufacturer information from its legacy mill certificate management system. This approach might have established a statistically valid extrapolation, rather than Salzgitter's mere speculation, of the missing manufacturer information based on the sample's actual ratio of Salzgitter-manufactured to non-Salzgitter-manufactured CTL plate sales. This approach would also have presented Commerce with an evidentiary proffer that Commerce would have been hard pressed to reasonably reject, and it would have better carried Salzgitter's burden to create an adequate record. QVD Food, supra, 658 F.3d

at 1324. And the court cannot understand why Salzgitter, having failed to figure out that relatively straightforward approach out on its own, did not more completely avail itself of the full operation of 19 U.S.C. § 1677m(c)(1) & (2) and promptly disclose its difficulties to Commerce <u>and</u> request assistance to figure out a path to ascertain the necessary information. An interested party's unilateral assertion of difficulty, like Salzgitter's here, rather than a more straightforward request for help, is fraught with risk. <u>See</u> <u>Maverick Tube Corp. v. United States</u>, 857 F.3d 1353, 1360–61 (Fed. Cir. 2018) (affirming Commerce's application of AFA where respondent failed to indicate that it was <u>unable</u> to provide relevant information nor suggest alternative for provision of that information).

   In conclusion, the record does not appear as detailed with Plaintiffs' efforts to obtain the missing information as they argue before the court, and on those points the court mainly confronts only self-serving statements or interpretations of the record. Importantly, Plaintiffs fail to identify where the record indicates the effect, if any, on Dillinger's and Salzgitter's margins if complete manufacturer information had been provided for all home market CTL plate sales. Accordingly, taking the record as a whole, Commerce's imposition of an adverse inference in the selection of facts available is reasonable.

### C. The Selected Adverse Facts Available

As partial AFA, for the final margin calculations Commerce applied the highest non-aberrational net price observed among Plaintiffs' downstream home market sales for which the identity of the manufacturer of the CTL plate had not been reported to all such sales. Decision Memorandum at 10, 11, 34, 64. Given this determination, Plaintiffs challenge whether it was reasonable for Commerce to substitute downstream price information covering CTL plate for which manufacturer information was missing from the record.

In Dillinger France, supra, the court was confronted with a near identical issue. Compare Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from France, A-427-828, at Cmt. 5 (Dep't of Commerce Mar. 29, 2017), available at https://enforcement.trade.gov/frn/summary/france/2017-06627-1.pdf (last visited this date), with Decision Memorandum at Cmts. 2 & 20; see also Dillinger France, 42 CIT at ___, 350 F. Supp. 3d at 1361–64 (discussing application of partial AFA to Dillinger France for failure to report manufacturer of CTL plate in certain downstream home market sales of affiliates). Plaintiff in that case argued that it (1) put forth its best efforts to provide the price and manufacturer data requested by Commerce, and that (2) for transactions where the manufacturer data was unknown but the sales price was contained in the record, Commerce impermissibly replaced the record sales prices with the highest non-aberrational net price among that plaintiff's downstream home market sales. There, the court upheld Commerce's decision that an adverse inference was warranted, but also

noted that "Commerce did not explain what authority permitted it to replace known information with adverse facts available[,]" 42 CIT at ___, 350 F. Supp. 3d at 1364, and remanded for further consideration. Here, the court does not reach the same conclusion, as Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to "<u>disregard all or part</u> of the original and subsequent responses" in an adverse inference scenario. 19 U.S.C. § 1677m(d) (emphasis added).

In any event, and importantly as to this issue, on remand Commerce "relied on the Court's statement that 'the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill.'" <u>See</u> Final Results of Redetermination Pursuant to Court Remand at 6, <u>Dillinger France S.A. v. United States</u>, No. 17-00159 (CIT Mar. 11, 2019), ECF No. 56-1. Commerce elaborated that "[g]iven this holding, and contrary to Nucor's argument that we should use the highest non-aberrational price as partial AFA, we find that we cannot ignore record information that is not in dispute, pursuant to the facts on the record of this investigation and the Court's decision." <u>Id.</u> As a result, Commerce changed its application of partial AFA and "1) treated these downstream home market sales transactions as Dillinger-France produced plate, rather than treating these transactions as sales of plate produced by an unrelated manufacturer; and 2) relied on the sales prices as reported." <u>Id.</u> at 6–7. However, in doing so, Commerce found that "because of the small number of affected transactions whose prices are used as a basis for normal value and which are actually compared to U.S. sale prices, these home market transactions have no measurable impact on Dillinger-France's estimated weighted-average dumping margin." <u>Id.</u> at 6.

Consol. Court No. 17-00158                                                                                      Page 18

Reasoned decision-making requires a certain measure of consistency, which is not present across the France and Germany investigations. As noted, the cases share near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue. The court therefore orders Commerce and the parties to review whether the same correction made in <u>Dillinger France</u> would have any material effect on the margins in this case, or if it would be immaterial. If the parties conclude that a similar correction as ordered in <u>Dillinger France</u> would materially affect the margins, the court will then remand this matter to Commerce to make a similar adjustment to its application of partial AFA to Dillinger and Salzgitter as it did in the <u>Dillinger France</u> remand with resulting adjustment of the investigation's margins.[3]  Accordingly, it is hereby

**ORDERED** that Commerce shall determine whether a similar correction as ordered in <u>Dillinger France</u> would materially affect the margins in this action; and it is further

**ORDERED** that Commerce shall notify the court with the results of its analysis on or before August 7, 2019.

                                                                                   /s/ Leo M. Gordon
                                                                                   Judge Leo M. Gordon

Dated: July 16, 2019
          New York, New York

---

[3] Including the "All Others" rate.  <u>See</u> thyssenkrupp Br. at 4.