Slip Op. 21-101

UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE,<br><br>               Plaintiff,<br><br>    and<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH,<br><br>               Consolidated Plaintiffs,<br><br>    and<br><br>THYSSENKRUPP STEEL EUROPE AG,<br><br>               Plaintiff-Intervenor,<br><br>    v.<br><br>UNITED STATES,<br><br>               Defendant,<br><br>NUCOR CORPORATION and<br>SSAB ENTERPRISES LLC,<br><br>               Defendant-Intervenors. | Before: Leo M. Gordon, Judge<br><br>Consol. Court No. 17-00158 |

**OPINION and ORDER**

[Commerce's Final Determination remanded in part.]

Dated: August 18, 2021

    Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC of Washington, D.C. for Plaintiff AG der Dillinger Hüttenwerke.

    Robert L. LaFrankie, Crowell & Moring LLP, of Washington, D.C. for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

      Kelly Ann Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C. for Defendant United States. On the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director, and Vito S. Solitro, Trial Attorney. Of counsel were Natan P. L. Tubman and Ayat Mujais, Attorneys, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

      Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP of Washington, D.C. for Defendant-Intervenor Nucor Corporation.

      Gordon, Judge: This consolidated action involves a challenge to the final determination in the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

      Before the court are the motions for judgment on the agency record of Plaintiff AG der Dillinger Hüttenwerke ("Dillinger") and Consolidated Plaintiffs Ilsenburger Grobblech GMBH, Salzgitter Mannesmann Grobblech GMBH, Salzgitter Flachstahl GMBH, and Salzgitter Mannesmann International GMBH (collectively "Salzgitter"). See Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40[1] ("Dillinger Br."); Salzgitter Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R.,

---

[1] All citations to the parties' Rule 56.2 briefs and the agency record are to their confidential versions unless otherwise noted.

Consol. Court No. 17-00158                                                                                    Page 3

ECF No. 43 ("Salzgitter Br."); Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Int. Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"); Reply in Supp. of Consol. Pls.' Rule 56.2 Mot. for J. on the Agency R., ECF No. 64 ("Salzgitter Reply"). Plaintiff-Intervenor thyssenkrupp Steel Europe AG ("thyssenkrupp") also filed a brief in support of Plaintiff Salzgitter's Rule 56.2 Motion. See Pl.-Int.'s Memorandum of Law in Support of Pl. Salzgitter's Rule 56.2 Mot., ECF No. 41 ("thyssenkrupp Br."). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018).

The court previously addressed Dillinger and Salzgitter's claims regarding the application of partial adverse facts available by Commerce for certain home market CTL plate sales made by Dillinger and Salzgitter's respective affiliates. See AG der Dillinger Huttenwerke v. United States, 43 CIT ___, 399 F. Supp. 3d 1247 (2019) ("Dillinger I"). Subsequently, the court remanded the action to Commerce. See Remand Order, ECF No. 83. Before the court are Commerce's Final Results of Redetermination Pursuant to Court Remand ("Remand Results"), ECF No. 85-1, filed pursuant to Dillinger I and the Remand Order. See Def.-Int. SSAB Enter. LLC's Comments Opposing Remand Results, ECF No. 96; Def.-Int. Nucor Corp.'s Revised Comments on Remand Determ., ECF No. 100; Def.'s Resp. to Comments on Remand Redeterm., ECF No. 104; Consol. Pls.' Resp. Comments in Support of Remand Determ., ECF No. 106.

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

The court again remands the Final Determination to Commerce for reconsideration of Dillinger's challenges to non-prime CTL plate cost shifting, application of the major input rule, treatment of certain general and administrative ("G&A") expenses, and the AFA issue. The court, in a separate opinion, see AG der Dillinger Huttenwerke v. United States, 45 CIT ___, Slip Op. 21-102 (Aug. 18, 2021), sustains the Final Determination as to Dillinger's challenges on differential pricing and adjustment of interest expenses to include a portion of Dillinger's parent holding company's interest expense.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966). Fundamentally, though, "substantial evidence" is best understood as a word

formula connoting reasonableness review. 3 Charles H. Koch, Jr., Administrative Law and Practice § 9.24[1] (3d ed. 2021). Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record." 8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute. See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A. Cost Shifting (Non-Prime Plate Adjustment)

