Slip Op. 21-102

UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, <br><br> Plaintiff, <br><br> and <br><br> ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, and FRIEDR. LOHMANN GMBH, <br><br> Consolidated Plaintiffs, <br><br> and <br><br> THYSSENKRUPP STEEL EUROPE AG, <br><br> Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, <br><br> NUCOR CORPORATION and SSAB ENTERPRISES LLC, <br><br> Defendant-Intervenors. | Before: Leo M. Gordon, Judge <br><br> Consol. Court No. 17-00158 |

**OPINION**

[Commerce's Final Determination sustained in part.]

Dated: August 18, 2021

Marc E. Montalbine, Gregory S. Menegaz, and Alexandra H. Salzman, deKieffer & Horgan, PLLC of Washington, D.C. for Plaintiff AG der Dillinger Hüttenwerke and Consolidated Plaintiff Friedr. Lohmann GmbH.

Robert L. LaFrankie, Crowell & Moring LLP, of Washington, D.C. for Plaintiff-Intervenor thyssenkrupp Steel Europe AG.

Kelly Ann Krystyniak, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice of Washington, D.C. for Defendant United States. On the brief were Brian M. Boynton, Acting Assistant Attorney General, Jeanne E. Davidson, Director, Tara K. Hogan, Assistant Director, and Vito S. Solitro, Trial Attorney. Of counsel were Natan P. L. Tubman and Ayat Mujais, Attorneys, U.S. Department of Commerce, Office of Chief Counsel for Trade Enforcement and Compliance of Washington, D.C.

Alan H. Price, Christopher B. Weld, and Stephanie M. Bell, Wiley Rein LLP of Washington, D.C. for Defendant-Intervenor Nucor Corporation.

Gordon, Judge: This consolidated action involves a challenge to the final determination in the antidumping duty investigation conducted by the U.S. Department of Commerce ("Commerce") of certain carbon and alloy steel cut-to-length plate ("CTL plate") from the Federal Republic of Germany. See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany, 82 Fed. Reg. 16,360 (Dep't of Commerce Apr. 4, 2017) ("Final Determination"), and accompanying Issues and Decision Memorandum, A-428-844 (Mar. 29, 2017), http://enforcement.trade.gov/frn/summary/germany/2017-06628-1.pdf (last visited this date) ("Decision Memorandum").

Plaintiff AG der Dillinger Hüttenwerke ("Dillinger" or "Plaintiff") challenges several aspects of Commerce's Final Determination. See Pl. Dillinger Mem. in Supp. of Rule 56.2 Mot. for J. on the Agency R., ECF No. 40 ("Dillinger Br.");[1] Def.'s Mem. Opp. Pls.' Rule 56.2 Mots. for J. on the Admin. R., ECF No. 55 ("Def.'s Resp."); Def.-Intervenor Nucor Corporation Resp. Br., ECF No. 58; Reply Br. of Pl. Dillinger, ECF No. 62 ("Dillinger Reply"). The court has jurisdiction pursuant to Section 516A(a)(2)(B)(i) of the Tariff Act

---

[1] Citations to the parties' Rule 56.2 briefs and agency record are to confidential versions unless otherwise noted.

of 1930, as amended, 19 U.S.C. § 1516a(a)(2)(B)(i) (2018),[2] and 28 U.S.C. § 1581(c) (2018).

In a separate opinion, the court remanded several issues from the Final Determination for reconsideration (non-prime CTL plate cost shifting, application of the major input rule, the treatment of certain general and administrative ("G&A") expenses, and an adverse facts available issue). See AG der Dillinger Huttenwerke v. United States, 45 CIT ___, Slip Op. 21-101 (Aug. 18, 2021). In this opinion, the court sustains the Final Determination for other issues Dillinger challenged that the court has determined lack merit: differential pricing and interest expense adjustments.

## I. Standard of Review

The court sustains Commerce's "determinations, findings, or conclusions" unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). More specifically, when reviewing agency determinations, findings, or conclusions for substantial evidence, the court assesses whether the agency action is reasonable given the record as a whole. Nippon Steel Corp. v. United States, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Substantial evidence has been described as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." DuPont Teijin Films USA v. United States, 407 F.3d 1211, 1215 (Fed. Cir. 2005) (quoting Consol. Edison Co. v. NLRB, 305 U.S.

---

[2] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2018 edition.

