A-428-844
Remand:  Slip Op. 21-101
Court No. 17-00158
~~Business Proprietary~~
E&C/OII:  DJG
*PUBLIC VERSION*

### *AG Der Dillinger Hüttenwerke, v. United States*
### Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021)

### Final Results of Redetermination Pursuant to Court Remand
### Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany

## I.    SUMMARY

The Department of Commerce (Commerce) has prepared these final results of

redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court)

in *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 21-101

(August 18, 2021) (*Dillinger Germany II*).  This action arises out of the final determination in the

less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length (CTL)

plate from Germany.[1]  The mandatory respondents in the underlying LTFV investigation are AG

Der Dillinger Hüttenwerke (Dillinger), and Ilsenburger Grobblech GmbH, Salzgitter

Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann

International GmbH (collectively, Salzgitter).

The Court remanded to Commerce to consider its:  (1) reallocation of costs between

prime and non-prime steel plate for Dillinger; (2) application of the major input rule with respect

to contemporaneity and the freight factor applied to Dillinger's coke input; (3) adjustments to

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

Dillinger's cost of production (COP) for inputs and services provided to affiliates; and (4) application of a partial adverse facts available (AFA) methodology to certain downstream home market sales reported by Salzgitter.  In light of the Court's remand order, on remand Commerce: (1) relied on the total cost assigned to the prime and non-prime products as recorded in Dillinger's normal books and records in accordance with section 776(a) of the Tariff Act of 1930, as amended (the Act); (2) provided further explanation and revised the major input rule adjustment for Dillinger's coke inputs to reflect a contemporaneous comparison of coke consumption values and freight costs sourced from affiliated and unaffiliated suppliers; (3) provided further explanation and revised the adjustments to Dillinger's COP for inputs and services provided to affiliates; and (4) provided further explanation regarding the application of partial AFA to Salzgitter and revised the margin according to the AFA methodology applied in the *Final Determination*.  As a result of our analysis, we made changes to Dillinger's margin calculations, which result in a revised weighted-average dumping margin of 4.98 percent, and we have reverted to the margin calculated in the *Final Determination* for Salzgitter, which resulted in a weighted-average dumping margin of 22.90 percent.  Moreover, as a result of Commerce's revision to the weighted-average dumping margins for both Dillinger and Salzgitter, the revised all-others rate is 20.99 percent.

## II.    BACKGROUND

Commerce published the *Final Determination* on April 4, 2017.[2]  As discussed in the *Final Determination*, Commerce:  (1) adjusted Dillinger's reported costs for non-prime products to reflect the products' sales value as recorded in Dillinger's normal books and records and then reallocated the difference to the cost of prime plate;[3] (2) adjusted the reported coke cost of

---

[2] *See Final Determination*; *see also Amended Final Determination*.
[3] *See Final Determination* IDM at Comment 31.

Dillinger's affiliate, Rogesa Roheisengesellschaft (Rogesa), to reflect the higher of:  (A) Rogesa's consumption value of coke from its affiliate, Zentralkokerei Saar Gesellschaft (ZKS), (B) Rogesa's adjusted consumption value of coke from unaffiliated suppliers, or (C) the reported COP of coke;[4] (3) adjusted the COP of the inputs and services Dillinger provided to Rogesa and ZKS to include a portion of Dillinger's general and administrative (G&A) expenses;[5] and (4) applied partial AFA on sales made by one of Salzgitter's affiliated downstream resellers where Salzgitter did not identify the manufacturer of the CTL plate, assigning the highest non-aberrational net price among all of the downstream sales by that reseller to all of these sales where Salzgitter failed to report the manufacturer of the CTL plate.[6]

In its August 18, 2021 opinion, the Court remanded Commerce's *Final Determination*. First, the Court remanded for Commerce to reconcile its reallocation of costs between prime and non-prime plate consistent with the Court of Appeals for the Federal Circuit (CAFC)'s opinion in *Dillinger France II* and rely on the actual costs of production for prime and non-prime plate.[7]

Further, regarding the major and minor input rules, the Court remanded to Commerce certain elements of Commerce's calculation of the major input adjustment factor.  The Court requested further explanation with respect to:  (1) the use of non-contemporaneous affiliated and unaffiliated consumption values; (2) the use of freight costs that were not contemporaneous with the coke values used and were calculated on wet-weight basis but applied to a quantity of coke on a dry-weight basis, (3) whether transfer prices should be adjusted to include G&A and interest expenses; and (4) the potentially distortive impact of a credit note adjustment on the average

---

[4] *Id.* at Comment 31.
[5] *Id.* at Comment 33.
[6] *Id.* at Comment 2.
[7] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6 (citing *Dillinger France S.A. v. United States*, 981 F. 3d 1318 (CAFC 2020) (*Dillinger France II*)).

consumption values used in the calculations.  Regarding Commerce's adjustment to Dillinger's

COP for the services provided to Rogesa and ZKS, the Court stated that Commerce failed to

address Dillinger's comments on the issue.  The Court remanded these issues for further

explanation or reconsideration because Commerce did not provide sufficient explanation for the

Court to determine if Commerce's determination was reasonable.[8]

Finally, the Court remanded to Commerce the opportunity to address its use of partial

AFA to calculate Salzgitter's margin in the *Final Determination*.  In *Dillinger Germany I*, the

Court ordered Commerce to recalculate the antidumping duty (AD) margin for Salzgitter using

the same partial AFA methodology it used in *Dillinger France I*, a parallel proceeding.[9]

Commerce, under protest, recalculated Salzgitter's margin using partial AFA, stating that the

Court had not provided Commerce an opportunity to consider alternative partial AFA

methodologies in light of the factual differences between *Dillinger Germany I* and *Dillinger*

*France I*.[10]  Thus, the Court remanded this issue again to allow Commerce to explain why a

different approach may be reasonable.

On September 21, 2021, we reopened the administrative record and issued a

supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime

products produced and the actual cost of producing the non-prime products, to obtain

---

[8] *Id.* at 6-11.
[9] *See AG Der Dillinger Hüttenwerke, v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*); *Dillinger France S.A., v. United States*, 350 F. Supp. 3d 1349 (CIT 2018) (*Dillinger France I*); and Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*Dillinger I* Remand Redetermination).
[10] *See* Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from France, *Dillinger France S.A. v. United States*, Court No. 17-00159, Slip Op. 18-150 (CIT October 31, 2018), dated March 11, 2019 (*Dillinger France I* Remand Redetermination).

information to ensure we have comparable consumption values to apply the major input rule, and to analyze the inputs and services that Dillinger provided to Rogesa and ZKS.[11]

On October 5, 2021, Dillinger submitted its response to this supplemental questionnaire.[12]

## III.   ANALYSIS

### A.   *Non-Prime Plate Adjustment*

As summarized above, the Court remanded Commerce's *Final Determination* to reconcile its reallocation of costs between prime and non-prime plate consistent with the CAFC's opinion in *Dillinger France II* and rely on the actual costs of production for prime and non-prime plate.[13]   Therefore, analogous with *Dillinger France II*, Commerce reopened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products.[14]   Because Commerce has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration,[15] we specifically explained that it was not appropriate to rely on the overall average cost of producing all prime products as a surrogate

---

[11] *See* Commerce's Letter, "Remand Supplemental Questionnaire," dated September 21, 2021 (Remand Supplemental Questionnaire).

[12] *See* Dillinger's Letter, "Response to Remand Questionnaire," dated October 5, 2021 (Remand Supplemental Response).

[13] *See Dillinger Germany II*, Slip Op. 21-101 at 5-6.

[14] *See* Remand Supplemental Questionnaire.  On March 25, 2021, Dillinger filed a motion to clarify the scope of the remand.  *See* Motion to Clarify Scope of Remand (March 25, 2021) (ECF 74, 75).  On March 26, 2021, the Court issued a stay order.  *See* Order to Stay Proceedings (March 26, 2021) (ECF 76).  On April 15, 2021, Commerce filed its response to the motion to clarify.  *See* Response to Motion to Clarify (April 15, 2021) (ECF 77).  On April 21, 2021, the Court issued an order denying the motion to clarify.  *See* Order Denying Motion to Clarify Scope of Remand (April 21, 2021) (ECF 78).

[15] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology."  *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

for the actual cost of producing the specific non-prime products at issue and requested that

Dillinger provide the actual product-specific COP of the non-prime products.[16]  Commerce

requires accurate and complete product-specific production cost information because such

information:  (1) provides the basis for determining whether comparison market sales were made

in the ordinary course of trade and can be used to calculate normal value (NV); (2) is used in the

difference-in-merchandise analysis; and (3) in certain other instances, is used as the basis for NV

itself.[17]  Indeed, both the CAFC and this Court have recognized that Commerce appropriately

analyzes reported product-specific costs of production.[18]  Moreover, the CAFC has recognized

that requiring costs to reflect cost differences attributable to physical characteristics ensures that

product-specific costs are reflective of the actual costs incurred to produce specific products and

has explained that "{r}eliance on physical characteristics, because of its ability to promote

consistency, is a predictable methodology that is administrable across all investigations and

administrative reviews."[19]

     In its supplemental questionnaire response on the issue of non-prime products, Dillinger

provided neither the physical characteristics of non-prime products produced, nor the actual

product-specific costs of production for the non-prime products.[20]  Specifically, concerning

Commerce's request for the physical characteristics of non-prime products, as Dillinger

explained during the investigation, it was not able to identify all physical characteristics of the

non-prime merchandise and it had already reported the physical characteristics at the greatest

---

[16] *See* Remand Supplemental Questionnaire at 3.
[17] *See, e.g.*, *Notice of Final Results of Antidumping Duty Administrative Review:  Stainless Steel Bar from India*, 70 FR 54023 (September 15, 2005), and accompanying IDM at Comment 1.
[18] *See generally Thai Plastic Bags Indus. Co. v. United States*, 853 F. Supp. 2d 1267 (CIT, 2012), *aff'd, Thai Plastic Bags Indus. Co. v. United States*, 746 F.3d 1358 (Fed. Cir. 2014) (*Thai Plastic Bags*); *see also Hyundai Electric & Energy Systems Co., Ltd, v. United States*, 466 F. Supp. 3d 1303, 1309 (CIT 2020).
[19] *See Thai Plastic Bags*, 746 F.3d at 1368.
[20] *See* Remand Supplemental Response at 2-15.

level of detail possible.[21]  Moreover, despite Commerce's explicit request that Dillinger provide

the actual product-specific costs of production for the non-prime products, Dillinger again

explained how its systems capture costs,[22] and that production for these products are not

differentiated between prime and non-prime merchandise.[23]  Dillinger then reiterated that it

based its costs for producing non-prime products on the "average **_actual_** total cost of

manufacture for all plate produced during the {period of investigation (POI)}."[24]  In other words,

Dillinger did not provide the product-specific actual COP for the non-prime products, even

though it explained that all production "is made to order and non-prime plate results from the

normal production of making plate for the specific customer order."[25]

    During the investigation, Dillinger provided the information necessary to calculate the

actual costs of production for prime products.  As explained in detail here, in response to our

remand supplemental questionnaire, Dillinger did not provide Commerce with the information

needed to calculate the actual costs of production for the non-prime products.  Specifically,

Dillinger provided Commerce neither with the actual product-specific costs of producing the

non-prime products nor with the physical characteristics of the non-prime products produced.  As

the total actual costs incurred by Dillinger, and verified by Commerce,[26] must be allocated to all

products produced, including prime and non-prime products, not knowing the actual cost of

producing the non-prime merchandise directly impacts the amount of costs assigned to the

production of the prime products.  If too much or too little cost is assigned to the non-prime

---

[21] _Id._ at 8.
[22] _Id._ at 7.
[23] _Id._ at 8.
[24] _Id._ at 6 (emphasis in the original).
[25] _Id._ at 11.
[26] _See_ Memorandum, "Verification of the Cost Response of AG de Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany," dated January 27, 2017 (Dillinger Cost Verification Report), at 21-22.

products, then too little or too much cost is assigned to the prime products produced.  Simply put, Dillinger has not provided the actual costs of production of non-prime products.[27]  Therefore, because necessary information is missing from the record, pursuant to section 776(a)(1) of the Act, we have relied on the total COP for both prime and non-prime merchandise as recorded in Dillinger's normal books and records as facts otherwise available to comply with the Court's order.

