UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: The Honorable Leo M. Gordon, Judge

| | |
|---|---|
| AG DER DILLINGER HÜTTENWERKE, | ) |
| Plaintiff, | ) |
| v. | ) |
| UNITED STATES, | ) Consol. Ct. No. 17-00158 |
| Defendant, | ) |
| and | ) |
| NUCOR CORPORATION, *et. al.*, | ) |
| Defendant-Intervenors. | ) |

## PLAINTIFF AG DER DILLINGER HÜTTENWERKE
## COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION

Marc E. Montalbine
J. Kevin Horgan
Gregory S. Menegaz
Alexandra H. Salzman
**deKieffer & Horgan, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, D.C. 20005
Tel: (202) 783-6900
email: montalbine@dhlaw.de
*Counsel to AG Der Dillinger Hüttenwerke*

Date: March 15, 2022

**TABLE OF CONTENTS**

I. ARGUMENT ........................................................................................................... 2

    A.    Commerce Has Made No Changes In Its Treatment of Non-Prime Plate and Its Redetermination Continues To Be Contrary To Law And Unsupported By Substantial Evidence ................................................................................................ 2

    B.    Application of Major Input Rule ............................................................................ 11

    C.    COP Adjustments Concerning Affiliated Inputs & Services ................................ 11

II. CONCLUSION ..................................................................................................... 12

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Hüttenwerke v. United States,
  Consol. Ct. No. 17-00158, slip op. 21-101 (C.I.T. Aug. 18, 2021) ......................... 2, 10

Borden, Inc. v. United States,
  4 F. Supp. 2d 1221 (C.I.T. 1998) ............................................................................... 11

Dillinger France S.A. v. United States,
  981 F.3d 1318 (Fed. Cir. 2020) .......................................................................... 2, 3, 8- 10

F.LII De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,
  216 F.3d 1027 (Fed Cir. 2000) .................................................................................... 11

United States v. Great Am. Ins. Co. of New York,
  F.3d 1320 (Fed. Cir. 2013) ........................................................................................... 9

World Finer Foods v. United States,
  24 CIT 541 (C.I.T. 2000) ....................................................................................... 10, 11

**Statutes**

19 U.S.C. § 1677b(e) ........................................................................................................ 2

19 U.S.C. § 1677b(f) ..................................................................................................... 2, 8

19 U.S.C. § 1677b(f)(1)(A) ............................................................................................... 2

19 U.S.C. § 1677e(a) ........................................................................................................ 6

19 U.S.C. § 1677e(b) ........................................................................................................ 7

19 U.S.C. § 1677m .......................................................................................................... 11

19 U.S.C. § 1677m(c) ................................................................................................... 3, 10

19 U.S.C. § 1677m(e) ........................................................................................................ 7

**Other Authorities**

Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Annex II ........................................................................................................ 11

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ............... 8

Pursuant to the Court's order of January 28, 2022 (ECF 132), plaintiff, AG der Dillinger Hüttenwerke ("Dillinger"), hereby submits these comments in opposition to the Final Results of Redetermination filed by the U.S. Department of Commerce ("Commerce") in this case on January 20, 2022 (ECF 129). The Final Results of Redetermination cover the following four issues:

(1) reducing the reported costs of non-prime steel plate for Dillinger to the selling price of non-prime plate and shifting the costs to prime steel plate;

(2) application of the major input rule with respect to contemporaneity and the freight factor applied to Dillinger's coke input;

(3) adjustments to Dillinger's cost of production (COP) for inputs and services provided to affiliates; and

(4) application of a partial adverse facts available (AFA) methodology to certain downstream home market sales reported by Salzgitter.

These comments in opposition address only the first issue related to non-prime plate. In the interest of simplifying the issues in this case for final adjudication, Dillinger accepts the remand redetermination with respect to issues 2 and 3 for purposes of this litigation. In its memorandum and order of August 18, 2021 (ECF 121), the Court stayed decision on Dillinger's challenge to Commerce's rejection of Dillinger's proposed quality code for sour transport plate pending the outcome of the currently remanded issues pursuant to AG der Dillinger Hüttenwerke v. United States, 45 CIT ___, Slip Op. 21-101 (Aug. 18, 2021). Memorandum and Order, 9 (Aug. 18, 2021) (ECF 121). The issue of proper product matching had a significant impact on the dumping margin.

