UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE LEO M. GORDON, JUDGE

| | |
|---|---|
| AG DER DILLINGER HUTTENWERKE,<br><br>   Plaintiff,<br><br>ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, AND SALZGITTER MANNESMANN INTERNATIONAL GMBH,<br><br>   Consolidated Plaintiffs,<br>and<br><br>THYSSENKRUPP STEEL EUROPE AG and FRIEDR. LOHMANN GMBH,<br><br>   Plaintiff-Intervenors,<br><br>v.<br>UNITED STATES,<br><br>   Defendant,<br>and<br><br>NUCOR CORPORATION and SSAB ENTERPRISES LLC,<br><br>   Defendant-Intervenors. | Consol. Court No. 17-00158<br><br>**NON-CONFIDENTIAL**<br>Business Proprietary Information has been deleted from Pages 4-5, 7 and 12. |

**CONSOLIDATED PLAINTIFFS' COMMENTS IN OPPOSITION TO SECOND REMAND DETERMINATION**

David E. Bond
Ron Kendler
Allison Kepkay

WHITE & CASE LLP
701 Thirteenth Street, NW
Washington, DC 20005
(202) 626-3600

March 15, 2022

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................................1

II. COMMERCE'S ATTEMPT TO DISTINGUISH THE CIRCUMSTANCES REGARDING SALZGITTER'S REPORTING AND DILLINGER FRANCE'S REPORTING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE; THEREFORE, THE AFA METHODOLOGY USED ON REMAND IS UNREASONABLE ..................................................................................................3

    A. Commerce Did Not Use an Equivalent Analysis to Determine Whether the Quantity of Affected Sales Materially Differed Between Salzgitter and Dillinger France ...................................................................................3

    B. Commerce's Reliance on the Net Prices of Salzgitter's Sales for Which the Manufacturer Could Not Be Identified as Justification for an Alternative AFA Methodology Was Based on Speculation ...............................6

    C. Commerce's Claim that Salzgitter Would Improperly Benefit from the *Dillinger France* AFA Methodology is Inaccurate ............................................8

    D. Commerce Relies on Other, Irrelevant Facts in an Attempt to Distinguish the France and Germany Investigations................................................9

III. COMMERCE'S RETURN TO THE AFA METHOLOGY USED IN THE *FINAL DETERMINATION* IS CONTRARY TO THE COURT'S RULING IN *DILLINGER FRANCE* AND IS UNREASONABLE..................................................10

IV. CONCLUSION..................................................................................................13

## TABLE OF AUTHORITIES

**Page(s)**

### CASES

*AG der Dillinger Hüttenwerke v. United States*,
   399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) .................................................................8, 10

*AG der Dillinger Hüttenwerke v. United States*,
   534 F. Supp. 3d 1403 (Ct. Int'l Trade 2021) ................................................................1, 2, 6

*Dillinger France S.A. v. United States*,
   350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) .................................................................. passim

*Dillinger France S.A. v. United States*,
   393 F. Supp. 3d 1225 (Ct. Int'l Trade 2019) .................................................................. passim

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*,
   216 F.3d 1027 (Fed. Cir. 2000) ...............................................................................................13

*Hyundai Steel Co. v. United States*,
   319 F. Supp. 3d 1327 (Ct. Int'l Trade 2018) ...........................................................................13

*Lucent Techs., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) .................................................................................................7

### STATUTES AND REGULATIONS

19 U.S.C. § 1677f-1(c) ........................................................................................................................6

19 U.S.C. § 1677m(d) .......................................................................................................................10

19 U.S.C. § 1677m(e) ..................................................................................................................10, 11

### ADMINISTRATIVE DETERMINATIONS

*Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*,
   82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017),
   and accompanying Issues & Decision Memorandum ..............................................................1

*Certain Carbon and Alloy Steel Cut-to-Length Plate From France*,
   82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017) ..............................................................1

NON-CONFIDENTIAL VERSION

**I.     INTRODUCTION**

Consolidated Plaintiffs Ilsenburger Grobblech GmbH ("ILG"), Salzgitter Mannesmann Grobblech GmbH ("MGB"), Salzgitter Flachstahl GmbH ("SZFG"), and Salzgitter Mannesmann International GmbH ("SMID") (collectively, "Salzgitter") submit these comments in opposition to the Department of Commerce's ("Commerce") *AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 21-101 (CIT August 18, 2021) – Final Results of Redetermination Pursuant to Court Remand – Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, ECF Doc. Nos. 129/130 (Jan. 20, 2022) ("*Second Remand Determination*"), in which Commerce applied the same AFA methodology to Salzgitter as it applied in the *Final Determination*.  See *Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16,360 (Dep't Commerce Apr. 4, 2017) ("*Final Determination*"); Issues and Decision Memorandum for the Final Affirmative Determination in the Less-Than-Fair-Value Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany (Mar. 29, 2017).

