**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON, JUDGE**

AG DER DILLINGER HUTTENWERKE,

*Plaintiff*,

ILSENBURGER GROBBLECH GMBH,
SALZGITTER MANNESMANN GROBBLECH
GMBH, SALZGITTER FLACHSTAHL GMBH,
SALZGITTER MANNESMANN
INTERNATIONAL GMBH, *and* FRIEDR.
LOHMANN GMBH,

*Consolidated Plaintiffs*,

and

THYSSENKRUPP STEEL EUROPE AG,

*Plaintiff-Intervenor*,

v.

UNITED STATES,

*Defendant*,

NUCOR CORPORATION *and* SSAB
ENTERPRISES LLC,

*Defendant-Intervenors*.

Consol. Court No. 17-00158

**NON- CONFIDENTIAL**
**VERSION**

*Business Proprietary Information*
*Removed from Brackets on Pages*
*3, 7, and 8.*

**DEFENDANT–INTERVENOR SSAB ENTERPRISES LLC's**
**COMMENTS IN SUPPORT OF SECOND REMAND RESULTS**

Roger B. Schagrin
Luke A. Meisner
Nicholas J. Birch
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for SSAB Enterprises LLC*

April 14, 2022

NON-CONFIDENTIAL VERSION

TABLE OF CONTENTS

I.   SUMMARY OF ARGUMENT ............................................................................................. 1

II.  ARGUMENT ................................................................................................................... 2

   A.   Commerce's Redetermination Complies with this Court's Order and with the Purposes of
        Applying Adverse Facts......................................................................................................... 3

   B.   Salzgitter's Arguments in Opposition to Commerce's Redetermination Are Without
        Merit........................................................................................................................................ 9

III. CONCLUSION ............................................................................................................... 16

NON-CONFIDENTIAL VERSION

TABLE OF AUTHORITIES

**Cases**

*Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198 (Ct. Int'l Trade 1986). ................................................................................................................ 11

*BMW of N. Am. LLC v. United States*, 926 F.3d 1291 (Fed. Cir. 2019) .............................. 5, 7, 11

*Dillinger France S.A., v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ........................................................................................................... passim

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ........................................... 4, 5

*F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) ..................................................................................................... 4, 5

*Kawasaki Steel Corp. v. United States*, 24 C.I.T. 684 (2000) ....................................................... 7

*Mukand, Ltd. v. United States*, 767 F.3d 1300 (Fed. Cir. 2014) ................................................... 4

*Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356 (CIT 2019) ........................................... 4

*Nippon Steel & Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214 (Ct. Int'l Trade 2020) .................................................................................................... 8, 14

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003)........................................ 12

*Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade  2017) ............................................................................................................ 5

*Papierfabrik August Koehler AG v. United States*, 180 F. Supp. 3d 1211 (CIT 2016) .................................................................................................................. 6, 14

*Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185 (Fed. Cir. 1990)........................................ 4

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 24 C.I.T. 841 (2000) .................................... 8

*Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330 (Fed. Cir. 2002) ............................................................................................................. 5, 13, 14

*Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099 (Fed. Cir. 2016) ...................... 6, 8

**Statutes**

19 U.S.C. § 1677e(a)...................................................................................................................... 12

19 U.S.C. § 1677e(b) ................................................................................................................. 4, 12

19 U.S.C. § 1677m(c)(1)................................................................................................................ 15

**Other Authorities**

Uruguay Round Agreements Act, *Statement of Administrative Action*, H.R. Doc. No. 103-316, vol. I (1994), reprinted in 1994 U.S.C.C.A.N. 4040 ....................................... 4, 8

On behalf of Defendant-Intervenor SSAB Enterprises LLC ("SSAB"), we hereby submit comments in support of the Second Results of Redetermination Pursuant to Court Remand (ECF Nos. 129) ("*Second Redetermination*"), filed by the U.S. Department of Commerce ("Commerce") on January 20, 2022 in the above-captioned action. SSAB's comments are limited to addressing Commerce's application of adverse facts available ("AFA") to mandatory respondents Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, "Salzgitter") in the second remand redetermination.

