## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE: THE HONORABLE LEO M. GORDON, SENIOR JUDGE

_____

|  |  |  |
|---|---|---|
| AG DER DILLINGER HUTTENWERKE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| ILSENBURGER GROBBLECH GMBH, | ) | |
| SALZGITTER MANNESMANN GROBBLECH | ) | |
| GMBH, SALZGITTER FLACHSTAHL GMBH, | ) | |
| SALZGITTER MANNESMANN | ) | |
| INTERNATIONAL GMBH, and | ) | Consol. Court No. 17-0158 |
| FRIEDR. LOHMANN GMBH, | ) | **PUBLIC VERSION** |
| | ) | **BPI Removed From Page 16** |
| Consolidated Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| UNITED STATES, | ) | |
| | ) | |
| Defendant, | ) | |
| | ) | |
| NUCOR CORPORATION and SSAB | ) | |
| ENTERPRISES LLC, | ) | |
| | ) | |
| Defendant-Intervenors. | ) | |

_____

## DEFENDANT'S RESPONSE TO COMMENTS ON REMAND REDETERMINATION

Defendant, the United States, respectfully submits this response to the comments filed by

plaintiff AG der Dillinger Huttenwerke (Dillinger) and consolidated-plaintiffs Ilsenbruger

Grobblech GmbH, Salzgitter Flachstahl GmbH, Salzgitter Mannesmann Grobblech Gmbh, and

Salzgitter Mannesmann International GmbH (collectively, Salzgitter).  *See* Dillinger Cmts.,

March 15, 2022 (ECF No. 134); Salzgitter Cmts., March 15, 2022 (ECF No. 135).  Their

comments and our response concern the Department of Commerce's second remand

redetermination, *see Final Results of Redetermination Pursuant to Court Remand*, January 20,

2022 (Remand Redetermination) (ECF No. 130), issued by Commerce pursuant to this Court's

opinion and remand order, *AG Der Dillinger Huttenwerke v. United States*, Court No. 17-00158, Slip Op. 21-101 (Ct. Int'l Trade 2021) (Remand Order) (ECF No. 119).

Of the four issues remanded to Commerce, the parties challenge Commerce's remand redetermination with respect to only two. No parties disagree with Commerce's findings regarding Commerce's recalculation of the major input adjustment factor or Commerce's adjustment to Dillinger's cost of production for the services provided to Rogesa and ZKS. *See* ECF Nos. 134, 135. Thus, in the absence of any objection, the Court should sustain the remand redetermination with respect to those two issues.

Dillinger and Salzgitter challenge the remaining two remanded issues: (1) adjustment to Dillinger's reported costs for non-prime products to reflect the products' sales value as recorded in Dillinger's normal books and records and Commerce's reallocation of the difference to the cost of prime plate, and (2) application of partial adverse facts available on sales made by one of Salzgitter's affiliated downstream resellers where Salzgitter did not identify the manufacturers of the CTL plate.

As we explain below, Commerce complied with the Remand Order, supported the Remand Redetermination with record evidence, and acted in accordance with law. Therefore, this Court should uphold the Remand Redetermination and enter final judgment for the United States.

## ARGUMENT

### I.   Background

On April 4, 2017, Commerce published its final affirmative determination for the antidumping duty investigation of certain carbon and alloy steel cut-to-length (CTL) plate from Germany. *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of*

*Germany*, 82 Fed. Reg. 16,360 (Dep't of Commerce April 4, 2017) (Final Determination).  In the

Final Determination, Commerce:  (1) adjusted Dillinger's reported costs for non-prime products

to reflect the products' sales value as recorded in Dillinger's normal books and records and

reallocated the difference to the cost of prime plate; (2) adjusted the reported cost for coke for

Dillinger's affiliate, Rogesa Roheisengesellschaft (Rogesa); (3) adjusted the cost of production

of the inputs and services Dillinger provided to Rogesa and Zentralkokerei Saar Gesellschaft

(ZKS), Rogesa's affiliate, to include a portion of Dillinger's general and administrative

expenses; and (4) applied partial adverse facts available on sales made by one of Salzgitter's

affiliated downstream resellers where Salzgitter did not identify the manufacturers of the CTL

plate.  *See Final Redetermination* IDM at Comments 1, 31, and 33.

