A-428-844<br>
Remand<br>
Slip Op. 22-114<br>
Court No. 17-00158<br>
POI: 04/01/2015 – 03/31/2016<br>
**Public Document**<br>
E&C/OA: PG/SM

*AG der Dillinger Hüttenwerke v. United States*,
**Court No. 17-00158, Slip Op. 22-114 (CIT September 23, 2022)**
**Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany**

**FINAL RESULTS OF REDETERMINATION**
**PURSUANT TO COURT REMAND**

**I.     SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *AG der Dillinger Hüttenwerke v. United States et al.*, Court No. 17-00158, Slip. Op. 22-114 (CIT September 23, 2022) (*Dillinger Germany III*).  This action arises out of the final determination in the less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length plate (CTL plate) from Germany.[1]

In *Dillinger Germany III*, the Court upheld Commerce's use of facts otherwise available in Commerce's calculations because Dillinger failed to place information on the record demonstrating the actual cost of production (COP) of its non-prime products.  However, the Court remanded Commerce's application of facts otherwise available, stating that Commerce inadequately explained its reliance on AG der Dillinger Hüttenwerke's (Dillinger) normal books

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany:  Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan:  Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

and records as facts otherwise available to supply the missing cost information.[2] Thus, the Court remanded Commerce to provide further explanation or reconsideration of the information used as facts otherwise available, in line with the parallel *Dillinger France* remand regarding the same issue.[3]

Consistent with the Court's order in *Dillinger Germany III*, on remand, Commerce has further explained why continuing to rely on Dillinger's books and records, *i.e.*, the recorded total costs assigned to the prime and non-prime products, to determine the COP for the non-prime products is the only reasonable approach. Consequently, the final estimated weighted-average dumping margin calculated for Dillinger in the *Second Remand Redetermination* remains unchanged.[4]

## II.   BACKGROUND

In the LTFV investigation, Commerce adjusted the reported costs for non-prime products to reflect the cost recorded in Dillinger's normal books and records, based on estimated sales values, and then allocated the excess costs allocated to non-prime products (*i.e.*, the difference between the reported and adjusted costs for non-prime products) to the COP for prime products.[5]

In *Dillinger Germany I*, the Court remanded to Commerce to reconsider its application of partial adverse facts available (AFA) to certain downstream home market sales reported by Dillinger.[6] Pursuant to *Dillinger Germany I*, Commerce issued its *First Remand*

---

[2] *See Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 6-7.
[3] *See Dillinger France S.A., v. United States et al.*, 589 F. Supp. 3d 1252 (CIT 2022) (*Dillinger France*).
[4] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT August 18, 2021), dated January 19, 2022 (*Second Remand Redetermination*), at 57–58, available at https://access.trade.gov/resources/remands/21-101.pdf.
[5] *See Final Determination* IDM at Comment 11.
[6] *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*).

2

*Redetermination*, in which Commerce reconsidered how it applied partial AFA to these sales.[7] As a result of its redetermination and consistent with the instructions of the Court, Commerce modified its application of the partial AFA and recalculated Dillinger's estimated weighted-average dumping margin.  Commerce's decision had no impact on Dillinger's recalculated estimated weighted-average dumping margin, which was unchanged from that calculated in the *Amended Final Determination* (*i.e.*, 5.52 percent).[8]

In *Dillinger Germany II*, the Court remanded to Commerce to consider its reallocation of costs between prime and non-prime steel plate for Dillinger, among other Dillinger cost issues, as well as the application of a partial AFA methodology to certain downstream home market sales reported by Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, Salzgitter).[9]  To comply with the Court's order, Commerce reopened the record and issued a supplemental questionnaire to Dillinger to obtain the physical characteristics of the non-prime products produced and the actual cost of producing the non-prime products.[10]  Dillinger, however, failed to provide either the physical characteristics of non-prime products produced or the actual product-specific COPs for the non-prime products.[11]  Because there was no information on the record to calculate the actual COP of the non-prime products, on remand, Commerce continued to rely on the cost assigned to the prime and non-prime products as recorded in Dillinger's normal books and records as facts otherwise available.  Commerce did this in accordance with section 776(a)(1) of the Tariff Act of 1930, as amended (the Act),

---

[7] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany,* Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/19-87.pdf.
[8] *Id.* at 5.
[9] *See AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (CIT 2021) (*Dillinger Germany II*).
[10] *See Second Remand Redetermination* at 4-5.
[11] *Id.* at 6-7.

