UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  The Honorable Leo M. Gordon, Judge

_____

AG DER DILLINGER HÜTTENWERKE,                   )
                                                )
                    Plaintiff,                  )
                                                )
ILSENBURGER GROBBLECH GMBH,                     )
SALZGITTER MANNESMANN                           )
GROBBLECH GMBH, SALZGITTER                      )
FLACHSTAHL GMBH, AND SALZGITTER                 )
MANNESMANN INTERNATIONAL GMBH                   )
and FRIEDR. LOHMANN GMBH,                       )
                                                )
                    Consolidated Plaintiffs,    )    Consol. Ct. No. 17-00158
and                                             )
                                                )
THYSSENKRUPP STEEL EUROPE AG,                   )
                                                )
                    Plaintiff-Intervenor,       )    **PUBLIC VERSION**
         v.                                     )    Confidential information deleted
                                                )    on pages 3-5, 7, 17 & 19
UNITED STATES,                                  )
                    Defendant,                  )
         and                                    )
                                                )
NUCOR CORPORATION and SSAB                      )
ENTERPRISES LLC,                                )
                                                )
                    Defendant-Intervenors.      )
_____        )

## PLAINTIFF AG DER DILLINGER HÜTTENWERKE
## COMMENTS IN OPPOSITION TO THE FINAL RESULTS OF REDETERMINATION

Marc E. Montalbine
Gregory S. Menegaz
Alexandra H. Salzman
Merisa A. Horgan

**deKieffer & Horgan, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, D.C. 20005
Tel: (202) 783-6900
email:  montalbine@dhlaw.de
*Counsel to AG Der Dillinger Hüttenwerke*

Date: February 21, 2023

## TABLE OF CONTENTS

I.    ARGUMENT ......................................................................................................... 2

A.   Commerce's Selection of Facts Available Does Not Accord with Law ............... 2

B.   The Non-Prime Production Costs Reported by Dillinger Should Be Accepted .... 7

C.   Commerce Erred in Shifting Production Costs from Non-Prime Products to Prime Products ................................................................................................... 8

D.   Commerce Has Imposed an Impermissible Adverse Inference ........................... 14

II.   CONCLUSION ...................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

AG der Dillinger Hüttenwerke v. United States
  592 F. Supp. 3d 1344 (CIT 2022) ............................................................................ 1

Anderson v. U.S. Sec'y of Agric.,
  462 F. Supp. 2d 1333 (CIT 2006) .......................................................................... 14

Dillinger France S.A. v. United States,
  350 F. Supp. 3d 1349 (CIT 2018) ............................................................................ 2

Dillinger France S.A. v. United States,
  981 F.3d 1318 (Fed. Cir. 2020) ....................................................................... *passim*

Husteel Co. v. United States,
  520 F. Supp. 3d 1296 (CIT 2021) .......................................................................... 12

Husteel Co. v. United States,
  552 F. Supp. 3d 1405 (CIT 2022) .......................................................................... 12

IPSCO, Inc. v. United States,
  965 F.2d 1056 (Fed. Cir. 1992) ....................................................................... 10, 11

LG Chem, Ltd. v. United States,
  534 F. Supp. 3d 1386 (CIT 2021) .......................................................................... 11

Manifattura Emmepi S.p.A. v. United States,
  799 F. Supp. 110 (CIT 1992) ................................................................................... 6

National Steel Corp. v. United States,
  870 F. Supp. 1130 (CIT 1994) ............................................................................... 20

NEXTEEL Co. v. United States,
  Consol. No. 20-03898, slip op. 22-135 (CIT Dec. 6, 2022) ................................... 13

Nippon Steel Corp. v. United States,
  337 F.3d 1373 (Fed. Cir. 2003) ............................................................................. 14

Rhone Poulenc, Inc. v. United States,
  899 F.2d 1185 (Fed. Cir. 1990) ............................................................................. 20

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States,
  355 F. Supp. 3d 1365 (CIT 2019) ..................................................................... 6, 12

ii

SKF USA Inc. v. United States,
  263 F.3d 1369 (Fed. Cir. 2001) ................................................................................. 13

**Statutes**

19 U.S.C. § 1677b(b)(3) .............................................................................. 2, 5, 8, 9

19 U.S.C. § 1677b(f)(1)(A) ............................................................................... 6, 14

19 U.S.C. § 1677e(a) ............................................................................................... 6

19 U.S.C. § 1677e(b) ............................................................................................ 14

**Administrative Determinations:**

Certain Carbon and Alloy Steel Cut-to-Length Plate From France: Final Determination of Sales at Less ThanFair Value, 82 Fed. Reg. 16363 (Apr. 4, 2017) ......................................................... 9

Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 12700 (March 8, 2011) ...................................................... 9

Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 19153 (Apr. 12, 2004) ...................................................... 9

**Other Authorities**

Uruguay Round Agreements Act, Statement of Administrative Action,
  H.R. Doc. No. 103-316, vol. 1 (1994) reprinted in 1994 U.S.C.C.A.N 4040 ......................... 5, 6

Pursuant to the Court's amended scheduling order of February 2, 2023 (ECF 160), plaintiff, AG der Dillinger Hüttenwerke ("Dillinger"), hereby submits these comments in opposition to the Final Results of Redetermination filed by the U.S. Department of Commerce ("Commerce") in this case on December 15, 2022 (ECF 153-1) ("Redetermination III").

