A-428-844<br>
Remand<br>
Slip Op. 23-94<br>
POI: 04/01/2015 – 03/31/2016<br>
**Public Document**<br>
E&C/OIX: PG

*AG der Dillinger Hüttenwerke v. United States*,
Court No. 17-00158, Slip Op. 23-94 (CIT June 23, 2023)
Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany

## FINAL RESULTS OF REDETERMINATION
## PURSUANT TO COURT REMAND

**I.    SUMMARY**

The U.S. Department of Commerce (Commerce) has prepared these final results of redetermination pursuant to the remand order of the U.S. Court of International Trade (the Court) in *AG der Dillinger Hüttenwerke v. United States et al.*, Court No. 17-00158, Slip. Op. 23-94 (CIT June 23, 2023) (*Dillinger Germany IV*). This action arises out of the final determination in the less-than-fair-value (LTFV) investigation of certain carbon and alloy steel cut-to-length plate (CTL plate) from Germany.[1]

In *Dillinger Germany IV*, the Court upheld Commerce's: (1) determination to assign the "likely selling price" recorded in AG der Dillinger Hüttenwerke's (Dillinger) books and records as the cost of production (COP) for non-prime plate; and (2) application of partial adverse facts available (AFA) to Ilsenburger Grobblech GmbH, Salzgitter Mannesmann Grobblech GmbH, Salzgitter Flachstahl GmbH, and Salzgitter Mannesmann International GmbH (collectively, Salzgitter). However, the Court remanded Commerce's model-match methodology, related specifically to Commerce's rejection of Dillinger's proposed quality code for sour service

---

[1] *See Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany: Final Determination of Sales at Less Than Fair Value*, 82 FR 16360 (April 4, 2017) (*Final Determination*), and accompanying Issues and Decision Memorandum (IDM); *see also Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria, Belgium, France, the Federal Republic of Germany, Italy, Japan, the Republic of Korea, and Taiwan: Amended Final Affirmative Antidumping Determinations for France, the Federal Republic of Germany, the Republic of Korea and Taiwan, and Antidumping Duty Orders*, 82 FR 24096 (May 25, 2017) (*Amended Final Determination*).

petroleum transport plate, for further explanation or, if appropriate, reconsideration in light of Commerce's approach in *Bohler*.²

As discussed below, consistent with the Court's order in *Dillinger Germany IV*, Commerce has reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate in light of our determination in *Bohler*, which Commerce now finds is analogous to the instant investigation. Therefore, Commerce has revised Dillinger's calculations using its reported quality code for sour service petroleum transport plate (*i.e.*, 771). Consequently, the final estimated weighted-average dumping margin for Dillinger increases to 4.99 percent.³

## II. BACKGROUND

In the LTFV investigation, Commerce rejected Dillinger's proposed quality code of 771 for sour service petroleum transport plate and reassigned these products to have a quality code of 772 for all petroleum transport plate products.⁴ Dillinger instituted litigation challenging this aspect of Commerce's model-match methodology, along with other issues.

In *Dillinger Germany I*, the Court remanded to Commerce to reconsider its application of partial AFA to certain downstream home market sales reported by Dillinger.⁵ Pursuant to *Dillinger Germany I*, Commerce issued its *First Remand Redetermination*, in which Commerce reconsidered how it applied partial AFA to these sales.⁶ In *Dillinger Germany II*, the Court

---

² *See Dillinger Germany IV*, Court No. 17-00158, Slip Op. 23-94 at 4 and 25; *see also Bohler Bleche GMBH & Co. KG v. United States*, 324 F. Supp. 3d 1344 (CIT 2018) (*Bohler*).
³ We note that this change does not affect the all-others rate, which remains unchanged from the rate calculated in *Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT August 18, 2021), dated January 19, 2022 (*Second Remand Redetermination*), at 57-58, available at https://access.trade.gov/resources/remands/21-101.pdf.
⁴ *See Final Determination* IDM at Comment 22.
⁵ *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (CIT 2019) (*Dillinger Germany I*).
⁶ *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany,* Court No. 17-00158, Slip Op. 19-87 (CIT July 16, 2019), dated October 8, 2019 (*First Remand Redetermination*), available at https://access.trade.gov/resources/remands/19-87.pdf.

remanded to Commerce to consider its reallocation of costs between prime and non-prime steel plate for Dillinger, among other Dillinger cost issues, as well as the application of a partial AFA methodology to certain downstream home market sales reported by Salzgitter.[7] In parallel with *Dillinger II*, the Court issued a separate memorandum and order sustaining Commerce's rejection of Dillinger's proposed quality code for sour service pressure vessel plate and staying Dillinger's challenge to Commerce's rejection of the proposed quality code for sour service petroleum transport plate pending the outcome of the cost issues on remand.[8]