Dillinger challenges Commerce's cost of production ("COP") determination for its prime and non-prime plates. Dillinger Br. at 33–37; see also 19 U.S.C. § 1677b(e) & 19 U.S.C. § 1677b(f)(1)(A). Commerce found that Dillinger uses an internal "factory results report" to "value[ ] non-prime products at their likely selling price, and uses this value as an offset to prime production." Decision Memorandum at 90 (footnote omitted). Commerce considered it reasonable to rely on this report to reallocate cost between prime and non-prime plates. Id. at 89–90. Dillinger argues that this reallocation contravened the statute and applicable case law. See Dillinger Br. at 33–37.

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that Commerce's decision to rely on information reflecting a respondent's "likely selling price," rather than actual cost data, violates the requirements of § 1677b(f). Dillinger France S.A. v. United States, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020) ("Dillinger France II"). Accordingly, the court remands this issue to Commerce to reconcile its COP determination with the Federal Circuit's decision in Dillinger France II.

### B. Major Input Rule (re: Blast Furnace Coke)

Dillinger describes itself as an "integrated" steel mill, meaning that it performs all steps necessary for producing steel internally from raw materials, such as iron ore and blast furnace coke, to the finished rolled steel product. Dillinger Br. at 37. During the period of investigation ("POI"), Dillinger obtained pig iron, a major raw material input used to produce CTL plate, from its affiliated producer, Rogesa Roheisengesellschaft ("Rogesa"). Rogesa obtained blast furnace coke, a major raw material input used to produce pig iron, from an affiliated producer, Zentralkokerei Saar Gesellschaft ("ZKS"). See Decision Memorandum at 90.

Dillinger challenges Commerce's use of Rogesa's affiliated and unaffiliated consumption values in applying the major input rule. See Dillinger Br. at 39–44; Dillinger Reply at 18–19; see also 19 U.S.C. § 1677b(f)(3) (major input rule); 19 C.F.R. § 351.407(b). Dillinger argues that Commerce deviated from the requirements of the applicable regulation, 19 C.F.R. § 351.407(b), when it selected Rogesa's reported consumption values instead of Rogesa's spot purchases of coke from unaffiliated

suppliers as the basis for determining the value of coke under the major input rule. See Dillinger Br. at 38–39; Dillinger Reply at 17–20. The court does not agree.

19 C.F.R. § 351.407(b) provides that Commerce "normally" will determine the value of a major input purchased from an affiliated person based on the "higher" of the price paid to an affiliated party, the amount usually reflected in sales of the major input, or the affiliate's cost of producing the input. The regulation does not "require" Commerce to use unaffiliated purchase prices as the basis for the valuation. Here, Commerce explained that the Rogesa's consumption values were usable as opposed to most companies Commerce deals with that typically "co-mingle the physical inventory and records for purchases of raw materials from differing suppliers, and thus are not able to provide consumption value information by input and supplier." Decision Memorandum at 93. Commerce preferred the reported Rogesa consumption values for coke as more accurate than the recorded purchase prices because the consumption values reflected both affiliated and unaffiliated suppliers (enabling a comparison) and because ZKS also reported its COP information on a consumption-value basis. See id. Since Rogesa provided consumption values for its coke by supplier, Commerce reasonably decided to use those values in applying the major input rule. Accordingly, the court is not persuaded by Dillinger's argument that Commerce contravened § 351.407(b) by selecting consumption values over purchase prices for determining coke value under the major input rule.

Dillinger next argues that Commerce's use of coke consumption values unreasonably distorted the coke value calculations because Commerce's comparison of

affiliated and unaffiliated consumption values failed to properly account for (1) contemporaneity, (2) freight expenses, (3) a certain credit note that ZKS issued to Rogesa, and (4) G&A and interest expenses. See Dillinger Br. at 39–42; Dillinger Reply at 22–25.