Consol. Court No. 17-00158                                                                Page 4

197, 229 (1938)).  Substantial evidence has also been described as "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).  Fundamentally, though, "substantial evidence" is best understood as a word formula connoting reasonableness review. 3 Charles H. Koch, Jr. Administrative Law and Practice § 9.24[1] (3d ed. 2021).  Therefore, when addressing a substantial evidence issue raised by a party, the court analyzes whether the challenged agency action "was reasonable given the circumstances presented by the whole record."  8A West's Fed. Forms, National Courts § 3.6 (5th ed. 2021).

Separately, the two-step framework provided in Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 842–45 (1984), governs judicial review of Commerce's interpretation of the antidumping statute.  See United States v. Eurodif S.A., 555 U.S. 305, 316 (2009) (Commerce's "interpretation governs in the absence of unambiguous statutory language to the contrary or unreasonable resolution of language that is ambiguous.").

## II. Discussion

### A.1. Differential Pricing Methodology

In the underlying investigation, Commerce found that there "is a meaningful difference between using the different comparison methods" and ultimately determined that the agency would "apply[] the A-to-T method to Dillinger's U.S. sales that pass the Cohen's *d* test and the A-to-A method to Dillinger's U.S. sales that do not pass the

Cohen's *d* test to calculate the weighted-average dumping margin for Dillinger." <u>Decision Memorandum</u> at 17; <u>see also</u> 19 C.F.R. § 351.414(c)(1).  Commerce's differential pricing methodology ("DPM") has been described extensively in other cases.  <u>See, e.g.</u>, <u>Stanley Works (Langfang) Fastening Systems Co. v. United States</u>, 41 CIT ___, ___, 279 F. Supp. 3d 1172, 1176–79 (2017) ("<u>Stanley Works</u>").

      Dillinger argues that Commerce's DPM failed to show that Dillinger's prices differed significantly among purchasers, regions, or periods of time pursuant to 19 U.S.C. § 1677f-1(d)(1)(B).  Specifically, Dillinger contends that Commerce (i) failed to find a "pattern" of differences and (ii) unreasonably aggregated price differences across the categories of purchasers, region, and time.  <u>See</u> Dillinger Br. at 27–31; Dillinger Reply at 8–12.  The court disagrees.

      Before Commerce, Dillinger argued that its made-to-order sales and various other economic considerations meant that DPM would only detect random variations, rather than a significant pattern of price differences.  <u>See</u> <u>Decision Memorandum</u> at 13.  Dillinger, however, provides no support to demonstrate that its made-to-order sales would cause distortions in Commerce's calculations.  Commerce explained that a company's economic goals were reflected through its pricing behavior and that the DPM was designed to reveal when a company resorted to targeted dumping.  <u>Decision Memorandum</u> at 20–21.  Relying on the Statement of Administrative Action ("SAA"), Commerce explained:

> The SAA states that "targeted dumping" is where "an exporter may sell at a dumped price to particular customers or regions, while selling at higher prices to other customers or regions."

> For "targeted" or masked dumping to exist, there must be both lower-priced U.S. sales which evidence dumping as well as higher-priced, non-dumped U.S. sales which "conceal," mask, hide this evidence of dumping. Therefore, since the purpose of section 777A(d)(1)(B) is to provide a remedy for "targeted dumping," pursuant to which the Department must satisfy the pattern requirement to demonstrate that the respondent's pricing behavior in the U.S. market exhibits characteristics "where targeted dumping may be occurring," the Department continues to find reasonable and logical its approach of including both lower-priced and higher-priced U.S. sales as part of a potential pattern of prices that differ significantly.

<u>Decision Memorandum</u> at 21 (internal citations omitted). Commerce further addressed Dillinger's concerns about the made-to-order nature of its products by explaining that the CONNUMs[3] used by Commerce in its analysis accounted for variations among Dillinger's products:

> Dillinger further asserts that its made-to-order products are so unique and embrace such a wide range of grades within a given CONNUM that any comparison of U.S. prices on a CONNUM basis must take into account these inter-CONNUM variations. The Department disagrees. The CONNUM and its constituent physical characteristics are all subject to comment during this investigation. Dillinger provided comments, and Dillinger's arguments have been fully considered. The established CONNUMs are the foundation for reporting not only comparison and U.S. market sales, but also Dillinger's costs of production, and are the basis for comparison of U.S. prices with normal value. Since the purpose of the differential pricing analysis is to consider whether the A-to-A method is appropriate to calculate

---

[3] A "CONNUM" is a contraction of the term "control number," and is Commerce jargon for a unique product (defined in terms of a hierarchy of specified physical characteristics determined in each antidumping proceeding). All products whose product hierarchy characteristics are identical are deemed to be part of the same CONNUM and are regarded as "identical" merchandise for purposes of the price comparison. The hierarchy of product characteristics defining a unique CONNUM varies from case to case depending on the nature of the merchandise under investigation.