### 1.  Necessary Information Is Missing from the Record

While Dillinger attempts to downplay the necessity of the product-specific actual COP information by arguing that because the "COM {cost of manufacturing} for the non-prime {control numbers (CONNUMs)} reported by Dillinger corresponds to the average **actual** total cost of manufacture for all plate sold during the POI,"[28] it had "properly reported the COP for non-prime merchandise based upon actual costs of production,"[29] we disagree.  It is well established that Commerce analyzes and relies upon product-specific costs.[30]  It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs.  The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[31] because it assigns the same cost to products with varying physical characteristics.  Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual total cost of manufacturing (TOTCOM) amounts for prime

---

[27] *See* Remand Supplemental Response at 8-9.
[28] *Id.* at 5 (emphasis in the original).
[29] *Id.* at 6.
[30] *See* Dillinger France S.A. v. United States, Court No. 17-00159; Final Results of Redetermination Pursuant to Court Remand (CIT February 18, 2021) (Dillinger France Final Remand 2021) at 7.
[31] *Id*.

products.[32]  Moreover, Dillinger acknowledged that the non-prime products can vary by size,

specification, and grade, which indicates that the associated costs vary, as well.[33]

Commerce does not have information on the record of this proceeding that is necessary

within the meaning of section 776(a)(1) of the Act.  Specifically, despite Commerce's request

that Dillinger submit the product characteristics of the non-prime products and the actual

product-specific cost of producing non-prime products to determine the actual COP for the prime

and non-prime products, Dillinger did not submit either the physical characteristics of the non-

prime products or the product-specific actual cost information.[34]  Dillinger is the sole party in

control of the actual production information.  It is incumbent on the company to make a

reasonable attempt to provide the actual product-specific cost information.  Dillinger explained

that it was unable to provide the actual COP of the non-prime merchandise and, as a result, we

do not have the actual COP information for the non-prime products produced.  Section 776(a)(1)

of the Act provides, subject to section 782(d) of the Act, that Commerce shall select from among

the facts otherwise available on the record if necessary information is not available on the record

of a proceeding.

While Dillinger attempts to downplay the necessity of the product-specific actual COP

information by arguing that because the "COM for the non-prime CONNUMs reported by

Dillinger corresponds to the average **_actual_** total cost of manufacture for all plate sold during the

POI,"[35] it had "properly reported the COP for non-prime merchandise based upon actual costs of

production,"[36] we disagree.  It is well established that Commerce analyzes and relies upon

---

[32] _See_ Dillinger's Letter, "AG der Dillinger Hüttenwerke Second Supplemental Section D Response," dated
November 7, 2016 (Dillinger SQRD2), at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled
"dhcop03").
[33] _Id._
[34] _Id._
[35] _Id._ at 5 (emphasis in the original).
[36] _Id._ at 6.

product-specific costs.[37]  It is not appropriate to substitute the "average actual total cost of manufacturing for all plate sold during the POI" for the actual product-specific costs.  The use of an "average cost" would not, by definition, comply with the CAFC's order to determine the "actual costs of prime and non-prime products"[38] because it assigns the same cost to products with varying physical characteristics.  Indeed, the distortive nature of simply taking the average cost of all products can be seen by the wide disparity in the reported actual TOTCOM amounts for prime products.[39]  Moreover, Dillinger acknowledged that the non-prime products can vary by size, specification, and grade, which indicates that the associated costs vary, as well.[40]

Dillinger's acknowledgment that non-prime products can vary by size, specification, and grade illustrates how Dillinger's inability to provide the actual physical characteristics of the non-prime products prevents Commerce from adjusting the reported overall average cost of prime products in an effort to estimate the actual product-specific costs of non-prime products. We note that, while Dillinger implies that it reported some of the physical characteristics (*i.e.*, "Dillinger is not able to identify all physical characteristics of the non-prime merchandise"),[41] the record demonstrates that Dillinger did not report any of the physical characteristics of the non-prime products in a useable manner.  In other words, while Dillinger submitted invoices to demonstrate that the non-prime products were plate (*i.e.*, the merchandise under consideration), the invoices did not contain precise information pertaining to the actual physical characteristics of the non-prime products.[42]  Therefore, because the CAFC has recognized that requiring costs to reflect cost differences attributable to physical characteristics ensures that product-specific costs

---

[37] *See* Dillinger France Final Remand 2021 at 7.
[38] *Id*.
[39] *See* Dillinger SQRD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").
[40] *Id.*
[41] *Id.* at 8 and 10.
[42] *See, e.g.*, Remand Supplemental Response at Appendices R-3 and R-8.

reflect the actual costs to produce specific products,[43] Dillinger's failure to submit the physical characteristics of the non-prime products precludes Commerce from being able to determine the actual costs of the non-prime products.

Because Dillinger did not submit the physical characteristics of the non-prime products and incorrectly claimed that the reported overall average cost of prime products was sufficient, rather than submit the requested product-specific actual COP data as requested, Commerce does not have the necessary information to determine the actual COP of non-prime products. Therefore, Commerce must select from among the facts otherwise available to replace that missing information, pursuant to section 776(a)(1) of the Act.

## 2. Commerce Satisfied Its Obligation to Provide Dillinger with the Opportunity to Supply the Necessary Information

Commerce satisfied its obligation under section 782(d) of the Act, because Commerce notified Dillinger of the deficiencies in the information it had reported and afforded Dillinger the opportunity to submit the necessary information.[44]  Section 782(d) of the Act provides that if Commerce determines that a response to a request for information does not comply with the request, Commerce will so inform the party submitting the response and will, to the extent practicable, provide that party the opportunity to remedy or explain the deficiency.  If the party fails to remedy the deficiency within the applicable time limits, Commerce may, subject to section 782(e) of the Act, disregard all or part of the original and subsequent responses, as appropriate.  Section 782(e) of the Act states further that Commerce shall not decline to consider submitted information if all of the following requirements are met:  (1) the information is submitted by the established deadline; (2) the information can be verified; (3) the information is

---

[43] *See Thai Plastic Bags*, 746 F.3d at 1368.
[44] *See* Remand Supplemental Questionnaire at 1-2.

not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination; (4) the interested party demonstrated that it acted to the best of its ability; and (5) the information can be used without undue difficulties.

As explained above, Commerce satisfied its obligation under section 782(d) of the Act when it reopened the record and issued a supplemental questionnaire to Dillinger with the explanation that the information submitted during the LTFV investigation (*i.e.*, the overall average actual cost of products sold during the POI) was insufficient and that Commerce required the actual product-specific COP of the non-prime products produced.  Rather than submit the requested product-specific information, Dillinger maintained that the information that it had submitted previously was sufficient because it was based on production value, rather than sales value.[45]  Moreover, section 782(e) of the Act does not require that Commerce use the overall average cost data because, as explained above, the use of the overall average cost of all products as a proxy for the actual product-specific COP of the non-prime products cannot serve as a reliable basis for calculating an AD margin within the meaning of section 782(e)(3) of the Act.[46]  Therefore, because the physical characteristics of the non-prime products and the product-specific COP of non-prime products is necessary information that is missing from the record, despite Commerce's reopening of the record to obtain the information, Commerce is selecting from among the facts otherwise available on the record to determine the COP of prime and non-prime products, pursuant to section 776(a)(1) of the Act.

### 3.  Use of Facts Available

Pursuant to section 776(a) of the Act, Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary information is not available; or (2) an interested party

---

[45] *See* Remand Supplemental Response at 6.
[46] *See Dillinger France I* Remand Redetermination at 10.

withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. As discussed above, because Dillinger failed to provide Commerce with the requested information, and because such information is necessary and missing from the record, we are selecting from among the facts otherwise available to fill the gap, pursuant to section 776(a)(1) of the Act.

In particular, Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products.[47]  Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation.[48] Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.[49]

As a result, Commerce is using the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records, as facts otherwise available. We have selected the selling prices of the non-prime products as facts otherwise available because this amount is used by Dillinger in its normal books and records; importantly, was verified by Commerce; and it is the best information available on the record.[50]

---

[47] *See* Remand Supplemental Response at 8-9.
[48] *Id.* at 4.
[49] *See, e.g.*, Dillinger Cost Verification Report.
[50] *See* Dillinger Cost Verification Report at 22 ("We also reviewed the FER during the POI.  In the line item "Seconds," the cost is equal to the net sales for these non-prime items").

### B.  *Major Input Rule Applied to Blast Furnace Coke*

During the POI, Dillinger obtained pig iron, a major input in the production of the CTL plate, from its affiliate, Rogesa.[51]  Rogesa obtained blast furnace coke, a major input in the production of pig iron from an affiliate, ZKS.[52]  In analyzing the value of the affiliated coke inputs recorded in Rogesa's books during the investigation, Commerce compared the POI average consumption values for large and small coke purchased from ZKS (the transfer prices) to the POI average consumption values for large and small coke purchased from unaffiliated parties (the market prices).[53]  While Dillinger challenged Commerce's use of Rogesa's affiliated and unaffiliated consumption values, rather than using purchase prices, in applying the major input rule, the Court found Commerce's use of consumption values was reasonable.[54]  However, the Court remanded for Commerce to consider whether the comparison of unaffiliated and affiliated consumption values and associated freight costs used in applying the major input rule for the specific input (coke) were on a contemporaneous basis, and further whether the freight costs for the coke were calculated on a consistent basis (*i.e.*, dry- versus wet-weight).[55]

In this regard, Dillinger argued that Rogesa's consumption values from unaffiliated suppliers reflect the values of coke purchased prior to the POI at the time when market prices were considerably higher, that freight costs were significantly different because the coke came from different countries than what was sourced during the POI, and that the calculated freight costs and the coke values to which they were applied were on different bases.[56]  After further

---

[51] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Section D Response," dated July 15, 2016, at D-7.
[52] *Id.* at D-8.
[53] *See* Memorandum, "Cost of Production and Constructed Value Calculation Adjustments for the Final Determination – AG der Dillinger Hüttenwerke," dated March 29, 2017 (Dillinger Final Cost Calc Memo), at 2 and Attachments 2.1 and 2.2.
[54] *See Dillinger Germany II*, Slip Op. 21-101 at 7.
[55] *Id*. at 8 to 10.
[56] *Id*. at 9 and 10.

review, we agree with Dillinger that certain unaffiliated suppliers' consumption values used in the major input analysis were predominately based on purchases made prior to the POI and those associated freight costs distorted the unaffiliated consumption values.[57]  Further, we agree with Dillinger that the calculated freight costs used in the major input analysis were not on a consistent basis with the coke values to which they were applied.[58]  Therefore, to comply with the Court's order and mitigate the non-contemporaneous nature of the comparison of affiliated and unaffiliated consumption values, we obtained POI monthly inventory movement schedules for coke from each affiliated and unaffiliated supplier, information regarding when the last coke purchases were made by Rogesa from each supplier, and a schedule detailing the freight cost by supplier for each month of the POI.[59]  Accordingly, using the suppliers' POI inventory movement schedules that show the beginning inventory, purchases, consumption, and ending inventory, we were able to determine the appropriate contemporaneous population of POI coke consumption values from unaffiliated suppliers.[60]  In this regard, we eliminated from our calculation the consumption values from unaffiliated suppliers that had a significant POI beginning inventory balances of coke and/or had no purchases of coke during the POI.  We then recalculated the POI unaffiliated consumption values by weight averaging the consumption values for the remaining unaffiliated suppliers.  Likewise, using the detailed freight cost schedule,[61] we were able to recalculate a freight cost that represents an amount that is contemporaneous with the POI, only associated with coke supplied during the POI, and reflects a

---

[57] *See* Dillinger SQRD2 at Appendix SD-34.
[58] *Id.*
[59] *See* Remand Supplemental Response at Appendix R-11.
[60] *Id.* at Appendices R-9 and R-12.
[61] *Id.* at Appendix R-11.

dry weight basis.  As a result of these changes, the major input adjustment decreases from [     ] percent to [     ] percent.