Issue 4 does not relate to Dillinger but rather relates solely to the consolidated plaintiffs Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter").

1

I.  ARGUMENT

   A.  **Commerce Has Made No Changes In Its Treatment of Non-Prime Plate and Its Redetermination Continues To Be Contrary To Law And Unsupported By Substantial Evidence**

In remanding this issue to Commerce, the Court stated:

> **A. Cost Shifting (Non-Prime Plate Adjustment)**
>
> Dillinger challenges Commerce's cost of production ("COP") determination for its prime and non-prime plates. Dillinger Br. at 33–37; see also 19 U.S.C. § 1677b(e) & 19 U.S.C. § 1677b(f)(1)(A). Commerce found that Dillinger uses an internal "factory results report" to "value[ ] non-prime products at their likely selling price, and uses this value as an offset to prime production." Decision Memorandum at 90 (footnote omitted). Commerce considered it reasonable to rely on this report to reallocate cost between prime and non-prime plates. Id. at 89–90. Dillinger argues that this reallocation contravened the statute and applicable case law. See Dillinger Br. at 33–37.
>
> The U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that Commerce's decision to rely on information reflecting a respondent's "likely selling price," rather than actual cost data, violates the requirements of § 1677b(f). Dillinger France S.A. v. United States, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020) ("Dillinger France II"). Accordingly, the court remands this issue to Commerce to reconcile its COP determination with the Federal Circuit's decision in Dillinger France II.

AG der Dillinger Hüttenwerke v. United States, Consol. Ct. No. 17-00158, slip op. 21-101 at 5-6 (Aug. 18, 2021).

In *Dillinger France II*, the Court of Appeals for the Federal Circuit ("CAFC") explained the problem with Commerce's original determination regarding the treatment of non-prime plate as follows:

> Commerce accordingly adjusted Dillinger's reported costs for non-prime plate "to reflect the sales values recorded in {Dillinger's} normal books and records" and allocated the difference to the costs for Dillinger's prime plate. In doing so, Commerce reduced the cost of non-prime plate and allocated a greater portion of cost to prime plate based on the selling price of non-prime plate.

Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (citations omitted). In striking down Commerce's determination, the CAFC specifically held that Commerce erred in

2

relying on "likely selling price" in Dillinger's books and records, explaining:

> Dillinger's records that Commerce relied on for the cost of non-prime and prime plate were based on "likely selling price" rather than costs of producing and selling the merchandise. <u>Because Dillinger's books and records were based on "likely selling price" rather than cost of production, Commerce erred in relying on them</u>.

Id. at 1324 (citations omitted) (emphasis added).

Despite the clear admonition from this Court and the Court of Appeals, Commerce has made no change in its determination and continues to rely exclusively on the "likely selling price" purportedly in Dillinger's internal "factory results report" rather than the actual cost of production data reported by Dillinger. Commerce simply ignores the decisions of this Court and the Court of Appeals.

From the very beginning of this investigation, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested that it report sales of non-prime merchandise by indicating a zero ("0") for any items, such as specification, that cannot be identified as was done in the investigation. *See* <u>Notification of Difficulties in Responding to the Questionnaire & Contact with Official in Charge</u>, 1-2 (June 8, 2016) (Barcode: 3476398) (P.R. 114). Commerce never objected to Dillinger's reporting of the physical characteristics for non-prime plate.[1] In fact, in its remand redetermination, Commerce acknowledges:

> Dillinger has explained that its system does not record the physical characteristics of the non-prime products produced or the actual product-specific costs of

---

[1] Pursuant to section 782(c) of the Act (19 U.S.C. § 1677m(c)), if an interested party promptly notifies Commerce after receiving a request for information that it is "unable to submit the information requested in the requested form and manner," then Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."

3

> producing the non-prime products. Indeed, we acknowledge that Dillinger informed us of its inability to report the physical characteristics of non-prime products during the investigation. Moreover, there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products.

Final Results of Redetermination, 13.