The Court remanded the use of adverse facts available ("AFA") with respect to certain sales by Salzgitter's affiliate, Salzgitter Mannesmann Stahlhandel GmbH ("SMSD"), for which the manufacturer could not be identified, for Commerce to explain "why, if there were material factual differences between the French and German investigations on the AFA issue, those differences were not reflected in the decision memoranda or Commerce's handling of AFA between the cases," which were "nearly identical (virtually verbatim)."[1]  *AG der Dillinger*

---

[1] The French investigation referenced in the Court's instructions related to the use of AFA to calculate the dumping margin for Dillinger France S.A. ("Dillinger France") in *Certain Carbon and Alloy Steel Cut-to-Length Plate From France*, 82 Fed. Reg. 16,363 (Dep't Commerce Apr. 4, 2017), which was considered by this Court in *Dillinger France S.A. v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ("*Dillinger France I*") (remanding the AFA issue to Commerce) and *Dillinger France S.A. v. United States*, 393 F. Supp. 3d 1225 (Ct. Int'l Trade 2019) ("*Dillinger France II*") (affirming Commerce's remand redetermination on the AFA issue).

*Hüttenwerke v. United States*, 534 F. Supp. 3d 1403, 1413 (Ct. Int'l Trade 2021) ("*Dillinger Germany II*"). To comply with the Court's order, Commerce was required to determine if there were "material factual differences" between Salzgitter and Dillinger France. If so, Commerce was required to explain why such differences "were not reflected" in the *Final Determination*. Finally, if Commerce chose to use an alternative AFA methodology for Salzgitter to that used for Dillinger France, it was required to "explain why such a disparate approach is reasonable." *Id.* at 1414.

Commerce's *Second Remand Determination* does not comply with the Court's instructions. First, Commerce's determination that the circumstances regarding Salzgitter materially differed from those regarding Dillinger France is neither reasonable nor based on substantial evidence. Accordingly, Commerce has not established that its disparate treatment of Salzgitter is justified. Second, Commerce's decision to apply the same AFA methodology to Salzgitter that it applied in the *Final Determination* improperly rejects information that is not in dispute – namely, verified price information for the sales at issue, and therefore results in a punitive margin. For these reasons, the Court should reject Commerce's *Second Remand Determination* and require Commerce to use the AFA methodology applied to Dillinger France on remand. Alternatively, if the Court believes that Commerce adequately explained why Salzgitter should be treated differently from Dillinger France, the Court should remand this case to Commerce with instructions to calculate a dumping margin using the price information reported for the sales at issue.

## II. COMMERCE'S ATTEMPT TO DISTINGUISH THE CIRCUMSTANCES REGARDING SALZGITTER'S REPORTING AND DILLINGER FRANCE'S REPORTING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE; THEREFORE, THE AFA METHODOLOGY USED ON REMAND IS UNREASONABLE

On remand, Commerce conceded that "the circumstances that led to Commerce's determination to resort to partial AFA in each investigation are *essentially the same* . . . ." *Second Remand Determination* at 26 (emphasis added). Commerce nevertheless concluded that the following differences between Salzgitter and Dillinger France are sufficiently material to justify different AFA methodologies: "(1) the number of sales lacking the requested manufacturer information; (2) the net prices among the sales with the missing data; and (3) the impact on the margin caused by the respondents' failure to provide the requested information." *Second Remand Determination* at 57. Each of these conclusions is incorrect.