## I.    SUMMARY OF THE ARGUMENT

Commerce's second remand redetermination both complies with this Court's order regarding the application of AFA to Salzgitter, and applies AFA in a manner that is fully compliant with statutory requirements and is necessary to achieve statutory goals. Commerce has detailed the significant factual differences between Salzgitter's noncooperation here and the noncooperation by the respondent Dillinger France S.A. ("Dillinger") in the underlying investigation and the noncooperation addressed by the Court in *Dillinger France S.A., v. United States*, 350 F. Supp. 3d 1349 (Ct. Int'l Trade 2018) ("*Dillinger France I*"), factual differences that resulted in very different outcomes. Commerce's application of AFA based on the particular facts here meets the statutory goal that the effect of AFA be adverse and is consistent with precedent holding that the application of AFA should reflect the seriousness of the noncooperation in question and should result in an increase in the margin to detour future noncooperation. The Court should thus sustain Commerce's redetermination to apply a partial-AFA rate of 22.90 percent to Salzgitter.

NON-CONFIDENTIAL VERSION

Salzgitter's arguments in opposition to Commerce's redetermination lack merit and should be rejected. Salzgitter argues Commerce must count how Salzgitter was noncooperative in a certain way, but Commerce is not required to ignore most of Salzgitter's noncooperation as Salzgitter seeks and did not in fact base its decision on some count of sales, but on the effect the noncooperation had on the outcomes of Commerce's investigation. Salzgitter also attempts to limit Commerce's ability to apply AFA in other ways that are not supported by the statute or by relevant precedent, relying repeatedly on claims that have already been rejected by this Court. Commerce properly rejected those arguments in its redetermination, and the Court should do the same here.

## II.    ARGUMENT

In its August 18, 2021 opinion, this Court remanded Commerce's determination in the underlying antidumping investigation on cut-to-length plate ("CTLP") from Germany to allow the agency to address the application of partial AFA to Salzgitter. Slip Op. 21-101, ECF No. 119 at 17-18. The Court instructed Commerce to address why Commerce's selected AFA methodology in this case differed from that in *Dillinger France I* given the similarity between the relevant agency memorandum in the two cases. *Id.* The Court recognized that the agency may have good reason for adopting different methodologies, but it instructed that if that was the case, Commerce must explain what previously unexplored factual differences make this outcome reasonable. *Id.* In its second remand redetermination, Commerce has complied with the Court's order by explaining why it is necessary to apply AFA as it did in this instance.

NON-CONFIDENTIAL VERSION

### A.    Commerce's Redetermination Complies with this Court's Order and with the Purposes of Applying Adverse Facts

In its first opinion in this case, this Court upheld Commerce's determination that it was necessary to apply partial AFA to Salzgitter due to Salzgitter's failure to fully cooperate with the investigative agency and to provide full the information requested on all its home market sales. ECF 72 at 9, 14. In the second remand redetermination, Commerce has explained why Salzgitter's failure to meet its burden of cooperation in this case is materially different than the noncooperation in *Dillinger France I*—or Dillinger Germany's noncooperation in this investigation—and why that difference necessitates a difference in the application of AFA.

As Commerce detailed in its second redetermination, while the underlying noncooperative actions were similar in nature in each instance (refusal to disclose information on the manufacturer), the critical differences were in both the scope of the refusal and in the impact of each refusal to cooperate. For comparison, Salzgitter refused to identify the manufacturer for [          ] of its home market sales (28,000 sales) than [                    ]. *Second Redetermination,* ECF No. 129 at 27. Due to that [              ] in the level of non-cooperation, "the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger's margin;" while the selection of an AFA application methodology for Salzgitter not only had an impact, it completely determined the outcome of Commerce's investigation of Salzgitter, resulting in either a 22.90-percent margin or a zero-percent margin (with Salzgitter's exclusion from the antidumping order altogether). *Id.* at 27-28. Likewise, as Commerce notes, in *Dillinger France I*, there were also only a small number of sales with unreported information, again resulting in "no measurable impact" on the margin, unlike the case for Salzgitter here. *Id.* at 27.