On September 6, 2019, this Court remanded this matter to Commerce, instructing

Commerce to recalculate the antidumping margin for Salzgitter and Dillinger following the

adverse facts available methodology in *Dillinger France.  See AG Der Dillinger Huttenwerke v.

United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade Sept. 6, 2019) (*Dillinger Germany I*).

Commerce did so under protest.  ECF No. 85 (first remand results).

On August 18, 2021, this Court again remanded to Commerce on four issues.  *See* ECF

No. 119 (remand order)*.*  First, this Court directed Commerce to reconcile its reallocation of

costs between prime and non-prime plate consistent with the United States Court of Appeals for

the Federal Circuit's opinion in *Dillinger France* and to rely on the actual costs of production for

prime and non-prime plate.  *See* Remand Order at 6; *Dillinger France S.A. v. United States,* 981

F.3d 1318 (Fed. Cir. 2020).  Second, this Court remanded certain elements of Commerce's

calculation of the major input adjustment factor, requesting further explanation with respect to:

(1) the use of non-contemporaneous affiliated and unaffiliated consumption values; (2) the use of

freight costs that were not contemporaneous with the coke values used and were calculated on wet-weight basis but applied to a quantity of coke on a dry-weight basis, (3) whether transfer prices should be adjusted to include general and administrative (G&A) and interest expenses; and (4) the potentially distortive impact of a credit note adjustment on the average consumption values used in the calculations. *See* Remand Order at 11. Third, this Court remanded Commerce's adjustment to Dillinger's cost of production for the services provided to Rogesa and ZKS for further explanation or reconsideration. *See* Remand Order at 17. Finally, this Court remanded Commerce's application of partial adverse facts available to Salzgitter, providing Commerce the opportunity to explain why it is reasonable to use a different approach to applying partial adverse facts available than what was used in *Dillinger France*. *See* Remand Order at 18.

Commerce issued draft remand results to interested parties for comment on December 3, 2021. *See Draft Remand Redetermination* (P.R.R. 7) (C.R.R. 6). On December 21, 2021, defendant-intervenors Nucor Corporation (Nucor) and SSAB Enterprise LLC (SSAB), plaintiff Dillinger, and consolidated-plaintiff Salzgitter submitted comments on the draft results. *See Nucor Comments on Draft Remand Results* (P.R.R. 15) (C.R.R. 12); *SSAB Comments on Draft Remand Results* (P.R.R 13); *Dillinger Comments on Draft Remand Results* (P.R.R. 14) (C.R.R. 11); *Salzgitter Comments on Draft Remand Results* (P.R.R. 16) (C.R.R. 13).

Commerce issued its second Remand Redetermination on January 20, 2022. *See* ECF No. 130 (Remand Redetermination). With regard to the issue of its non-prime plate adjustment, Commerce reopened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime plate produced and the actual cost of producing the non-prime products, in line with the Federal Circuit's holding in *Dillinger France*. *See* Remand Redetermination at 5. Dillinger did not provide the physical characteristics or the actual product

specific cost of production of non-prime plate. *Id.* at 6.  Therefore, because necessary information was missing from the record, Commerce applied facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and used the total cost of production for both prime and non-prime plate as recorded in Dillinger's books and records to comply with the Remand Order. *Id.* at 8.

With regard to Commerce's calculation of the major input adjustment factor to blast furnace coke, Commerce reopened the record and obtained relevant information from the period of the investigation regarding inventory movement schedules for coke from each affiliated and unaffiliated supplier, including freight and costs. *See* Remand Redetermination at 15.  Using this information, Commerce recalculated the unaffiliated consumption values by weight, averaging the consumption values for the remaining unaffiliated suppliers, recalculating freight costs, and determining a new major input adjustment. *Id.* at 15-16.  Commerce further provided additional explanation and clarification regarding whether transfer prices should be adjusted to include G&A and interest expenses, as well as the credit note adjustment. *Id.* at 17-21.