3

because Dillinger failed to provide its actual product-specific COPs for non-prime products, as requested by Commerce. In addition, in response to the Court's order, Commerce made other revisions to Dillinger's reported costs and provided further explanation regarding the application of partial AFA to Salzgitter. As a result of the changes to Dillinger's reported costs, Commerce recalculated Dillinger's estimated weighted-average dumping margin (*i.e.*, 4.98 percent).[12]

In *Dillinger Germany III*, the Court upheld Commerce's use of facts otherwise available for determining the COP of Dillinger's non-prime products. However, the Court remanded Commerce's selection of the facts otherwise available. As detailed below, because of Dillinger's failure to provide the information necessary to determine accurate product-specific COPs for non-prime products, the best available information is that recorded in Dillinger's normal books and records. Thus, the estimated weighted-average dumping margin calculated for Dillinger in the *Second Remand Redetermination* remains unchanged.

### III.   ANALYSIS

Commerce has continued to rely on Dillinger's normal books and records, which is the only reasonable approach for determining the allocation of total costs between prime and non-prime products, and the per-unit costs of non-prime products. In *Dillinger Germany III*, the Court held that Commerce's use of facts available pursuant to section 776(a)(1) of the Act was appropriate because Dillinger failed to submit its actual cost of producing non-prime products.[13] However, the Court also directed that, "in making its selection of facts otherwise available, Commerce must explain how its reliance on information indicating the 'likely selling price' of non-prime products accords with its obligation to ensure that the reported costs of production

---

[12] *Id.* at 2. In the *Second Remand Redetermination*, Commerce also revised the margin for Salzgitter and recalculated the all-others rate to be 22.90 percent and 20.99 percent, respectively. *Id.*
[13] *See Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 8.

reasonably reflect the <u>cost of producing the merchandise</u> under consideration."[14]  Accordingly, Commerce has prepared these final results of redetermination to explain how the information recorded for non-prime products in Dillinger's normal books and records is not only the best available information on the record, but also ensures that the reported costs reasonably reflect the cost of producing both prime and non-prime products.

In the *Second Remand Redetermination*, Commerce explained that:

> {a}s the total actual costs incurred by Dillinger, and verified by Commerce, must be allocated to all products produced, including prime and non-prime products, not knowing the actual cost of producing the non-prime products directly impacts the amount of costs assigned to the production of prime products.  If too much or too little cost is assigned to the non-prime products, then too little or too much cost is assigned to the prime products produced.[15]

Here, the production of non-prime products is an inevitable consequence of its production of prime products because Dillinger does not intend to produce non-prime products.

For example, while Dillinger may intend to produce 100 prime units, it may conclude after quality testing that two of the units are imperfect plates that are not suitable for use in the same applications as prime products.[16]  Relying on Dillinger's normal books and records, as facts available, to value both the prime and non-prime merchandise is the only reasonable approach because it recognizes that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such.

Therefore, for reasons discussed above, Dillinger's normal books and records are more reasonable to use as facts otherwise available because they recognize that the lost value of the

---

[14] *Id.* (emphasis in original).
[15] *See Second Remand Redetermination* at 7-8.
[16] *See* Memorandum, "2015-2016 Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany:  Verification of the Cost Response of AG der Dillinger Hűttenwerke," dated January 27, 2017.

non-prime products, which is an inevitable result of Dillinger's production of prime products, is appropriately considered to be a cost of producing the prime products. Consequently, Dillinger's proposal to assign the overall average cost of all prime products is unreasonable because it would distort the disparity in cost across prime CTL plate products, as well as the disparity in "size, specification, and grade" among non-prime products.[17] Thus, although both Dillinger's proposal and Dillinger's normal books and records are flawed because Dillinger chooses not to track the actual costs of producing non-prime products, we find that the use of the amounts recorded in Dillinger's normal books and records is reasonable for use as facts otherwise available.