In its memorandum and order of September 23, 2022 (ECF 152) remanding this matter back to Commerce, the Court directed that:

> Commerce must explain how its reliance on information indicating the "likely selling price" of non-prime products accords with its obligation to ensure that the reported costs of production reasonably reflect the cost of producing the merchandise under consideration.

AG der Dillinger Hüttenwerke v. United States, 592 F. Supp. 3d 1344, 1349 (CIT 2022) ("Dillinger Germany III").

Commerce's final results do not comply in any manner with the instructions of this Court. Rather, Commerce again has made no change in its original determination and continues to write down the reported costs of non-prime plate to its sales value and shift these costs to prime plate, the exact thing that the CAFC found to be unlawful in *Dillinger France III*. Dillinger France S.A. v. United States, 981 F.3d 1318, 1321 (Fed. Cir. 2020) ("Dillinger France III") (stating that Commerce "adjusted Dillinger's reported costs for non-prime plate 'to reflect the sales values'" of the non-prime plate).

Commerce provides no explanation as to how the "likely selling price" of non-prime products bears any relation to the cost of producing the merchandise under consideration. Rather, Commerce simply erroneously states that Dillinger uses "this precise accounting treatment in its audited financial statements." Redetermination III, 15. Commerce thereby conflates the administrative record in this case with that of Dillinger France S.A. in Court No. 17-00159 (Dillinger France S.A. v. United States). Dillinger France S.A. and the plaintiff in this

1

case, AG der Dillinger Hüttenwerke, are legally independent entities established and operating in different countries subject to differing generally accepted accounting principles and practices. The administrative record in this case shows that Dillinger Germany does not classify prime and non-prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products in its audited financial statements.

## I.   ARGUMENT

### A.   Commerce's Selection of Facts Available Does Not Accord with Law

As the Court in *Dillinger France I* stressed, facts available is only used to fill an "informational gap" in the administrative record.  <u>Dillinger France S.A. v. United States</u>, 350 F. Supp. 3d 1349, 1364 (CIT 2018) ("<u>Dillinger France I</u>").  The informational gap to be filled in this current situation is the actual costs of production of non-prime products.  The statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product.  19 U.S.C. § 1677b(b)(3).  Accordingly, the selection of facts available for the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials and of fabrication or other processing employed in producing the non-prime products.

In its final results of redetermination, Commerce continues to use the "estimated sales values" of the non-prime products as facts available for their actual cost of production. <u>Redetermination III</u>, 2.  Commerce provides no explanation as to how the "estimated sales values" of non-prime products bear any relation to the cost of producing the merchandise under consideration.  Rather, Commerce simply erroneously states that Dillinger uses "this precise accounting treatment in its audited financial statements."  <u>Id</u>. at 15.

The sales values used by Commerce as the costs of non-prime merchandise in the original

investigation was only [        ] Euros/ton.  *See* <u>Final COP Memo</u>, Attachment 1 (March 29, 2017) (PD531, CD767).[1]  This figure was not taken from anything in Dillinger's normal books and records concerning the cost of non-prime merchandise.  Rather, the source of the information was the narrative response to Dillinger's supplemental section D questionnaire on the question concerning the "quantity and value of non-prime, defective, and low quality plates sold during the POI."  *See* <u>Final COP Memo</u>, Attachment 1 (March 29, 2017) (PD531, CD767) (citing to <u>Dillinger Supplemental Section D Questionnaire Response</u>, page 22 (Sept. 28, 2016); R3-PD350, R3-CD404.  This figure has absolutely nothing to do with the costs of production.

The record evidence in this case shows that Dillinger does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products.  These inventory values, without any distinction between prime and non-prime products, also tie directly to Dillinger's audited financial statements.  It is therefore a fundamental error for Commerce to claim that Dillinger uses the likely selling price of non-prime products as their costs "in its audited financial statements."  *See* <u>Redetermination III</u>, 15.

As the record clearly shows, all costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime, is booked to the same cost object/inventory account (*i.e.*, [                                      ]).  <u>Remand Questionnaire Response</u>, 8-9 (Oct. 5, 2021); R2-PD5; R2-CD2.  The amount in this account is used as the basis for reporting inventory values

---

[1] Citations to the public and confidential record of the original investigation filed on September 11, 2017 are designated as "PD" and "CD," respectively.  Citations to the public and confidential record of the second final results of redetermination filed on February 11, 2022 are designated as "R2-PD" and "R2-CD," respectively.  Citations to the public and confidential record of the third final results of redetermination filed on December 29, 2022 are designated as "R3-PD" and "R3-CD," respectively.

and manufacturing costs in both the financial and cost accounting systems.  Id.  The average cost of production booked to this account during the POI was [      ] Euros/ton and the ending inventory value at the end of the POI (March 2016) was [      ] Euros/ton.  Id. at App. R-4. The inventory value at the end of the year also ties directly to Dillinger's 2015 audited financial statements.  Id.