In *Dillinger Germany III*, the Court remanded to Commerce to again reconsider its selection of the facts otherwise available for determining the COP of Dillinger's non-prime products.[9] In *Dillinger Germany IV*, the Court sustained Commerce's determination to assign the "likely selling price" recorded Dillinger's books and records as the COP for non-prime plate and the application of partial AFA to Salzgittter.[10] However, the Court remanded for further explanation and reconsideration Commerce's decision to reject Dillinger's proposed quality code for sour service petroleum transport plate, which, as noted above, had been stayed after *Dillinger Germany II*, in light of Commerce's approach in response to *Bohler*.[11]

### III.  ANALYSIS

As the Court ordered, Commerce has reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) in light of our analysis of the facts in *Bohler*. In *Bohler*, the Court held that Commerce's model-match methodology used in the underlying LTFV investigation "failed to adequately account for 'the alloy content of the Plaintiffs' specialized high alloy steel products, thereby failing to account for significant

---

[7] *See AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403 (CIT 2021) (*Dillinger Germany II*).
[8] *See Memorandum and Order*, ECF No. 121 (August 18, 2021) (*August 2021 Order*).
[9] *See AG der Dillinger Hüttenwerke v. United States*, 592 F. Supp. 3d 1344 (CIT 2022) (*Dillinger Germany III*).
[10] *See Dillinger Germany IV* at 12.
[11] *Id.* at 22-28.

differences in physical characteristics, costs, and price.'"[12] Specifically, in the LTFV investigation underlying *Bohler*, the respondent proposed the addition of two additional product characteristics (*i.e.*, grade and process) to account for the alloy content of its specialized, high-alloy steel products.[13] The respondent suggested adding the field "grade" to define the amount of alloy in a product and its corresponding cost and the field "process" to account for significant variations in the cost of production arising from different manufacturing processes used to produce different steel products.[14] According to the respondent, these additional product characteristics were necessary because the extant product characteristics "'{did} not provide an accurate basis for comparing {home market and export} sales … because it unreasonably group{ed} together high alloy, Special Steel CTL plate products that differ significantly … resulting in {product control numbers} … with wildly divergent sales prices and costs of production' which could 'lead to highly arbitrary dumping margin calculations.'"[15] In *Bohler*, the Court sustained Commerce's exclusion of the respondent's field "process," but remanded to Commerce its exclusion of the field "grade," directing Commerce to "design a model-match methodology in {that} investigation that account{ed} for all commercially significant physical differences."[16] On remand, Commerce replaced the field "quality" with the respondent's proposed field "grade," to account for all commercially significant differences, including alloy content.[17]

In the instant case, as in *Bohler*, Dillinger asserts that Commerce's model-match methodology does not accurately account for physical differences between certain products it

---

[12] *Id*. (citing *Bohler*, 324 F. Supp. 3d at 1348).
[13] *See Bohler*, 324 F. Supp. 3d at 1348.
[14] *Id*.
[15] *Id*., 324 F. Supp. 3d at 1349.
[16] *Id.*
[17] *See Final Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Austria*, Court No. 17-00163 (CIT July 9, 2018), dated October 9, 2018, at 7.

produces. To correct Commerce's model-match methodology, Dillinger proposed the addition of an additional subfield (*i.e.*, code 771) under the existing "quality" product characteristic to differentiate Dillinger's sour service petroleum transport plate, which is used to transport petroleum products containing high amounts of hydrogen sulfide, from other steels designated specifically for the transport of petroleum products (*i.e.*, currently code 772).[18] To support the commercially significant differences in the physical characteristics of sour service petroleum transport plate when compared to other steels designated for the transport of petroleum products, Dillinger provided: (1) sales and cost information for products with its proposed quality code, demonstrating the consistently higher net prices and costs for sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products; and (2) documentation comparing the manufacturing of sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products, as well demonstrating the unique physical properties of sour service petroleum transport plate.

Thus, we find that the facts of this case are analogous to those of *Bohler*. Specifically, in *Bohler*, the respondent argued for a revision to the model-match hierarchy, through the addition of two product characteristic fields (*i.e.*, "grade" and "process") to account for commercially significant physical differences, while Dillinger has similarly proposed a revision to the model-match hierarchy, through the additional quality product characteristic code (*i.e.*, 771), to account for the different physical characteristics of sour service petroleum transport plate. Additionally, in *Bohler*, the respondent provided information on the record to support the additional product characteristic to demonstrate the impact of alloy content on the COP of its products, while

---

[18] Commerce also permitted respondents to include additional quality codes not included in Commerce's list when reporting the "quality" product characteristic for its products. *See* Commerce's Letter, "Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Germany," dated June 10, 2016, at 8.