Dillinger notes that the recorded consumption values reflect the value of coke purchased "in large part prior to the POI." Dillinger Br. at 40. Dillinger also notes that Rogesa's purchases of blast furnace coke during the POI from unaffiliated suppliers involved different countries and significantly lower prices than purchases prior to the POI. Id. Dillinger argues that because Rogesa's consumption values reflect the value of coke purchased prior to the POI "at a time when market prices were considerably higher and are obviously influenced by higher freight costs," the consumption values "cannot reasonably be used as an indicator of what the transfer price of ZKS' coke sales during the POI would have been had it not been affiliated with R[ogesa]." Id. Defendant notes that "[n]othing in the regulation places a temporal limitation on the data that Commerce may use." Def.'s Resp. at 36. Defendant adds that "Commerce's selection of consumption values from Rogesa's records, some of which were during the [POI], ensured that the transfer prices reflected the market under consideration, of which Rogesa was indisputably a participant." Id. These two responses, although true in the abstract, do not address the issue Dillinger is arguing—that the consumption values selected distort the input calculation. The regulation, of course, has an implicit temporal limitation on the data Commerce selects, and it is foolish for Commerce to contend otherwise. Likewise, saying that some of the records were during the POI does not

respond to Dillinger's contention that most (or "in large part") were not. The upshot is that the court cannot sustain this aspect of Commerce's decision as reasonable. More explanation is needed. The court will therefore remand this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

As for freight expenses (and potential distortions), Commerce acknowledged that it was necessary to adjust Rogesa's coke consumption values to ensure that those values were on the same basis as unaffiliated consumption values. See Decision Memorandum at 93. Commerce explained:

> Rogesa's coke consumption values from ZKS are freight exclusive (because both companies are located on the same factory premises), while the unaffiliated coke consumption values are freight inclusive. As a result, to ensure that the comparison between the affiliated and unaffiliated consumption values is on the same basis, we adjusted the unaffiliated consumption values to reflect freight-exclusive values. Therefore, for the final determination, we adjusted Rogesa's reported coke cost to reflect the higher of … Rogesa's consumption value of coke from its affiliate, ZKS, Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or the reported COP of coke.

Id.

Dillinger contends that Commerce did not have information on the historic inventory values Commerce was using net of freight expenses because it never requested such information, having changed its methodology for the final determination. Dillinger Br. at 40. Dillinger explains that Rogesa's inventory of unaffiliated coke purchases made prior to the POI came from different countries than its unaffiliated purchases of coke during the POI, and thus they involved significantly different per ton freight costs. See id. at 41. Dillinger highlights that Commerce calculated an average

per ton freight cost based upon purchases of blast furnace coke from unaffiliated suppliers during the POI.  See id. at 40–41.  Therefore, according to Dillinger, Commerce's freight adjustment to Rogesa's unaffiliated consumption values unreasonably assumes that the freight expense for its pre-POI inventory is the same as that for unaffiliated purchases of coke during the POI.  See id.  Adjusting consumption values to ensure either a freight inclusive or freight exclusive comparison does seem reasonable.  The court remands this issue to Commerce to for further analysis and explanation, and, if necessary, reconsideration.

Dillinger also argues that Commerce erred in multiplying the freight cost per-ton by the quantity of coke on a dry basis and should have adjusted for the fact that the freight factor used by Commerce was based on the wet weight of coke.  Dillinger Br. at 42; Dillinger Reply at 22.  Commerce did not address this issue below, believing it was moot because Commerce used reported coke consumption values that were on the same weight basis, rather than purchase prices that may have reflected either a dry-weight or wet-weight basis.  See Decision Memorandum at 93.  Commerce though does need to address the potential unreasonableness of using a wet-weight basis freight factor for the adjustment of dry-weight basis consumption values.  Therefore, the court remands this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

As for the credit note (and its potential distortionary effect), Commerce reduced the reported affiliated coke consumption values used in applying the major input rule by the credit note issued by ZKS to Rogesa.  See id.  Dillinger challenges this adjustment,