> Dillinger's weighted-average dumping margin, and the comparisons on which this calculation is based are defined by CONNUMs, the Department finds that it is appropriate, and reasonable, to use these same CONNUMs as the basis for the comparisons of U.S. prices in the differential pricing analysis.

Id. at 20.

Nonetheless, Dillinger now argues that aggregation of price differences across the categories of purchasers, region, and time "completely failed to establish any pattern of price differences with respect to each category on its own" in contravention of the statute. Dillinger Br. at 29.

The Decision Memorandum details how Commerce's DPM evaluates such differences, consistent with the statute:

> The Cohen's *d* test compares the U.S. sale prices sequentially to each purchaser, region and time period, with all other U.S. sale prices (i.e., the U.S. sales to all other purchasers, regions or time periods, respectively) of comparable merchandise. What appears to be the concern of Dillinger, for example with purchasers, is that the U.S. sales to each purchaser may not be evenly distributed across the other two types of groups, regions and time periods. Thus, Dillinger posits that the "Department therefore cannot determine whether a price difference is actually due to real differences between purchasers or simply due to the fact that the sales are to purchasers in different regions or during different time periods."

> The Department finds that this is neither a flaw in the Cohen's *d* test nor a distortion of the results. The Department also does not find that there are flaws related to the other two groups (i.e., U.S. sales to a particular region that are equally distributed across all purchasers and time periods, or U.S. sales in a particular time period that are equally distributed across all purchasers and regions). The one possible distortion that could arise, for example that each

> purchaser is located in a specific region, is that similar results would occur when comparing prices by purchaser and by region. However, the ratio test does not double-count the sales value when a given U.S. sale price is found to be significantly different by purchaser and region. There is no assumption about correlated distribution of sales between purchasers, regions or time periods, and indeed a given U.S. sale price may be found to be significantly different by all three categories. Yet the ratio test ensures that any such correlation between purchasers, regions and/or time periods does not distort the results of the test and result in a finding that a larger proportion of the U.S. sale value is at prices which differ significantly.

Decision Memorandum at 21–22.

The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has already rejected similar arguments to those presented here challenging Commerce's finding of a "pattern" under § 1677f-1. See Dillinger France S.A. v. United States, 981 F.3d 1318, 1324–26 (Fed. Cir. 2020) (rejecting Dillinger's various challenges to Commerce's finding of pattern in that matter, noting "there is nothing in § 1677f-1 or the regulations promulgated thereunder that requires Commerce to consider custom products differently when determining whether [a pattern exists pursuant to § 1677f-1(d)(1)(B)]"). As in Dillinger France, Commerce here accounted for Dillinger's concerns and reasonably explained its finding of a pattern of significant price differences in the Decision Memorandum. Accordingly, Commerce's determination as to Dillinger's DPM challenge is sustained.

### A.2. Zeroing as part of DPM

Dillinger next argues that Commerce's use of zeroing as part of its DPM is unlawful under the statute. It contends that zeroing "distorts both of the requirements provided in

section 1677f-1(d)(1)(B)" because it compares "a non-zeroed margin" with a "zeroed margin," and the difference in result between the A-to-A and A-to-T method is due solely to this asymmetrical use of zeroing. Dillinger Br. at 32.

The Federal Circuit has upheld Commerce's use of zeroing for its DPM. See Apex Frozen Foods Private Ltd. v. United States, 862 F.3d 1337, 1348 (Fed. Cir. 2017) ("We hold that Commerce's meaningful difference analysis -- comparing the ultimate antidumping rates resulting from the A-A methodology, without zeroing; and the A-T methodology, with zeroing – was reasonable."). That Court rejected the very same argument Dillinger raises here, stating:

> [W]e find it immaterial whether the A-A and A-T margins would be nearly identical if zeroing were applied evenly or not at all … The notion that Commerce's chosen methodology is unreasonable because it only measures the effects of zeroing is misplaced … [D]ifferences revealed by zeroing are not inconsequential or to be ignored … In other words, the effects of zeroing are precisely what 19 U.S.C. § 1677f-1(d)(1)(B) seeks to address.

Id. at 1349 (citations omitted).