We note, however, that because of the foregoing methodological change, we found that small blast furnace coke was not purchased from unaffiliated suppliers during the POI. Accordingly, because small blast furnace coke consumed during the POI was only sourced from Rogesa's affiliate ZKS during the POI, we do not have a market consumption value to use in the application of the major input rule.[62]  Accordingly, pursuant to section 776(a) of the Act, Commerce will use "facts otherwise available" to fill gaps in the record if:  (1) necessary information is not available; or (2) an interested party withholds information requested by Commerce, fails to provide the information by the deadline or in the manner requested, significantly impedes the proceedings, or provides information that cannot be verified. Specifically, for small blast furnace coke, after changing the methodology in determining the population of the unaffiliated consumption values that should be used as a comparison to the affiliated consumption values in the application of the major input rule, we found that Dillinger did not have any contemporaneous purchases of small blast furnace coke during the POI on the record.  Because it is necessary to have contemporaneous purchases of small blast furnace coke information on the record to use in the application of the major input rule, and such information is missing from the record, we are selecting from among the facts otherwise available to fill the gap, pursuant to section 776(a)(1) of the Act.  Therefore, as facts available, we applied the results of the ZKS-sourced large coke major input analysis to the ZKS-sourced small coke consumption.

The Court also remanded for Commerce to consider whether G&A and financial expenses must be added to ZKS' transfer prices to place them on the same basis as the market

---

[62] *Id*. at 19.

prices to which they are compared.[63]   In this regard, Dillinger argued that the market prices are fully-loaded prices that cover all costs of the unaffiliated seller including selling, G&A, and financial expenses, while the transfer prices to which they are compared are based only on ZKS' TOTCOM.[64]   According to Dillinger, Commerce's cost calculations ultimately add G&A and financial expenses to the reported TOTCOM; thus, the actual end value of the affiliated input is the transfer price plus the additional amounts for G&A and financial expenses.[65]   Hence, Dillinger concluded that in order for the transfer price to be on the same basis as the unaffiliated sales price, this fully loaded transfer price must be used in the analysis.[66]

In this argument, Dillinger ambiguously refers to G&A and financial expenses; thus, we are uncertain whether these are the G&A and financial expenses incurred by ZKS or those incurred by Dillinger.   Nevertheless, as it pertains to G&A and financial expenses, we find that all elements of our major input analysis are on a consistent basis.   The goal of the minor (*i.e.*, transactions disregarded) and major input rules is to determine whether the prices paid to affiliated parties for a specific input (in this case, coke) reflect arm's-length values.   Since arm's-length values when applying these rules represent transactions between two unrelated parties (*i.e.*, market prices) and prices that recover the COP as defined by the statute,[67] we are testing the affiliated purchase price for a specific input as recorded in a respondent's normal books and records to ensure it reflects the higher of market price (transactions disregarded) or both the market price and COP (*i.e.*, major input rule).   In this case, ZKS is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron)

---

[63] *See Dillinger Germany II*, Slip Op. 21-101 at 11.

[64] *See* Dillinger's Letter, "Plaintiff AG der Dillinger Hüttenwerke's Rule 56.2 Memorandum in Support of Motion for Judgment Upon the Agency Record," dated March 12, 2018 (Dillinger Brief), at 41.

[65] *Id.*

[66] *Id.*

[67] *See* section 773(b)(3)(A)(B) of the Act.

used by Dillinger to produce CTL plate.  Accordingly, we tested whether the price that ZKS charged Rogesa for coke, that passed to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions by comparing those transactions to the market price and COP.  In analyzing the value of the affiliated coke inputs recorded in Rogesa's books, Commerce compared the POI average consumption values for coke purchased from ZKS (the transfer price) to the POI average consumption value for Rogesa coke purchased from unaffiliated parties (the market price).[68]  Contrary to Dillinger's claim, it is not relevant how ZKS may have set its sales prices for the coke it sold to its affiliate Rogesa.  It is the amount actually charged by ZKS and paid and recorded by Rogesa in its normal books and records for the affiliated purchases of coke that is being tested, regardless of how that transfer price was determined by the affiliated seller.  Accordingly, Commerce compared the consumption value for coke inputs that Rogesa purchased from ZKS to the consumption value for the coke inputs that Rogesa purchased from unaffiliated parties.  Although Dillinger argues that Commerce will add G&A and financial expenses to the affiliated coke inputs in its cost calculations, these are downstream costs incurred by Dillinger that have nothing to do with the market price for coke purchases.  Furthermore, Dillinger's G&A and financial expenses will be added to all Dillinger activity; thus, both the affiliated and unaffiliated coke inputs would be part of the denominator used to calculate Dillinger's G&A and financial expense ratios and both the affiliated and unaffiliated coke inputs would be allocated a proportionate share of Dillinger's G&A and financial expenses.  In summary, our statutorily directed endeavor here is to test whether the affiliated transfer price paid by Dillinger reflects the higher of the market price or COP to ensure it represents an arm's-length transaction.[69]  Thus, we disagree that, with regard to G&A and

---

[68] *See* Dillinger Final Cost Calc Memo at Attachment 2.1.
[69] *See* Dillinger Final Cost Calc Memo at 2.

financial expenses, there is an imbalance in our comparison of Dillinger's purchases of coke from affiliated and unaffiliated parties.

With respect to the credit note referenced by the Court,[70] we have revisited Dillinger's original objections and find it is necessary to first clarify the issue before the Court. While the Court refers to our credit note adjustment applied at Attachment 2.1 of the final calculation memorandum, Dillinger does not contest the credit note adjustment for coke. Rather, Dillinger argues that "{t}he Department also did not account for the fact that, in Attachment 3 of its final cost calculation memorandum, it added over [                ] Euros in additional costs to ZKS' reported cost of manufacture."[71] Thus, the adjustment at issue stems from Attachment 3 of our final cost calculation memorandum, which addresses the fair market value of the inputs and services that Dillinger provided to Rogesa and ZKS. Specifically, at Attachment 3, Commerce applied a minor input adjustment to ZKS' cost of manufacturing (COM) that increased, to a market value, the transfer price of the inputs and services provided by Dillinger to ZKS.[72] Dillinger contends that this amount must be factored into the Attachment 2.1 major input (coke) adjustment calculation because "when the Department compares unaffiliated sales prices with the affiliated cost of production under the major input rule, it must use the final affiliated cost of production {of coke} after all of the other adjustments made by the Department."[73]

In this regard, we disagree with Dillinger that the additional ZKS manufacturing costs calculated in Attachment 3 need to be accounted for in the calculation of our major input adjustment for affiliated coke inputs. Here, once again, Dillinger misplaces the purpose of the

---

[70] *See Dillinger Germany II*, Slip Op. 21-101 at 10.
[71] *See* Dillinger Brief at 41-42.
[72] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[73] *See* Dillinger's Letter, "Reply Brief on Behalf of Plaintiff AG der Dillinger Hüttenwerke," dated August 22, 2018, at 24.

major input rule and, specifically, how the rule is applied in determining Dillinger's COM for CTL plate. ZKS is an affiliated producer of a major input (*i.e.*, coke) used by Rogesa, and an affiliated producer of a major input (*i.e.*, pig iron) used by Dillinger to produce CTL plate. Accordingly, the purpose of calculating ZKS' COP of coke is to ensure that the price ZKS charges Rogesa for coke, that passes to Dillinger through its purchases of pig iron from Rogesa, are arm's-length and above-cost transactions, by comparing those transactions to the market price and COP. Therefore, despite our revision to ZKS' actual cost of producing the coke, our major input analysis determined that the market price for coke was higher than the transfer price or ZKS' COP for the coke. Consequently, at Attachment 2.1, we adjusted Dillinger's reported costs to reflect the market value of the coke supplied by ZKS.[74] In doing so, we based our adjustment factor on the difference between the average market price of coke and the average transfer price of coke (*i.e.*, the difference between the average consumption values for coke Rogesa obtained from unaffiliated parties and the average consumption values for coke Rogesa obtained from ZKS). Because the reported costs reflect the transfer price of the coke (and not ZKS' adjusted COP for the coke), it is appropriate to calculate the major input adjustment as the difference between the market value of the coke and the value that needs to be adjusted, *i.e.*, the transfer price of the coke. Because we are adjusting those transfer prices to reflect market prices (and not to reflect ZKS' adjusted COP of coke), there is no need to factor in the additional coke manufacturing costs calculated at Attachment 3. In fact, with regard to our adjustment of ZKS' COM, Attachment 3 confirms that "{t}his adjustment applies to the coke COM. Since the market price of coke as calculated at Attachment 2.1 exceeds the transfer price and COP, the adjustment to the transfer price {of the Dillinger inputs and services} has no effect on the

---

[74] *See* Dillinger Final Cost Calc Memo at Attachment 2.1.

reported cost."[75]  Since we did not rely on ZKS' adjusted COP, but rather relied on the difference between the market and transfer prices of coke to calculate our major input adjustment to Dillinger's reported costs, we disagree that the additional ZKS manufacturing costs calculated at Attachment 3 need to be factored into our calculation of the major input adjustment to the coke inputs.

### C.  *Adjustment to Expenses for Inputs and Services Provided to Affiliates*

The Court also found that Commerce failed to fully address Dillinger's arguments that the addition of Dillinger's G&A expenses to the cost of the labor services that Dillinger provided to ZKS and Rogesa overstates costs.[76]  Accordingly, we have reexamined Dillinger's arguments as directed by the Court.

During the POI, Dillinger provided labor services to its affiliates Rogesa and ZKS, who paid Dillinger for these services and those costs became part of ZKS and Rogesa's COMs of the coke ZKS provided to Rogesa and the pig iron Rogesa provided to Dillinger.[77]  To test whether the affiliated labor service transactions were at arm's length, in the investigation we compared the transfer prices Rogesa and ZKS paid Dillinger to Dillinger's cost of the services.[78]  While these labor services are considered to be a minor input, we used the cost of providing the services as a reasonable proxy for a market price because no market price for such services was available.[79]  To calculate Dillinger's total cost of the services, we included a portion of Dillinger's G&A expenses.  Commerce explained that this was appropriate because Dillinger's G&A expense ratio was based on the unconsolidated financial statements, which do not

---

[75] *Id.* at Attachment 3.
[76] *See Dillinger Germany II*, Slip Op. 21-101 at 12-17.
[77] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Supplemental Section D Response," dated September 28, 2016 (SQRD1), at 15.
[78] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[79] *Id.* at 2.

eliminate transactions between the affiliated parties; therefore, Dillinger "essentially included the cost of the inputs and services provided to Rogesa and ZKS twice; once when they were sold to the affiliates, and once when Dillinger consumed the inputs provided by Rogesa and ZKS."[80] Consequently, in order to fully account for Dillinger's G&A expenses, it was necessary to include a portion of Dillinger's G&A expenses when calculating the total cost of the services Dillinger provided to Rogesa and ZKS.

Dillinger countered that, in adding the G&A expenses, Commerce failed to consider the payments from Rogesa and ZKS to Dillinger for the services.[81]  According to Dillinger, these payments were other income to Dillinger that Commerce allows as an offset to G&A expenses; thus, any increase in the Rogesa and ZKS costs at one level merely results in an increase in the other income that is allowed as an offset at another level.[82]  Essentially, Dillinger argued that by including both the cost of the labor services and the associated other income in the calculation of Dillinger's G&A expense ratio, Dillinger effectively eliminated the double-counting of the labor service costs in the denominator to the G&A expense ratio.[83]  As a result, Dillinger claimed that there was no need to also apply G&A expenses to the cost of the labor services that Dillinger provided to Rogesa and ZKS.