Because non-prime plate can only be distinguished from prime plate at the end of the production process and therefore both types of plate use precisely the same materials and undergo precisely the same processing steps, Dillinger's reporting methodology of using the actual average cost of production of all plate during the POI is reasonable. Therefore, Dillinger properly based its COP reporting for non-prime merchandise on actual costs of production. The COM for the non-prime CONNUMs reported by Dillinger corresponds to the average **actual** total cost of manufacture for all plate produced during the POI of nearly 550 EUR/ton. *See* Remand Questionnaire Response, 6 & App. R-5 (Oct. 5, 2021) (Barcode: 4168333) (Remand C.R. 2; Remand P.R. 5). Instead of using this average **actual** total cost of manufacture as the COP for non-prime plate, Commerce used the resale price of non-prime plate of less than 350 EUR/ton as the COP for non-prime plate and transferred the difference to the COP for prime plate. Final COP Memo, Attachment 1 (March 29, 2017) (P.R. 531; C.R.767).

Commerce tries to justify its stubborn application of the sales price as COP for non-prime plate by claiming that there is necessary information missing from the administrative record requiring the application of facts available. The information that Commerce claims is missing is the CONNUM-specific costs for non-prime products. Commerce however fails to explain how the sales price of non-prime plate bears any relation to the CONNUM-specific costs of non-prime plate. Indeed, the sales price of non-prime plate bears no relation whatsoever to the cost of producing that product. Rather, because non-prime plate cannot be identified until the end of

the production process, it undergoes all of the same production steps and incurs all of the same production costs that are used in producing prime plate.

There is no necessary information missing from the record. Dillinger properly reported costs of production for both prime and non-prime merchandise and this information was fully verified. The calculation of the costs of production for prime material is entirely independent from the calculation of the costs of non-prime material. The reported production costs for prime merchandise are based upon the specific standard costs of the individual production orders adjusted to actual costs using a variance. *See* BGH Second Supplemental Section D Response, App. SD-48 (Nov. 7, 2016) (Barcode: 3520987) (C.R. 511; P.R. 447). The variance is calculated using the total standard and actual costs for the POI. Id. at App. SD-47.

All of this information was verified by Commerce. Commerce accepted and verified the reported costs of both prime and non-prime material during the investigation and noted no problems in the underlying costs or how the non-prime CONNUMs were reported. Commerce simply took a portion of the costs reported for non-prime plate and shifted it to the cost of prime plate. Commerce's shifting of reported costs from non-prime plate to prime plate was accomplished through a few lines of code in its SAS program and it is only these lines of code that need to be changed in order to comply with the Court's remand order.

Moreover, the physical characteristics for non-prime merchandise are not necessary for Commerce's margin calculation since no non-prime merchandise was sold to the United States. Accordingly, because no non-prime merchandise was sold to the United States, none of the home market sales of non-prime merchandise would be matched to U.S. sales or used in the margin calculations. Therefore, no non-prime cost information will be used in (1) determining whether comparison market sales were made in the ordinary course of trade and can be used to calculate

5

normal value; (2) in the difference-in-merchandise analysis; or (3) as the basis for normal value. Thus, the prices and costs of non-prime merchandise sold in the home market play no role in the margin calculation, either for constructed value purposes (CV) or for the analysis of sales at less than the costs of production (COP).

While Commerce states that it must have actual product-specific cost information for non-prime plate, the average net sales value it uses as "facts available" is neither product-specific nor related to actual costs. Commerce fails to show that the net sales value it has used for non-prime merchandise bears any relation to the actual costs of producing that plate. Therefore, in no case, can the net sales value of non-prime plate be properly used as "facts available" for the actual cost of non-prime plate under section 776(a) of the Act (19 U.S.C. § 1677e(a)).

Commerce concedes that it "has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration." Final Results of Redetermination, 5. However, Commerce fails to show how the sales price of non-prime plate reasonably reflects the cost of producing the merchandise under consideration.

The average actual costs used by Dillinger in reporting the cost of non-prime plate represent the best information available on the administrative record as to the actual costs of producing non-prime plate. This information corresponds to the average **actual** total cost of manufacture for all plate sold during the POI. Remand Questionnaire Response, 6-7 & App. R-5 (Oct. 5, 2021) (Barcode: 4168333) (Remand C.R. 2; Remand P.R. 5). That the information is an average does not diminish the fact that it is based upon **actual** costs as directed by the CAFC. Non-prime plate can come from any steel grade and customer order and both types of plate use precisely the same materials and undergo precisely the same processing steps since non-prime plate can only be distinguished from prime plate at the end of the production process.