### A. Commerce Did Not Use an Equivalent Analysis to Determine Whether the Quantity of Affected Sales Materially Differed Between Salzgitter and Dillinger France

Commerce seeks to distinguish between Salzgitter and Dillinger France based on the number of affected sales, claiming that the scope of non-cooperation for Salzgitter was larger compared to Dillinger France. *See Second Remand Determination* at 27. However, because Commerce's analysis is not equivalent to its analysis with respect to Dillinger France, Commerce's conclusion is meaningless.

In the *Dillinger France* appeal, Commerce concluded that it was appropriate to include all sales for which the manufacturer was unknown in the dumping calculation "because of the small number of affected transactions *whose prices are used as the basis for normal value and which are actually compared to U.S. sale prices,* these home market transactions *have no measurable impact* on Dillinger France's . . . margin." *Dillinger France II*, 393 F. Supp. 3d at 1228 (quoting

3

Commerce's Remand Results at 6) (emphasis added). Commerce did not conduct such an analysis with respect to Salzgitter. Instead, Commerce simply cited to the entire number of sales (28,000 observations) for which Salzgitter could not identify the manufacturer as a basis to quantify its alleged non-cooperation. *See Second Remand Determination* at 27, 55. Even though Commerce claimed that the universe of sales considered with respect to Salzgitter was larger than the universe of sales considered with respect to Dillinger France, Commerce did not similarly consider the linkage between the number of Salzgitter sales affected and Salzgitter's dumping margin.

Indeed, were Commerce to apply the analysis used for Dillinger France to Salzgitter, it is clear that only a very small fraction of SMSD's sales for which the manufacturer was unknown were used "as a basis for normal value" and were "actually compared to U.S. sales prices." *See Dillinger France II*, 393 F. Supp. 3d at 1228 (quoting Commerce's Remand Results at 6). The record shows that:

- If all sales for which the manufacturer was unknown were included in the margin calculation, only [ ] out of the total [ ] control numbers ("CONNUMs") that Salzgitter reported in the home-market sales databases were compared to U.S. sales. *See Computer Programs from USDOC to File Pertaining to Salzgitter: Final Determination Comparison Market Program*, CD 759 (Mar. 30, 2017) (Barcode 3556312-01) ("*Final Determination Comparison Market Program*"); *Computer Programs from USDOC to File Pertaining to Salzgitter: Final Determination Margin Program*, CD 760 (Mar. 30, 2017) (Barcode 3556312-02) ("*Final Determination Margin Program*");[2] *Revised Home-Market Sales Database*, CD 749 (Feb. 6, 2017) (Barcode 3541289-02) ("*Final Home-Market Sales Database*"); *Revised US Sales Database*, CD 747 (Feb. 3, 2017) (Barcode 3541167-02) ("*Final US Sales Database*"); *SAS Data for Fifth Supplemental Sections B & C Response*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03) ("*Separate Database*").

---

[2] Commerce's output printouts of Salzgitter's margin program, as provided in *Memorandum to the File, Final Determination Margin Calculation for Salzgitter*, PD 527/CD 762, at Attachment 1 and Attachment 2 (Mar. 29, 2017), only provide a sample set of transactions that are run through the program. Salzgitter therefore cites the margin programs themselves, and the accompanying sales databases, in order to capture the relevant information on the record.

4

- Out of those [ ] CONNUMs, only [ ] contained one or more sales for which the manufacturer was unknown. *Id.*

- And, out of these [ ] CONNUMs, there were only [ ] above-cost transactions, or [ ] metric tons ("MT"), for which the manufacturer was unknown and were "actually compared to U.S. sales prices." *Id.*

- By quantity, these sales represent **only [ ] percent of all home-market sales**.³

- By the number of sales, the [ ] above cost transactions for which the manufacturer was unknown and were "actually compared to U.S. sales prices" **still only amount to [ ] percent of sales.**⁴

Commerce claims that using the same analysis for Salzgitter as used for Dillinger France would require it to "establish a new test of materiality . . . that would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis." *Second Remand Determination* at 55. This rhetoric misses the point. A valid comparison of Commerce's conclusions with respect to whether the sales at issue in the *Dillinger France* case were large or small, when compared to those at issue here, requires Commerce to apply the same analysis in both cases. Otherwise, the results of the comparison will necessarily differ. In *Dillinger France*, Commerce concluded that the number of affected transactions was small when looking only at the "transactions whose prices are used as the basis for normal value" that were "actually compared to U.S. sale prices . . . ." *Dillinger France II*, 393 F. Supp. 3d at 1228 (quoting Commerce's Remand Results at 6). It must make the same comparison here.