3

Commerce's determination that these factual differences necessitate a difference in the application of AFA was properly based on the rational for applying AFA and on the reason Congress granted Commerce the specific authority to use this tool.

As plainly stated in the statue, Commerce "may use an inference that is *adverse to the interests of that party* in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b) (emphasis added). Congress's central purpose in providing Commerce with this authority was to "ensure that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully." Uruguay Round Agreements Act, *Statement of Administrative Action*, H.R. Doc. No. 103-316, vol. I, at 870 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4199 ( "*SAA*"). Congress intended the use of AFA to be "an essential investigative tool in antidumping and countervailing duty proceedings." *Id*, H.R. Doc. No. 103-316 at 868, 1994 U.S.C.C.A.N. at 4198. "Because Commerce lacks subpoena power, Commerce's ability to apply adverse facts is an important one." *Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1276 (Fed. Cir. 2012) (*citing Rhone Poulenc, Inc. v. United States*, 899 F.2d 1185, 1191 (Fed. Cir. 1990)).

The only way that Commerce can apply this essential investigative tool is "to provide respondents with an incentive to cooperate." *F.Lii de Cecco di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027, 1032 (Fed. Cir. 2000). To do so, Commerce must "ensure that a respondent does not obtain a more favorable antidumping rate by failing to cooperate." *Mukand, Ltd. v. United States*, 767 F.3d 1300, 1307 (Fed. Cir. 2014); *see also Nat'l Nail Corp. v. United States*, 390 F. Supp. 3d 1356, 1374 (CIT 2019) ("…the purpose for using an adverse inference is carried over from the pre-1994 best information available analysis—to encourage compliance with questionnaire inquiries."). "Without the ability to enforce full compliance with its questions,

Commerce runs the risk of gamesmanship and lack of finality in its investigations." *Essar Steel*, 678 F.3d at 1276.

Thus, the statute and precedent make clear that in order to apply AFA, Commerce must apply facts that are *adverse* to the noncooperative party. Further, the application of those facts should be tied directly to the impact the party's noncooperation has on the outcome of Commerce's determination, so that this respondent does not gain more from its noncooperation than it loses from the application of AFA. The Federal Circuit has stated that it is clear from the statute that Congress intended an AFA rate to include "some built-in increase intended as a deterrent to non-compliance." *De Cecco*, 216 F.3d at 1032; *see also Essar Steel*, 678 F.3d at 1276 (quoting the same), *Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1340 (Fed. Cir. 2002) (*quoting De Cecco*); *Özdemir Boru San. ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1245 (Ct. Int'l Trade  2017) (stating the same). Thus, while the "appropriate rate" to apply AFA will depend on the facts of a given case, an appropriate AFA rate, among other requirements, "includes 'some built-in increase' to deter non-compliance." *BMW of N. Am. LLC v. United States*, 926 F.3d 1291, 1301-02 (Fed. Cir. 2019) (*quoting De Cecco*).

The application of AFA applied should also "reflect{} the seriousness of the non-cooperating party's misconduct," and Commerce should consider the respondent's "level of culpability" in applying AFA. *Id.* For example, the Federal Circuit rejected one noncooperative respondent's argument that it should receive an AFA rate of 3.92 percent, as the Court saw that rate was "the same rate that was received by cooperative respondents and indeed is lower than the…rate assigned to {the other} mandatory respondent {} who fully cooperated with Commerce." *Viet I-Mei Frozen Foods Co. v. United States*, 839 F.3d 1099, 1110 (Fed. Cir.