For the third remanded issue, Commerce's adjustment to Dillinger's cost of production for the services provided to Rogesa and ZKS, Commerce reexamined Dillinger's arguments, as directed by this Court. *Id.* at 21.  Commerce provided additional explanation as to where it agreed and disagreed with Dillinger's positions, and tied those determinations to record evidence. *Id.* at 21-25.

Finally, with regard to the fourth remanded issue, the application of partial adverse facts available to Salzgitter, Commerce discussed how the scope of Salzgitter's failure to cooperate is substantially different than the scope of Dillinger's or Dillinger France's failure to cooperate, and thus, that a different application of partial adverse facts available is warranted. *Id.* at 27. Specifically, Commerce explained the difference in the amount of downstream sales of CTL

plate without an identified manufacturer between Salzgitter, Dillinger, and Dillinger France, and how Commerce's purpose and goals in selecting a partial adverse facts available methodology was frustrated with regard to Salzgitter when Commerce was forced to apply the same methodology used in Dillinger France.  *Id.* at 27-31.  Dillinger's rate was ultimately revised from 5.52%  to 4.98%, and Salzgitter was assigned the same rate as in the final determination, 22.90%.  *Id.* at 2.

## II.     Standard of Review

In remand proceedings, the Court will sustain Commerce's determinations if they are "in accordance with the remand order," and are "supported by substantial evidence, and are otherwise in accordance with law."  *See MacLean-Fogg Co. v. United States*, 100 F. Supp. 3d 1349, 1355 (Ct. Int'l Trade 2015) (citing 19 U.S.C. § 1516a(b)(1)(B)(i)).  "Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).  Under this standard, "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966) (citations omitted).  Instead, when, as here, Congress has entrusted an agency to administer a statute that demands inherently fact-intensive inquiries, Commerce's conclusions may be set aside only if the record contains evidence "so compelling that no reasonable factfinder" could reach the same conclusion.  *See I.N.S. v. Elias-Zacarias*, 502 U.S. 478, 483-84 (1992).

## III.    The Court Should Sustain Commerce's Non-Prime Plate Adjustment

A.      Commerce's Redetermination Complies With The Remand Order And Is Supported By Substantial Evidence

The Court should sustain Commerce's Remand Redetermination because Commerce's

application of facts otherwise available in the absence of actual costs for non-prime plate complies with the Remand Order and is supported by substantial evidence. First, Commerce relied on information from the investigation to calculate the actual cost of production for prime products. Second, in response to the Remand Order, Commerce issued a supplemental questionnaire to Dillinger to obtain the actual product-specific cost information for non-prime products, as directed by the Federal Circuit. The supplemental questionnaire explained that it was inappropriate to rely on the *overall* average cost of producing all prime products as a surrogate for the *actual* cost of producing the specific non-prime products produced. *See generally* Remand Supplemental Questionnaire (P.R. R. 1)( C.R.R. 1). Notwithstanding this, Dillinger did not provide the requested information in its supplemental questionnaire response necessary to calculate the actual costs of production for non-prime products, instead insisting that the estimated allocation it provided in the original investigation should be used because it did not track –and thus could not provide – actual, product-specific costs. *See* Remand Redetermination at 6. Because Dillinger France failed to provide actual, product-specific costs in response to Commerce's request, Commerce applied facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) and relied on the total cost of production for both prime and non-prime merchandise as recorded in Dillinger's normal books and records. *Id.*

In *Dillinger France*, the Federal Circuit directed Commerce to "determine the actual costs of prime and non-prime products." 981 F.3d at 1324. Moreover, that Court has recognized that Commerce requiring costs to reflect cost differences attributable to physical characteristics ensures that product-specific costs reflect the actual costs to produce specific products. *See Hyundai Elec. & Energy Sys. Co. v. United States*, 15 F.4th 1078 (Fed. Cir. 2021) (affirming determination to apply facts otherwise available where importer failed to produce actual,

product-specific costs in response to Commerce's questionnaire).  Thus, Commerce required the physical characteristics of non-prime products to determine the "actual cost" of non-prime products.  Dillinger's failure to submit the physical characteristics or product-specific actual cost information, as requested by Commerce, precluded Commerce from doing so and necessitated the use of facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1).  Remand Redetermination at 11.