## IV.    INTERESTED PARTY COMMENTS

On November 16, 2022, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[18] On November 23, 2022, we received comments from Dillinger and Nucor Corporation (Nucor), which are summarized below.[19]

*Dillinger's Comments:*

- Because facts available are used to fill an informational gap and, in this proceeding, the information gap to be filled is the actual costs of producing non-prime products which, pursuant to section 773(b)(3)(A) of the Act, shall be equal to the cost of materials and of fabrication or other processing of any kind employed in producing the product, the information used as facts available must correspond as closely as possible to the actual cost of producing the non-prime products.
- Commerce has not explained how the "likely selling price" corresponds to the actual cost of materials and fabrication.
- The likely selling price is below the total cost of any product control numbers (CONNUMs) in Dillinger's reported cost data.
- The sales value used by Commerce as the "COP for non-prime products" is not taken from the internal factory results.

---

[17] *See Second Remand Redetermination* at 9.
[18] *See* Draft Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany, *AG der Dillinger Hüttenwerke v. United States*, Court No. 17-00158, Slip Op. 22-114 (CIT September 23, 2022), dated November 16, 2022 (Draft Results of Redetermination).
[19] *See* Dillinger's Letter, "Comments on Draft Results of Redetermination," dated November 23, 2022 (Dillinger's Comments); *see* Nucor's Letter, "Comments on Draft Results of Redetermination," dated November 23, 2022 (Nucor's Comments).

- Non-prime products undergo the same production process as prime products and do not become less costly because they cannot be sold at full price.
- The Statement of Administrative Action states that the information Commerce uses as facts available must be reasonable under the circumstances.[20]  Commerce's use of the likely selling price fails this standard of reasonableness.
- Dillinger's proposed methodology is the most reasonable calculation of the cost of producing non-prime products because it is based on the actual total cost of manufacture for all plate sold during the period of investigation (POI).  This methodology uses the total standard costs from the primary cost report and then adjusts to actual costs using a two-step cost variance.
- Because non-prime plates can only be distinguished at the end of the production process, prime and non-prime plates use the same materials and undergo the same processing.
- The U.S. Court of Appeals for the Federal Circuit (Federal Circuit) prohibited the use of the likely selling price in place of the COP.
- Commerce's reference to "lost value" apparently means the fact that the sales price of non-prime products does not cover the COP of those products, which results in a loss on the sale.
- There is no statutory provision which authorizes either the reduction of the actual costs for the lost value resulting from a sale or the increase of actual costs attributable to the loss on another sale.  Thus, Commerce's shifting of production costs from non-prime to prime products is contrary to the express wording of the statute.
- Commerce's increase in the production costs of prime products to account for lost value is contrary to Commerce's longstanding practice of excluding inventory write-downs in the COP.[21]
- Commerce's shifting of costs from non-prime to prime products also runs counter to the decision of the Federal Circuit in *Dillinger France II* which stated that "{b}ecause Dillinger's books and records were based on 'likely selling price' rather than cost of production, Commerce erred in relying on them."[22]
- In *IPSCO*, the Federal Circuit struck down as unreasonable a methodology that allocated production costs to non-prime products based on market value, thereby reducing the production costs of non-prime products to below their actual COP.[23]  Moreover, in *IPSCO*, the Federal Circuit found that reducing a product's COP to the product's selling price amounted to "circular reasoning" which "contravened the express requirement of the statute which sets forth the cost of production as an independent standard for fair value."[24]

---

[20] *See* Dillinger's Comments at 4 (citing Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4198).

[21] *Id.* at 6 (citing *Polyethylene Retail Carrier Bags from Thailand:  Final Results of Antidumping Duty Administrative Review*, 76 FR 12700 (March 8, 2011), and accompanying IDM at Comment 6; *see also Stainless Steel Wire Rod from the Republic of Korea:  Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying IDM at Comment 7).

[22] *Id.* at 7 (citing *Dillinger France S.A. v. United States,* 981 F.3d 1318, 1321-24 (Fed. Cir. 2020) (*Dillinger France II*)).