The "internal factory results" are not used for reporting inventory values or manufacturing costs in Dillinger's financial and cost accounting systems.  See Dillinger Comments on Remand Determination, 9 (March 15, 2022) (ECF No. 134).  Moreover, as explained above, the sales value used by Commerce as the "COP for non-prime products" is not taken from the internal factory results but rather Dillinger's supplemental section D questionnaire response.  See Final COP Memo, Attachment 1 (March 29, 2017) (PD531, CD767).

The notes to Dillinger's audited financial statements do not show any shifting of costs from non-prime to prime plate as erroneously claimed by Commerce.  See Redetermination III, 14-15.  Again, Commerce seems to confuse the administrative record in this case with that of the French company, Dillinger France S.A., in Court No. 17-00159 (Dillinger France S.A. v. United States).  The valuing of inventory at the lower of cost or market value is a basic practice that does not in anyway result in the shifting of costs from non-prime to prime merchandise.  See Reply Brief, 16-17 (ECF 63).

It is therefore a fundamental error for Commerce to claim that Dillinger uses the likely selling price of non-prime products as their costs "in its audited financial statements."  See Redetermination III, 15.

Commerce's use of the [      ] Euros/ton average sales value of non-prime plate sold in

4

Germany during the POI bears no relation to the actual costs of producing the non-prime plate. 19 U.S.C. § 1677b(b)(3). This dramatically low value obviously does not correspond to the full cost of materials and of fabrication or other processing employed in producing the non-prime products and therefore cannot properly be used as facts available for the actual costs of production. In fact, this per-ton value is less than the total cost of manufacture (TOTCOM) of any of the reported CONNUMs. *See* Dillinger Second Supplemental Section D Response, App. SD-50 & COP data file dhcop03.sas7bdat (Nov. 7, 2016); R3-PD447, R3-CD511 & R3-CD526 (with TOTCOM ranging from        [        ] Euros/ton to [          ] Euros/ton and having a weighted-average of [          ] Euros/ton).

Because non-prime plate cannot be identified until the end of production, it goes through the exact same production steps as prime plate, incurring the exact same costs. It is therefore **impossible** for the actual cost of production of non-prime plate to be lower than the actual costs of production (TOTCOM) of any of the CONNUMs (*i.e.*, products) manufactured during the period of investigation. Non-prime plate does not become less costly to produce simply because it cannot be sold at full price. Therefore, Commerce's use of resale value as the "best available information on the record" concerning the actual cost of production of non-prime products has no reasonable basis in the administrative record of this proceeding and must be rejected.

As stated in the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), the information Commerce uses as facts available must be "reasonable to use under the circumstances." *See* Statement of Administrative Action, H.R. Rep. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198. In fact, the SAA states that in cases involving the use of facts available, Commerce "must make {its} determinations based on all evidence of record, weighing the record evidence to determine that which is most

probative of the issue under consideration." Id.  Similarly, in *Shandong*, this Court explained:

> The provisions of § 1677e(a) are known as "facts available," or "neutral facts available," and the guiding principle for choosing what facts to apply is accuracy in the given case.

Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States, 355 F. Supp. 3d 1365, 1370 (CIT 2019).

Commerce's use of the likely selling price of non-prime plate as facts available for the actual costs of production of the non-prime plate violates these legal standards of reasonableness and accuracy.  Commerce's "authority to select best information otherwise available is subject to a rational relationship between data chosen and the matter to which they are to apply." Manifattura Emmepi S.p.A. v. United States, 799 F. Supp. 110, 115 (CIT 1992).

Moreover, even if Dillinger's normal books and records did use the likely selling price of non-prime plate as its costs of production, how an item is treated in a respondent's accounting records is not determinative.  Rather, the costs of production used in Commerce's antidumping duty calculations must reasonably reflect a respondent's actual costs regardless of how costs are reported in a respondent's books and records.  *See* 19 U.S.C. § 1677b(f)(1)(A).  This was the clear holding of the CAFC in *Dillinger III* where it stated that Commerce erred in relying on Dillinger France's books and records because they "were based on 'likely selling price' rather than cost of production."  Dillinger III, 981 F.3d at 1324.  This was also Commerce's clear determination in *NEXTEEL* where it stated:

> {I}n *Dillinger*, the U.S. Court of Appeals for the Federal Circuit (CAFC) held that Commerce's CV calculation must reasonably reflect a respondent's actual cost, whether or not the respondent's books and records reflect such costs.

Final Results of Redetermination Pursuant to Ct. Remand, 7 (July 18, 2022) (Case No. 1:20-cv-03898-CRK (ECF 96-1)).