5

Dillinger similarly provided information on the record to demonstrate the consistently higher costs and net prices for sour service petroleum transport plate, along with supporting documentation. As a result, we reconsidered our rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) and have now included this quality code in the CONNUMs used in the margin calculations for Dillinger to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products.[19]

## IV. INTERESTED PARTY COMMENTS

On August 10, 2023, Commerce released the draft results of redetermination to all interested parties and invited parties to comment.[20] On August 17, 2023, Dillinger and Nucor Corporation (the petitioner) submitted comments.[21] The petitioner in its comments agreed with Commerce's Draft Remand.[22] Dillinger's comments are summarized below.

*Dillinger's Comments*

- Commerce in its model-match methodology may only treat products as identical if the products have either: (1) no differences in physical characteristics; or (2) only minor and "not commercially significant" differences.[23]
- Commerce's initial questionnaire expressly permitted Dillinger to include additional quality codes in its response.[24]
- Dillinger provided Commerce with hundreds of pages of standards and specifications illustrating the differences in the actual physical characteristics with respect to the proposed additional quality codes.[25] This information is outlined in Dillinger's brief to the Court in the first iteration of this litigation.[26]

---

[19] *See* Memorandum, "Alternative Margin Calculations for AG der Dillinger Hüttenwerke S.A. Pursuant to Draft Results of Fourth Remand Redetermination," dated August 10, 2023.
[20] *See Draft Results of Redetermination Pursuant to Court Remand, Certain Carbon and Alloy Steel Cut-to-Length Plate from Germany*, Court No. 17-00158 (CIT June 23, 2023), dated August 10, 2023 (Draft Remand).
[21] *See* Dillinger's Letter, "Comments of Draft Results of Redetermination," dated August 17, 2023 (Dillinger's Comments); *see also* Petitioner's Letter, "Comments of Draft Results of Redetermination," dated August 17, 2023 (Petitioner's Comments).
[22] *See* Petitioner's Comments.
[23] *See* Dillinger's Comments. at 3 (citing *Union Steel* v. *United States*, 753 F. Supp. 2d 1317, 1322 (CIT 2011)).
[24] *Id*. at 3-4 (citing Commerce's Letter, "Product Characteristics for the Antidumping Duty Investigation of Certain Carbon and Alloy Steel Cut-to-Length Plate from the Republic of Germany," dated June 10, 2016, at Attachment 1 at 8).
[25] *Id*.
[26] *Id*. at 3-4 and Attachment 1.

- Currently, Commerce's model-match methodology is insufficient because it does not account for how lower levels of phosphorus and sulfur in sour service petroleum transport plate significantly change the alloy content of the product, when compared to other steels designated specifically for the transport of petroleum products.[27]
- The manufacturing process for creating steel products that meets the specifications for sour service petroleum transport plate is more extensive than the manufacturing process for other steels designated specifically for the transport of petroleum products. Therefore, both the COP and sales price of sour service petroleum transport plate are higher than the COP and subsequent sales price of non-sour service petroleum transport plate.[28]
- Sour service petroleum transport plate is marketed and sold under a distinct grade name that includes an "S," signifying it complies with requirements of Annex H for sour service (*i.e.*, it can transport sour petroleum products without corroding).[29]
- The manufacturing, marketing, and use-case distinctions in physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products result in physical differences that are commercially significant. Therefore, Commerce cannot treat sour service petroleum transport plate as identical to other steels designated specifically for the transport of petroleum products that have not undergone the desulfurization and dephosphorization processes.[30]
- The addition of grade as a new product characteristic field, as the respondent in *Bohler* requested, would have effectively resolved the model-match issue in this investigation. However, Dillinger took a less impactful approach because it determined that simply adding an additional quality code would be sufficient.[31]
- Commerce incorrectly claimed that Dillinger has not submitted information regarding cost and price differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products. On the contrary, Dillinger submitted extensive sales and cost information for each transaction, and differentiated sour service petroleum transport plate from other steels designated specifically for the transport of petroleum products in its sales and cost files.[32]
- Commerce asserts that Dillinger must illustrate the existence of a significant difference-in-merchandise (DIFMER) adjustment (*i.e.*, 20 percent or more) between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products. However, nowhere in *Bohler* does the Court condition its decision on there the existence of a DIFMER of 20 percent or more.[33]
- When comparing control numbers for sour service sour service petroleum transport plate to other steels designated specifically for the transport of petroleum products that differ only in quality code, the DIFMER adjustments are meaningful.[34]
- Commerce has never established specific thresholds for cost differences in establishing its model-match criteria. Rather, Commerce has based its model- match criteria on

---

[27] *Id*. at 3-4.
[28] *Id*. at 4-5.
[29] *Id*. at 5.
[30] *Id*.
[31] *Id*. at 6.
[32] *Id*.
[33] *Id*. at 7.
[34] *Id*. at 7 and Attachment 2.