Consol. Court No. 17-00158 Page 11

which resulted in an additional cost to ZKS's reported cost of manufacture.  See Dillinger Br. at 41–42; Dillinger Reply at 24.  Defendant explains that to the extent Commerce's methodology resulted in a larger adjustment associated with ZKS's coke sales to Rogesa, it nevertheless more accurately reflects the average unit consumption values.  Def.'s Resp. at 39.  This though is a post hoc rationale that the court cannot sustain.  See Motor Vehicle Mfrs. Ass'n v. State Farm Ins., 463 U.S. 29, 50 (1983) ("courts may not accept appellate counsel's post hoc rationalizations for agency action" (citing Burlington Truck Lines, Inc. v. United States, 371 U.S. 156, 168 (1962))).  Commerce should have requested a remand to address this issue directly in the first instance (if in fact it has a material effect on the margin).  Accordingly, the court remands this issue to Commerce for further analysis and explanation, and if necessary, reconsideration.

Dillinger also maintains that to have a comparison on the same basis, Commerce must use the "full value including G&A and INTEX (interest expenses) in analyzing whether the affiliated transfer price is below comparable market value." Dillinger Br. at 41.  Defendant responds that Commerce's use of consumption values as a basis for comparison obviated the need to make Dillinger's suggested adjustments to G&A and interest expenses, Def.'s Resp. at 39, but here again, this is post hoc rationalization of agency counsel, and the court will therefore remand this issue to Commerce for further consideration.

Consol. Court No. 17-00158                                                                                      Page 12

### C. Expenses for Inputs & Services Provided to Affiliates

Commerce adjusted the COP of the inputs and services that Dillinger provided to Rogesa and ZKS to include a portion of Dillinger's G&A expenses. <u>Decision Memorandum</u> at 96. Commerce explained:

> Because the G&A expense ratio is calculated using Dillinger's unconsolidated financial statements, the transactions between Dillinger and its affiliates, Rogesa and ZKS, have not been eliminated from these financial statements. Thus, Dillinger's cost of goods sold includes both the cost of the inputs and services that Dillinger sold to Rogesa and ZKS, as well as the cost of the CTL plate that Dillinger sold to third parties. In producing CTL plate, Dillinger consumes inputs produced by Rogesa and ZKS (<u>e.g.</u>, pig iron); thus, embedded in the cost of the CTL plate Dillinger sold is also the cost the inputs provided by Rogesa and ZKS, including the inputs and services that Rogesa and ZKS obtained from Dillinger.
>
> Therefore, in calculating the G&A expense ratio, we have essentially included the cost of the inputs and services provided to Rogesa and ZKS in the denominator twice; once when they were sold to the affiliates, and again when Dillinger consumed the inputs provided by Rogesa and ZKS.
>
> Based on this calculation, in order to account for all of Dillinger's G&A expenses, it is appropriate to apply Dillinger's G&A expense ratio to both the costs of: 1) the CTL plate; and 2) the inputs and services. As a result, we disagree with Dillinger that application of the G&A expense ratio to the cost of the inputs and services Dillinger provided to its affiliates results in the double counting of Dillinger's G&A expenses.

<u>Id.</u>

Dillinger provided the labor to Rogesa and ZKS for production of blast furnace coke and pig iron. Commerce found that the provision of these services by Dillinger, and the cross-charges for them by Dillinger to its affiliates and from its affiliates to Dillinger, is ultimately both cost and income to Dillinger. Dillinger argues that "any increase in the

transfer price would merely result in other income being realized by Dillinger" and "[t]herefore it makes no sense to increase G&A expenses at one level and offset them by income at another level." Dillinger Br. at 43. Dillinger points to Commerce's long-standing practice of using "other income" to offset to G&A expenses. See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decision Memorandum at cmts. 3 & 4.

Commerce, however, explained that its determination to rely on Dillinger's unconsolidated financial statements as the basis for the G&A expense ratio is consistent with its past practice. See Decision Memorandum at 96 & n.279 (citing Large Residential Washers from the Republic of Korea, 77 Fed. Reg. 75,988 (Dep't of Commerce Dec. 26, 2012), and accompanying Issues and Decision Memorandum ("Korean Washers IDM") at cmt. 7)). Commerce's "methodology is to calculate the rate based on the company-wide G&A costs incurred by the producing company allocated over the producing company's company-wide cost of sales, and not on a consolidated, divisional, or product-specific basis." Korean Washers IDM at 44. When relying on unconsolidated financial statements as the basis of the G&A expense ratio, Commerce must account for transactions between affiliates that otherwise are not eliminated from those statements. Decision Memorandum at 96 & n.280.