Dillinger attempts to distinguish Apex by arguing that the exception in § 1677f-1(d)(1)(B) applies only to significant differences for the same product among purchasers, regions, or time periods and does not relate to significant price differences between different products. Dillinger Br. at 30. Defendant responds that Dillinger failed to raise the issue of applying the A-to-T method between different products at the administrative level and therefore failed to exhaust its administrative remedies with respect to this argument. Def.'s Resp. at 26–27. Dillinger replies that its inter-product

Consol. Court No. 17-00158                                                                                      Page 10

argument is "part and parcel" of its argument that zeroing distorts the requirements under § 1677f-1(d)(1)(B)(i)-(ii) for application of the A-to-T method.  Dillinger Reply at 12–13.

       The court agrees with Defendant that Dillinger should have raised this argument before the agency.  Here, Dillinger failed to exhaust its inter-product argument before Commerce when it did not argue whether § 1677f-1(d)(1)(B) permits using the A-to-T method when evaluating significant price differences between products.  If the argument had been raised at the administrative level, Commerce would have had the opportunity to apply its expertise to assess its practice and statutory interpretation on the basis of a more developed record.  See Stanley Works, 279 F. Supp. 3d at 1189.  Dillinger's contention that its argument is merely "part and parcel" of its zeroing allegations, see Dillinger Reply at 12–13, does not excuse its failure to explicitly expound on its inter-product argument at the administrative level because a challenge to the application of one aspect of § 1677f-1(d)(1)(B) "do[es] not incorporate any conceivable challenge to elements of that analysis." Id.  Despite Dillinger's contentions to the contrary, none of the exceptions to administrative exhaustion apply.  Accordingly, Commerce's DPM determination is sustained.

### B. Interest Expense Adjustment

       During the investigation, Dillinger reported to Commerce what Dillinger believed to be its "full" general and administrative (G&A) expenses, including its share of the operating expenses incurred by the holding company SHS Stahl-Holdings-Saar ("SHS Holding") with which Dillinger is affiliated.  SHS Holding performs certain services

for its affiliates and charges them for the cost of these services to cover SHS Holding's operating expenses, such as personnel expenses. See Dillinger Br. at 44–45.

For the final determination, Commerce reiterated its practice to exclude investment-related gains and losses from the calculation of the cost of production because it considers them a separate profit-making activity unrelated to a company's normal operations. Decision Memorandum at 97–98. Based on this, Commerce determined to increase a portion of SHS Holding's "unrecovered costs" that should be allocated to its affiliates including Dillinger. The effect of the adjustment was to increase the portion allocated to and included in Dillinger's G&A expenses. See Decision Memorandum at 97–98.

Dillinger challenges this adjustment as unreasonable given the record (unsupported by substantial evidence). See Dillinger Br. at 44–47; Dillinger Reply at 28-30. Dillinger argues that it complied with Commerce's instructions to report its own interest expenses based upon "the highest consolidation level available," which was at the level of DHS-Dillinger Hütte Saarstahl AG because Dillinger is not consolidated with SHS Holding, and that Commerce verified Dillinger's reported G&A without making any adjustment. Dillinger points out that the adjustment relates completely to interest expenses incurred by SHS Holding, arguing Commerce has a "long-standing and uniform practice" not to include interest expenses in a respondent's G&A expenses as indicated by Commerce's standard questionnaire requiring the calculation of the G&A expense ratio and the interest expense ratio separately based upon different and distinct methodologies. Dillinger Br. at 45–46 (citing Questionnaire at D-14 & D-15, PD 102).

Consol. Court No. 17-00158 Page 12

Alternatively, Dillinger argues Commerce erred by failing to offset the affiliate's interest expenses by the affiliate's significant income from shareholding, because holding investments is the "normal operation" or "ordinary business activity" of a holding company. Id. at 46–47.

These arguments are unpersuasive. They conflate financial expenses with Commerce's treatment of investment activities and are contrary to Commerce's practice to include the suppliers' financial expenses in the cost of production as Commerce explained in the administrative proceeding. The court also perceives no inconsistency in requiring a respondent to report separate ratios for its own G&A and interest expenses versus Commerce's treatment of supplier expenses attributable to the respondent. See Decision Memorandum at 87–88, 98. Accordingly, the court sustains Commerce's determination for Dillinger's interest expense adjustments.

### III. Conclusion

For the foregoing reasons, the court sustains Commerce's Final Determination as to Dillinger's challenges to Commerce's differential pricing and the interest expense adjustment.

                                                  /s/ Leo M. Gordon
                                                  Judge Leo M. Gordon

Dated: August 18, 2021
      New York, New York