While we agree with Dillinger's logic in this matter, we disagree that Dillinger did, in fact, offset the cost of the labor services included in the denominator of the G&A expense ratio with the associated other income received from Rogesa and ZKS when Dillinger calculated its reported G&A expense ratio.  Our conclusions in the investigation were based on the detailed records of this case; however, in the Remand Supplemental Questionnaire, we requested

---

[80] See *Final Determination* IDM at Comment 32.
[81] See Dillinger Brief at 43.
[82] *Id.*
[83] *Id.*

additional written confirmation of these facts from Dillinger.[84]  In its response, Dillinger

confirmed that, although the labor service costs were included in the denominator to the G&A

expense ratio, the associated other income was not included anywhere in the G&A expense ratio

calculation.[85]  Therefore, by not offsetting the costs of the labor services with the associated

income, Dillinger relied on a larger denominator in the calculation and thereby reduced the G&A

expense ratio.  Therefore, Dillinger's chosen methodology for calculating the G&A expense ratio

compelled Commerce to apply the diluted G&A expense ratio to the cost of the labor services

(which are included in the denominator of the ratio calculation) to ensure that all of Dillinger's

G&A expenses, as they relate to the production of CTL plate, were absorbed in the cost

calculations.[86]

Dillinger also argued that including Dillinger's own G&A expenses (as they relate to the

labor services) in the cost of the coke and pig iron that flow into Dillinger's TOTCOM, and then

applying the G&A expense ratio to Dillinger's TOTCOM, which includes the coke and pig iron

costs, double counts G&A expenses that relate to the labor services.[87]  We reviewed our final

cost calculations to confirm that Dillinger's G&A expenses were not double counted in this

manner.  In the investigation, Commerce increased Dillinger's TOTCOM by [    ] percent for the

portion of the labor service adjustment that was related to CTL plate.[88]  When Commerce

calculated Dillinger's G&A expenses, we applied Dillinger's G&A expense ratio to a CTL plate

TOTCOM that did not include the affiliated transaction adjustments.[89]  Hence, Dillinger's G&A

---

[84] *See* Remand Supplemental Questionnaire.
[85] *See* Remand Supplemental Response at 21-22.
[86] *See* Memorandum, "Margin Calculations for AG der Dillinger Hüttenwerke S.A. Pursuant to Draft Results of Remand Redetermination," dated December 3, 2021 (Draft Remand Calculation Memorandum), at Attachment 4.
[87] *See* Dillinger Brief at 43-44.
[88] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[89] *Id.* at 4.  Specifically, Commerce applied Dillinger's G&A expense ratio of [    ] percent to the following net figure:  Dillinger's revised TOTCOM (*i.e.*, TCOMCOP) less TOTCOM * [    ] percent (the [    ] percent reflects

expense ratio was not applied on top of the [    ] percent adjustment and the G&A expenses related to the labor services were not double counted.

Finally, Dillinger argued that Commerce did not allocate any portion of the labor services adjustment to the non-subject products that were produced with Rogesa's pig iron, but rather allocated the entire adjustment to CTL plate.[90]  According to Dillinger, only [    ] percent of the pig iron produced by Rogesa was used by Dillinger.  Further, of the amount related to Dillinger, Commerce's calculation erroneously "treats the entire absolute increase in the costs of coke and pig iron as if they flow 100% into the cost of manufacturing (COM) of plate and then builds a ratio where the denominator is limited to only the COM of plate."[91]  However, according to Dillinger, it used the Rogesa pig iron to produce both subject and non-subject products and Commerce's calculation failed to reflect this.

After further review, we agree with Dillinger that there are errors in our calculation of the labor services adjustment factor.  In the final cost calculation memo at Attachment 3, we calculated the difference between the total transfer price that Rogesa paid Dillinger for the labor services and Dillinger's total cost of the services (*i.e.*, the total adjustment of [    ] thousand Euros).[92]  This total adjustment value is related to all Rogesa activity.  Therefore, to determine what portion of this total adjustment was related to CTL plate production, we first excluded the portion of the total adjustment that was related to Rogesa's non-pig iron activities (*i.e.*, multiplied the total adjustment value by the [    ] percent that pig iron represents of Rogesa's

---

two adjustments – the [    ] percent minor input labor service adjustment from Attachment 3 and the [    ] percent major input coke adjustment from Attachment 2.1).
[90] While we calculated the additional G&A expenses that were related to the labor services Dillinger provided to ZKS, we did not adjust the transfer price Dillinger paid to ZKS to reflect ZKS' actual COP, but rather relied on the market price of the coke inputs.  *See* Dillinger Final Cost Calc Memo at Attachment 3.
[91] *See* Dillinger Brief at 44.
[92] *See* Dillinger Final Cost Calc Memo at Attachment 3.

total activities, excluding the difference).[93]  Next, we multiplied the result, *i.e.*, the portion of the total adjustment value that was related to pig iron, by the percentage that pig iron represents of Dillinger's TOTCOM (*i.e.*, [    ] percent).[94]  However, this step was incorrect.  Instead, the second step should allocate the total adjustment related to Rogesa's pig iron production to the entities that purchased and consumed the pig iron (*e.g.*, Dillinger, *etc.*).  Therefore, this step should reflect the percentage of Rogesa's total pig iron production that was sold to Dillinger (*i.e.*, the [    ] percent referenced by Dillinger, calculated as [      ] metric tons (MT) of Rogesa's total [      ] MT in pig iron production).[95]  Next, in our final cost calculations, we divided the result from the prior step by Dillinger's TOTCOM for CTL plate.[96]  However, this step was also incorrect.  Because Dillinger consumed pig iron in the production of both subject and non-subject merchandise, Dillinger's portion of the pig iron adjustment should be allocated to all products that were produced with pig iron.  Therefore, we agree with Dillinger that the denominator here should reflect Dillinger's COM for all products that were produced with Rogesa's pig iron, and not just the manufacturing costs for CTL plate.  The revised calculation is as follows:  ([    ] thousand Euros * [    ]% * [    ]%) / [      ] thousand Euros, which reflects [    ] thousand Euros for CTL plate costs + [      ] thousand Euros for Dillinger France slab costs + [      ] thousand Euros for non-subject slab costs + [      ] thousand Euros for foundry costs.[97]  As a result, correcting this calculation decreases the labor services minor input adjustment that is related to Dillinger's cost of CTL plate from [    ] percent to [    ] percent.

### D.  Remand Results on Partial AFA

---

[93] *Id.*
[94] *Id.*
[95] *See* Dillinger Brief at 44; and SQRD1 at Appendix SD-10.
[96] *See* Dillinger Final Cost Calc Memo at Attachment 3.
[97] *See* Dillinger Final Cost Calc Memo at Attachment 3; Dillinger SQRD1 at Appendix SD-10; and SQRD2 at Appendix SD-44.

As noted above, in *Dillinger Germany I*, while the Court sustained Commerce's use of partial AFA to Dillinger and Salzgitter, the Court did not agree with how Commerce applied partial AFA in this instance, and thus instructed Commerce to recalculate the margins from the LTFV investigation for Dillinger and Salzgitter according to the methodology used in *Dillinger France II*.[98]  In response, Commerce recalculated Salzgitter's margin under protest, explaining that due to the Court's specific instructions, "Commerce was unable to consider whether an alternative methodology would have been more appropriate in the instant case … the Court's order deprives Commerce of the ability to further consider whether the purpose of section 776 of the Act, *i.e.*, inducing cooperation has been satisfied."[99]  Thus, in *Dillinger Germany II*, the Court remanded this issue to Commerce, allowing that "{i}f Commerce wishes to apply a different AFA approach in this proceeding than the one it ultimately applied in the French investigation, {Commerce} must explain why a disparate approach is reasonable."[100]

The Court noted that the fact patterns that led to Commerce's application of partial AFA in both the LTFV investigations underlying *Dillinger Germany I* and *Dillinger France I* did not appear distinguishable.[101]  Commerce acknowledges that the circumstances that led to Commerce's determination to resort to partial AFA in each investigation are essentially the same; in each investigation, the respondent (*i.e.*, Dillinger France S.A. (Dillinger France) in the CTL plate from France LTFV investigation and Dillinger and Salzgitter in the CTL plate from Germany LTFV investigation) failed to report the manufacturer for certain downstream sales of CTL plate resold by an affiliated reseller.[102]  However, as discussed below, the scope of

---

[98] *See Dillinger Germany* I, 399 F. Supp. 3d at 1257.
[99] *See Dillinger Germany I* Remand Redetermination at 4.
[100] *See Dillinger Germany II*, Slip Op. 21-101 at 18.
[101] *Id.* at 17-18.
[102] *See Final Determination* IDM at Comments 2 and 20; and *Certain Carbon and Alloy Steel Cut-to-Length Plate from France:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16363 (April 4, 2017), and accompanying IDM at Comment 5.

Salzgitter's failure to cooperate is substantially different than the scope of Dillinger's (or Dillinger France's) failure to cooperate.

Specifically, Salzgitter reported approximately 28,000 downstream sales of CTL plate for which it did not identify the manufacturer,[103] out of a total of [     ] Salzgitter-produced home market sales used in our analysis.[104]  Thus, these sales represented more than [  ] percent of Salzgitter's home market sales used in our analysis.  In contrast, Dillinger reported only [  ] downstream sales for which it did not identify the manufacturer, out of a total of [     ] home market sales examined (*i.e.*, less than [  ] percent).[105]  With this number of impacted downstream sales, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger's margin.  While the number of sales with missing manufacturer information for Dillinger France is not on the record of this proceeding, Commerce notes that only a small number of Dillinger France's downstream home market sales lacked manufacturer information.  Thus, the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger France's margin.[106]

The difference between Salzgitter's, Dillinger's, and Dillinger France's missing information warrants the application of different partial AFA methodologies.  For Dillinger and Dillinger France, applying the partial AFA methodology in *Dillinger France I* (*i.e.*, treating all unidentified manufacturer sales as produced by the respondent, and relying on the reported sales prices on the record) had no effect on the margins calculated in the underlying LTFV

---

[103] These downstream sales were made by Salzgitter's affiliate Salzgitter Mannesmann Stahlhandel GmbH (SMSD). *See* Memorandum, "Final Determination Calculations for Salzgitter," dated March 29, 2017 (Salzgitter Final Calculation Memo), at Attachment I, SAS Log at page 55 (indicating that the number of observations where the seller is SMSD and the manufacturer is "UNKNOWN" is [     ]).
[104] *Id*. at Attachment I, SAS Log at page 56.
[105] *See* Memorandum, "Final Determination Calculations for Dillinger," dated March 29, 2017 (Dillinger Final Calculation Memo), at Attachment I, SAS Log at pages 67-68.
[106] *See Dillinger France I* Remand Redetermination at 6.

investigations.[107]  Therefore, Commerce's intended purpose in selecting the partial AFA

methodology, discussed in detail below, continued to be undisturbed on remand.  However, for

Salzgitter, applying this methodology had a material effect on the margin, resulting in a change

from the 22.90 percent calculated in the *Final Determination*, to a rate of zero percent and

Salzgitter's potential exclusion from the AD order.[108]  Thus, this methodology did not support

Commerce's goals in applying partial AFA, as stated below.