While Commerce alleges that using the average cost of all products is "distortive," it fails to explain how having a varying cost for the non-prime CONNUMs would in any way change the antidumping margin calculation. Because no non-prime plate was sold in the United States, none of the non-prime CONNUMs will be used in the margin calculation. Commerce could vary the reported cost for non-prime CONNUMs in any way and it would have no effect upon the margin calculation. The only way that Commerce is affecting the margin calculation is by shifting the cost of non-prime plate to prime plate. It is this shifting of costs from non-prime plate to prime plate that is distortive.

In addition, the actual average costs reported by Dillinger for non-prime plate meet all of the requirements of section 782(e) of the Act (19 U.S.C. § 1677m(e)) and should therefore be accepted. Dillinger submitted the actual average cost information for non-prime plate by the established deadline in the original investigation and this information was fully verified. Dillinger acted to the best of its ability in providing the cost information for non-prime plate on the most product-specific basis permitted by its books and records. This information on the actual average costs of non-prime plate is a reliable basis for reaching the final determination and this information can be used without undo difficulties.

By using the likely selling price of non-prime plate rather than the actual average cost of production of non-prime plate reported by Dillinger, Commerce has imposed an impermissible adverse inference. Under section 776(b) of the Act (19 U.S.C. § 1677e(b)), Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information." 19 U.S.C. § 1677e(b). Dillinger cooperated to the best of its ability with respect to reporting the product characteristics for non-prime plate and the actual cost of production. A neutral and reasonable

application of facts available would apply the total average actual cost of production for non-prime plate reported by Dillinger.  Because non-prime plate can only be distinguished from prime plate at the end of the production process, both types of plate use precisely the same materials and undergo precisely the same processing steps.  Therefore, it is reasonable to assume that their average costs of production will be the same.  Commerce's assumption that the actual cost of non-prime plate are nearly 40% lower than those of prime plate based on the likely selling price of non-prime plate is simply unreasonable and is unsupported by any evidence on the administrative record.

As stated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), the information Commerce uses as facts available must be "reasonable to use under the circumstances."  *See* Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198.  Commerce's use of the likely selling price of non-prime plate as facts available for the actual costs of production of the non-prime plate fails this standard of reasonableness.

In addition, Commerce never claimed in the original investigation or in any previous stage of these judicial proceedings that the likely selling price of non-prime plate in Dillinger's books and records was necessary as facts available for the actual production cost of the non-prime plate.  Commerce simply argued that it was entitled to use the likely selling price under 19 U.S.C. § 1677b(f) because they were recorded in Dillinger's records kept in accordance with GAAP.  The CAFC specifically rejected this argument stating that Commerce erred in relying on the likely selling price recorded in Dillinger's books and records because they were not based upon the costs of production.  Dillinger France II, 981 F.3d at 1324.  Commerce cannot now raise a new argument as to why it can rely on the likely selling price in Dillinger's books and

records despite the clear prohibition set by the CAFC. Commerce's arguments are not based on any new evidence or change in the administrative record and these arguments should have been previously raised in these proceedings. Having failed to do so, Commerce has waived the ability to raise its new argument at this time. *See* United States v. Great Am. Ins. Co. of New York, 738 F.3d 1320, 1328 (Fed. Cir. 2013) (finding that government waived arguments that were not properly raised in its summary-judgment filings).

It is also incorrect to claim that Dillinger values non-prime plates at their sales value in its normal books and records. All costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime merchandise, is booked to the same cost object. Remand Questionnaire Response, 8-9 (Oct. 5, 2021) (Barcode: 4168333) (Remand C.R. 2; Remand P.R. 5). The amount in this account is used as the basis for reporting inventory values and manufacturing costs in both the financial and cost accounting systems. Id. The "internal factory results" referenced by Commerce in its remand redetermination are not used for reporting inventory values or manufacturing costs in Dillinger's financial and cost accounting systems. *See* Final Results of Redetermination, 40. In fact, the source of the average sales price used by Commerce as the COP for non-prime plate is simply the average sales price of non-prime plate listed in the narrative response to the Dillinger's supplemental section D questionnaire response. *See* Final COP Memo, Attachment 1 (March 29, 2017) (PD531, CD767). This figure has absolutely nothing to do with the costs of production.

Moreover, even if Dillinger's normal books and records did value non-prime plates at their sales value, it would still be improper for Commerce to rely on this information in reporting costs of production. This was made clear by the CAFC in *Dillinger France II*. In that case, the

9

court held that Commerce erred in relying on "likely selling price" in Dillinger's books and records, explaining:

> Dillinger's records that Commerce relied on for the cost of non-prime and prime plate were based on "likely selling price" rather than costs of producing and selling the merchandise. <u>Because Dillinger's books and records were based on "likely selling price" rather than cost of production, Commerce erred in relying on them</u>.