Aside from the fact that Commerce used a non-equivalent analysis for Salzgitter, it has not actually considered evidence regarding Dillinger France in its comparison. As Commerce admits,

---

³ The total quantity of sales in Salzgitter's final home-market sales database (*salz_hm07*) was [       ] MT, excluding sales manufactured by TKS and TKSE. *See Final Home-Market Sales Database*, CD 749 (Feb. 6, 2017) (Barcode 3541289-02).

⁴ The total number of Salzgitter-produced home-market observations referenced by Commerce in the *Second Remand Determination* was [       ]. *See Second Remand Determination* at 27.

such evidence is not on the record of this case. *See Second Remand Determination* at 27, 55. Instead, Commerce references information regarding sales by Dillinger **Germany** in the completely separate antidumping investigation. *Id.* Therefore, substantial evidence does not support Commerce's conclusion that sales at issue for Dillinger France were smaller than the sales at issue for Salzgitter. Further, Commerce's comparison does not respond to the Court's request for an explanation of the differences between Salzgitter and Dillinger **France** that justify a different AFA methodology. *See Second Remand Determination* at 27; *see also Dillinger Germany II*, 534 F. Supp. 3d at 1413-14.

Finally, and contrary to Commerce's assertions, it is entirely appropriate and consistent with both the statute and Department practice to assess whether the affected sales were small based primarily on the volume of the affected sales, rather than the number of the affected sales. *See Second Remand Determination* at 27 (claiming that Salzgitter's request to compare volume of sales amounts to "a test that would allow the respondent, not Commerce, to determine what information is relevant"). The number of sales is not a relevant factor in the dumping margin calculation, whereas sales quantity is a significant factor under the statute in the calculation of a weighted-average dumping margin. *See* 19 U.S.C. § 1677f-1(c) (noting that Commerce shall determine the "weighted average dumping margin"). Therefore, it was unreasonable for Commerce to disregard the quantity of sales as a basis for comparison between Salzgitter's and Dillinger France's affected sales.

**B.    Commerce's Reliance on the Net Prices of Salzgitter's Sales for Which the Manufacturer Could Not Be Identified as Justification for an Alternative AFA Methodology Was Based on Speculation**

Commerce claims that it was justified in treating Salzgitter differently than Dillinger France because it "cannot rule out the possibility that the sales with the highest prices were entirely

or primarily of CTL plate manufactured by Salzgitter, and Salzgitter's failure to report the manufacturer information was an attempt to obscure this fact, thereby distorting the margin." *Second Remand Determination* at 30-31.  This is pure speculation.  "It is well established that speculation does not constitute substantial evidence." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009) (internal quotation marks and citation omitted).

Commerce has not pointed to any evidence to support a claim that Salzgitter attempted to obscure the manufacturer information during the original investigation.  Nor can it.  The record affirmatively demonstrates that Commerce's claim is false.  The electronic systems used by Salzgitter's affiliate, SMSD, were not designed to identify the manufacturer of the tens of thousands of CTL plate sales made each year.  *See Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 1-3 (Nov. 25, 2016); *Case Brief*, PD 515/CD 753, at 8-14 (Feb. 13, 2017). SMSD explained that it had no need to do so for ordinary commercial reasons, nor had SMSD ever been required by Commerce to respond to an antidumping questionnaire.  *See First Supplemental B/C Response*, PD 312, 314/CD 173, 174, at 4, Exhibit Supp. B-2 (Sept. 15, 2016); *Third Sections B & C Supplemental Response*, PD 392/CD 446, at 5 (Oct. 17, 2016).  Nevertheless, when SMSD was asked to respond to the questionnaire in the CTL plate investigation, it devised a method to identify the manufacturer for its sales by electronically linking information kept in two separate systems.  *See Case Brief*, PD 515/CD 753, at 8-14 (Feb. 13, 2017).  In this way, SMSD identified the manufacturer for **over [     ] percent** of SMSD's total reported home-market sales volume.  *Id.* at 10.  Commerce verified this information.  *See generally SMSD Sales Verification Report*, PD 504/CD 742 (Feb. 1, 2017).