2016). Granting a noncooperative party a lower rate than the rate received by a fully cooperative respondent "would only incentivize gamesmanship and undermine the purpose of the AFA provisions if recalcitrant respondents…were rewarded with favorable rates." *Id.* The Court agreed with Commerce that an AFA rate of 25.76% in that case "was appropriate to ensure {the respondent} did not benefit from refusing to cooperate with Commerce's requests for complete information." *Id.*

In *Papierfabrik August Koehler AG v. United States*, this Court addressed a case with strong parallels to the issue here. The Court posed as a hypothetical "an unusual circumstance" where a respondent "might have received a small or de minimis margin even had it cooperated fully and in good faith." *Papierfabrik August Koehler AG v. United States*, 180 F. Supp. 3d 1211, 1231 (CIT 2016). The Court explained that if Commerce were to be confined to applying only an AFA rate that was not an increase from that small or *de minimis* margin,

> such a rate could never be sufficiently *"adverse"* within the meaning of §
> 1677e(b) as to provide any meaningful deterrent to the type of misconduct
> involved. Where that is the case, a court must be mindful of the purpose of
> § 1677e(b), which is to allow Commerce to use an adverse inference in
> choosing from among the facts otherwise available.

*Id*. (emphasis added). The Court recognized that the situation it was addressing there was "just such an extraordinary circumstance," where the respondent would have received a "small" margin of 3.16%, but Commerce had discovered that the respondent had withheld information on certain home market sales and so applied AFA. *Id*., 180 F. Supp. 3d at 1217-18, 1230. The Court upheld Commerce's application of a total AFA rate of  75.36 percent, justified as "an adequate deterrent to future 'noncooperation.'" *Id*. at 1231-32.

In the second remand redetermination in this case, Commerce has properly recognized and explained that when the methodology in *Dillinger France I* is applied in this case, "Salzgitter

may well receive a more favorable dumping margin than it would have received if the company

had fully cooperated…." *Second Redetermination*, ECF No. 129  at 30. Because Salzgitter

refused to report full information on over [    ] percent of its home market sales, the agency found

itself unable to determine "what Salzgitter's margin would have been if Salzgitter had fully

cooperated." *Id.* Significantly, the question is not whether Commerce should have applied

AFA—this Court already has upheld Commerce's decision that the statutory requirements for

AFA to be applied were met (Slip Op. 19-87, ECF No. 72 at 15; Slip Op. 21-101, ECF No. 119

at 17). The relevant question is what methodology Commerce should use to apply AFA to

achieve the relevant goal in applying AFA. And what Commerce could determine from the

information that was available on the record is that one methodology benefited the

noncooperative Salzgitter while the other led to an outcome that was actually adverse.

Thus, Commerce's selected AFA methodology in the second redetermination is

necessary to meet the central goal of applying AFA. Commerce's methodology assures that there

is a significant increase in the margin applied to Salzgitter so that Salzgitter does not benefit

from its more significant refusal to cooperate. Commerce's application both reflects the

seriousness of Salzgitter's noncooperation (*see BMW*, 926 F.3d at 1301-02) and provides a

deterrent measure for future respondents who would otherwise see that Salzgitter benefitted from

Commerce's inability to apply meaningful AFA. As this Court has stated,

> If the missing information is important, and a large volume of that
> information is missing, it is logical to draw a more adverse inference
> because that would further the goal of creating an incentive for
> respondents to provide the information.

*Kawasaki Steel Corp. v. United States*, 24 C.I.T. 684, 697 (2000). Disallowing Commerce from

applying AFA in the manner it has would assure that Salzgitter would be "rewarded with {a}

favorable rate{}" (*Viet I-Mei Frozen Foods*, 839 F.3d at 1110) that would be lower than the rate

applied to respondents that where considerably less noncooperative (in the case of Dillinger

Germany, noncooperative on [                                        ] as was Salzgitter).

 Moreover, the CIT has explained that while "the use of primary information is not in

itself a guarantee against {the Court} finding AFA to be unreasonable, plaintiff has a challenging

burden to demonstrate the reason that the use for AFA of plaintiff's own data, supplied to

Commerce in the immediate proceeding, is not supported by substantial evidence." *Nippon Steel*

*& Sumitomo Metal Corp. v. United States*, 483 F. Supp. 3d 1214, 1228-29 (Ct. Int'l Trade 2020).