Specifically, to determine actual costs, as directed by this Court, Commerce relied on the cost assigned to the prime and non-prime merchandise as recorded in Dillinger's normal books and records – *i.e.,* the cost assigned to the non-prime merchandise based on Dillinger's estimated selling price of the non-prime products – as facts otherwise available.  *Remand Redetermination* at 13.  Commerce selected Dillinger's estimated selling prices of the non-prime products as facts otherwise available because this amount is relied upon by Dillinger in its normal books and records, was verified by Commerce, and is information that was available on the record.  *Id.*

Dillinger argues that Commerce ignored the directives of this Court and Federal Circuit because Commerce continued to rely on the "likely selling prices" in Dillinger's books and records, rather than the actual cost of production.  Dillinger Cmts. at 3.  Dillinger further argues that continuing to use its books and records as facts otherwise available was incorrect because Dillinger "properly reported the total actual costs of non-prime plate."  Dillinger Cmts. at 4.  However, as Commerce explained, Dillinger failed to submit either the actual product-specific costs of producing the non-prime products or the physical characteristics of the non-prime products, and Commerce did not have the information that is necessary to calculate the actual costs of prime and non-prime products.  Remand Redetermination at 35.  Commerce has an obligation to ensure that the reported costs of production reasonably reflect the cost of producing

the merchandise under consideration.  In order to do so, Commerce must have the opportunity to analyze information pertaining to the cost of producing the merchandise under consideration on both an aggregate and product-specific basis.  Remand Redetermination at 35.  Moreover, this Court specifically ordered a remand for Commerce to determine the actual costs of prime and non-prime products in accordance with the Federal Court's decision in *Dillinger France*. Remand Opinion at 6.

Indeed, given the combination of the Federal Circuit's directive, Commerce's long-standing (and judicially-approved) practice of analyzing costs on a control number, or "CONNUM"-specific basis, and record evidence, it is perplexing that Dillinger asserts that it accurately reported the total actual costs of non-prime products.  Dillinger Cmts. at 4.  To the contrary, the record indicates that Dillinger did not provide costs for non-prime plate on a product specification or CONNUM-specific basis and, as a result, Commerce's application of facts otherwise available was necessary.

Moreover, and contrary to Dillinger's assertions, the Federal Circuit did not *prohibit* Commerce from using likely selling prices for *any purpose* whatsoever.  Dillinger Cmts. at 3. Rather, the Federal Circuit directed Commerce to "determine the actual costs of prime and non-prime products."  *Dillinger France*, 981 F.3d at 1324.  In accordance with that decision, Commerce requested Dillinger's actual costs, but Dillinger was not able to provide them.  With the resulting gap in the record, Commerce was required to rely on facts otherwise available, and selected Dillinger's own internal valuation of prime and non-prime product to fill that gap, in accordance with 19 U.S.C. § 1677e.  The Federal Circuit's holding does not bar Commerce from *ever* using likely selling prices *for any purpose*, but rather instructed Commerce not to rely on that information in lieu "the actual costs of prime and non-prime products."  981 F.3d at 1324.

Commerce re-opened the record on remand, and Dillinger had an opportunity to provide additional information, which might have included production reports or finished goods inventory excerpts to show which production runs resulted in the production of non-prime plates. *Remand Redetermination* at 40. Dillinger chose not to do so. Thus, because Dillinger did not report the actual product-specific costs of producing non-prime products and, because Commerce verified the total costs of producing all products during the period of investigation, Commerce reasonably relied on the allocation of costs between prime and non-prime products recorded in Dillinger's normal books and records as facts otherwise available. Although Commerce acknowledged that the use of the non-prime cost information recorded in Dillinger's normal books and records (*i.e.*, the estimated sales prices) does not vary by CONNUM and does not reflect cost differences attributable to the physical characteristics, this information is nevertheless the best available information to fill the gap in the record because it is based on the actual costs Dillinger assigns to the non-prime products in its normal books and records. Remand Redet. at 13. Commerce's determination to rely on costs from Dillinger's normal books and records as facts otherwise available to calculate the actual cost of non-prime products is reasonable and complies with the *Remand Opinion.*

B. Commerce's Redetermination Is In Accordance With Law

This Court also should sustain Commerce's Remand Redetermination because it is in accordance with law. Dillinger argues that Commerce misapplied the facts otherwise available provision because Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics, suggested an alternative pursuant to 19 U.S.C. § 1677m(c), and no party challenged this alternative. Dillinger Cmts. at 10. Further, Dillinger asserts that Commerce applied an adverse inference in its facts otherwise available determination. Dillinger Cmts. at 7.