[23] *Id.* at 7 – 8 ((citing *IPSCO, Inc. v. United States*, 965 F.2d 1056, 1058 (Fed. Cir. 1992) (*IPSCO*)).

[24] *Id*. (citing *IPSCO*, 965 F. 2d at 1059).

- In *Dillinger France II*, the Federal Circuit expressly affirmed *IPSCO* and stated that "if *IPSCO* governs, Commerce's reliance on Dillinger's books and records was impermissible."[25]
- Commerce's shifting of production costs from non-prime products to prime products also conflicts with the recent redetermination in *Husteel* in which the Court, after stating that Commerce's reallocation of costs from non-prime to prime products was "problematic" in light of the Federal Circuit's decision in *Dillinger France II*, remanded the matter back to Commerce.[26] On remand, Commerce stopped reducing the reported costs of non-prime products to resale value and accepted the respondent's cost reporting, which assigned full cost to both prime and non-prime products.[27]
- The situation in *Husteel*, in which the respondent did not track the costs of prime and non-prime products separately and reported the same average COP for both prime and non-prime products, is analogous to the current proceeding, because Dillinger does not track the costs of prime and non-prime products, and, therefore, calculated an average actual COP for non-prime products.
- Commerce's use of the likely selling price of non-prime products rather than the actual COP allocated to non-prime products is an impermissible adverse inference.
- Section 776(b) of the Act provides that Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information."
- Dillinger complied to the best of its ability, and, in Commerce's final results of redetermination submitted on January 20, 2022, Commerce acknowledged that there was no evidence that Dillinger tracks the physical characteristics of non-prime products or the actual product-specific cost of producing non-prime products.
- Commerce's assumption in its use of likely selling price is that the actual cost of producing non-prime products is only roughly 60 percent as high as the cost of producing prime products. Commerce's assumption is not supported by record evidence and is unreasonable when the products use the same materials and undergo the same production processes.

*Nucor's Comments:*

- Commerce explained why its reliance on the costs recorded in Dillinger's normal books and records for prime and non-prime products is appropriate and reasonably reflects the cost of producing prime and non-prime products.
- Commerce highlighted the fact that the production of non-prime products is a consequence of the production of prime products and is, therefore, a cost of producing the prime products.
- Commerce explained that, while Dillinger may intend to produce 100 prime units, Dillinger may conclude that two of the units are imperfect and, thus, have to sell these two units at a reduced price.

---

[25] *Id.* at 8 (citing *Dillinger France II*, 981 F. 3d at 1322).
[26] *Id.* at 8 – 9 ((citing *Husteel Co. v. United States*, 520 F. Supp. 3d 1296, 1309 (CIT 2021)).
[27] *Id.* ((citing *Husteel Co. v. United States*, 552 F. Supp. 3d 1405 (CIT 2022) (*Husteel*)).

- The loss associated with selling these two non-prime products is an unavoidable cost of producing the 98 prime units.
- Assigning costs in a manner which acknowledges this reality is an appropriate method for allocating costs and results in a reasonable representation of the actual costs of merchandise under consideration.

**Commerce's Position:**

We continue to rely on the allocation of total costs between prime and non-prime products as recorded in Dillinger's normal books and records as facts available, pursuant to section 776(a)(1) of the Act.  The information recorded in Dillinger's normal books and records, including the likely selling price of non-prime products, to allocate costs for the POI is the most reasonable information on the record to fill in the informational gap caused by Dillinger's failure to provide either the actual cost of producing non-prime products and their physical characteristics, or other information from its production records.  Such information could have provided Commerce with the information needed to ascertain the non-prime product's actual costs and to comply with the Federal Circuit's directive to determine the actual costs of prime and non-prime products.  Dillinger's argument that *Dillinger France II* prohibits the use of the information recorded in its normal books and records as facts otherwise available is unreasonable because it not only ignores the actual language and directive of the Federal Circuit but is also premised on unsupported assumptions concerning the informational gap (*i.e.*, the actual costs of producing non-prime products) created by Dillinger's decision not to submit the information that Commerce requested.