6

**B.** **The Non-Prime Production Costs Reported by Dillinger Should Be Accepted**

The most reasonable calculation of the actual production costs of non-prime plate is the calculation reported by Dillinger.  This information corresponds to the average **actual** total cost of manufacture for all plate sold during the POI.  Remand Questionnaire Response, 6-7 & App. R-5 (Oct. 5, 2021); R2-PD5; R2-CD2.  This amount was calculated using the total standard costs from the primary cost report and then adjusted to actual costs using a two-step cost variance, resulting in an average actual cost of production of [     ] Euros/ton.  Id. at App. R-5.

That the costs are an average does not diminish the fact that it is based upon **actual** costs as directed by the CAFC.  Non-prime plate can come from any steel grade and customer order and both types of plate use precisely the same materials and undergo precisely the same processing steps since non-prime plate can only be distinguished from prime plate at the end of the production process.  Indeed, the average actual cost of production of [     ] Euros/ton used by Dillinger is very close to the weighted-average total cost of manufacture (TOTCOM) of all reported CONNUMs of [     ] Euros/ton.  See Dillinger Second Supplemental Section D Response, App. SD-50 & COP data file dhcop03.sas7bdat (Nov. 7, 2016); R3-PD447, R3-CD511 & R3-CD526.  This is to be expected since non-prime plate can come from any steel grade and customer order.  The [     ] Euros/ton average sales value used by Commerce bears no relation to any of these costs.

It is an error for Commerce to replace this specific actual cost information with the "estimated sales values" of non-prime plate.  See Redetermination III, 2 (stating that Commerce adjusted the reported costs "based on estimated sales values").  The "estimated" sales value of non-prime plate does not correspond to the plate's cost of production and the use of the likely selling price in place of the cost of production was specifically prohibited by the CAFC.

C.      **Commerce Erred in Shifting Production Costs from Non-Prime Products to Prime Products**

In its final results of redetermination, Commerce has expressly shifted production costs from non-prime products to prime products.  Commerce's stated rational is that the "lost value" on the non-prime products is a cost of producing the prime products.  Redetermination III, 5.  By lost value, Commerce apparently means the fact that the sales price of the non-prime products does not cover the costs of production of those products, thereby resulting in a loss on the sale.

The fact that non-prime plate is sold at a loss does not in any way reduce the actual costs of producing that plate.  As explained above, the statute is clear that the reported costs of production "shall be an amount equal to" the cost of materials and of fabrication or other processing employed in producing the merchandise.  19 U.S.C. § 1677b(b)(3).  There is no provision in the statute to reduce the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of the merchandise.  Nor is there any provision in the statute to increase the costs of materials, fabrication and processing employed in producing the merchandise by the "lost value" resulting from the sale of other merchandise.  Commerce's shifting of production costs from non-prime products to prime products is therefore contrary to the express wording of the statute and not in accordance with law.

Indeed, the increase of production costs to account for "lost value" is contrary to Commerce's longstanding practice of excluding inventory write-downs in the costs of production.  As Commerce stated in its Issues and Decision Memorandum for the final determination in the companion investigation on CTL plate from France,:

> Our practice is to exclude inventory write-downs that are attributable to finished goods from a respondent's COP because we consider the write-down of finished

8

goods to be more clearly related to the sale of merchandise rather than to its production.

France Final IDM at 57 & n.184 (citing Polyethylene Retail Carrier Bags from Thailand: Final Results of Antidumping Duty Administrative Review, 76 Fed. Reg. 12700 (March 8, 2011) and accompanying IDM; Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 19153 (Apr. 12, 2004), and accompanying IDM at Comment 7).

In its final results of redetermination, Commerce admits that this is its established practice and that this established practice relates to the write-down of finished goods to below their cost of production. *See* Redetermination III, 15-16. This is precisely what Commerce is doing in its calculation of "lost value" in this case. It is taking a write-down of the finished goods inventory for non-prime plate based upon the difference between the cost of production of that plate and its estimated selling price and then applying this write-down to the cost of prime products.

Commerce's attempt to label the write-down in the value of the non-prime plate finished goods inventory as "indirect costs" for the production of prime products finds no support in law, and Commerce cites to no statute, regulation, court decision or prior administrative determination supporting this categorization. As explained above, the statute expressly details that the reported cost of production for a product "shall be an amount equal" to "the cost of materials and of fabrication or other processing of any kind employed in producing" the product. 19 U.S.C. § 1677b(b)(3). Under this clear definition, the actual costs of non-prime products must correspond, as closely as possible, to the cost of materials and of fabrication or other processing employed in producing the non-prime products. The same is true for the costs of production reported for prime products. The reported cost of prime products must be equal to

9

the cost of materials, fabrication and processing employed in producing those products.  Both prime and non-prime plate meet the definition of merchandise under consideration and there is no provision in the statute that would permit the shifting of the cost of production from one product of merchandise under consideration to another product of merchandise under consideration.