- physical characteristics, regardless of whether such characteristics results in cost differences.[35]
- Commerce must also apply a fair and objective standard when identifying commercially significant differences in physical characteristics. It cannot require Dillinger to provide information that was never requested of other parties to this proceeding. For example, Commerce made changes to the quality codes based on comments Nucor submitted (*e.g.*, adding codes for tool steel and mold steel) without requiring Nucor to present evidence of differences in physical characteristics, price comparability, cost differences, or DIFMER.[36]
- Most significantly, Commerce folded seven quality codes related to pressure vessel steel into one quality code at the petitioner's behest, even though the petitioner did not submit information about cost comparability or sales price.[37]
- In *Bohler*, the Court specifically found that the plaintiffs' proposed addition of a new product characteristic field to Commerce's model-match methodology was not untimely, even though they were made after the initial comment period had expired and Commerce had issued its final product characteristics. If such significant additions to the model-match methodology cannot properly be considered untimely, then the limited addition of a quality code for sour service pressure vessel steel (as specifically permitted by the questionnaire instructions) cannot be considered untimely. Therefore, Commerce should reconsider its determination that Dillinger's addition of a quality code for sour service pressure vessel steel (*i.e.*, 759) was untimely.[38]
- Commerce noted in its *Final Determination* that there is no correlation between the magnitude of the weighted-average dumping margin and the extent to which Commerce's model-match methodology may be flawed. Therefore, Commerce's consideration of this issue should not be dependent upon the margin impact.[39]
- The proper model-match methodology is an issue that recurs in every subsequent administrative review, making it important to the proceeding.[40]

**Commerce's Position:**

We reviewed the comments submitted on the Draft Remand and, after considering those comments and the facts on the record, agree with Dillinger that the facts of the instant investigation are similar to those in *Bohler*. In the Draft Remand, we attempted to distinguish the facts of this case from those of *Bohler*, noting that: (1) in *Bohler*, the respondent argued for the addition of a new product characteristic to be added to the model-match hierarchy, while here

---

[35] *Id.* at 8 (citing *Final Determination* IDM at Comment 22).
[36] *Id.* 8-9.
[37] *Id.* at 9.
[38] *Id.* at 10.
[39] *Id.* at 12-13.
[40] *Id.* at 13.

Dillinger has proposed an additional code under the existing "quality" product characteristic; and (2) in *Bohler,* the respondent provided analysis supporting the additional product characteristic to demonstrate the impact of alloy content on the COP of its products, while Dillinger has provided no such analysis that would support a change in our determination here.  Therefore, in the Draft Remand, because of the differences between *Bohler* and the instant investigation, we did not revisit our decision to reject Dillinger's proposed additional quality code for sour service petroleum transport plate (*i.e.*, 771).[41]

However, after considering Dillinger's comments on the Draft Remand, we have reconsidered our comparison of the facts of *Bohler* and the instant case, as described in the "Analysis" section above.  Therefore, consistent with our determination in *Bohler*, we find it appropriate in this instance, and based on the facts here, to include Dillinger's proposed quality code for sour service petroleum transport plate in our calculation of Dillinger's margin for these final results of redetermination to account for commercially significant physical differences between sour service petroleum transport plate and other steels designated specifically for the transport of petroleum products.

Finally, we disagree with Dillinger that Commerce should also reconsider its rejection of Dillinger's proposed quality code for sour service pressure vessel steel, given that the Court already sustained Commerce's rejection of this quality code.[42]  As a result, we have not revisited this issue in these final results of redetermination.

V.      **FINAL RESULTS OF REDETERMINATION**

For the reasons discussed above, Commerce determines that the facts in this investigation and the investigation underlying *Bohler* are, in fact, analogous.  Therefore, Commerce has

---

[41] *See* Draft Remand at 6-7.
[42] *See* August 2021 Order at 9.

9

reconsidered its rejection of Dillinger's proposed quality code for sour service petroleum transport plate (*i.e.*, 771) and now includes this quality code in the CONNUMs used in the margin calculations for Dillinger.  Consequently, the final estimated weighted-average dumping margin for Dillinger increases to 4.99 percent.  Because Dillinger's margin is different from the rate in the *Amended Final Determination*, we intend to issue a *Timken*[43] notice with the amended final determination, should the Court sustain these final results of redetermination.[44]

9/6/2023

X 

Signed by: LISA WANG
Lisa W. Wang
Assistant Secretary
  for Enforcement and Compliance

---

[43] *See Timken Co. v. United States*, 893 F.2d 337 (Fed. Cir. 1990) (*Timken*).
[44] We note that the revision to Dillinger's margin here does not affect the calculation of the all-others rate. However, Commerce did revise the all-others rate in the *Second Remand Redetermination*.  The CIT sustained this aspect of Commerce's determination in *Dillinger Germany III*.  Therefore, we intend to include the revised all-others rate of 20.99 percent calculated in the *Second Remand Redetermination* in this *Timken* notice.