Commerce appears to have first determined the difference between the transfer price and market price for pig iron. Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3). Commerce then multiplied the above difference by

the percentage of Rogesa's operations related to the production of pig iron, and further multiplied this by the percentage of pig iron used in the cost of manufacturing CTL plate to calculate the total adjustment to add to Dillinger's cost of manufacturing. Id. The calculated total reflects only the percentage of Rogesa's production pertaining to pig iron used in the manufacture of CTL plate. Id. Commerce used the same methodology for its calculations with respect to ZKS and coke. Id.

Defendant dismisses Dillinger's argument that Commerce allegedly "treats the entire absolute cost of manufacture (COM) of plate and then builds a ratio where the denominator is limited only to COM of plate," Dillinger Br. at 44, as lacking merit because the contested increase was already calculated to pertain solely to the cost of pig iron and coke used in manufacturing CTL plate. See Def.'s Resp. at 42 (citing Final Dillinger COP Memorandum, CD 767, Attach. 3). Defendant maintains that Commerce thus built a denominator likewise limited to the cost of manufacturing CTL plate.

Dillinger argues that Commerce ignores the fact that the same total increase in the amount of the costs paid by the affiliates for Dillinger's labor services would have resulted in an equal amount of income to Dillinger for those services, and additional income to Dillinger is used as an offset to G&A expenses under Commerce's long-standing practice. See Dillinger Br. at 43 (citing Circular Welded Non-Alloy Steel Pipe from the Republic of Korea, 79 Fed. Reg. 37,284 (Dep't of Commerce July 1, 2014) (Final Results), and accompanying Issues and Decisions Memorandum at cmts. 3 & 4). Dillinger notes that Commerce failed to address its "prior" (or current) practice of off-setting G&A expenses with other income in its Decision Memorandum. Moreover, in its response brief,

Defendant states only that "Dillinger's earnings on other activities simply do not relate to the cost of producing subject merchandise." See Def.'s Resp. 41. Dillinger contends that this statement has no support in the record and that the labor services provided by Dillinger to Rogesa and ZKS are directly related to the production of pig iron and blast furnace coke and have been included in Dillinger's reported COPs. Therefore, Dillinger argues that any income earned on providing these labor services to Rogesa and ZKS are, by definition, activities directly related to the cost of producing subject merchandise.

Dillinger further contends that Commerce has provided no response to Dillinger's argument that Commerce's adjustment results in an illogical multiplication of G&A expenses by having Dillinger charge itself its own G&A expenses and then having these expenses flow into the total cost of manufacture for the end product, which is again charged with G&A expenses. See Dillinger Br. at 43. Dillinger insists that prior to Commerce's final adjustment there has been no double-counting of the cost of Dillinger's labor services to Rogesa and ZKS in the G&A expense ratio denominator. Dillinger argues that the record shows pig iron produced by Rogesa was used in the production of both subject and non-subject merchandise, and that the remaining pig iron was consumed by a different company to make non-subject merchandise. Id. at 43–44. Defendant dismisses Dillinger's argument, contending that "Commerce took account of [the fact that not all of the pig iron produced by Rogesa was consumed by Dillinger for subject merchandise] by utilizing a methodology that only included pig iron used in the production of CTL plate." Def.'s Resp. at 43. Dillinger, however, rightfully highlights that Commerce's calculations for this adjustment on the record appear to be inconsistent with the agency's

purported acknowledgment that not all pig iron produced by Rogesa was consumed in the production of subject merchandise.  See Dillinger Reply at 27–28.