The Court sustained Commerce's use of partial AFA to Salzgitter.[109]  Specifically, the

Court agreed first with Commerce's application of facts otherwise available, noting that

Salzgitter was incorrect in stating it had provided Commerce with sufficient information.[110]  The

Court stated that it agreed Commerce could not determine whether to include or exclude certain

CTL plate transactions because of the missing manufacturer information and, thus, Commerce's

gap filling with facts otherwise available was required.[111]  Next, when looking at Commerce's

application of partial AFA and Salzgitter's arguments against this, the Court stated that

Salzgitter's arguments were unpersuasive.  Specifically, the Court was perplexed as to why

Salzgitter did not conduct its own statistical analysis to attempt to tie the missing manufacturer

information to the 28,000 CTL plate sales.[112]  The Court further pointed to the record, stating

that Salzgitter presented the Court with only "self-serving statements or interpretations of the

record" to show that Salzgitter had attempted to obtain the missing information, which were not

supported by the record itself, and thus Commerce's application of partial AFA was reasonable

when looking at the record as a whole.[113]

---

[107] *See Dillinger I* Remand Redetermination at 2; and *Dillinger France I* Remand Redetermination at 4.
[108] *Id*. at 2 and 4-5.
[109] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[110] *Id.* at 1253.
[111] *Id.*
[112] *Id.* at 1255 – 1256.
[113] *Id.*

Accordingly, Commerce's authority to apply partial AFA to Salzgitter for its failure to provide the requested manufacturer information for its downstream sales is not in dispute. However, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding.  It is well established that Congress intended Commerce to use AFA as a means to induce cooperation in its proceedings and address evasion concerns.[114]  The purpose of AFA is to provide respondents with an incentive to cooperate in Commerce's investigations and reviews and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable determination.[115]  However, the change in the AFA methodology prescribed by the Court in *Dillinger France I* and applied to Salzgitter in the *Dillinger I* Remand Redetermination frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.

Here, Commerce considered the extent to which Salzgitter may benefit from its own lack of cooperation.[116]  In selecting a partial AFA methodology, Commerce seeks to adopt a methodology that would induce future cooperation and ensure that necessary information is placed on the record.  If respondents find there is no benefit to their cooperation, they may conclude that withholding information or providing only certain information, rather than providing a fulsome response, is more advantageous.  These concerns now arise here because, using the *Dillinger France I* methodology, Salzgitter may well receive a more favorable

---

[114] *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed. Cir. 2014).
[115] *See F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1028, 1032 (Fed. Cir. 2000).
[116] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, vol. 1 (1994) (SAA) at 870.

dumping margin than it would have received if the company had fully cooperated with Commerce, and, as a result, Salzgitter would ultimately be excluded from the AD order.

Because of Salzgitter's reporting failures, which are significant, representing more than [  ] percent of Salzgitter's home market sales used in our analysis, we are unable to determine what Salzgitter's margin would have been if Salzgitter had fully cooperated with our requests for information and properly reported the manufacturer of the downstream sales at issue. Commerce relies on the manufacturer information to match U.S. sales to comparison market sales produced by the same manufacturer for comparison purposes in calculating the dumping margin. Without this critical information, Commerce cannot properly identify which home market sales to compare to U.S. sales. Thus, Commerce cannot determine which of the nearly 28,000 downstream sales without a reported manufacturer were produced by Salzgitter (and are thus potentially comparable to Salzgitter's U.S. sales), and which were produced by other manufacturers (and are thus excluded from the comparison pool).

The impact of the missing manufacturer information is further demonstrated by the pricing of the sales with this missing information. To determine the highest non-aberrational net price (*i.e.*, [       ] Euros) to be assigned to the downstream sales with missing manufacturer information, Commerce sorted all of SMSD's net prices for these sales in descending order and selected the transaction at the beginning of a smooth continuum of net prices.[117] Because Salzgitter failed to report the manufacturer of these sales, we cannot determine if the net prices correlated to the manufacturer of the CTL plate. Commerce cannot rule out the possibility that the sales with the highest prices were entirely or primarily of CTL plate manufactured by

---

[117] *See* Salzgitter Final Calculation Memo at 2, Attachment I, SAS Log at page 55, and Attachment I, SAS Output at 81.

Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin.

The Court notes that Commerce did not raise the material factual differences between Salzgitter, Dillinger, and Dillinger France in the underlying final determinations of the LTFV investigations.[118]  The differences described above were not relevant to our LTFV final determinations because the partial AFA methodology applied in the final determinations would ensure cooperation from respondents in future proceedings, particularly as applied to Salzgitter. However, after the Court ordered Commerce to apply the revised partial AFA methodology in *Dillinger France I*, these differences between the respondents became both apparent and relevant, as demonstrated in the different impact on the respondents' margins by applying this methodology and Commerce's inability to obtain its goals in applying partial AFA for Salzgitter.

Further, the Court in *Dillinger France I* considered the application of partial AFA only as it pertained to one respondent, Dillinger France, based on a different record in a different case. The Court in that proceeding (and Commerce in its remand redetermination) did not need to consider whether any differences between the respondents in the CTL plate from Germany LTFV investigation and CTL plate from France LTFV investigation were relevant.  In this proceeding, we find that the difference in the application of partial AFA to the respondents, as described above, is relevant.  Accordingly, Commerce's *Final Determination* partial AFA methodology for Salzgitter, which results in an estimated weighted-average dumping margin of 22.90 percent, should be sustained on remand.

---

[118] *See Dillinger Germany II,* Slip Op. 21-101 at 18.

## IV.    INTERESTED PARTY COMMENTS

On December 3, 2021, Commerce released the draft results of redetermination to all interested parties and invited interested parties to comment.[119]  On December 21, 2021, we received comments from Nucor Corporation (Nucor);[120] SSAB Enterprises LLC (SSAB);[121] Dillinger;[122] and Salzgitter.[123]

**Comment 1:  Non-Prime Plate Adjustment**

*Dillinger Comments*

- Commerce erred in the Draft Remand Results in shifting the reported COP from non-prime to prime plate.  This methodology of shifting costs to reflect the sales value of the non-prime plate was rejected by the CAFC.[124]

- Commerce incorrectly claims that Dillinger values non-prime plate at its sales value in its normal books and records.  Rather, all costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime merchandise, is booked to the same cost object.  Moreover, even if Dillinger's normal books and records valued non-prime plate at its sales value, under *Dillinger France I*, it would still be improper for Commerce to rely on this information in reporting COP.[125]

---

[119] *See AG Der Dillinger Hüttenwerke, v. United States* Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021), Draft Results of Redetermination Pursuant to Court Remand Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, issued on December 3, 2021 (Draft Remand Results).
[120] *See* Nucor's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Nucor Comments).
[121] *See* SSAB's Letter, "Comments on Draft Remand Redetermination," dated December 21, 2021 (SSAB Comments).
[122] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated December 21, 2021 (Dillinger Comments).
[123] *See* Salzgitter's Letter, "Comments on Draft Results of Redetermination Pursuant to Second Court Remand," dated December 21, 2021 (Salzgitter Comments).
[124] *See* Dillinger Comments at 1-2 (citing *Dillinger France II*; *see also Dillinger Germany II*, Slip Op. 21-101).
[125] *Id*. at 2 (citing Remand Supplemental Response at 8-9; and *Dillinger France I* at 1324).

- Commerce also incorrectly stated that Dillinger did not report the actual costs of producing non-prime plate. The COM for the non-prime CONNUMs Dillinger reported corresponds to the average actual total COM for all plate sold during the POR.[126]

- Throughout the underlying LTFV investigation, Dillinger fully disclosed its difficulties in reporting all of the physical characteristics for non-prime plate and proposed alternatives to report the physical characteristics it could not identify. Commerce made no objections to Dillinger's non-prime physical characteristic reporting methodology.[127]

- Moreover, the reporting of physical characteristics for non-prime merchandise is not necessary because no non-prime merchandise was sold to the United States; therefore, none of the home market sales of non-prime merchandise would be used in the margin calculations to be matched to U.S. sales.[128]

- No necessary information is missing from the record. Dillinger properly reported COP for both prime and non-prime merchandise and Commerce fully verified this information. The calculation of COP for prime material is entirely independent from the calculation of COP for non-prime material and no party has challenged the costs of prime material.[129]

- Although Commerce states that it must have actual product-specific cost information for non-prime plate, the average net sales value it uses as "facts available" is neither product-specific nor related to actual costs. Commerce failed to demonstrate that the net sales value used for non-prime merchandise bears any relation to the actual costs of producing that plate. Therefore, in no case can the net sales value of non-prime plate be properly

---

[126] *Id*. at 2-3 (citing Remand Supplemental Response at 6-7, 12-13, and Appendix R-5).
[127] *Id*. at 3-4.
[128] *Id*. at 4.
[129] *Id*. at 3.

used as "facts available" for the actual cost of non-prime plate under section 776(a) of the Act.[130]

- The average actual costs Dillinger reported for the cost of non-prime plate represent the best information available on the record for the actual COP of non-prime plate.  This information corresponds to the average actual total COM for all plate sold during the POI and fulfills the requirements of section 782(e) of the Act.[131]

- Commerce's use of the likely selling price of non-prime plate, rather than the actual average COP reported by Dillinger, is effectively an impermissible adverse inference. Under section 776(b) of the Act, Commerce may only impose an adverse inference when a party has failed to cooperate.  Dillinger fully cooperated to the best of its ability during the LTFV investigation; therefore, Commerce's implicit adverse inference in its non-prime plate adjustment methodology is unwarranted and unreasonable.[132]

*Nucor Comments*

- Commerce properly relied on the costs for prime and non-prime merchandise, as recorded in Dillinger's normal books and records, as the best available information for the non-prime plate adjustment in the Draft Remand Results.  Commerce's approach is fully supported by the record and is consistent with the statute, the Court's order, and the CAFC's opinion in *Dillinger France II*.[133]

---

[130] *Id*. at 4.
[131] *Id.* at 5.
[132] *Id*. at 5-6.
[133] *See* Nucor Comments at 13-16 (citing sections 776(a) and 782(d) of the Act; and *Dillinger France II*, 981 F.3d at 1321 and 1324).

*Commerce's Position:*

We continue to find that, because Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products, as requested, Commerce does not have the information that is necessary to calculate the actual costs of prime and non-prime products. As explained above, Commerce has an obligation to ensure that the reported COP reasonably reflect the cost of producing the merchandise under consideration and necessarily analyzes information pertaining to the cost of producing the merchandise under consideration on both an aggregate and product-specific basis.[134]  Moreover, the Court ordered a remand requiring Commerce to "reconcile its COP determination with the CAFC decision in *Dillinger France II*."[135]  In *Dillinger France II*, the CAFC specifically ordered a remand requiring Commerce to "determine the actual costs of prime and non-prime products."[136]  Indeed, given the combination of the CAFC's directive that Commerce "determine the actual costs of prime and nonprime products" and Commerce's long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis,[137] it is perplexing that Dillinger continues to claim that its failure to submit the actual product-specific costs of producing non-prime products or, at a minimum, the physical characteristics of non-prime products, as Commerce requested, has not resulted in a record lacking necessary information.

Dillinger's argument, that section 782(c) of the Act requires that Commerce depart from its long-standing, judicially-approved practice of analyzing costs on a CONNUM-specific basis

---

[134] *See* Remand Supplemental Questionnaire at 3; *see also Thai Plastic Bags*, 746 F. 3d at 1368.
[135] *See Dillinger Germany II*, Slip Op. 21-101 at 6.
[136] *See Dillinger France II*, 981 F. 3d at 1321.
[137] *See Thai Plastic Bags*, 746 F.3d at 1368.

because Dillinger cannot provide the necessary information, is misplaced.[138]  Section 776(a)(1)

of the Act requires that Commerce apply facts otherwise available if "necessary information is

not available on the record."  Unlike section 776(a)(2)(B) of the Act, which requires that

Commerce consider section 782(c) of the Act before applying facts available when an interested

party fails to provide requested information by the deadlines or in the form and manner

requested, section 776(a)(1) of the Act simply requires that necessary information is not

available on the record.  Here, as discussed above, information pertaining to the actual cost of

producing the non-prime products and their physical characteristics is necessary information and

Dillinger's claim that it is unable to provide the necessary information does not create an

obligation for Commerce to depart from its long-standing, judicially-approved practice of

analyzing costs on a CONNUM-specific basis.