Id. at 1324 (citations omitted) (emphasis added). Moreover, based upon *Dillinger France II*, this Court has already noted that the internal factory results report does not reflect Dillinger's actual cost data but rather the likely selling price of non-prime plate. *See* <u>AG der Dillinger Hüttenwerke v. United States</u>, Consol. Ct. No. 17-00158, slip op. 21-101 at 5-6 (Aug. 18, 2021).

Finally, as explained above, within 14 days of receiving the original questionnaire in the investigation back in 2016, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested a reporting alternative pursuant to 19 U.S.C. § 1677m(c). *See* <u>Notification of Difficulties in Responding to the Questionnaire & Contact with Official in Charge</u>, 1-2 (June 8, 2016) (Barcode: 3476398) (P.R. 114). Under section 1677m(c), if an interested party promptly notifies Commerce after receiving a request for information that it is "unable to submit the information requested in the requested form and manner," then Commerce "shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party."

The Court in *World Finer Foods* found that when, as in this case, a respondent notifies Commerce of its difficulties in providing requested information pursuant to 19 U.S.C. §1677m(c), Commerce may not impose adverse facts available unless it has first responded to the "overtures of cooperation from the exporter/producer." *See* <u>World Finer Foods v. United</u>

10

States, 24 CIT 541, 544-45 (2000). In that case, the Court stated that the statutory scheme under 19 U.S.C. § 1677m "is designed to prevent the unrestrained use of facts available as to a firm that makes its best efforts to cooperate with Commerce." Id. at 543 (citing Borden, Inc. v. United States, 4 F. Supp. 2d 1221, 1245 (CIT 1998), *aff'd sub nom*, F.LII De Cecco Di Filippo Fara S. Martino S.p.A. v. United States, 216 F.3d 1027 (Fed Cir. 2000)). The Court also noted that this provision was enacted to implement portions of Annex II to the WTO Antidumping Agreement, which provides that "information which 'may not be ideal' should not be disregarded if the party 'has acted to the best of its ability.'" World Finer Foods, 24 CIT at 543 (citing Agreement on Implementation of Article VI of the General Agreement on Tariffs and Trade 1994, Annex II).

### B.  Application of Major Input Rule

In its remand redetermination, Commerce has revised its application of the major input rule and correspondingly reduced its cost adjustment. While Dillinger noted certain remaining issues with respect to Commerce's draft remand redetermination that have not been corrected, Dillinger accepts the remand redetermination with respect to this issue in the interest of simplifying the issues in this case for final adjudication. *See* Dillinger Comments on Draft Results of Redetermination, 6-8 (Dec. 21, 2021) (Barcode: 4193680) (Remand C.R. 11; Remand P.R. 14).

### C.  COP Adjustments Concerning Affiliated Inputs & Services

In its remand redetermination, Commerce has revised the adjustments made for certain inputs and services provided to affiliates and correspondingly reduced its cost adjustment. While Dillinger noted certain remaining issues with respect to Commerce's draft remand redetermination that have not been corrected, Dillinger accepts the remand redetermination with

11

respect to this issue in the interest of simplifying the issues in this case for final adjudication. See Dillinger Comments on Draft Results of Redetermination, 8-9 (Dec. 21, 2021) (Barcode: 4193680) (Remand C.R. 11; Remand P.R. 14).

## II. Conclusion

For the reasons stated above, Commerce's Final Results of Redetermination with respect to the issue of non-prime plate are not supported by substantial evidence on the administrative record or in accordance with the law. We therefore respectfully request that the Court remand this case back to Commerce with explicit directions to accept Dillinger's non-prime plate costs as reported and to stop shifting costs from non-prime to prime plate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
Gregory S. Menegaz
Alexandra H. Salzman**
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de

Date: March 15, 2022
*Counsel to AG der Dillinger Hüttenwerke*

---

\* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).
\*\* Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word 2013 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that this brief complies with the word limitations set forth. Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that this brief contains **3,893** words. In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

/s/ *Marc E. Montalbine*

Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1090 Vermont Ave., N.W.
Suite 410
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email: montalbine@dhlaw.de
*Counsel to AG der Dillinger Hüttenwerke*