###    C.   Commerce's Claim that Salzgitter Would Improperly Benefit from the *Dillinger France* AFA Methodology is Inaccurate

Commerce claims that calculating Salzgitter's margin using the *Dillinger France* methodology "frustrates Commerce's goals of inducing cooperation by ensuring that a non-cooperating respondent does not receive a more favorable AFA rate than it would have received if the company had cooperated fully." *See Second Remand Determination* at 29, 55. This statement is incorrect. As Salzgitter has shown, it would not receive a more favorable AFA rate using the methodology applied to Dillinger France than it would have received if it reported the manufacturer for all sales, as long as Commerce does not unjustifiably "ignore record information that is not in dispute," namely the prices and other information for the SMSD sales, which Commerce verified. *See SMSD Sales Verification Report*, PD 504/CD 742 (Feb. 1, 2017).

During the investigation, Salzgitter provided Commerce with three alternative methods to use the sales for which the manufacturer could not be identified to calculate normal value:

- Treat none of the sales as Salzgitter-manufactured plate (Alternative 1).

- Treat all sales as Salzgitter-manufactured plate (Alternative 2).

- Treat a percentage of each sale as Salzgitter-manufactured plate based on SMSD's purchases from each supplier (Alternative 3).[5]

---

[5]   Under Alternative 3, Salzgitter used SMSD's actual purchase data during the period of investigation, which was verified by Commerce, to calculate the percentage of the quantity of each sale that was treated as Salzgitter-manufactured plate. *See Case Brief*, PD 515/CD 753, at Exhibit 1 (Feb. 13, 2017); *SMSD Sales Verification Report*, PD 504/CD 742, at 8 (Feb. 1, 2017). Salzgitter also provided programming language for this alternative approach. *See Case Brief*, PD 515/CD 753, at Exhibit 1 (Feb. 13, 2017). Because Alternative 3 was based on the full universe of SMSD's actual purchases during the period; it was at least as accurate as, and likely more accurate than, a random sample. For this reason, Salzgitter respectfully suggests that the Court may have not fully understood Alternative 3 when it questioned "why Salzgitter did not conduct its own statistical analysis to attempt to tie the missing manufacturer information." *AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247, 1255-56 (Ct. Int'l Trade 2019) ("*Dillinger Germany I*").

*Case Brief*, PD 515/CD 753, at 14-15 (Feb. 13, 2017); *Hearing Transcript*, PD 522, at 27:09–27:20 (Mar. 8, 2017).

Under each of these alternatives, Salzgitter's dumping margin was the same – *nil* (indicating a negative dumping margin or up to 2 percent).[6] *See Hearing Transcript*, PD 522, at 26:15–26:18 (Mar. 8, 2017). This evidence shows that, regardless of how the SMSD sales for which the manufacturer could not be identified were used in calculating Salzgitter's margin, Salzgitter would not receive a more favorable result than if it had been able to determine the manufacturer for the sales. Therefore, the record refutes Commerce's speculation that Salzgitter may have benefitted from not reporting the manufacturer for the sales.

    **D.    Commerce Relies on Other, Irrelevant Facts in an Attempt to Distinguish the France and Germany Investigations**

Commerce further seeks to justify the difference in AFA methodologies between the two investigations on the grounds that the France investigation "pertained to one respondent, Dillinger France, based on a different record in a different case." *Second Remand Determination* at 31. The number of respondents involved in the two investigations is irrelevant. Furthermore, Commerce does nothing to refute the Court's conclusion that Commerce's reasoning in applying AFA was "virtually verbatim" in both the Germany and France cases, and yet it has applied different AFA methodologies.

---

[6] Commerce claims that Salzgitter's margin calculations under these scenarios are merely self-serving applications of the record. *See Second Remand Determination* at 56. However, in the *First Remand Determination*, Commerce applied Alternative 1, which is the same as the approach taken in *Dillinger France*, and the resulting margin was zero. *See AG Der Dillinger Hüttenwerke, v. United States*, Court No. 17-00158, Slip. Op. 19-87 (CIT July 16, 2019) – Final Results of Redetermination Pursuant to Court Remand Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, ECF Doc. No. 85 (Oct. 7, 2019), at 5 ("*First Remand Determination*").