"The SAA also states that Commerce does not have to prove that the {selected} facts available

are the best alternative information. 'Rather, the facts available are information or inferences

which are reasonable to use under the circumstances.'" *Ta Chen Stainless Steel Pipe, Inc. v.*

*United States*, 24 C.I.T. 841, 850 (2000), *aff'd*, 298 F.3d 1330 (Fed. Cir. 2002) (quoting *SAA*,

H.R. Doc. No. 103-316 at 869, 1994 U.S.C.C.A.N. at 419). Here, Commerce appropriately used

data reported by Salzgitter to apply AFA. *See Second Redetermination,* ECF No. 129 at 30-31

(discussing Commerce's use of Salzgitter's own price information). Commerce's use of that

primary information from the record directly results in the outcome that meets the goals of

applying it as AFA. That application is reasonable and proper.

 In contrast to the facts surrounding Salzgitter's noncooperation, the facts surrounding

Dillinger's noncooperation, here and in *Dillinger France I*, were such that Commerce's choice of

methodology did not result in differing outcomes. Again, Commerce's methodological choices

reflected the seriousness, or the "scope" as termed by Commerce in the redetermination, of the

specific party's failure to cooperate. *See Second Redetermination,* ECF No. 129 at 27.  Those

factual differences required a different methodology to apply AFA to "support Commerce's

goals in applying partial AFA" (*id.* at 8); goals that, as discussed, are the goals directed by the statute.

In this redetermination, Commerce also responded to the Court's questions regarding why these differences were not discussed in the respective memorandum the agency issued on the various applications of partial AFA. Commerce explains that the differences in the factual situations were not relevant until different methods to apply AFA began to be applied in *Dillinger France I. Id.* at 31. As has been discussed in these comments, the differences identified by Commerce between the situations are fundamentally intertwined with the purposes and proper practice in applying AFA. Commerce's second remand redetermination provides a full explanation, supported by substantial evidence on the record, of why it was proper and necessary for Commerce to select the AFA methodology it did here to respond to Salzgitter's noncooperation here and explains why that methodology reasonably differed than a methodology that may be reasonable in factually different situations. *See id.* at 57. The Court should therefore sustain Commerce's redetermination of a 22.90 percent margin partial AFA for Salzgitter. *Id.* at 31.

### B.   Salzgitter's Arguments in Opposition to Commerce's Redetermination Are Without Merit

In its March 15, 2022 comments opposing the second redetermination, Salzgitter raises a number of arguments against Commerce's reasoned determination. Salzgitter Comments, ECF No. 135. These arguments are without merit and should be rejected by the Court.

First, Salzgitter argues that Commerce did not use an "equivalent analysis" in comparing the factual situations of Salzgitter's noncooperation in this investigation and in *Dillinger France I.* Salzgitter Comments, ECF No. 135 at 3-6. Salzgitter argues that in *Dillinger France I,*

Commerce focused only on the home market sales that were ultimately matched for comparison with U.S. sales and, as a result, Commerce must undertake an identical analysis here rather than citing to the total number of home market sales for which Salzgitter refused to provide full information. *Id.* at 3-4. Salzgitter thus attempts to focus the argument on a difference that was not significant in the decision that Commerce actually made. In other words, Salzgitter seeks to minimize the extent of its noncompliance with Commerce's reporting instructions by arguing that only some of those sales were used as comparison sales in Commerce's margin calculation. *Id.* at 4-5. But Salzgitter cannot escape the fact that, regardless of how Salzgitter tallies its noncooperation, that noncooperation had a *critical* effect on the outcome of the margin calculation –  critical enough that it controls entirely whether Salzgitter will be faced with the discipline of an order. *See Second Redetermination,* ECF No. 129 at 28. As discussed above, Commerce was not focused solely on the number of sales which were not reported fully or that were used as a comparison for normal value. Commerce also looked at the *outcome* that the noncooperation had in each case. *See id.* at 27 (explaining that the number of sales lacking information in *Dillinger France I* was relevant specifically because "the application of partial AFA, regardless of any methodology, had no measurable impact on Dillinger France's margin.").