Finally, Dillinger argues that the missing information from the record does not affect the margin. Dillinger Cmts. at 7.

First, Dillinger did not argue that Commerce applied an adverse inference during the remand proceeding, and thus failed to exhaust its administrative remedies. It should not be able to make this argument now before the Court. *See generally* Dillinger Comments on Draft Remand; 28 U.S.C. § 2637(d); *Boomerang Tube, LLC, TMK IP-SCO v. United States*, 856 F.3d 908, 912-13 (Fed. Cir. 2017).

In any event, Commerce did not apply an adverse inference; instead it lawfully applied facts otherwise available, pursuant to 19 U.S.C. § 1677e(a)(1). Indeed, Dillinger cites to no instance where Commerce has ever relied upon *a party's own valuation of product* as an "adverse inference" in the application of facts otherwise available. Section 677e(a)(1) applies when necessary information is missing from the record, and Dillinger does not contest Commerce's determination that it failed provide Commerce with costs on a CONNUM and product specification –specific basis. Thus, faced with a gap in the record, Commerce properly applied 19 U.S.C. § 1677e(a)(1) and selected from facts otherwise available on the record to determine the actual cost of non-prime products as directed by this Court. Remand Redet. at 13.

Dillinger's mere disagreement with the information Commerce selected does not render the application of facts otherwise available adverse. It is well-settled that Commerce has broad discretion in selecting from facts available to fill a gap in the record. *Navigator Co., S.A. v. United States,* 463 F. Supp. 3d 1302, 1308 (Ct. In''l Trade 2020) (*citing Acciai Speciali Terni S.P.A. v. United States*, 142 F. Supp. 2d 969, 989 (Ct. Int'l Trade 2001)). As discussed above, Commerce selected from among available information to fill the gap in the record, and the determination to rely on Dillinger's *own valuation* for the products was reasonable. Commerce

further explained why Dillinger's suggested method, using the overall average cost of producing

prime plate products, is not a reliable basis for calculating an accurate weighted average

dumping margin.  Remand Redet. at 39.  Commerce explained that this method assigns the same

costs to products with varying physical characteristics, even though there is a wide disparity in

the reported actual total cost of manufacturing amounts for prime products.  *Id.*  Commerce's

application of facts otherwise available pursuant to 19 U.S.C. § 1677e(a)(1) is in accordance

with law.

Dillinger next argues that, because it could not provide the necessary information, 19

U.S.C. § 1677m(c) requires Commerce to depart from its long-standing, judicially approved

practice of analyzing costs on a CONNUM-specific basis.  Dillinger Cmts. at 7.  But Commerce

considered and rejected this approach, explaining that the overall average cost of producing

prime plate urged by Dillinger is not appropriate to use as facts otherwise available because that

proposed methodology assigns the same costs to products with varying physical characteristics.

Remand Redetermination at 8.  In contrast, Dillinger's own internal cost-shifting takes into

account the costs of various types of CTL steel.

Further, Dillinger's assertion that its proposed overall average cost methodology satisfies

the requirement of 19 U.S.C. § 1677m(c) such that application of facts otherwise available is not

necessary is incorrect.  19 U.S.C. § 1677m(c) provides that:

> Commerce shall not decline to consider submitted information if all of the
> following requirements are met: (1) the information is submitted by the
> established deadline; (2) the information can be verified; (3) *the information is not
> so incomplete that it cannot serve as a reliable basis for reaching the applicable
> determination;* (4) the interested party demonstrated that it acted to the best of its
> ability; and (5) the information can be used without undue difficulties.