The Federal Circuit in *Dillinger France II* did not prohibit Commerce's reliance on the information recorded in Dillinger's normal books and records as facts otherwise available to allocate total POI costs between prime and non-prime products.  In *Dillinger France II*, the Federal Circuit held that Commerce was prohibited from relying on Dillinger's normal books

9

and records to determine the total costs allocable to non-prime products for the purpose of calculating their normal value, because Dillinger's normal books and records assign costs to non-prime products based on their likely selling prices, rather than Dillinger's actual costs of producing and selling the non-prime products.[28] In *Dillinger Germany III*, this Court, after sustaining Commerce's decision to apply facts otherwise available,[29] agreed with Commerce that the Federal Circuit's decision in *Dillinger France II* does not prevent Commerce from relying on Dillinger's normal books and records as facts otherwise available.[30] Accordingly, because the Federal Circuit's decision in *Dillinger France II* pertained to the calculations of normal value and constructed value and does not address or limit the nature of information Commerce may rely on as facts otherwise available, Dillinger's arguments concerning *Dillinger France II* and *IPSCO* are unavailing. Moreover, Dillinger's argument that Commerce should accept its "estimated" costs of producing non-prime products because Commerce relied on the costs assigned to non-prime products in the normal books and records of the respondent in *Husteel* ignores that, in *Husteel*, Commerce relied on these costs because it determined that the respondent "does not separately classify prime and non-prime products, nor does it value these products differently for inventory purposes, but rather assigns them full cost"[31] and that the respondent's "reported costs reflect the actual costs of producing non-prime products."[32] In this proceeding, Dillinger, unlike the respondent in *Husteel*, values prime and non-prime products differently. Specifically, Dillinger values non-prime products at their likely selling price, rather than full cost.

---

[28] *See Dillinger France II*, 981 F. 3d at 1324.
[29] *Dillinger Germany III*, Court No. 17-00158, Slip. Op. 22-114 at 7.
[30] *Id*.
[31] *See Husteel*, 552 F. Supp. 3d at 1411.
[32] *Id*. (quoting page 5 of the Final Results of Redetermination Pursuant to Ct. Remand, Sept. 2, 2021, ECF, No. 113 filed in the *Husteel* litigation).

Dillinger's normal books and records provide reasonable information to rely on to fill the gap caused by Dillinger's failure to submit information pertaining to its actual "cost of materials and fabrication or other processing of any kind employed in producing the merchandise"[33] (*i.e.*, the actual costs of non-prime products). Specifically, record evidence supports the conclusion that the use of the information recorded in Dillinger's normal books and records results in the accurate allocation of total direct and indirect costs reasonably attributed to the cost of producing prime products, while Dillinger's arguments rely on assumptions (*e.g.*, Dillinger assumes, without supporting record evidence to demonstrate which product runs resulted in the production of non-prime products, that the actual costs of producing non-prime products cannot be lower than the cost of producing prime products). Moreover, Dillinger's argument that Commerce's reliance on the allocation of costs between prime and non-prime products recorded in its normal books and records is unreasonable and that Commerce must rely on its proffered "estimate" is based on assumptions which are unsupported by record evidence precisely due to Dillinger's decision not to provide Commerce with information concerning the physical characteristics of the non-prime merchandise produced or the actual product-specific costs of producing non-prime products.

Dillinger's argument that its proffered "estimate" should be accepted as reasonable because it was based on the total standard costs from the primary costs report and then adjusted to actual costs using a two-step cost variance, resulting in an average COP, is a red herring. An overall product-line yield rate is meaningless for the purposes of determining the product-specific costs of producing non-prime plates because Dillinger did not provide necessary information concerning the actual physical characteristics of the non-prime products produced.

---

[33] *Id*. at 7.

There is no evidence to support an inference that the dispersion of the physical characteristics of non-prime products is the same as the dispersion of the physical characteristics of prime products.