Commerce's shifting of production costs from non-prime products to prime products is also contrary to the CAFC's in *Dillinger France III*.  In that decision, the Court explained the problem with Commerce's original determination regarding the treatment of non-prime plate as follows:

> Commerce accordingly adjusted Dillinger's reported costs for non-prime plate "to reflect the sales values recorded in {Dillinger's} normal books and records" and allocated the difference to the costs for Dillinger's prime plate.  In doing so, Commerce reduced the cost of non-prime plate and allocated a greater portion of cost to prime plate based on the selling price of non-prime plate.

Dillinger France III, 981 F.3d 1318, 1321 (Fed. Cir. 2020) (citations omitted).  In striking down Commerce's determination, the CAFC specifically held that Commerce erred in relying on "likely selling price" in Dillinger France's books and records, explaining:

> Dillinger's records that Commerce relied on for the cost of non-prime and prime plate were based on "likely selling price" rather than costs of producing and selling the merchandise.  Because Dillinger's books and records were based on "likely selling price" rather than cost of production, Commerce erred in relying on them.

Id. at 1324 (citations omitted) (emphasis added).

Moreover, the reporting of a non-prime product's production costs based upon sales value was expressly struck down by the CAFC in IPSCO, Inc. v. United States, 965 F.2d 1056 (Fed. Cir. 1992).  In that case, the court struck down as "unreasonable" a methodology that would allocate production costs to the non-prime merchandise based upon market value, thereby

reducing the allocated production costs for non-prime merchandise to below its actual cost of production. Id. at 1058-59. The court explicitly found that "{b}y its terms, the statute expressly covers actual production costs" and the statute's broad language does not "authorize adjustment of these production costs to account for products of a lower grade or less value." Id. at 1059-60. The court in *IPSCO* also found that reducing a product's cost of production to that product's ultimate selling price amounted to "circular reasoning" that "contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value." IPSCO, 965 F.2d at 1061.[2]

    *IPSCO* was expressly reaffirmed by the CAFC in *Dillinger France III* with respect to precisely the same shifting of production costs from non-prime products to prime products done by Commerce in this case. In *Dillinger France III*, the CAFC stated:

> Here, there is no dispute that Commerce relied on the likely selling price of non-prime plate in its determination of cost. Thus, if *IPSCO* governs, Commerce's reliance on Dillinger's books and records was impermissible.

Dillinger France III, 981 F.3d at 1322. The Court went on to explain how *IPSCO* did govern the case and that Commerce's actions in shifting production costs from non-prime products to prime products was unlawful. Id. at 1322-24.

    Commerce simply ignores the CAFC's decisions in *Dillinger III* and *IPSCO* stating that the cases do not "limit the nature of information Commerce may rely on as facts otherwise available." *See* Redetermination III, 10. However, the resort to facts available does not give Commerce unbridled authority to apply any information it desires as facts available. Rather,

---

[2] Notably, the Court also affirmed Commerce's rejection of a value-based cost methodology due to the problem of "circularity," meaning that "prices are used to determine the product-specific costs which in turn are either compared to those same prices or are used to construct prices (*i.e.*, through the sales-below-cost test and constructed value)." LG Chem, Ltd. v. United States, 534 F. Supp. 3d 1386, 1394 (CIT 2021).

Commerce must apply information that fills the gap as to the actual costs of production for non-prime products.  As such, Commerce must follow all statutory and judicial authorities concerning what properly constitutes actual costs of production.  See <u>Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States</u>, 355 F. Supp. 3d 1365, 1370 (CIT 2019) (stating that "the guiding principle for choosing what facts to apply is accuracy in the given case").

Commerce's shifting of production costs from non-prime products to prime products also conflicts with its recent remand determination in *Husteel*.  In that case, the court found "problematic" "Commerce's explanation of how a methodology that calculates costs of non-prime products based on its resale value and reallocates the difference between the resale value and actual costs of producing non-prime products to the costs of prime products accords with the Court of Appeals' instruction to use actual costs when calculating constructed value."  <u>Husteel Co. v. United States</u>, 520 F. Supp. 3d 1296, 1309 (CIT 2021) (citing <u>Dillinger III</u>, 981 F.3d at 1321-24) (hereinafter "<u>Husteel II</u>").  The Court therefore refused to sustain Commerce's determination and remanded the matter back to Commerce with respect to the costs of non-prime products for the respondent NEXTEEL.

On remand, Commerce stopped reducing NEXTEEL's reported costs of non-prime products based on resale value and instead accepted NEXTEEL's cost reporting that assigned prime and non-prime products the same full cost.  *See* <u>Husteel Co. v. United States</u>, 552 F. Supp. 3d 1405 (CIT 2022) (hereinafter "<u>Husteel III</u>").  From its questionnaire responses, it is clear that NEXTEEL did not separately track the actual costs of prime and non-prime products but rather reported the same average cost of manufacture for both prime and non-prime products.  <u>NEXTEEL Supplemental Section D Response</u>, 6 (July 3, 2018); <u>Joint Appendix</u> (Case No. 1:19-cv-00112-CRK (ECF 73-1)) at p. 347.