In support of its argument, Dillinger highlights that on the third line of Attachment 3 to the Cost Calculation Memorandum, Commerce lists a certain amount in Euros as the adjustment for the labor services Dillinger provided to Rogesa, which is based upon 100% of the labor services provided by Dillinger to Rogesa.  Dillinger points out that the amount is not in any way reduced to reflect the fact that more than half of Rogesa's pig iron was used in non-subject products.  See id.  Dillinger further notes that on the fourth line of the same attachment, Commerce calculates a "Percentage of Operations Related to the Production of Pig Iron," but this percentage only shows that a certain percentage of Rogesa's total sales related to pig iron, with the rest relating to non-pig iron products or other operating income.  Id. at 28.  Dillinger argues that this calculation does not take into account the fact that of these pig iron sales, less than half were consumed in the production of subject CTL plate.  Further, Dillinger offers that the rate of the certain percentage used by Commerce on the fifth line of Attachment 3 also does not adjust for the fact that most of the pig iron was used in non-subject products, but rather indicates the percentage of the total cost of CTL plate that is accounted for by pig iron.  Id.  Dillinger contends that the calculation for ZKS follows the same pattern and does not adjust for the pig iron and coke consumed in the production of non-subject merchandise.  In summary, Dilllinger argues that Commerce is simply taking the entire amount of the adjustment related to pig iron sales and applying it exclusively to subject CTL plate.  Id.

Commerce's explanation in the Decision Memorandum does not reasonably address or resolve Dillinger's arguments. This issue therefore requires further explanation or consideration, and accordingly is remanded.

### D. Remand Results on Partial Adverse Facts Available

In Dillinger I, the court sustained Commerce's application of partial AFA, but remanded the Final Results for Commerce to review whether the same correction made to partial AFA by Commerce in a parallel proceeding, Dillinger France S.A. v. United States, 43 CIT ___, 350 F. Supp. 3d 1349 (2019) ("Dillinger France I"), involving the same issue, "would have any material effect on the margins in this case, or if it would be immaterial." Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1257. Commerce determined that a similar correction as ordered in Dillinger France I would have a material effect, and the court remanded to Commerce to recalculate the antidumping duty margin for Salzgitter. See Remand Order.

On remand, Commerce, under protest, recalculated Salzgitter's antidumping duty margin. Commerce noted that "the Court's order did not provide Commerce with the opportunity to consider an alternative partial AFA methodology, in light of the factual differences between the two cases." See Remand Results at 4. Commerce observed:

> [I]t is the role of Commerce to consider, in the first instance, whether a particular AFA methodology complies with the statute's directive in any particular case. Pursuant to the Court's order, Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case. Due to this limitation, Commerce further agrees with Nucor that the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, i.e., inducing cooperation, has been satisfied. Accordingly, it is under respectful protest that Commerce has

> followed the Court's instructions directing us to recalculate Salzgitter's margin utilizing the partial AFA methodology discussed above.

Id. As the court explained in Dillinger I, "[r]easoned decision-making requires a certain measure of consistency, which is not present across the French and German investigations. As noted, the cases share near identical (almost verbatim) Issues and Decision Memoranda on the AFA issue." See Dillinger I, 43 CIT at ___, 399 F. Supp. 3d at 1257. Commerce now argues in the Remand Results that the French and German investigations are somehow factually distinguishable so that the AFA methodology applied in the Dillinger France decisions may not be appropriate for the German investigation. Given the remand for the other issues, the court will also remand the AFA issue so that Commerce may explain why, if there were material factual differences between the French and German investigations on the AFA issue, those differences were not reflected in the decision memoranda or Commerce's handling of AFA between the cases, which the court noted were nearly identical (virtually verbatim). Commerce may reconsider this issue and may explain why an alternative AFA methodology might be appropriate, but Commerce must first provide a reasoned explanation for issuing virtually identical decision memoranda and AFA treatment across the two investigations, and then arguing on remand that there were material factual differences not previously identified or explained that warrant differing AFA treatment across the two investigations. If Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, the agency must explain why such a disparate approach is reasonable.

### III. Conclusion

For the foregoing reasons, it is hereby

**ORDERED** that Commerce address the issues remanded above; and it is further

**ORDERED** that Commerce shall file its remand results on or before November 16, 2021; and it is further

**ORDERED** that, if applicable, the parties shall file a proposed scheduling order with page limits for comments on the remand results no later than seven days after Commerce files its remand results with the court.

                                                                        /s/ Leo M. Gordon
                                                                     Judge Leo M. Gordon

Dated: August 18, 2021
       New York, New York