        Further, Dillinger's argument that Commerce must accept the overall average cost of

prime products as a surrogate for the actual costs of producing non-prime products because no

party challenged Dillinger's reporting of physical characteristics for non-prime plate is meritless.

First, Commerce explained above why the overall average cost of producing prime products is

not an appropriate substitute for the actual product-specific COP.  Second, Dillinger's argument

that Commerce never challenged Dillinger's reporting of the physical characteristics of non-

prime products fails to acknowledge key facts.  The combination of Dillinger's assertion that it

could not report the physical characteristics of non-prime products, Commerce's decision to

---

[138] Section 782(c) of the Act provides that "{i}f an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and *may* modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party" (emphasis added). Section 782(c) of the Act does not require that Commerce alter its judicially approved practice of analyzing costs on a CONNUM-specific basis.

accept the allocation of total costs assigned to non-prime products as recorded in Dillinger's normal books and records (*i.e.*, the actual sales value), and the fact that no non-prime products were sold to customers in the United States (*i.e.*, the non-prime products sold in the home market would never serve as a potential match to products sold in the United States), rendered a discussion of Dillinger's claimed inability to report the physical characteristics of non-prime products unnecessary for the *Final Determination*.  While Dillinger's reporting of the physical characteristics was not relevant for the *Final Determination*, the accurate reporting of the physical characteristics of non-prime products became necessary once the Court held that Commerce must determine the actual costs of prime and non-prime products.  Accordingly, Commerce reopened the record and issued a supplemental questionnaire to obtain the information deemed necessary by the Court (*i.e.*, the actual CONNUM-specific costs and the physical characteristics of non-prime products).[139]  As discussed above, Dillinger did not submit the requested information.[140]

Dillinger's argument that the costs of non-prime products have no impact on the margin calculation, since no non-prime merchandise was sold to the United States, is flawed.  It is a *non sequitur* to state that "the draft results of redetermination err in shifting reported costs of production from non-prime plate to prime plate"[141] and then argue that the issue has no impact on the margin calculation.[142]  Because the shifting of costs from prime to non-prime products has a direct effect on the costs of both product groups, it directly affects the results of the sales-below-cost test and calculation of constructed value profit, regardless of whether non-prime products were sold in the United States.  Indeed, the fact that the weighted-average dumping

---

[139] *See* Remand Supplemental Questionnaire.
[140] *See* Remand Supplemental Response at 1-8.
[141] *See* Dillinger Comments at 1-2.
[142] *Id* at 4.

margin changes as a result of the allocation of costs between prime and non-prime products demonstrates that there is an impact on the calculated weighted-average dumping margin, and it also illustrates why ensuring the accurate reporting of product-specific production costs is an essential step in Commerce's obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration.[143]

As mentioned above, we continue to find that Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products and have applied facts otherwise available, pursuant to section 776(a)(1) of the Act, because necessary information (*i.e.*, the actual CONNUM-specific costs of producing non-prime products) is not available on the record.  Section 776(a)(1) of the Act simply requires that necessary information is missing from the record and does not, unlike section 776(a)(2) of the Act consider whether a party has impeded a proceeding or withheld information.  Section 776(a) of the Act states that *either* necessary information is missing from the record *or* an interested party has impeded the proceed or withheld information.  There is no *and* statement; section 776(a) does not require both conditions to be met to apply facts otherwise available. Indeed, in a recent case this Court held that section 776(a) of the Act has several layers and multiple uses, stating "{n}otably, paragraphs (1) and (2) are in the alternative, joined by the word 'or,' meaning that Commerce must use facts otherwise available if *either* necessary

---

[143] *See* section 773(f)(1)(A) of the Act (stating that "{c}osts shall normally be calculated based on the records of the exporter or producer of the merchandise, if such records are kept in accordance with the generally accepted accounting principles of the exporting country (or the producing country, where appropriate) and *reasonably* reflect the costs associated with the production and sale of the merchandise." (emphasis added.))  Additionally, the Court has recognized that Commerce "must ensure that {a respondent's} reported costs capture all of the costs incurred by the respondent in producing the subject merchandise' before it can appropriately use that respondent's cost allocation methodology." *See Sidenor Indus. SL v. United States*, 664 F. Supp. 2d 1349 (CIT 2009) (quoting *Myland Indus., Ltd. v. United States*, 31 CIT 1696, 1703 (CIT 2007)).

information is not available *or* the circumstances in paragraph (2) apply."[144]  Accordingly,

Dillinger's argument that it cooperated to the best of its ability in this proceeding and, thus, that

Commerce has imposed an impermissible adverse inference under section 776(b) of the Act is

misplaced.  What is required is merely that one of the conditions provided by the statute is met –

here, the record is missing necessary information and, thus, one of the conditions under section

776(a) of the Act is met.

We disagree with Dillinger's assertions that the overall average cost of producing non-

prime plate satisfies the requirements of section 782(e) of the Act and represents the best

available information on the record such that the use of facts otherwise available is not

necessary.  Section 782(e) of the Act provides that:

> Commerce shall not decline to consider submitted information if all of the following
> requirements are met:  (1) the information is submitted by the established deadline;
> (2) the information can be verified; (3) the information is not so incomplete that it
> cannot serve as a reliable basis for reaching the applicable determination; (4) the
> interested party demonstrated that it acted to the best of its ability; and (5) the
> information can be used without undue difficulties.

As explained previously, the use of the overall average cost of producing prime products cannot

serve as a reliable basis for calculating an accurate weighted-average dumping margin because it

assigns the same costs to products with varying physical characteristics even though there is, in

fact, a wide disparity in the reported actual total COM amounts for prime products.[145]

Dillinger's contention that the use of the overall average actual cost of producing prime plate

satisfies the Court's and the CAFC's directive because it necessarily results in the calculation of

the actual aggregate costs of producing non-prime products is false.  As discussed above, while

---

[144] *See Hung Vuong Corp. v. United States*, 483 F. Supp. 3d 1321, 1336 (CIT 2020) (further explaining that the first
pathway for applying the facts otherwise available analysis focuses solely on the absence of necessary information,
not the reason why it is missing).
[145] *See* Dillinger SQRD2 at Exhibit SD-50 (containing a printout of Dillinger's COP database labeled "dhcop03").

Dillinger knows its total costs of producing all products (*i.e.*, both prime and non-prime),[146] Dillinger does not record the actual product-specific costs of producing non-prime products.[147] Dillinger's argument that the overall actual average cost of producing all of its prime plate sold equals the product-specific cost of the non-prime plate produced assumes, without evidence, that the product mixes of prime and non-prime products produced during the period are identical. If Dillinger had wanted to present evidence of the specific non-prime products produced, it could have relied on production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plate. Dillinger chose not to do so. Further, we disagree with Dillinger's claim that we incorrectly stated that it values non-prime plate at its sales value in its normal books and records. In fact, in its supplemental questionnaire response, Dillinger stated that "in Dillinger's internal factory results, non-prime merchandise is reported at its sales value (*i.e.*, manufacturing costs = net sales value)."[148] Likewise, we disagree with Dillinger's argument that the net sales value of non-prime plate cannot be properly used as "facts available" for the actual cost of non-prime plate. As mentioned above, since Dillinger was not able to provide the actual specific costs of producing the non-prime products or the physical characteristics of the non-prime products, Commerce has to resort to use the best available information on the record. Accordingly, because Dillinger has not reported the actual product-specific costs of producing non-prime products and, because Commerce has verified the total costs of producing all products during the POI,[149] we are relying on the allocation of costs between prime and non-prime products recorded in Dillinger's normal books and records as the best available information. While we recognize that the use of the non-prime cost information

---

[146] *See* Dillinger Cost Verification Report at 9.
[147] *See* SDQR1 at 22.
[148] *See* SDQR1 at 22.
[149] *See* Dillinger Cost Verification Report at 9.

recorded in Dillinger's normal books and records (*i.e.*, the actual sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics, this information is preferable because it is based on the actual costs Dillinger assigns to the non-prime products produced in its normal books and records.

**Comment 2:  Major Input Rule Applied to Blast Furnace Coke**

*Dillinger Comments*

- Commerce's failed to explain in the Draft Remand Results how it determined the "Affiliated Consumption (Transfer Price)" of [      ] EUR/MT.  The source for this value is either incorrect or missing from the Draft Remand Calculation Memorandum. Specifically, Commerce cites "Attachment 1.2." as the source of this figure; however, no such attachment exists.[150]

- Commerce fails to explain in the Draft Remand Results how the calculated transfer price comports with the Court's instruction that the adjustment be contemporaneous and on the same basis (*i.e.*, wet- vs. dry-weight basis, freight, G&A, and interest expenses).  Rather, Commerce's Draft Remand Results adjustment distorts the actual difference between the contemporaneous POI prices for large coke purchased from ZKS and unaffiliated parties.[151]

- Commerce's average freight calculation for unaffiliated coke purchases is distortive because it calculated an average freight rate for the POI for all unaffiliated coke purchases, rather than apply the county-specific POI freight rate that Dillinger reported.[152]

---

[150] *See* Dillinger Comments at 6 (citing Draft Remand Calculation Memorandum at Attachment 3.).
[151] *Id.* at 6-7 (citing Remand Supplemental Response at Appendix R-13).
[152] *Id.* at 7.

- Commerce further erred by applying facts available to the small blast furnace coke consumed, for which there were no contemporaneous purchases of small blast furnace coke from unaffiliated parties. In such circumstances, Commerce's normal practice would be to compare the transfer price with the affiliate's COP of the input. Instead, Commerce used the adjustment calculated for large blast furnace coke to increase Dillinger's reported costs for small blast furnace coke. In doing so, Commerce essentially applied an adverse inference in applying the major input rule to Dillinger's small coke purchases, even though none of the statutory requirements of section 776(a) or (b) of the Act are present.[153]

- If Commerce continues to adjust ZKS' total cost of producing coke to add G&A and other expenses to the transfer price of the inputs and services Dillinger provided, Commerce must also include the additional cost of over [          ] Euros to the market price in its major input analysis of the coke inputs supplied by ZKS. Otherwise, Commerce overstates the difference between the cost and the market value.[154]

*Nucor Comments*

- Commerce's calculation of the major input adjustment for coke in the *Final Determination* was appropriate and supported by the record. However, in consideration of the Court's remand instructions and the additional information collected by Commerce as part of this proceeding, Nucor considers that Commerce's adjustment in the Draft Remand Results complies with the Court's instructions.[155]

---

[153] *Id.*
[154] *Id.* at 7-8.
[155] *See* Nucor Comments at 16.

*Commerce's Position:*

We disagree with Dillinger that the Draft Remand Results fail to explain how Commerce determined its proposed market value and how the proposed value comports with the Court's ruling of being contemporaneous and on the same basis.[156]  First, we acknowledge that the reference to Attachment 1.2 in the Draft Remand Calculation Memorandum was an error; the correct reference is to Attachment 3 at page 2.  Nevertheless, the calculation of the [       ] EUR/MT figure is shown on the second page of Attachment 3 to the Draft Remand Calculation Memorandum, as Dillinger acknowledges.[157]  While Dillinger also claims there is no explanation as to how Commerce derived the figures on this page, Dillinger notes the source Commerce cited in this calculation.  Specifically, Dillinger states that the "source for the calculation is '11/7/16 Supp D, Appendix SD-34' so it is not clear as to whether any of the information in Dillinger's October 5, 2021 questionnaire response was used in arriving at the [       ] Eur/MT figure."[158]  Thus, while Dillinger acknowledges that Commerce explained how the market value was calculated, Dillinger suggests that Commerce is limited to using only the Remand Supplemental Response in the remand redetermination.  We disagree.  Commerce referenced the source for each value used in the calculation of the [       ] EUR/MT figure in the Draft Remand Results.[159]  The fact that a source document listed on the worksheet was from the record of the LTFV investigation does not mean the calculation is unsupported or unexplained.