9

## III. COMMERCE'S RETURN TO THE AFA METHODOLOGY USED IN THE *FINAL DETERMINATION* IS CONTRARY TO THE COURT'S RULING IN *DILLINGER FRANCE* AND IS UNREASONABLE

Even if Commerce had met the Court's requirements for using a different AFA methodology for Salzgitter than was used for Dillinger France, it erred by returning to the methodology used in the *Final Determination*.

Commerce does not mention the conclusion from *Dillinger France I*, where the Court held that "Commerce's decision to apply partial AFA to replace information in the record was not supported by substantial evidence and was contrary to law" because "*the reliability of the reported sales prices has not been called into question and there is no informational gap in the sale prices for Commerce to fill*." *Dillinger France I*, 350 F. Supp. 3d at 1364 (emphasis added). The Court's confirmation of Commerce's remand in *Dillinger France II* repeated that Commerce is limited to using FA to filling "informational gaps in the record." *See Dillinger France II*, 393 F. Supp. 3d at 1229. And, this Court likewise made this point when it referenced Commerce's conclusion in *Dillinger France II* that Commerce "cannot ignore record information that is not in dispute, pursuant to the facts on the record of this investigation and the Court's decision." *Dillinger Germany I*, 399 F. Supp. 3d at 1257. This all inevitably leads to the conclusion that Commerce was not permitted on remand to disregard Salzgitter's verified sales prices for the sales at issue as a result of the missing manufacturer. Yet, that is exactly what Commerce did.

Although this Court concluded that Commerce may "disregard all or part of the original and subsequent responses" (referencing 19 U.S.C. § 1677m(d)), *Dillinger Germany I*, 399 F. Supp. 3d at 1256, Commerce may only do so "subject to subsection (e)" of the statute. Subsection (e) of 19 U.S.C. § 1677m requires that several criteria be met before Commerce may disregard information:

10

> . . . {Commerce} shall not decline to consider information that is submitted by an interested party and is necessary to the determination but does not meet all the applicable requirements established by the administering authority or the Commission, if—
>
> > (1) the information is submitted by the deadline established for its submission,
> > (2) the information can be verified,
> > (3) the information is not so incomplete that it cannot serve as a reliable basis for reaching the applicable determination,
> > (4) the interested party has demonstrated that it acted to the best of its ability in providing the information and meeting the requirements established by the administering authority or the Commission with respect to the information, and
> > (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(e). Salzgitter's pricing information met all five criteria: (1) the information was submitted by the deadline established for its submission;[7] (2) the information was verified;[8] (3) the information was complete and could have served as a reliable basis for reaching the final determination;[9] (4) Salzgitter acted to the best of its ability in providing pricing information;[10] and (5) the pricing information could be used without undue difficulties.[11] Thus, there was no informational gap with respect to Salzgitter's pricing information for the sales with an unknown manufacturer that would enable Commerce to disregard the information and substitute the "highest non-aberrational net price".

---

[7] *See Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 1, Exhibit 5th Supp. BC-1 (Nov. 25, 2016); *Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03).

[8] *See generally SMSD Sales Verification Report*, PD 504/CD 742 (Feb. 1, 2017).

[9] *See SMSD Sales Verification Report*, PD 504/CD 742, at 6-7, 14-15 (Feb. 1, 2017); *Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 1, Exhibit 5th Supp. BC-1 (Nov. 25, 2016); *Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03).

[10] *See Fifth Supplemental Sections B & C Response*, PD 475/CD 631, at 1, Exhibit 5th Supp. BC-1 (Nov. 25, 2016); *Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03).

[11] *See id.* In fact, Commerce used this pricing information without undue difficulties in the *First Remand Determination*.

Further, as discussed above, regardless of whether Commerce includes none, some, or all of the sales for which the manufacturer was unknown, Salzgitter's margin would still be *nil*. Therefore, Commerce's claim that the missing manufacturer information was critical to "identify which home market sales to compare to U.S. sales" and to calculate an accurate dumping margin is conclusively disproven by the evidence. While Commerce's claim may be correct in theoretical terms, it has no bearing on the specific facts of this case.