Commerce did not set a bright-line figure or percentage that some type of sales had to reach before a certain AFA methodology would be applied. Thus, how that number is specifically tallied is irrelevant to the actual decision made by the agency. Instead, Commerce focused on the fact that in *Dillinger France I* (and for Dillinger Germany here), the respondent's noncooperation did not make any difference in the application of AFA. For Salzgitter, in stark contrast, its lack of full reporting had a major effect on the outcome, requiring application of a different AFA methodology. Salzgitter's focus on how some numbers can be compared entirely

10

misses the point that the comparison of the outcomes, not the bare counts, was the most critical difference.

And as Commerce points out, Salzgitter's claims that Commerce must focus only on the number tallied by Salzgitter as the relevant point of comparison "would allow a respondent, not Commerce, to determine what information is relevant for Commerce's analysis." *Second Redetermination*, ECF No. 129 at 55. Salzgitter claims "{t}his rhetoric misses the point." Salzgitter Comments, ECF No. 135 at 5. But it is again Salzgitter that misses the point. Salzgitter attempts to erase the significance of the copious number of home market sales for which it did not report full information (28,000 instances). *See id.* at 5-6. But as the Federal Circuit has explained, the application of AFA should reflect the seriousness of the noncooperation. *See BMW*, F.3d at 1301-02. Salzgitter choose not to provide full information on 28,000 sales. At the time it did so, it did not know which of those sales would serve as comparison sales. Nevertheless, Salzgitter chose to withheld full information for all of them. "It is Commerce, not the respondent, that determines what information is to be provided…" *Ansaldo Componenti, S.p.A. v. United States*, 628 F. Supp. 198, 205 (Ct. Int'l Trade 1986). In *Ansaldo Componenti*, this Court rejected a respondents' claim that its lack of cooperation was irrelevant as the respondent decided it need only report information on "comparable transformer sales." *Id.* The Court should reject Salzgitter's equivalent argument here that its decision not to report the full information Commerce sought should be ignored because Salzgitter sees that full information as irrelevant in hindsight.

Salzgitter also claims that Commerce's concern that Salzgitter could have been attempting to manipulate the investigation by choosing not to report the full information Commerce sought is "pure speculation." Salzgitter Comments, ECF No. 135 at 7. Salzgitter

11

again misses the point. Commerce did not base its application of AFA on evidence that Salzgitter was attempting to manipulate the outcome. Commerce did not need to reach such a finding. The statute does not require that Commerce provide substantial evidence of a nefarious purpose behind noncooperation before AFA can be applied and an adverse outcome be enforced. The statute only requires that necessary information be absent from the record and that this gap be caused by a party's failure to cooperate. 19 U.S.C. §§ 1677e(a) and (b); *see also Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1383 (Fed. Cir. 2003) ("the statute does not contain an intent element" for the application of AFA). Commerce did not make a finding of malfeasance by Salzgitter. *See Second Redetermination,* ECF No. 129 at 30-31. Commerce did demonstrate how Salzgitter's lack of cooperation prevented Commerce from having the information it needed to apply its normal calculation methodologies. *Id.* Commerce thus properly applied AFA to avoid the possibility of allowing Salzgitter from benefiting from its noncooperation. *Id.*

Salzgitter also argues that Commerce's claim that Salzgitter would benefit from its noncooperation if the AFA methodology from *Dillinger France I* were applied "is incorrect." Salzgitter Comments, ECF No. 135 at 8. Salzgitter relies on the fact that it "provided Commerce with three alternative methods" to calculate a margin for Salzgitter which all purportedly resulted in a zero margin for Salzgitter. *Id.* at 8-9. Commerce correctly points out that this approach was already rejected by the Court in its first determination here. *See Second Redetermination*, ECF No. 129 at 56 (*citing* Slip Op. 19-87, ECF No. 72); *see also* Slip Op. 19-87, ECF No. 72 at 14 (noting that Salzgitter's three alternative calculations lacked any indication that they "would reasonably reflect the missing CTL plate manufacturer information for the relevant transactions"). Here again, Salzgitter attempts to usurp the role of the investigative agency, deciding what possible calculation methodologies Commerce could pursue. Dumping margin