19 U.S.C. § 1677m(c) (emphasis added).  As Commerce explained, the overall average cost

method that Dillinger advocates cannot serve as a reliable basis for calculating an accurate

weighted-average dumping margin because there is a wide disparity in the reported actual total cost of manufacturing amounts for prime products.  Remand Redetermination at 10.  Thus, the requirements of 19 U.S.C. § 1677m(c) were not met by the information provided by Dillinger, and resort to facts otherwise available was necessary and in accordance with law.

Next, Dillinger's argument that the costs and physical characteristics of non-prime products, *i.e.*, the missing information, have no impact on the margin calculation is flawed. Dillinger Cmts. at 7.  As an initial matter, it is inherently inconsistent to assert that "the only way Commerce is affecting the margin calculation is the shifting of the cost of non-prime to prime plate" and then argue that the issue has no impact on the margin calculation.  *Remand Redetermination* at 37; Dillinger Cmts. at 7.  Because the shifting of costs from prime to non-prime products has a direct effect on the costs of both product groups, it directly affects the results of the sales-below-cost test and calculation of constructed value profit regardless of whether non-prime products were sold in the United States.  *Id.*  Indeed, the fact that the weighted-average dumping margin changes as a result of the allocation of costs between prime and non-prime products demonstrates that there is an impact on the calculated weighted-average dumping margin.  It also illustrates why ensuring the accurate reporting of product-specific production costs is an essential step in Commerce's obligation to ensure that the reported costs reasonably reflect the cost of producing the merchandise under consideration, as directed by the Federal Circuit.  Moreover, Dillinger cites no authority for its apparent proposition that a party need only provide information to Commerce if that information will affect the dumping margin. Such a legal principle would run counter to Commerce's statutory directive by creating a system that relies on importers to provide *only information it believe will change its margin*.

Finally, Dillinger's argument that Commerce should accept its alternative suggestion of using the overall average costs as a surrogate for the actual costs of non-prime products because no party challenged Dillinger's reporting of physical characteristics or reported costs of non-prime products fails.  Dillinger Cmts. at 5.  Although no interested parties challenged Dillinger's reporting of the cost of production of non-prime products, Commerce identified the issue in the preliminary determination, and the petitioner argued in its administrative case brief that Commerce should continue this adjustment in the final determination.  *Remand Redetermination* at 37.  Dillinger's claim that, by relying on Dillinger's reported costs of non-prime product as the starting point in its calculation, Commerce implicitly accepted them incorrect.  *Id.*  To the contrary, and as discussed above, the Federal Circuit did not direct Commerce to rely on the costs as Dillinger reported them, but rather to "determine the actual costs of prime and non-prime products."  981 F.3d at 1324.  Moreover, Dillinger offers no legal authority limiting Commerce's findings only to those explicitly advocated by an interested party.  As Commerce explained, Dillinger's alternative proposed method is not appropriate here, and its inability to supply the necessary information for Commerce to make its determination reasonably required the use of facts otherwise available.  Remand Redet. at 39.

## IV.    The Court Should Sustain Commerce's Application Of Partial Adverse Facts Available To Salzgitter

It is well established that Commerce may use facts available with an adverse inference (adverse facts available) as a means to induce cooperation in its proceedings and address evasion concerns.  *See Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States,* 753 F.3d 1227, 1235 (Fed. Cir. 2014).  Thus, the purpose of applying adverse facts available is to provide respondents with an incentive to cooperate in Commerce's proceedings and ensure that necessary information is placed on the record to enable Commerce to reach a reasonable determination.

*See F.Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States,* 216 F.3d 1028, 1032 (Fed. Cir. 2000). As a result, in selecting a partial adverse facts available methodology, Commerce seeks to adopt a methodology that induces future cooperation and ensures necessary information is placed on the record. *Id.* In the same vein, if respondents find there is no benefit to their cooperation, they may conclude that withholding information or providing only certain information is advantageous.