Further, there is no evidence on the record to support Dillinger's assumption that its costs of producing non-prime products cannot be lower than its cost of producing its prime products. Absent the physical characteristics and actual COP information for the non-prime products produced, which are solely in the possession of Dillinger, none of the above assumptions are supported by record information. For these same reasons, Dillinger's argument that Commerce's reliance on its normal books and records is unreasonable and that the costs of producing non-prime products cannot be lower than the costs of producing prime products is without merit.

Dillinger's insistence that Commerce rely on its proffered "estimate" rather than its normal books and records and its claims that its "estimate" is a more suitable figure to use as facts otherwise available at this stage of the proceeding is curious considering that Dillinger was given the opportunity to submit information to demonstrate its actual costs of producing non-prime products. Dillinger misconstrues Commerce's statement that "there is no evidence on the record to demonstrate that Dillinger does, in fact, track the physical characteristics of non-prime products produced or the actual product-specific costs of the non-prime products"[34] as an endorsement of Dillinger's assertion that it could not have provided Commerce with the necessary information pertaining to the physical characteristics of the non-prime products and their actual COP. Commerce noted its concern with Dillinger's decision not to submit "the product-specific actual cost of production for the non-prime products, even though it explained that all production is 'made to order and non-prime plate results from the normal production of

---

[34] *See Second Remand Redetermination* at 13.

making plate for the specific customer order'"[35] and that its "system uses actual cost and consumption of inputs and actual yields."[36]  Quite simply, Commerce stated that there was no record evidence to demonstrate that Dillinger tracked either the physical characteristics of non-prime products or their actual product-specific COPs, which is not the same as stating that Dillinger could not have reviewed its records to ascertain the requested information.  In other words, Dillinger could have submitted the product-specific information it uses in its annual review of product-specific standards,[37] along with production records, which, because products are produced to order,[38] would likely contain information on the physical characteristics of the products it was attempting to produce.  Such information could have permitted Commerce to ascertain the actual costs of producing non-prime products.  Dillinger failed to provide the information requested by Commerce, which is solely in its control and, instead, argued that its proffered methodology, which it subsequently admitted was "just an estimate," was sufficient.  It is unclear why Dillinger chose not to review its records to supply Commerce with the requested information or, at a minimum, submit documentation to illustrate which production runs resulted in the production of non-prime plates.  In any event, Dillinger did not provide the necessary information on the record and the application of facts otherwise available was appropriate.  For the reasons articulated herein, Commerce reasonably relied on Dillinger's books and records to fill the informational gap created by Dillinger's decision not to provide the cost information that it now seeks to "estimate."

---

[35] *See* Dillinger's Letter, "Response to Remand Questionnaire," dated October 5, 2021 (Remand Questionnaire Response), at 11.
[36] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Section D Response," dated July 15, 2016, at D-15.
[37] *See* Memorandum, "Verification of the Cost Response of AG der Dillinger Hüttenwerke in the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-To-Length Plate from Germany," dated January 27, 2017, at 5 – 7.
[38] *See* Remand Questionnaire Response at 11.

There is no record evidence to support Dillinger's assertion that Commerce's reliance on the likely selling price recorded in its normal books and records is an unreasonable basis for the allocation of costs to non-prime products. However, there is record evidence to demonstrate that the use of the likely selling price of non-prime products results in a reasonable allocation of total costs to prime products, because it recognizes the total direct costs (*i.e.*, direct materials and conversion costs) and indirect costs (*i.e.*, the lost value of the non-prime plates) attributable to the production of prime plates. In other words, record evidence supports the hypothetical that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, any lost value of the two imperfect plates is an additional cost of producing the 98 perfect ones and Dillinger's normal books and records accounted for it as such.

For example, Dillinger's audited financial statements acknowledge that finished goods and work-in-process (WIP) inventories are assessed at its manufacturing costs or the lower fair value derived from the sales market. Importantly, Dillinger's auditor confirmed that these financial statements, which Dillinger prepared, "give a true and fair view of the assets, financial and earning position of the Company for the year then ended in accordance with the accounting rules and principles according to German commercial law."[39] Moreover, the auditor specifically noted that "the audit includes the assessment of the applied accounting principles and substantive estimates of the Board of Management of the company…our audit did not raise any objections."[40] In other words, the auditor acknowledged that Dillinger's practice of allocating the lost value attributable to the production of non-prime products to prime products resulted in a reasonable allocation of both the direct and indirect costs to the production of prime products.