12

In its remand redetermination in *NEXTEEL*, Commerce stated:

> {I}n Dillinger, the U.S. Court of Appeals for the Federal Circuit (CAFC) held that Commerce's CV calculation must reasonably reflect a respondent's actual cost, whether or not the respondent's books and records reflect such costs.  In the instant case, NEXTEEL does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products.  Moreover, in its normal books and records, NEXTEEL calculates the cost for non-prime products in the same manner as prime products.  Consequently, NEXTEEL's reported costs reflect the full actual costs of producing its prime and non-prime products as required in *Husteel*.  Therefore, for purposes of this remand and consistent with the CAFC's decision in *Dillinger*, we have reversed the adjustment made in the Final Results and rely on what the CAFC referred to as the actual costs of prime and non-prime products as reported by NEXTEEL.

Final Results of Redetermination Pursuant to Ct. Remand, 7-8 (July 18, 2022) (Case No. 1:20-cv-03898-CRK (ECF 96-1)) (footnotes omitted).  The Court recently sustained Commerce's remand redetermination on this point.  NEXTEEL Co. v. United States, Consol. No. 20-03898, slip op. 22-135 (CIT Dec. 6, 2022).

This is exactly the same as Dillinger's situation in this case.  As detailed above, Dillinger does not separately classify prime products differently for inventory purposes, but rather assigns the same manufacturing costs to both prime and non-prime products.  Remand Questionnaire Response, 8-9 (Oct. 5, 2021); R2-PD5; R2-CD2.  Dillinger therefore calculated the average actual cost of production for non-prime products based upon the actual cost of production for all plate produced during the POI.  Because non-prime plate cannot be identified until the end of production, it goes through the exact same production steps as prime plate, incurring the exact same costs.

As the CAFC has stressed, "{a}n agency action is arbitrary when the agency offers insufficient reasons for treating similar situations differently."  SKF USA Inc. v. United States, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  Similarly, this Court has made clear that a "fundamental

principle of law and justice is that like cases should be treated alike." Anderson v. U.S. Sec'y of Agric., 30 CIT 1742, 1748, 462 F. Supp. 2d 1333, 1339 (2006).

### D.     Commerce Has Imposed an Impermissible Adverse Inference

By using the likely selling price of non-prime plate rather than the actual cost of production allocated to non-prime plate in Dillinger's verified cost calculation, Commerce has imposed an impermissible adverse inference.  Under the statute, Commerce may only impose an adverse inference when it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with the request for information."  19 U.S.C. § 1677e(b).  All of the record evidence in this case shows that Dillinger put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in this investigation.  See Nippon Steel Corp. v. United States, 337 F.3d 1373, 1382 (Fed. Cir. 2003).  Dillinger responded in a prompt, careful and comprehensive manner to all of Commerce's requests for information.

For example, within 14 days of receiving the original questionnaire in the investigation back in 2016, Dillinger notified Commerce of its difficulties in reporting all of the physical characteristics for non-prime plate and suggested that it report sales of non-prime merchandise by indicating a zero ("0") for any items, such as specification, that cannot be identified.  See Notification of Difficulties in Responding to the Questionnaire, 1-2 (Jun. 8, 2016); PD114.  In a conference call on June 17, 2016, Commerce informed Dillinger that, "if Dillinger required specific guidance or acceptance of its reporting methodology, we would need to consider additional information that we expected Dillinger to include in its questionnaire responses." Telecon with Dillinger Counsel on Questionnaire Reporting (June 20, 2016); PD147.  Dillinger provided additional information concerning its reporting of non-prime material in its questionnaire responses, and this information was verified by Commerce.

14

Commerce noted no problems with Dillinger's reporting of the product characteristics for non-prime material or the actual costs for prime and non-prime material reported in Dillinger's verified cost calculations.  Rather, Commerce's only objection was that the reported COP should be based upon the sales value of non-prime material because prime and non-prime products could not be used in the same general applications and because Dillinger's normal books and records valued non-prime products at their likely selling price.  *See* Final Issues & Decision Memorandum, 89-90 (March 29, 2017); PD525 (hereinafter "Final IDM").

Thus, Dillinger promptly informed Commerce of the limitations on its ability to report the product characteristics and cost of production for non-prime material at the very beginning of the investigation.  When, some five years later, Commerce issued Dillinger a supplemental questionnaire in relation to this Court's second remand, Dillinger timely and completely responded to this questionnaire.  In its questionnaire response, Dillinger demonstrated through the submission of invoices, commercial orders, journal entries and inventory schedules that it does not track the actual production costs of non-prime plate on a product-specific basis.  Remand Questionnaire Response, 7-15 and Apps. R-3, R-4, R-7 & R-8 (Oct. 5, 2021); R2-PD5, R2-CD2.