We also disagree that our calculation in the Draft Remand Results distorts the actual difference between the contemporaneous POI price of large coke purchased from ZKS, and the

---

[156] While Dillinger identifies the "'Affiliated Consumption (Transfer Price)'" of [       ] EUR/MT" (*see* Dillinger Comments at 6), this value and the associated source document (Attachment 1.2) subsequently referenced by Dillinger actually reflect the unaffiliated consumption value (market price), rather than the transfer price.
[157] *See* Dillinger Comments at 6.
[158] *Id*.
[159] *See* Draft Remand Calculation Memorandum at Attachment 3.

price of purchases from unaffiliated third parties.  Dillinger in its comments referred to POI

average purchase values,[160] and therefore disregards the Court's decision to uphold Commerce's

use of consumption values in this proceeding.[161]  The per-unit cost of [      ] EUR/MT

Commerce calculated reflects an average consumption value, while the [      ] EUR/MT

Dillinger proffered pertains to an average purchase value.  The Court states that "the court is not

persuaded by Dillinger's argument that Commerce contravened {19 CFR} 351.407(b) by

selecting consumption values over purchase prices for determining coke value under the major

input rule."[162]  Therefore, there is no distortion in Commerce's use of consumption values in

comparing affiliated and unaffiliated supplier pricing behavior in the major input calculation.

We also disagree with Dillinger that Commerce's average freight calculation in the Draft

Remand Results is distortive.  In its brief to the Court, Dillinger argued that Commerce made an

unreasonable assumption that coke transport costs from [                    ] are the same as

those from [                                    ].[163]  Our revisions in

the Draft Remand Results remedy this issue.  While our calculation of the average freight cost

during the POI still reflects transport from [                ], we deducted this POI average

freight cost from a revised per-unit average coke consumption value that no longer includes the

non-POI purchases from [                ].[164]  Further, we only deducted these freight costs

from the consumption values of coke that were transported from [                ].  Thus, our

overall revised major input analysis addresses Dillinger's original concern that the average

---

[160] *See* Dillinger Comments at 6-7.
[161] *See Dillinger Germany II*, Slip Op. 21-101 at 7.
[162] *Id.*
[163] *See* Dillinger Brief at 41.
[164] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.

freight cost Commerce calculated was too low to be used to adjust purchases from [

].[165]

However, Dillinger now argues that Commerce must calculate a country-specific freight rate. We disagree. First, Dillinger failed to proffer this argument prior to this remand proceeding even though our use of an average freight rate is consistent with our freight calculation in the *Final Determination*.[166] Rather, Dillinger challenged the use of pre-POI unaffiliated blast furnace coke purchases that were "influenced by higher freight costs"[167] and were not properly adjusted with a freight rate that reflects purchases from "[

]."[168] Because the pre-POI purchases that Dillinger challenged have been removed from our calculations, we now properly match the average POI freight costs from

[                                                                    ], with purchases from those same countries.[169] Second, Commerce routinely relies on averages in calculating major and minor input adjustments.[170] In fact, the courts have approved Commerce's use of overall averages in its calculations.[171] Thus, after the changes applied in our Draft Remand Results, we do not find that using an average freight rate for [                                          ] to adjust purchases from those same countries is unreasonable.

---

[165] *See* Dillinger Brief at 41.
[166] *See* Dillinger Final Cost Calc Memo at Attachment 2.2.
[167] *See* Dillinger Brief at 40.
[168] *See* Dillinger Brief at 41.
[169] *See* Draft Remand Recalculation Memorandum at Attachment 3.
[170] *See, e.g., Light-Walled Rectangular Pipe and Tube from Mexico: Final Results of Antidumping Duty Administrative Review; 2016-2017*, 84 FR 16646 (April 22, 2019), and accompanying IDM at Comment 5, where Commerce used an average of two market prices in the major input analysis; and, *Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 11, where Commerce explains that "{t}he reported costs are a weighted-average of the costs TCK incurred during the POI. Accordingly, the transactions disregarded analysis also needs to be based on the weighted-average of all the affiliated and unaffiliated purchases TCK made during the POI."
[171] *See Non-Oriented Electrical Steel from the Republic of Korea: Final Determination of Sales at less Than Fair Value and Negative Determination of Critical Circumstances*, 79 FR 61612 (October 14, 2014), and accompanying IDM at Comment 2.

We also disagree with Dillinger that Commerce essentially applied an adverse inference in its calculation of the major input adjustment to small blast furnace coke consumption. Dillinger states that under the major input rule, Commerce practice is to simply compare the transfer price with the affiliate's cost of producing the input when there are no contemporaneous market prices on the record.[172]  Dillinger adds that, contrary to Commerce's claims, it is not necessary to have contemporaneous purchases of small blast furnace coke information on the record to use in the application of the major input rule.[173]  Dillinger's interpretation of the major input rule is incorrect.  In the absence of a market price, Commerce's practice is to obtain surrogate information, where available, that would allow it to fulfill the requirements of sections 773(f)(2) and (3) of the Act to test the affiliated party transactions for major inputs against both market prices and the affiliate's COP.[174]  In this case, we determined that the most reasonably available information was the pricing behavior between the same parties for a similar input. Thus, we relied on the difference between the market value and transfer price of large coke, as this data is readily available and the inputs are similar.[175]  Therefore, Commerce did not apply an adverse inference in its calculation of the margin input adjustment.  Rather, we relied on the information available on the record in order to satisfy the statutory analysis described in sections 773(f)(2) and (3) of the Act, that is, a comparison of the transfer price for a major input to both a market price and to the affiliate's COP for the input.  Because no contemporaneous market price for small blast furnace coke was available on the record, we relied on the difference between the market and transfer prices for large blast furnace coke as indicative of the affiliate's pricing

---

[172] *See* Dillinger Comments at 7.
[173] *Id*.
[174] *See Mattresses from Cambodia:  Final Affirmative Determination of Sales at Less Than Fair Value and Final Negative Determination of Critical Circumstances*, 86 FR 15894 (March 25, 2021) (*Mattresses from Cambodia*), and accompanying IDM at Comment 1.
[175] *See* Draft Remand Calculation Memorandum at Attachment 3.

behavior for small coke.  Therefore, we did not err in using the facts available on the record to determine whether the small coke transfer prices reflect market prices, but rather relied on the best information available to comply with the analysis outlined in the statute.

Finally, Dillinger contends that, if Commerce adjusts ZKS' cost of producing the blast furnace coke, this adjustment should also be factored into Commerce's major input analysis of the affiliated coke inputs.  While we performed a transactions disregarded analysis of the inputs and services ZKS obtained from Dillinger in accordance with section 773(f)(2) of the Act, ultimately, we did not rely on ZKS' total cost of producing coke in our calculation of the major input adjustment to coke inputs.[176]  As noted above, in our major input analysis of the affiliated coke inputs, we determined that the market value was higher than both the transfer price and the affiliate's actual cost of producing the coke.  Because Dillinger's reported costs include coke inputs at their transfer price, our major input adjustment is therefore calculated as the difference between the market price and the transfer price for the coke.  Therefore, ZKS' actual cost of producing the coke was not a component in the calculation of our major input adjustment, and any potential adjustment to ZKS' total blast furnace coke costs (large and small) need not be incorporated into the major input adjustment applied to the reported costs.

**Comment 3:  Adjustment to Expenses for Inputs and Services Provided to Affiliates**

*Dillinger Comments*

- There is no basis for Commerce's adjustment.  It is not in dispute that the transfer prices Dillinger charged ZKS and Rogesa were higher than Dillinger's total cost of the inputs and services provided.  However, increasing the transfer price to include a portion of Dillinger's G&A expenses only increases Dillinger's other income which, under

---

[176] *See* Dillinger Final Cost Calc Memo at Attachment 3; and Draft Remand Calculation Memorandum at Attachment 3.

Commerce's long-standing practice, is treated as an offset to G&A expenses. Thus, Commerce's adjustment that increases G&A expenses at one level and offsets them by income at another level makes no sense.[177]

- Commerce failed to adequately explain the calculation of this adjustment in the Draft Remand Results because the market value figure used in the calculation cannot be found in Attachment 4 of the Dillinger Final Cost Calc Memo, the source referenced in the Draft Remand Results.[178]

- In the Draft Remand Results, Commerce miscalculated the denominator used in the calculation of the adjustment. Instead of [          ] Euros, Commerce should use Dillinger's full POI COP of [          ] Euros. Alternatively, Commerce should revise the portion of the denominator related to CTL plate to reflect the total COM of CTL plate of [          ] Euros, rather than the [          ] Euros used in the Draft Remand Results.[179]

*Nucor Comments*

- In its Draft Remand Results, Commerce properly continued to adjust the reported costs so that the inputs and services Dillinger provided to ZKS and Rogesa, and the inputs ZKS and Rogesa in turn provided to Dillinger, reflect arm's length values.[180]

- Commerce addressed each specific argument raised by Dillinger regarding the calculation and implemented several revisions as a result.[181]

---

[177] *See* Dillinger Comments at 8.
[178] *Id.* at 8-9.
[179] *Id.* at 9 (citing SQRD2 at Appendix SD-44; and Draft Remand Calculation Memorandum at Attachment 4).
[180] *See* Nucor Comments at 18.
[181] *Id.*

- Therefore, pursuant to the Court's order, Commerce's Draft Remand Results fully address Dillinger's comments and explain Commerce's adjustments related to the inputs and services Dillinger provided to ZKS and Rogesa.[182]

*Commerce's Position:*

In accordance with the Court's order, Commerce addressed each argument proffered by Dillinger with regard to the inputs and services that Dillinger provided to its affiliates ZKS and Rogesa during the POI. While our evaluation of Dillinger's original arguments resulted in revisions to our analysis and calculation of this adjustment, our revised analysis nonetheless demonstrates that there is a basis for an adjustment.

As noted above, Commerce compared the transfer prices Dillinger charged ZKS and Rogesa for the inputs and services to Dillinger's total cost of the inputs and services. We calculated the total cost of these affiliated transactions as the cost of the inputs and services provided plus an allocated portion of Dillinger's G&A expenses (calculated by applying Dillinger's G&A expense ratio to the cost of the inputs and services). While Dillinger claims the transfer price covers the cost of the inputs and services, Dillinger's reported cost for the inputs and services did not include G&A expenses.[183] We explained above that it was appropriate to include a portion of Dillinger's G&A expenses because the denominator to Dillinger's G&A expense ratio included the cost of the inputs and services provided to Dillinger's affiliates. Although Dillinger continues to argue that the other income collected from ZKS and Rogesa for the inputs and services (the transfer price) offsets the associated costs and makes an allocation of G&A expenses to the cost of the inputs and services unnecessary, we disagree. As noted above, we confirmed with Dillinger that the other income collected from ZKS and Rogesa (the transfer

---

[182] *Id.* at 18-19.
[183] *See* SQRD1 at Appendix SD-26.

price) was not included in the calculation of Dillinger's G&A expense ratio. Had Dillinger excluded the cost of the inputs and services from the G&A expense ratio denominator or included the other income in the denominator to "offset" the associated costs, then Dillinger would be correct that it is unnecessary to add G&A expenses to the cost of these affiliated inputs and services. However, this is not the case. Dillinger's calculation of its G&A expense ratio, which includes the cost of the inputs and services provided to ZKS and Rogesa in its denominator, effectively acknowledges that a portion of its G&A expenses are related to these affiliated activities. Thus, our addition of a portion of Dillinger's G&A expenses in calculating the total cost of the affiliated inputs and services merely follows Dillinger's reported methodology for calculating its G&A expense ratio.