In addition, Commerce's selection of the highest non-aberrational net price as AFA is inappropriate. Commerce fails to acknowledge that the sale from which this price was derived would not even be used as a basis for normal value in Salzgitter's margin calculation.[12] The "highest non-aberrational net price" in question selected by Commerce related to a sale of CONNUM [                    ], which was **so dissimilar to the products sold to the United States that it was not compared to a single U.S. sale**.[13] *See Final Determination Comparison Market Program*, CD 759 (Mar. 30, 2017) (Barcode 3556312-01); *Final Determination Margin Program*, CD 760 (Mar. 30, 2017) (Barcode 3556312-02); *Final Home-Market Sales Database*, CD 749 (Feb. 6, 2017) (Barcode 3541289-02); *Final US Sales Database*, CD 747 (Feb. 3, 2017) (Barcode 3541167-02); *Separate Database*, CD 633 (Nov. 25, 2016)

---

[12] Notably, Commerce neither compares nor contrasts the selected highest non-aberrational net price with anything Dillinger-related, leaving any distinction between the two companies or cases on this point incomplete.

[13] Further, the product to which the "highest non-aberrational net price" related was further processed by [            ] (expressed by the coding of [     ] in Field FABRH). *See Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03). Thus, the product was a custom-made product, with a higher cost of production and price. *See Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03); *First Supplemental B/C Response*, PD 312/CD 173 at 10-11 (Sept. 15, 2016); *Sections B, C, and E Responses*, PD 200/CD 108, at B-15-B-16 (July 15, 2016). [          ] of the U.S. sales were further processed, demonstrating the clear difference between this product and those regularly sold in the US market. *See Final Home-Market Sales Database*, CD 749 (Feb. 6, 2017) (Barcode 3541289-02); *Final US Sales Database*, CD 747 (Feb. 3, 2017) (Barcode 3541167-02); *Separate Database*, CD 633 (Nov. 25, 2016) (Barcode 3525331-03).

(Barcode 3525331-03). Although Commerce emphasizes that the purpose of AFA is to induce the respondent's cooperation, this does not give Commerce unlimited authority as to the way in which it may apply AFA. *See F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000) ("{T}he purpose of section 1677e(b) is to provide respondents with an incentive to cooperate, not to impose punitive, aberrational, or uncorroborated margins."); *see also Hyundai Steel Co. v. United States*, 319 F. Supp. 3d 1327, 1356 (Ct. Int'l Trade 2018) (recognizing that using aberrational transactions "based on the nature of the transaction or product involved" is an impermissible application of AFA.). It is unreasonable and punitive for Commerce to extrapolate the price of a wholly dissimilar product, and use that price as the basis for normal value for all of Salzgitter's home-market sales for which it could not identify the manufacturer.[14] Accordingly, the Court should reject Commerce's selection of AFA.

## IV. CONCLUSION

For the foregoing reasons, Salzgitter requests that the Court reject Commerce's *Second Remand Determination* and require Commerce to use the AFA methodology applied to Dillinger France on remand. Alternatively, if the Court believes that Commerce adequately explained why Salzgitter should be treated differently from Dillinger France, the Court should remand this case

---

[14] As Salzgitter explained in previous remand comments, Commerce's approach in the *Final Determination* resulted in an inappropriately inflated dumping margin that was "over **12 times higher**" than the margin calculated in the *First Remand Determination* that used the actual sales data for the SMSD sales. *See* Consol. Pls' Responsive Comments in Support of First Remand Determination, ECF Doc. Nos. 106/107 (Dec. 18, 2019), at 10.

NON-CONFIDENTIAL VERSION

to Commerce with instructions to calculate a dumping margin using the price information reported for the sales at issue.

        Respectfully submitted,

        WHITE AND CASE LLP

        /s/ David E. Bond
        David E. Bond
        Ron Kendler
        Allison Kepkay

        WHITE AND CASE LLP
        701 Thirteenth Street, NW
        Washington, DC 20005
        (202) 626-3600

        Counsel to Consolidated Plaintiffs

Date: March 15, 2022

CERTIFICATE OF COMPLIANCE

I, David E. Bond, certify that the attached brief complies with the word limitation requirement, as stated in the Standard Chambers Procedures. The word count for Salzgitter's Comments in Opposition to Second Remand, as computed by the White & Case word processing system (Microsoft Word 2016), is 4,232.

                                         /s/ David E. Bond
                                         David E. Bond