12

calculations are notoriously complex and require a multitude of judgment calls and intermediate determinations by the decision maker before a final margin is determined. This complexity is demonstrated by the fact that Salzgitter was able to concoct three different calculations which all reached its self-serving goal of escaping the discipline of an antidumping duty order. But Commerce is in no way limited to selecting from the calculation alternatives submitted by a respondent. The fact that Salzgitter could calculate a zero margin based on its own calculations provides no evidence that the agency actually empowered under the statute to make those choices should do the same.

Further, none of the alternatives proposed by Salzgitter actually shows what the margin would be if Salzgitter had fully cooperated. They are simply alternative ways to fill in the information Salzgitter did not provide. *See* Salzgitter Comments, ECF No. 135 at 8 (describing Salzgitter's three alternatives "to use the sales for which the manufacturer could not be identified"). Salzgitter only offers alternative applications of "facts available", but it does not (and indeed cannot) show what margin would have resulted if it had cooperated. Nor does Salzgitter show that its preferred methodologies meet the statutory goals for the application of *adverse* facts available. Commerce instead properly selected an adverse method that did meet those goals. Commerce's selection of the proper methodology to apply AFA is due particular deference. *Ta Chen,* 298 F.3d at 1338–39 ("{i}n the case of uncooperative respondents, the discretion granted by the statute {to Commerce} appears to be particularly great…."). The fact

13

that the respondent can identify an alternative methodology provides no reason to encroach on the great discretion Congress gave Commerce.[1]

This Court rejected a similar argument in *Papierfabrik*, where the noncooperative respondent claimed that the home-market sales information it had withheld from Commerce had no material effect on the margin and that it "would have qualified for a *de minimis* margin in any event." *Papierfabrik*, 180 F. Supp. 3d. at 1226. The Court disagreed, holding that Commerce does not need to attempt to fill in information that was withheld from the agency to calculate what the benefit to the respondent might have been had it cooperated with the agency: "Commerce is under no obligation to reach the finding {that the noncooperative respondent} did not benefit from its own lack of cooperation." *Id.* The Court should again reject the same arguments here, as Salzgitter's claims would force Commerce to fill in the very information Salzgitter withheld with no adverse inference.

---

[1] The same holds true for Salzgitter's claim that Commerce could not use the price it applied  as AFA because the product for that sale was unlike some other products. Salzgitter Comments, ECF No. 135 at 12. Salzgitter attempts to infuse some vital meaning on the fact that this product was not compared to any U.S. sales. *Id.* But Salzgitter points to no authority that requires Commerce to use only sales prices for identical products as facts available with an adverse inference. *Id.* Instead, as stated by the Federal Circuit in *Ta Chen*, Commerce has considerable latitude in selecting what facts to apply as adverse facts. And as stated by this Court in *Nippon Steel & Sumitomo Metal*, that discretion is particularly supported when Commerce uses the respondent's own data as the substitute data, as Commerce did here. 483 F. Supp. 3d 1228-29. As Commerce explained, and Salzgitter does not challenge, the price was a non-aberrational price from among Salzgitter's sales of this type of in-scope merchandise. Second Redetermination, ECF No. 129 at 30. In fact, Commerce rejected some prices for these sales that were higher. *Id.* Salzgitter claims that this product was "wholly dissimilar," but never explains how one type of in-scope steel product is "wholly dissimilar" from another type of in-scope steel product. *See* Salzgitter Comments, ECF No. 135 at 13. Instead, Commerce reasonably used a non-aberrational price from the same type of sale as the fact available for sales of a similar product, applying the increase so that the fact used was properly adverse. Salzgitter's repeated attempts to focus on trivial differences in the products fails to detract from Commerce's proper application of AFA.