As an initial matter, this Court has already sustained Commerce's use of partial adverse facts available to Salzgitter. *Remand Redetermination* at 28-29, *citing Dillinger Germany I,* 399 F. Supp. 3d at 1256 ("taking the record as a whole, Commerce's imposition of an adverse inference in the selection of facts available is reasonable.") This Court agreed with Commerce's use of partial adverse facts available, finding that Commerce was unable to determine whether to include or exclude certain CTL plate transactions because of the missing manufacturer information, and thus resulting in a gap to be filled pursuant to 19 U.S.C. § 1677e(a). *Id.* at 1253. However, noting that Commerce provided substantially similar analysis of this issue in both *Dillinger France* and here, yet ultimately determined that the missing information in *Dillinger France* would not affect the margin, the Court provided Commerce an opportunity to explain why a different approach to applying partial adverse facts available than what was used in *Dillinger France* is reasonable. *Id.* at 1257 ("The court therefore orders Commerce and the parties to review whether the same correction made in *Dillinger France* would have any material effect on the margins in this case, or if it would be immaterial.")

On remand, Commerce provided the requested explanation. Commerce explained why the scope of Salzgitter's failure to cooperate is substantially different from the circumstances in *Dillinger France,* and why – in this matter – Commerce relied on partial facts otherwise

available without an adverse inference for Dillinger and applied an adverse inference to Salzgitter. *See* Remand Redetermination at 26-27; Remand Order at 17-18. First, Commerce discussed why the difference between Salzgitter's, Dillinger's, and Dillinger France's missing information warrants different partial adverse facts available methodologies. *Id.* at 27. Commerce explained that Salzgitter's downstream sales of CTL plate that did not have a manufacturer identified represented more than [    ] percent of Salzgitter's home market sales, while in contrast Dillinger's downstream sales without an identified manufacturer represented less than [    ] percent of its home market sales. *Id.* Thus, for Dillinger, the application of the partial adverse facts available methodology also used in *Dillinger France* on remand had no effect on the margin, and Commerce's intended purpose in selecting the partial adverse facts available methodology remained unchanged on remand. *Id.* at 28. However, for Salzgitter, applying the partial adverse facts available methodology used in *Dillinger France* would have had a material effect on the margin, resulting in a change from 22.09 percent to zero percent and the potential for exclusion from the order, which would not have served the purpose of an adverse inference. *Id.* at 29.

In determining whether Commerce's goals in applying a partial adverse facts available methodology were met here, Commerce explained that it considered the extent to which Salzgitter benefitted from its own lack of cooperation. *Id.* Conducting the comparison directed by the Court, if Commerce applied the methodology used in *Dillinger France*, Salzgitter received a more favorable dumping margin (*i.e.,* zero percent) than it likely would have had it fully cooperated and provided the missing manufacturer information. *Id.* at 30. Further, because Salzgitter did not provide the missing manufacturer information, Commerce could not ignore the

possibility that Salzgitter's failure to report the manufacturer information was an attempt to distort the margin. *Id.* at 30-31.

Salzgitter argues that Commerce seeks to distinguish between Salzgitter, Dillinger, and Dillinger France based on the number of affected sales, but that the analysis is not equivalent. Instead, Salzgitter asserts, rather than compare the number of home market sales with missing manufacturer data, Commerce should compare the number and quantity of home market sales to the products sold in the United States. Salzgitter Br. at 6. However, Commerce's analysis of the affected sales, and their respective effect on the application of adverse facts available, is reasonable and consistent with the statute.

First, Salzgitter's proposed analysis would require Commerce to establish a new test of materiality to determine whether adverse facts available is warranted, allowing a respondent, and not Commerce, to determine what information is relevant for Commerce's analysis. *Remand Redetermination* at 55. This approach is not supported by the statute, nor is it supported by the holdings in *Dillinger France* or *Dillinger Germany*. *Id.* The Court in both cases sustained Commerce's use of partial adverse facts available under the original analysis; it is only how Commerce applied partial adverse facts available that is at issue. *Id.*

Salzgitter next argues that Commerce's claim that applying a different methodology to Salzgitter was justified because Salzgitter could have been attempting to distort the margin was based on pure speculation. Salzgitter Br. at 6-7. Similarly, Salzgitter contests Commerce's determination that calculating Salzgitter's margin using the *Dillinger France* methodology would frustrate Commerce's goals in applying adverse facts available. *Id.* at 8. These arguments are without merit: under the *Dillinger France* methodology, Salzgitter would receive a zero rate and be excluded from the order. Remand Redetermination at 55-56. As discussed above,

because Salzgitter failed to provide the requested information, Commerce cannot determine what the resulting margin would be if Salzgitter had complied fully. *Id.* at 56. Moreover, Commerce is not required to "demonstrate that the countervailable subsidy rate or dumping margin used by {Commerce} reflects an alleged commercial reality of the interested party." 19 U.S.C. § 1677e(d)(3)(B).