---

[39] *See* Dillinger's Letter, "AG der Dillinger Hüttenwerke Supplemental Section A Response," dated August 3, 2016, at Appendix S-9.
[40] *Id.*

Dillinger's assertion that the allocation of lost value to non-prime products results in an inaccurate and impermissible allocation of manufacturing costs to the pool of costs to be allocated to prime products and its insistence that Commerce rely on its methodology, which it has admitted is "just an estimate,"[41] ignores not only the justification it uses for this precise accounting treatment in its audited financial statements, but also the fact that the reason Commerce does not have the actual costs of producing non-prime products is Dillinger's failure to supply this information.  Accordingly, because Commerce is faced with a situation where, because Dillinger did not submit information which would have permitted Commerce to determine the actual costs of producing non-prime products for the purposes of calculating normal value, it is entirely reasonable for Commerce, as facts otherwise available, to rely on Dillinger's normal books and records.

We note that reliance on Dillinger's normal books and records for this purpose is not counter to Commerce's practice regarding write-downs of finished goods.  Commerce has explained previously that it includes write-downs of raw materials and WIP in the calculation of a respondent's total COP during the period in which a write-down occurs because, when the company subsequently consumes the written-down raw materials and/or WIP, it will value the input at the written-down value, rather than historical cost, so that not including the write-downs would result in costs never being captured.[42]  As Dillinger noted, Commerce's treatment of write-downs of finished goods differs in that Commerce does not include such write-downs in the calculation of a respondent's total COP because write-downs of finished goods are more

---

[41] *See Dillinger France*, 589 F. Supp. 3d at 1257.
[42] *See Circular Welded Non-Alloy Steel Pipe from the Republic of Korea:  Final Results of the Antidumping Duty Administrative Review*, 75 FR 34980 (June 21, 2010), and accompanying IDM at Comment 2.

closely associated with the sale, as opposed to the production, of merchandise.[43] The reason why Commerce considers the write-down of finished goods to be associated with the sale, rather than production, of merchandise is because the finished goods are valued at historical cost so that including the write-down of finished goods would result in double counting a portion of the costs. In the current proceeding, we are simply using the information recorded in Dillinger's normal books and records (*i.e.*, the likely selling price of non-prime products) to determine the allocation of total period manufacturing costs between prime and non-prime products.

As explained above, Commerce's reliance on Dillinger's normal books and records is a reasonable application of facts otherwise available, pursuant to section 776(a)(1) of the Act. Dillinger is quite simply mistaken that Commerce's reliance on its books and records to fill an informational gap created by Dillinger's decision is an impermissible adverse inference because Commerce's reliance on the information recorded in Dillinger's normal books and records accords with its own recognition that the information recorded in its normal books and records results in the total direct and indirect costs reasonably attributable to the production of prime products being allocated to prime products.

## V. FINAL RESULTS OF REDETERMINATION

For the reasons discussed above, we have continued to use the approach presented in the draft results of redetermination as the approach in these final results of redetermination. As a result, Commerce is relying on the costs recorded for the prime and non-prime products as recorded in Dillinger's normal books and records as facts otherwise available pursuant to section 776(a)(1) of the Act because Dillinger failed to provide its actual product-specific COP for non-prime products. Commerce's decision in this regard results in no change to Dillinger's estimated

---

[43] *See Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 FR 19153 (April 12, 2004), and accompanying IDM at Comment 7.

weighted-average dumping margin calculated in the *Second Remand Redetermination* (*i.e.*, 4.98 percent). Because Dillinger's margin is different from the rate in the *Amended Final Determination*, we intend to issue a *Timken* notice with the amended final determination, should the Court sustain these final results of redetermination.[44]

12/15/2022

X 

Signed by: LISA WANG

Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[44] We also intend to include the revised all-others rate of 20.99 percent calculated in the *Second Remand Redetermination* in this *Timken* notice.

17