Non-prime plate results from the normal production of making plate for a specific customer order.  Accordingly, non-prime plate can come from any steel grade and customer order.  Id. at 12.  At the end of production, the plate is examined for conformity with the customer specifications.  Any plate that does not meet the agreed customer specifications (*e.g.*, plates having defects such as surface cracks, nonconformity of weight or dimensions, nonconformity of physical or mechanical properties, *etc.*) is classified as non-prime and placed in stacks/piles at the mill.  Id. at 13-14.  Once non-prime plate is placed in this pile, it loses all

15

traceability to the original production order.  After a stack becomes sufficiently large, Dillinger's

sales staff will contact certain customers (*e.g.*, distributors) known to purchase non-prime plate.

The entire stack is sold to the customer for one price per ton as "WILDMASSBLECHE"

("product odds and ends plates") or "PLAQ. FORTES 2E CHOIX" ("heavy plates 2nd choice")

without any reference to steel grade or specification and without any certification/warranty as to

grade, type or chemistry.  Id. at 14; Reply Brief, 17 (ECF 63).

 In its final results of redetermination for the second remand, Commerce acknowledged

this record evidence, stating:

> In particular, Dillinger has explained that its system does not record the physical
> characteristics of the non-prime products produced or the actual product-specific
> costs of producing the non-prime products.  Indeed, we acknowledge that
> Dillinger informed us of its inability to report the physical characteristics of non-
> prime products during the investigation.  Moreover, there is no evidence on the
> record to demonstrate that Dillinger does, in fact, track the physical characteristics
> of non-prime products produced or the actual product-specific costs of the non-
> prime products.

Final Results of Redetermination, 13 (Jan. 20, 2022) (footnotes omitted) (ECF 129)

("Redetermination II").  Thus, Commerce explicitly determined that there is "no evidence on the

record" to demonstrate that Dillinger's system records the physical characteristics of the non-

prime products produced or the actual product-specific costs of producing the non-prime

products.

 Rather, Dillinger's actual average cost system uses a six-digit cost unit number

("Kostenträgernummer") to calculate production costs and inventory values.  These cost unit

numbers track production on a general level, such as "crude steel" or "finished plate," and do not

differentiate between various steel grades or between prime and non-prime merchandise.

Remand Questionnaire Response, 9; R2-PD5, R2-CD2; *see also* Cost Verification Report, 5-6

(Jan. 27, 2017) (stating "We found that the actual cost system has one cost object for heavy plate

16

under which all MUC production costs were incurred"); PD502, CD740.   Thus, all actual costs related to the production of heavy plate, regardless of whether the plate is prime or non-prime merchandise, are booked to the same cost unit number (*i.e.*, [

]).  Non-prime plate cannot be identified until the end of production and therefore undergoes the exact same production steps as prime plate.

Accordingly, Dillinger used the available information on the actual costs of production to allocate the total actual costs to non-prime plate.  This information corresponds to the average **<u>actual</u>** total cost of manufacture for all plate sold during the POI.  <u>Remand Questionnaire Response</u>, 6-7 & App. R-5 (Oct. 5, 2021); R2-PD5; R2-CD2.  This amount was calculated using the total standard costs from the primary cost report and then adjusted to actual costs using a two-step cost variance, resulting in an average actual cost of production of [       ] Euros/ton. <u>Id</u>. at App. R-5.

In its final results of redetermination for this third remand, Commerce attempts to retreat from its clear, unequivocal determination that there is "no evidence on the record" to demonstrate that Dillinger's system records the physical characteristics of the non-prime products produced or the actual product-specific costs of producing the non-prime products. However, the reasons given by Commerce in attempting to qualify its earlier unequivocal determination make no sense.  Commerce asserts that even though the information is not tracked in Dillinger's system, Dillinger could have "reviewed its records to ascertain the requested information."  *See* <u>Redetermination III</u>, 13.  How can information be found in the records, if the information is not tracked?

Commerce also fails to identify any specific records where it believes actual product-specific costs of producing non-prime plate could be found.  Commerce claims that Dillinger

"could have submitted the product-specific information it uses in its annual review of product-specific standards," citing to pages 5-7 of Dillinger's cost verification report.  *See* id. at 13. However, pages 5-7 of the cost verification report relate to product-specific standard costs and not to actual costs.  *See* Cost Verification Report, 5-7 (Jan. 27, 2017); PD502, CD740.  By contrast, the cost verification report confirms that Dillinger tracks actual consumption and actual production costs only by broad cost objects that reflect major production steps, such as slab or plate production.  Id. at 6.  Commerce specifically found that the actual cost system has only one cost object for heavy plate under which all the production costs for the merchandise under consideration ("MUC") were incurred.  Id.  Commerce is therefore incorrect in claiming that the physical characteristics of non-prime products and their actual product-specific costs of production could have been ascertained from this information.

Similarly, Commerce's statement that "production records . . .would likely contain information on the physical characteristics of the products" is also without any factual support on the record.  *See* Redetermination III, 13.  The final results of redetermination cite only to page 11 of Dillinger's remand questionnaire response in support of this statement.  Id.  However, page 11 of Dillinger's remand questionnaire response makes no reference to any production records. Thus, Commerce's claim that Dillinger has information "in its control" on the physical characteristics of non-prime products and their actual product-specific COPs is baseless and is not supported by any evidence on the administrative record.