Regarding Dillinger's comments on our calculation worksheet, we first note that the worksheet includes fields for values, for any formulas used to calculate values, and for references to source documents used in the calculation. For the market value shown on the worksheet, our reference to Attachment 4 of the Dillinger Final Cost Calc Memo provides the source for Dillinger's G&A expense ratio, which is a component of the formula that calculates the market value. However, we note that we also calculated the same market value in the Dillinger Final Cost Calc Memo; therefore, the market value itself can be found at Attachment 3 of that document.

Finally, Dillinger objects to the denominator used in the calculation of the adjustment but provides no argument to support the use of the proffered alternatives. We examined the alternative denominators submitted by Dillinger and find that they are not on the same basis as the per-unit TOTCOMs to which the adjustment will be applied. Specifically, Dillinger's

alternative denominators include G&A and other expenses that are not included in TOTCOM.[184]
As a result, we do not find it appropriate to rely on the alternative denominators Dillinger
submitted for the calculation of the affiliated transactions adjustment.

**Comment 4:  Remand Results on Partial AFA**

*Salzgitter Comments*

- Commerce's draft remand results do not meet the Court's remand requirements because
  Commerce failed to adequately explain the alleged differences between the AFA
  determinations in the underlying LTFV investigations of CTL plate from Germany and
  France that would support different AFA treatment.  In particular, Commerce's reliance
  on highlighting the difference in the number of reported sales for which manufacturer
  data was missing is overly simplistic.  Commerce should instead consider the quantity of
  such sales that would have been compared to U.S. sales; under that metric there is no
  significant difference between Salzgitter and the Dillinger companies.[185]

- Commerce incorrectly stated that applying the *Dillinger France I* AFA methodology to
  Salzgitter frustrates the goal of inducing cooperation by ensuring a non-cooperative
  respondent does not receive a more favorable rate than if it had cooperated fully.  Based
  on Salzgitter's analysis, Salzgitter would not have received a more favorable AFA rate if
  it had reported the manufacturer for all home market sales.[186]

- Commerce's application of the AFA methodology from the *Final Determination* is
  unreasonable and contrary to the conclusions in *Dillinger France I*, in which the Court
  noted that the reliability of the reported sales prices had not been questioned.  There is no

---

[184] *See* SQRD2 at Appendix SD-44.
[185] *See* Dillinger Comments at 3-5.
[186] *Id*. at 5-8.

information gap for Commerce to fill with AFA because Salzgitter reported the requisite information for the vast majority of sales at issue.  Further, the missing manufacturer information would not affect the margin, according to Salzgitter's methodologies of incorporating none, some, or all of the unknown manufacturer sales in the calculation of NV.[187]

*SSAB Comments*

- Commerce's draft remand results explain in detail the material differences in applying the *Dillinger I* AFA methodology between Salzgitter, Dillinger, and Dillinger France, pursuant to the Court's remand instructions.  Commerce's application of the *Final Determination* AFA methodology to Salzitter is appropriate given these meaningful differences.[188]

- The application of AFA is an essential tool to provide respondents with an incentive to cooperate that ensures they do not receive a more favorable result by failing to cooperate.  As Commerce explained in the draft remand results, the application of the *Dillinger France I* methodology to Salzgitter may well have provided Salzgitter with a more favorable dumping margin than if Salzgitter had fully cooperated.  Thus, Commerce's application of the *Final Determination* AFA rate fulfills the purpose of establishing an adequate deterrent to future noncooperation.[189]

- Commerce's selection of Salzgitter's AFA rate is also appropriate in this instance because it relied on Salzgitter's own price information and applied it to those sales where Salzgitter did not cooperate by supplying all of the requested information.  As a result,

---

[187] *Id*. at 8-11.
[188] *See* SSAB Comments at 1-5.
[189] *Id.* at 5-9.

Commerce's selection was reasonable and consistent with the statutory intent of applying AFA.[190]

*Nucor Comments*

- Commerce fully explained in the draft remand results the factual differences between Salzgitter, Dillinger, and Dillinger France, and why these differences justify applying partial AFA differently. Commerce's explanation fully complies with the Court's remand and should be maintained in the final results of redetermination.[191]

- Specifically, Salzgitter failed to identify the manufacturer for 28,000 SMSD sales, which accounted for a significant portion of Salzgitter's home market sales; thus, the application of the AFA rate also had a significant margin impact. In contrast, the number of downstream sales for which Dillinger failed to report the manufacturer was small; thus, the application of the AFA rate had no impact on the margin. Accordingly, the number of affected sales represents the extent of each respondent's failure to cooperate and the corresponding extent to which each record was incomplete, facts which support different approaches to the application of AFA.[192]

- Commerce further satisfied the Court's remand by pointing out that application of the *Dillinger I* methodology to Salzgitter would likely result in a more favorable result (*i.e.*, exclusion from the antidumping duty order) than if Salzgitter had cooperated fully. This result would undermine the purpose of AFA to encourage full cooperation by all respondents.[193]

---

[190] *Id.* at 9-10.
[191] *See* Nucor Comments at 8-10.
[192] *Id.* at 10-11.
[193] *Id.* at 11-13.

*Commerce's Position:*

The Court remanded the *Final Determination* to Commerce to explain why: (1) Commerce did not address the material factual differences between Salzgitter, Dillinger, and Dillinger France on the AFA issue in the *Final Determination* and the CTL plate from France LTFV investigation;[194] (2) these material factual differences warrant differing AFA treatment among these companies;[195] and (3) applying a different AFA methodology to Salzgitter than to Dillinger and Dillinger France is reasonable.[196]

As discussed above, Commerce complied fully with the Court's instructions. We explained that the material factual differences between the companies were not apparent or relevant in the CTL plate from France and Germany LTFV final determinations in applying the original partial AFA methodology, but are now apparent and relevant based on the application of the *Dillinger France I* partial AFA methodology. We demonstrated above that these material differences had a significant impact on Salzgitter's margin, but no impact on the margins calculated for either Dillinger or Dillinger France. In turn, these differences affected Commerce's goals in using partial AFA as a means to induce cooperation because the margin result for Salzgitter under the *Dillinger France I* methodology provides no incentive for Salzgitter to cooperate by providing requested information to Commerce. Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter is reasonable.

Contrary to Salzgitter's claims, the Court did not instruct Commerce to rely on record information not in dispute (*i.e.*, Salzgitter's reported home market price data) in responding to the Court's remand.[197] The Court previously affirmed that Commerce's application of partial

---

[194] *See Dillinger Germany II* at 18.
[195] *Id.*
[196] *Id.*
[197] *See* Salzgitter Comments at 7-9 (citing *Dillinger France I*, 350 F. Supp. 3d at 1364).

AFA to Salzgitter in the *Final Determination* was warranted.[198]  In its opinion, the Court acknowledged Commerce's statutory authority under section 782(d) of the Act to "disregard all or part of the original and subsequent responses" when relying on AFA.[199]  Accordingly, applying the *Final Determination* partial AFA methodology to Salzgitter does not conflict with the Court's instructions.

Salzgitter contends that Commerce failed to adequately explain the material differences between Salzgitter and the Dillinger companies.  To make this claim, Salzgitter asserts that comparing the number of home market sales with missing manufacturer data (*i.e.*, 28,000 for Salzgitter compared to [  ] for Dillinger) is irrelevant; the relevant metric is the number and quantity (in metric tons) of home market sales that Commerce may have compared to the products sold to the United States.[200]  Salzgitter would have Commerce establish a new test of materiality to determine whether AFA is warranted – a test that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis.  However, Salzgitter's proposal is not one advocated by the Court in either *Dillinger France I* or *Dillinger Germany I*, nor is it supported by the statute.

As described in detail above, the application of the *Dillinger France I* partial AFA methodology to Salzgitter deprives Commerce of the ability to apply section 776 of the Act meaningfully in this proceeding because it frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully.  Under the *Dillinger France I* partial AFA methodology, Salzgitter would receive a zero rate and, consequently, would be excluded

---

[198] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.
[199] *Id.*
[200] *See* Salzgitter Comments at 4-5.

from the AD order.  Because of Salzgitter's failure to provide requested information, Commerce cannot determine what the resulting margin would have been if Salzgitter had complied fully with Commerce's requests to report the manufacturer information for all of its home market sales.  Thus, it is reasonable to assume that Salzgitter would receive a more favorable result under the *Dillinger France I* methodology as a result of withholding information than by providing the requested information and allowing Commerce to properly analyze the sales in question.

Salzgitter argues that the three alternatives it proposed in the *Final Determination* to account for the missing manufacturer data all resulted in a zero or *de minimis* margin;[201] therefore, Salzgitter did not receive a more favorable result than if it had provided the requested information.  However, the Court already rejected this approach in *Dillinger Germany I*, noting that Salzgitter's conclusions regarding these alternative constituted "mere speculation" and "self-serving statements or interpretations of the record," highlighting Salzgitter's failure to identify where the record actually identified the effect on Salzgitter's margin if it had supplied the manufacturer data for all its home market sales.[202]

Commerce applied the *Dillinger France I* methodology to Salzgitter in response to the Court's directions in *Dillinger Germany I*.  The differences between Dillinger France and Salzgitter were not relevant to the Court in *Dillinger France I* because only the application of partial AFA to Dillinger France was at issue.  While the Court in *Dillinger Germany I* had directed Commerce to follow the *Dillinger France I* partial AFA methodology in the interest of

---

[201] These alternatives are to treat:  1) none of the home market sales with missing manufacturer data as Salzgitter-manufactured plate; 2) all of these sales as Salzgitter-manufactured plate; or 3) a percentage of each sale as Salzgitter-manufactured plate based on SMSD's annual plate purchases from each supplier.  *See Salzgitter Comments* at 6 (citing Salzgitter's Letter, "Salzgitter Case Brief," dated February 13, 2017, at 14-15).
[202] *See Dillinger Germany I*, 399 F. Supp. 3d at 1256.

consistency, the Court in *Dillinger Germany II* has now provided Commerce with an opportunity to explain why the *Dillinger France I* partial AFA methodology should not be applied to Salzgitter.  Commerce's explanation above details the differences between Salzgitter and the Dillinger companies in:  (1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information.  These differences are significant and warrant the application of a different partial AFA methodology than that prescribed by *Dillinger France I* to achieve the purpose of the statute to incentivize a respondent's full cooperation in an antidumping proceeding.

## V.    FINAL RESULTS OF REDETERMINATION

As a result of our redetermination, Dillinger's and Salzgitter's estimated weighted-average dumping margins are 4.98 percent and 22.90 percent, respectively.[203]  Moreover, in accordance with section 735(c)(5)(A) of the Act, which provides that the estimated all-others rate shall be an amount equal to the weighted average of the estimated weighted-average dumping margins established for exporters and producers individually investigated, excluding any zero and *de minimis* margins, we revised the all-others rate based on the margins noted above for Dillinger and Salzgitter, in accordance with the *Amended Final Determination*.  Accordingly, as a result of our redetermination, the all-others rate is 20.99 percent.[204]

Because Dillinger's margin and the all-others rate are different from the rates in the *Amended Final Determination*, we intend to issue a *Timken* notice with the amended final determination, should the Court sustain these final results of redetermination.  Should the Court

---

[203] *See* Draft Remand Calculation Memorandum; and *Amended Final Determination*, 82 FR at 24098, respectively.
[204] *See* Memorandum, "Calculation of the All-Others Rate for the Draft Results of Redetermination," dated December 3, 2021.

sustain these final results of redetermination with respect to Salzgitter, the published *Timken*

notice/amended final determination on the above determinations would not need to include a

discussion of Salzgitter because Salzgitter's original weighted-average dumping margin of 22.90

percent calculated in the *Final Determination* would be reinstated.

1/19/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
 for Enforcement and Compliance