NON-CONFIDENTIAL VERSION

Salzgitter finally attempts to relitigate arguments that have already been rejected by this Court. Salzgitter claims that Commerce could not reject the information Salzgitter submitted for its home market sales simply because Salzgitter chose not to disclose all the information regarding those sales. Salzgitter Comments, ECF No 135 at 10. The Court already rejected that argument, noting that "Commerce has clear statutory authority pursuant to 19 U.S.C. § 1677m(d) to '**disregard all or part** of the original and subsequent responses' in an adverse inference scenario." Slip Op. 19-87, ECF No. 72 at 17 (emphasis in the original).

Salzgitter's reliance on § 1677m(e) is also without merit. That provision does not obligate Commerce to accept Salzgitter's partial information as Salzgitter argues. Salzgitter claims that it met all requirements of § 1677m(e), including the requirement that it "acted to the best of its ability in providing the information." Salzgitter Comments, ECF No 135 at 11. That claim has also already been rejected by the Court, which noted that Salzgitter's excuses for not producing the information (after Salzgitter demonstrated to Commerce at verification that it could in fact produce the missing information for a given sale when pressed) "neither excuses nor resolves the problem" and rejected Salzgitter's "unilateral assertion of difficulty" as insufficient to meet Salzgitter's "burden to create an adequate record." Slip Op. 19-87, ECF No. 72 at 13-15. As Salzgitter did not fully cooperate with the investigating agency to the full extent it was able,[2] Salzgitter cannot now find refuge behind § 1677m(e) from the consequences of its less-than-full cooperation with the agency.

---

[2] Including, as the Court has properly pointed out, taking advantage of the ability to request agency assistance under 19 U.S.C. § 1677m(c)(1) and (2) if it truly faced difficulties in providing requested information that it sought to overcome. Slip Op. 19-87, ECF No. 72 at 15.

NON-CONFIDENTIAL VERSION

### III.    CONCLUSION

In sum, Commerce's second remand redetermination fully complies with the Court's order to explain why Commerce's application of a partial-AFA rate of 22.90 percent to Salzgitter was reasonable. Commerce has set out why the particular facts in this situation make that application reasonable, even if a different methodology was reasonable in different situations. Commerce has also explained why highlighting those differences only become relevant after it issued its memorandum in the investigations.

Salzgitter's arguments, on the other hand, lack merit and fail to show that Commerce acted improperly. Therefore, the Court should continue to reject Salzgitter's claims and instead sustain Commerce's second remand redetermination to prevent a non-cooperative respondent from benefiting from its non-cooperation.

Respectfully submitted,
/s/ Nicholas J. Birch_____
Roger B. Schagrin
Luke A. Meisner
Nicholas J. Birch
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for SSAB Enterprises LLC*

April 14, 2022

16

NON-CONFIDENTIAL VERSION

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE LEO M. GORDON, JUDGE**

| | |
|---|---|
| AG DER DILLINGER HUTTENWERKE, | |
| *Plaintiff*, | |
| ILSENBURGER GROBBLECH GMBH, SALZGITTER MANNESMANN GROBBLECH GMBH, SALZGITTER FLACHSTAHL GMBH, SALZGITTER MANNESMANN INTERNATIONAL GMBH, *and* FRIEDR. LOHMANN GMBH, | |
| *Consolidated Plaintiffs*, | |
| and | Consol. Court No. 17-00158 |
| THYSSENKRUPP STEEL EUROPE AG, | |
| *Plaintiff-Intervenor*, | |
| v. | |
| UNITED STATES, | |
| *Defendant*, | |
| NUCOR CORPORATION *and* SSAB ENTERPRISES LLC, | |
| *Defendant-Intervenors*. | |

**CERTIFICATE OF COMPLIANCE WITH WORD LIMITATION**

I, Nicholas J. Birch, hereby certify that these comments contain 4,793 words, according to the word count function of the word processing program used to prepare this brief, and therefore complies with the word limitations as set forth in ¶ 2(B) of the Standard Chambers Procedures of this Court.

/s/ Nicholas J. Birch\_\_\_\_\_
Roger B. Schagrin
Luke A. Meisner
Nicholas J. Birch
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700
*Counsel for SSAB Enterprises LLC*