Similarly, while Salzgitter claims that the three alternatives it proposed in the *Final Determination* all resulted in a zero or *de minimis* margin, this Court has already rejected those alternatives. *Dillinger Germany I*, 399 F. Supp. 3d at 1255. Notably, the Court found these alternatives and the conclusions drawn by Salzgitter to be "mere speculation" and "self-serving," and, in fact, that these highlighted that Salzgitter could not identify the effect on Salzgitter's margin that this information would have. *Id.*

Finally, Salzgitter argues that Commerce erred in returning to the methodology used in the final determination because Commerce did not address the conclusion from *Dillinger France* that there was no gap in the record to be filled, and Commerce cannot disregard Salzgitter's verified sales prices on the record pursuant to 19 U.S.C. §1677m(d). Salzgitter Br. at 10. Further, Salzgitter argues that Commerce failed to address the Court's conclusion that the factual circumstances in this case and *Dillinger France* were identical. *Id.* at 9. However, these arguments fail.

In its remand redetermination, Commerce explained that the material factual differences between the companies was not apparent or relevant in both investigations when applying the original partial adverse facts available methodology, but became relevant when Commerce was required to apply the methodology used in *Dillinger France*. *Remand Redetermination* at 54, 56. Commerce specifically listed the differences between Salzgitter, Dillinger, and Dillinger France,

noting the differences between the number of sales lacking the requested manufacturer information, the net prices among the sales with missing data, and the impact on the margin caused by each company's failure to provide the requested information.  *Id.* at 57.  In addition, Commerce demonstrated that the factual differences had a significant impact on Salzgitter's margin under the *Dillinger France* methodology, but no impact on the margins for Dillinger or Dillinger France, which detrimentally affected Commerce's purpose in using partial adverse facts available to induce cooperation.  *Id.*  Therefore, Commerce *did* address the Court's concern about the factual similarities between the cases, and why returning to the methodology used in the Final Determination was nonetheless reasonable in this instance.  *Id.*

In addition, this Court did not instruct Commerce to rely on record information (*i.e.,* Salzgitter's reported home market price data) that Salzgitter claims Commerce must use.  *Id.;* Salzgitter Br. at 10.  Indeed, this Court acknowledged Commerce's statutory authority under 19 U.S.C. § 1677e to "disregard all or part of the original and subsequent responses" when relying on adverse facts available.  *Dillinger Germany I,* 399 F. Supp. 3d at 1256.  The remand order did not foreclose Commerce's return to the methodology used in the final determination, which this Court should sustain*.  Remand Redetermination* at 55.

## <u>CONCLUSION</u>

For these reasons, we respectfully request that the Court sustain Commerce's *Remand Redetermination* and enter final judgment in favor of the United States.

Respectfully Submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

PATRICIA M. MCCARTHY
Director

/s/ Tara K. Hogan.
TARA K. HOGAN
Assistant Director

OF COUNSEL:

/s/ Kelly A. Krystyniak
AYAT MUJAIS                                   KELLY A. KRYSTYNIAK
Office of the Chief Counsel for               Trial Attorney
Trade Enforcement & Compliance                U.S. Department of Justice, Civil Division
Department of Commerce                        Commercial Litigation Branch
                                              P.O. Box 480
                                              Ben Franklin Station
                                              Washington, D.C. 20044
                                              Telephone: (202) 307-0163
                                              Facsimile: (202) 514-8640
                                              E-mail: Kelly.A.Krystyniak@usdoj.gov

April 14, 2022                                Attorneys for Defendant

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Rule 2(b) of the Court's Standard Chambers Procedures, defendant's counsel

certifies that this brief complies with the Court's type-volume limitation rules.  According to the

word count calculated by the word processing system with which the brief was prepared, this

brief contains a total of 5,651 words.

<u>s/ Kelly A. Krystyniak</u>

April 14, 2022