Commerce's statement that Dillinger "chose not to review its records to supply Commerce with the requested information" is also not supported by any evidence on the administrative record.  *See* Redetermination III, 13.  Rather, the evidence demonstrates that Dillinger promptly and carefully reviewed its records, explaining to Commerce in detail the

18

manner and type of information recorded in its system and provided Commerce with all of the information in its control.

A neutral and reasonable application of facts available would apply the total cost of production for non-prime plate reported in Dillinger's verified cost calculation. As explained above, the reported cost of production for non-prime plate corresponds to the average **actual** total cost of production for all plate produced during the POI. Because non-prime plate can only be distinguished from prime plate at the end of the production process, both types of plate use precisely the same materials and undergo precisely the same processing steps. Therefore, it is reasonable to assume that their average costs of production will be the same. Commerce's assumption that the actual costs for non-prime plate are only roughly 60% as high as those for prime plate based on the likely selling price of non-prime plate is simply unreasonable and is unsupported by any evidence on the administrative record.

As detailed above, all of the cost information on the administrative record shows an actual cost of production far higher than the [        ] Euros/ton likely selling price imposed by Commerce as the cost of production for non-prime plate. For example, the weighted-average total cost of manufacturing for all CONNUMs is [        ] Euros/ton and the actual average cost of production for all plate produced during the POI as reported by Dillinger is [        ] Euros/ton. *See* Dillinger Second Supplemental Section D Response, App. SD-50 & COP data file dhcop03.sas7bdat (Nov. 7, 2016); R3-PD447, R3-CD511 & R3-CD526. Similarly, the average cost of production booked to the cost object/inventory account ([

                    ]) during the POI was [        ] Euros/ton and the ending inventory value at the end of the POI (March 2016) was [        ] Euros/ton. Remand Questionnaire Response, App. R-4; R2-PD5; R2-CD2.

By rejecting all of these other cost of production figures and applying an unreasonably low cost of production to non-prime plate based upon resale value, Commerce is applying an adverse inference that impermissibly shifts costs from non-prime plate to prime plate and thereby increases the dumping margin.  Non-prime plate can come from any steel grade and customer order.  Thus, there is no way that the actual cost of production for non-prime plate can be lower than the total cost of production for any of the CONNUMs produced during the POI.

As the Court stressed in *National Steel Corp.*, Commerce must be reasonable in its application of its chosen methodology, and Commerce's actions may become unreasonable in nature if it rejects low-margin information in favor of high-margin information that is demonstrably less probative.  National Steel Corp. v. United States, 18 C.I.T. 1126, 1132, 870 F. Supp. 1130, 1136 (1994) (citing Rhone Poulenc, Inc. v. United States, 899 F.2d 1185, 1190 (Fed. Cir. 1990)).

**II.      Conclusion**

For the reasons stated above, Commerce's Final Results of Redetermination are not supported by substantial evidence on the administrative record or in accordance with the law. We therefore respectfully request that the Court remand this case back to Commerce with explicit directions to accept Dillinger's costs as reported and to stop shifting costs from non-prime to prime plate.

Respectfully submitted,

/s/ *Marc E. Montalbine*
Marc E. Montalbine*
Gregory S. Menegaz
Alexandra H. Salzman**
Merisa A. Horgan
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Fax:  (202) 783-6909
email:  montalbine@dhlaw.de

Date: February 21, 2023                                        *Counsel to AG der Dillinger Hüttenwerke*

_____

* Admitted to Virginia Bar; practice limited to Federal International Trade Matters pursuant to D.C. Bar Rule 49(c)(2).
** Admitted to California Bar; practice supervised by attorneys of the firm who are active D.C. Bar members pursuant to D.C. Bar Rule 49(c)(8).

## Word Count Certificate of Compliance

This brief has been prepared utilizing Microsoft Word for Microsoft 365 using a proportionally spaced typeface (12 point Times New Roman font).

In accordance with the Chambers Procedures of this Court, the undersigned certifies that these comments comply with the word limitations set forth in the Court's scheduling order of January 4, 2023 (ECF 158).  Specifically, excluding those exempted portions of the brief, as set forth in section 2(B)(1) of the Chambers Procedures, I hereby certify that these comments contain **5,994** words.  In accordance with the Chambers Procedures, this certified word count is based on the word count feature in the word processing system (Microsoft Word) used to prepare this brief.

 /s/ *Marc E. Montalbine*
Marc E. Montalbine
**DEKIEFFER & HORGAN, PLLC**
1156 Fifteenth Street, N.W.
Suite 1101
Washington, DC 20005
Tel: (202) 783-6900
Fax: (202) 783-6909
email:  montalbine@dhlaw.de
*Counsel to AG der Dillinger Hüttenwerke*