# United States Court of Appeals
# for the Federal Circuit

---

**AG DER DILLINGER HUTTENWERKE,**
*Plaintiff-Appellant*

**ILSENBURGER GROBBLECH GMBH,
SALZGITTER FLACHSTAHL GMBH, SALZGITTER
MANNESMANN GROBBLECH GMBH,
SALZGITTER MANNESMANN INTERNATIONAL
GMBH, FRIEDR. LOHMANN GMBH,
THYSSENKRUPP STEEL EUROPE AG,**
*Plaintiffs*

**v.**

**UNITED STATES, SSAB ENTERPRISES LLC,
NUCOR CORPORATION,**
*Defendants-Appellees*

---

2024-1498

---

Appeal from the United States Court of International Trade in Nos. 1:17-cv-00158-LMG, 1:17-cv-00160-LMG, 1:17-cv-00162-LMG, Senior Judge Leo M. Gordon.

---

Decided: October 6, 2025

---

MARC EDWARD MONTALBINE, DeKieffer & Horgan, PLLC, Washington, DC, argued for plaintiff-appellant. Also represented by JAMES KEVIN HORGAN, MERISA ANNE

HORGAN.

KARA WESTERCAMP, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, TARA K. HOGAN, PATRICIA M. MCCARTHY; AYAT MUJAIS, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

STEPHANIE MANAKER BELL, Wiley Rein, LLP, Washington, DC, argued for defendant-appellee Nucor Corporation. Also represented by ALAN H. PRICE, MAUREEN E. THORSON, ENBAR TOLEDANO, CHRISTOPHER B. WELD.

ROGER BRIAN SCHAGRIN, Schagrin Associates, Washington, DC, for defendant-appellee SSAB Enterprises LLC. Also represented by NICHOLAS J. BIRCH, SAAD YOUNUS CHALCHAL, CHRISTOPHER CLOUTIER, ELIZABETH DRAKE, WILLIAM ALFRED FENNELL, JEFFREY DAVID GERRISH, LUKE A. MEISNER.

———————————

Before LOURIE, DYK, and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

Appellant AG der Dillinger Hüttenwerke appeals from a final decision of the U.S. Court of International Trade regarding an antidumping duty investigation. The Trade Court sustained the U.S. Department of Commerce's rejection of Dillinger's proposed adjustment to the model-match methodology and Commerce's selection of likely selling price as facts otherwise available for a cost of production analysis. We affirm the Trade Court's ruling as to Dillinger's model-match proposal. But we hold that it was unreasonable for Commerce to use likely selling price as facts otherwise available for cost of production, and thus we vacate the Trade Court's ruling as to Commerce's selection of

facts otherwise available.  Accordingly, we vacate and remand.

## BACKGROUND

In an antidumping duty investigation, Commerce must determine whether merchandise subject to the investigation is being, or is likely to be, "sold in the United States at less than its fair value."  19 U.S.C. § 1673(1).  To do so, Commerce compares the normal value, typically the price at which a "foreign like product" is sold in an exporter's home country, to the export price of the subject merchandise.  *Id.* §§ 1677a, 1677b(a), 1677(16) (defining "foreign like product"), 1677(35)(A) (defining "dumping margin").  To determine whether merchandise qualifies as a foreign like product, Commerce may use a "model-match" methodology to categorize similar products based on their physical characteristics.  *See id.* § 1677(16); *SKF USA, Inc. v. United States*, 537 F.3d 1373, 1375 (Fed. Cir. 2008).  When determining the normal value, under certain conditions, Commerce may disregard sales of the foreign like product made at prices less than the cost of production.  19 U.S.C. § 1677b(b).

Commerce issues questionnaires to obtain information necessary for an investigation.  *SKF USA, Inc. v. U.S. Customs & Border Prot.*, 556 F.3d 1337, 1340–41 (Fed. Cir. 2009).  If "necessary information is not available on the record," Commerce must fill in the gaps using facts otherwise available to it "in reaching the applicable determination." 19 U.S.C. § 1677e(a); *see Oman Fasteners, LLC v. United States*, 125 F.4th 1068, 1075 (Fed. Cir. 2025).

## I.

This appeal arises from an antidumping duty investigation of certain carbon and alloy steel cut-to-length plate from Germany.  *See Certain Carbon and Alloy Steel Cut-to-Length Plate from the Federal Republic of Germany*, 82 Fed. Reg. 16360 (Dep't of Commerce Apr. 4, 2017)

("*Final Determination*"); J.A. 5882–5981 (issues and deci-
sion memorandum accompanying the *Final Determina-
tion*). The U.S. Department of Commerce ("Commerce")
selected AG der Dillinger Hüttenwerke ("Dillinger"), the
appellant before this court, as a mandatory respondent.

The U.S. Court of International Trade ("Trade Court")
remanded this case to Commerce four times before the cur-
rent appeal arrived at this court. Given this history, our
recitation of the facts and procedural history is limited to
the two issues currently on appeal: Dillinger's proposed ad-
justment to Commerce's model-match methodology and
Commerce's selection of likely selling price as facts other-
wise available for cost of production.

A.

During the investigation, on May 19, 2016, Commerce
solicited comments from interested parties on the physical
characteristics to be used to develop its model-match meth-
odology. J.A. 225. In response, on June 2, 2016, Dillinger
requested that Commerce split the category covering steel
used to transport petroleum products into two categories
with separate quality codes, one of which would cover "sour
service" petroleum transport plate, also referred to as sour
transport plate. J.A. 237–39. Sour transport plate refers
to steel used to transport sour crude oil. According to Dil-
linger, sour crude oil contains high amounts of sulfur and
is extremely corrosive to standard steel, so sour service pe-
troleum transport plate must be "specially made to with-
stand this corrosion," resulting in a higher cost of
production and warranting a separate category.
J.A. 238–39. On June 10, 2016, Commerce issued its final
product characteristics, which rejected Dillinger's request
for a separate quality code for sour transport plate.
J.A. 370–84.

Commerce then issued a series of questionnaires. In
response, on July 15, 2016, Dillinger renewed its proposal
to split the category covering steel used to transport

petroleum products, requesting that Commerce use quality code 771 for sour transport plate. J.A. 1678; J.A. 1690–93. Next, Commerce issued its first supplemental questionnaire. In response, on September 20, 2016, over three months after Commerce issued its final product characteristics, Dillinger requested for the first time that the category covering steel for pressure vessel plate be split into two categories (codes 759 and 760), of which code 759 would relate to sour pressure vessel plate. J.A. 3077; J.A. 3086–88. Dillinger asserted that its proposed code 759 for sour pressure vessel plate was "analogous" to its proposed code 771 for sour transport plate, and that its proposed code 759 was justified based on many of the same reasons as code 771. J.A. 3088.

Shortly thereafter, Commerce issued its preliminary margin calculation for Dillinger, rejecting Dillinger's proposed codes 759 and 771. J.A. 4852–53. Commerce issued its final determination on March 29, 2017, and, consistent with its preliminary determination, Commerce once again rejected Dillinger's proposed codes 759 and 771. J.A. 5957–60.

B.

In its questionnaires, Commerce also requested that Dillinger report product-specific cost of production data for non-prime plate. Non-prime plate is plate that does not meet customer specifications for prime material but nonetheless may still be sold as plate. Appellant Br. 36 n.1. In its questionnaire and supplemental questionnaire responses, Dillinger informed Commerce that it "is not able to report all the product characteristics for non-prime [plate]," including its cost of production. J.A. 360–61. Dillinger explained that its non-prime plate "is sold by the railcar load as 'odds and ends'" and Dillinger's computerized sales records do not record any "grade/specification information" for these sales. *Id.* Dillinger claimed that this lack of traceability prevented it from reporting product

characteristics at "the level of specificity" that Commerce requested. J.A. 361. As such, Dillinger reported the cost of production for all non-prime plate "based upon the average cost of all plate from the cost object heavy plate," meaning that Dillinger reported the cost of producing non-prime plate based on the average cost of producing prime plate. J.A. 3954.

In its final determination, Commerce disagreed with Dillinger's reported cost of production for non-prime plate. J.A. 5970–71. Commerce adjusted Dillinger's reported costs to be consistent with how Commerce understood these costs to be recorded in Dillinger's normal books and records, i.e., that cost of production was equal to the expected sales value of non-prime plate.[1] *Id.*

## II.

## A.

Dillinger appealed Commerce's final determination to the Trade Court, challenging Commerce's rejection of its proposed quality codes relating to sour service steel and its adjustment to Dillinger's reported cost of production for non-prime plate. Dillinger argued that Commerce should have accepted its proposed quality codes because there are commercially significant differences between sour service steel and non-sour service steel, and that Commerce's adjustment to Dillinger's reported cost of production of non-prime plate was unlawful because Commerce replaced actual cost data with sales data. J.A. 5991–93; J.A. 6001–11.

In August 2021, the Trade Court ruled that Commerce erred in adjusting Dillinger's reported cost of production for non-prime plate to reflect likely selling price, rather than

---

[1]    Dillinger disputes Commerce's interpretation of its normal books and records. Appellant Br. 47–50. We need not reach this dispute given our resolution of this appeal.

on the basis of actual cost of production data. *AG der Dillinger Hüttenwerke v. United States*, 534 F. Supp. 3d 1403, 1407 (Ct. Int'l Trade 2021) (*Dillinger II*).[2]  The Trade Court held that Commerce needed to review and alter its cost of production determination for non-prime plate so as to be consistent with *Dillinger France S.A. v. United States*, 981 F.3d 1318, 1321–24 (Fed. Cir. 2020) (*Dillinger France*), which held that Commerce's reliance on information reflecting a respondent's "likely selling price," rather than actual cost data, violated 19 U.S.C. § 1677b(f).  *Dillinger II*, 534 F. Supp. 3d at 1407 (quoting *Dillinger France*, 981 F.3d at 1321–24).

In a separate order issued the same day, the Trade Court affirmed Commerce's rejection of Dillinger's proposal to add code 759 for sour vessel plate as untimely. J.A. 32–40 ("*August 2021 Order*").  The Trade Court stayed further consideration of Commerce's rejection of Dillinger's other proposed quality code, code 771 for sour transport plate, pending the outcome of several additional issues that it remanded in *Dillinger II*. *August 2021 Order*, J.A. 40.

On remand, Commerce reopened the record and requested that Dillinger provide the actual cost data of producing non-prime products.  J.A. 48–49.  Dillinger did not do so for the same reasons it previously explained, namely that its non-prime products are untraceable. J.A. 6092–6106.  Dillinger also explained that non-prime plate "undergoes the exact same production steps as prime plate."  J.A. 6100.  In its second remand redetermination, Commerce relied on its interpretation of Dillinger's normal

---

[2]    Dillinger, among other plaintiffs, previously appealed Commerce's final determination to the Trade Court. *See AG der Dillinger Hüttenwerke v. United States*, 399 F. Supp. 3d 1247 (Ct. Int'l Trade 2019) (*Dillinger I*).  *Dillinger I* is not at issue in this appeal.

books and records as facts otherwise available to fill the informational gap. J.A. 49–56.

### B.

Dillinger appealed to the Trade Court again, challenging Commerce's decision to use the likely selling price of non-prime plate as facts otherwise available for missing cost of production information. *AG der Dillinger Hüttenwerke v. United States*, 592 F. Supp. 3d 1344 (Ct. Int'l Trade 2022) (*Dillinger III*). Dillinger argued that Commerce erred in using likely selling price as facts otherwise available for actual cost of production information, which is a distinct metric. *Id.* at 1346.

In *Dillinger III*, the Trade Court affirmed Commerce's use of facts otherwise available but held that another remand was necessary for Commerce to explain why its reliance on the likely selling price as facts otherwise available reasonably reflects the cost of producing non-prime plate. *Id.* at 1347–49.

In its third remand redetermination, Commerce explained that its use of likely selling price as facts otherwise available was reasonable because producing non-prime products is "an inevitable consequence" of Dillinger's prime product production as "Dillinger does not intend to produce non-prime products." J.A. 115. Commerce stated that its reliance on Dillinger's normal books and records as facts otherwise available was the "only reasonable approach because it recognize[d] that, where Dillinger cannot produce 98 perfect plates without producing two imperfect plates, the lost value of the two imperfect plates is actually a cost of producing the 98 perfect ones and should be accounted for as such." *Id.*

### C.

Dillinger appealed to the Trade Court a fourth time, challenging Commerce's decision to use the likely selling price of non-prime plate as facts otherwise available for

missing cost of production information and Commerce's rejection of Dillinger's proposed quality code 771 for sour transport plate. *AG der Dillinger Hüttenwerke v. United States*, 648 F. Supp. 3d 1321, 1323 (Ct. Int'l Trade 2023) (*Dillinger IV*). Dillinger continued to argue that Commerce's adjustment of Dillinger's reported cost of production was contrary to *Dillinger France*, and Commerce should have used the average cost of production for all plate as facts otherwise available. *Id.* at 1325–26.

Regarding its proposed quality code 771, Dillinger argued that there are commercially significant differences between sour service steel and non-sour service steel, citing *Bohler Bleche GmbH & Co. KG v. United States*, 324 F. Supp. 3d 1344 (Ct. Int'l Trade 2018), in which the Trade Court struck down the same model-match methodology that Commerce used in this investigation. *Id.* at 1335.

In *Dillinger IV*, the Trade Court sustained Commerce's third remand redetermination with respect to the cost of production of Dillinger's non-prime plate. *Id.* at 1325–28. The Trade Court ruled that Dillinger "failed to demonstrate that Commerce's application of facts otherwise available was unreasonable given the limited information in the record," and that Dillinger's proposal that Commerce use the average actual cost of production for all of its plate sold during the period of investigation was not persuasive. *Id.* at 1325–27.

Also in *Dillinger IV*, the Trade Court remanded Commerce's decision to reject Dillinger's proposed quality code 771 for sour transport plate, ruling that *Bohler* was instructive. *Id.* at 1333–36. The Trade Court instructed Commerce on remand "to further explain why its determination [was] reasonable in light of [the approach it implemented] in *Bohler*, or if appropriate, reconsider its rejection of Dillinger's proposed quality code for sour transport plate." *Id.* at 1336.

In its fourth remand redetermination, Commerce determined that the facts in *Bohler* were "analogous" to the facts of this proceeding and thus it accepted Dillinger's proposed quality code 771 for sour transport plate. J.A. 158–65. However, Commerce rejected Dillinger's request on remand that Commerce reconsider its rejection of Dillinger's proposed code 759 for sour vessel plate, ruling that the Trade Court had already sustained its rejection of code 759 in *Dillinger II*. J.A. 164.

D.

Dillinger appealed to the Trade Court once more, again challenging Commerce's rejection of its proposed quality code 759. *AG der Dillinger Hüttenwerke v. United States*, 672 F. Supp. 3d 1351 (Ct. Int'l Trade 2023) (*Dillinger V*). Dillinger argued that because Commerce accepted Dillinger's proposed quality code 771, Commerce should have also accepted its proposed quality code 759 for sour pressure vessel plate. *Id.* at 1355.

The Trade Court construed Dillinger's argument as a request for reconsideration of its *August 2021 Order* rejecting Dillinger's proposed quality code 759 and ruled that "factual distinctions" between the timeliness of the model-match proposal at issue in *Bohler* versus Dillinger's proposal rendered reconsideration inappropriate. *Id.* at 1355–56. Accordingly, the Trade Court sustained Commerce's fourth remand redetermination. *Id.* at 1356, 58.

Dillinger appeals. We have jurisdiction under 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

We review the Trade Court's rulings de novo by "stepping into its shoes and applying the same standard of review." *Vandewater Int'l Inc. v. United States*, 130 F.4th 981, 991 (Fed. Cir. 2025) (quoting *JTEKT Corp. v. United States*, 642 F.3d 1378, 1381 (Fed. Cir. 2011)). This court must reverse determinations that are not supported by

substantial evidence or not in accordance with the law. *Viraj Grp. v. United States*, 476 F.3d 1349, 1354 (Fed. Cir. 2007) (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938).

This court "review[s] Commerce's rejection of submissions as untimely under its own deadlines for abuse of discretion." *Tau-Ken Temir LLP v. United States*, 147 F.4th 1363, 1371 (Fed. Cir. 2025).

## DISCUSSION

Dillinger raises two arguments on appeal. First, Dillinger argues that Commerce erred in rejecting its proposed code 759 for sour pressure vessel plate. Appellant Br. 22–36. Second, Dillinger argues that Commerce erred in using Dillinger's likely selling price as its cost of production. *Id.* at 36–58. We address each argument in turn.

## I.

Dillinger argues that Commerce acted inconsistently by refusing to accept its proposed quality code 759 for sour service pressure vessel plate yet accepting its proposed quality code 771 for sour transport plate. *Id.* at 22. According to Dillinger, the "issues involving sour service petroleum transport plate and sour service pressure vessel plate are exactly the same," so Commerce's inconsistent treatment of identical issues renders its determination arbitrary and thus unlawful. *Id.* at 22–23.

Dillinger is correct that it submitted to Commerce the same general evidence to support its proposed quality codes 759 and 771, and Commerce ultimately accepted code 771. J.A. 3077; J.A. 3086–88 (explaining that quality code 759 is "analogous to" quality code 771 and "Dillinger has already provided extensive information on the corrosive effects of sour petroleum products"). But Commerce did not reject quality code 759 on the merits of the evidence

presented; rather, Commerce rejected quality code 759 as untimely.  J.A. 5958 ("Dillinger did not propose [quality code 759] in the Dillinger Model Match Comments, even though it appears to have been aware of such sour service products at the time."); *August 2021 Order*, J.A. 38–39; *Dillinger V*, 672 F. Supp. 3d at 1355–56.  Dillinger proposed a quality code for sour transport plate on June 2, 2016, during the model-match comment period.  J.A. 237–39.  By contrast, Dillinger did not propose quality code 759 until its first supplemental questionnaire response, which occurred after the comment period had closed, over three and a half months after Dillinger's model-match comments, over three months after Commerce issued its final product characteristics, over two months after Dillinger's initial questionnaire response, and about forty-five days before the preliminary determination.  J.A. 3077; J.A. 3086–88.  Proposed code 759 stands alone, given the untimeliness of Dillinger's proposal.

Further, Commerce acted within its discretion in rejecting Dillinger's proposed quality code 759 as untimely.  "Commerce has discretion to establish and enforce time limits for submitting information" in an investigation.  *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021); *see Tau-Ken Temir LLP*, 147 F.4th at 1373–75 (discussing general considerations guiding Commerce's use of its discretion to reject untimely submissions).  As discussed above, Dillinger's proposal was significantly late.  And critical to this appeal is Dillinger's admission that the basis supporting its proposed additions of quality codes 759 and 771 was the same.  This shows that Dillinger had the necessary information to propose quality code 759 when it first proposed a quality code for sour transport plate several months earlier, yet Dillinger chose not to.  Dillinger has offered no explanation for this delay.  *Tau-Ken Temir LLP*, 147 F.4th at 1374 (Commerce may consider the "reasons for the submission's untimeliness.").

Dillinger argues that its proposed code 759 was not untimely, relying on the Trade Court's decision in *Bohler*. Dillinger argues that "a key holding in *Bohler*" is that proposed model-match comments are not untimely even if submitted after the comment period and after Commerce issued its final product characteristics. Appellant Br. 32. Dillinger also argues that Commerce's notice of final product characteristics invited Dillinger to use additional quality codes, and Dillinger reserved the right to propose additional codes. *Id.* at 31–32.

*Bohler* is not binding authority on this court. In any event, as the Trade Court correctly recognized, Dillinger's reliance on *Bohler* is misplaced given key "factual distinctions" between *Bohler* and this case. *Dillinger V*, 672 F. Supp. 3d at 1355–56. The plaintiffs in *Bohler* "raised their concerns at every turn" and proposed their modification in their initial questionnaire responses "just 35 days after [Commerce] issued its revised model-match methodology, four months prior to the" preliminary determination. *Bohler*, 324 F. Supp. 3d at 1352. Additionally, Commerce solicited "additional clarifying information on this issue." *Id.* As discussed above, the same cannot be said of Dillinger, who proposed code 759 much later, and Commerce rejected this proposal shortly thereafter, rather than soliciting additional information.

Dillinger's remaining arguments are unavailing. Even assuming Dillinger is correct that Commerce intended to invite untimely proposals, which does not appear to be the case, Commerce is not required to accept all untimely proposals. Dillinger relies on boilerplate language that appeared in Commerce's notice of final product characteristics but was notably absent from Commerce's first supplemental questionnaire, which Dillinger was responding to when it first proposed code 759. Further, there is no indication that Commerce informed Dillinger that it could submit proposals at any and all stages of the investigation, regardless of the magnitude of the untimeliness of

the proposal. As to Dillinger's reservation of rights, Dillinger has no authority to reserve the right to submit untimely proposals. *Dongtai Peak Honey Indus. Co. v. United States*, 777 F.3d 1343, 1352 (Fed. Cir. 2015) ("It is not for [respondent] to establish Commerce's deadlines or to dictate to Commerce whether and when Commerce actually needs the requested information." (cleaned up)). Commerce's purported invitation and Dillinger's asserted reservation of rights do not support a finding that Commerce relinquished its discretion to reject untimely model-match proposals, especially when those proposals were received several months later, as was Dillinger's proposal of code 759. Commerce maintained its discretion to enforce time limits. *Goodluck India*, 11 F.4th at 1342.

In sum, we reject Dillinger's argument that Commerce's denial of proposed quality code 759 was arbitrary and thus unlawful. The untimeliness of Dillinger's proposal is a sufficient explanation for why Commerce treated quality code 759 different from quality code 771, even if Dillinger's evidence and argument in support of both codes were largely the same.

## II.

Dillinger argues that Commerce's use of likely selling price as facts otherwise available in its cost of production analysis is unlawful. Appellant Br. 42–47. According to Dillinger, the fact that non-prime plate is sold at a loss does not in any way reduce the actual cost of producing that plate, and 19 U.S.C. § 1677b(b)(3) requires Commerce to calculate the actual cost of production. *Id.* at 42–43. Dillinger relies on *Dillinger France* to support its position. *Id.* at 45.

In *Dillinger France*, we addressed whether Commerce's reliance on a respondent's normal books and records, which allocated cost based on likely selling price rather than actual cost, was proper. *Dillinger France*, 981 F.3d at 1321–24. We held that Commerce's reliance on

information reflecting "likely selling price," rather than actual cost data, violated 19 U.S.C. § 1677b(f). *Id.* We reasoned that under § 1677b(f), Commerce may use an exporter or producer's records when the records "reasonably reflect the costs associated with the production and sale of the merchandise," and respondent's records indicating "likely selling price" did not reasonably reflect cost of production.[3] *Id.*

*Dillinger France* also examined and relied on *IPSCO, Inc. v. United States*, 965 F.2d 1056 (Fed. Cir. 1992), which "held a method that 'calculat[ed] costs for both limited-service and prime products on the basis of their relative prices' to be 'an unreasonable circular methodology' because it 'contravened the express requirements of the statute which set forth the cost of production as an independent standard for fair value.'" 981 F.3d at 1322 (quoting *IPSCO*, 965 F.2d at 1061). *Dillinger France* and *IPSCO* establish that likely selling price does not reasonably reflect the cost of production. *Id.* at 1321–24; *IPSCO*, 965 F.2d at 1059–61.

Appellees respond that *Dillinger France* and *IPSCO* are inapplicable because neither case considered the use of likely selling price as facts otherwise available under 19 U.S.C. § 1677e for missing production cost information.

---

[3]    *Dillinger France* stated that it was "unclear" whether "Commerce's calculation of normal value involved determining constructed value" under 19 U.S.C. § 1677b(e), or cost of production under 19 U.S.C. § 1677b(b)(3). *Dillinger France*, 981 F.3d at 1321 n.1. "In either event, . . . the alleged errors would affect either calculation." *Id.* Here, the parties address 19 U.S.C. § 1677b(b)(3), so we presume Commerce's calculation of normal value involved determining cost of production under 19 U.S.C. § 1677b(b)(3).

U.S. Br. 37–41; Nucor Corp. and SSAB Enters. LLC Br. 25–26.

While Appellees are correct that *Dillinger France* and *IPSCO* did not address facts otherwise available under 19 U.S.C. § 1677e, nonetheless, the reasoning of both cases applies here. Like the reasonableness requirement of 19 U.S.C. § 1677b(f), the information Commerce uses as facts otherwise available under 19 U.S.C. § 1677e must be "reasonable to use under the circumstances." Statement of Administrative Action, H.R. Doc. No. 103-316, at 869 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 ("SAA").[4] Additionally, the information Commerce uses as facts otherwise available should be based on "that which is most probative of the issue under consideration." *Id.* Here, the issue under consideration is cost of production under 19 U.S.C. § 1677b. Just as likely selling price does not "*reasonably* reflect" cost of production, *Dillinger France*, 981 F.3d at 1321–24 (emphasis added), it is not reasonable for Commerce to rely on likely selling price as facts otherwise available for cost of production. The undisputed evidence shows that Dillinger's cost of producing prime plate is readily available, and Commerce has not contested Dillinger's assertion that non-prime plate undergoes the same production process as prime plate. J.A. 50 ("During the investigation, Dillinger provided the information necessary to calculate the actual costs of production for prime products."); J.A. 409–10 (explaining that non-prime plate is identified "after the production process"); J.A. 6100 ("Non-prime plate cannot be identified until the end of production

---

[4]    The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application." 19 U.S.C. § 3512(d).

and therefore undergoes the exact same production steps as prime plate.").

Regardless of whether Commerce proceeds under 19 U.S.C. § 1677b(f), as in *Dillinger France*, or 19 U.S.C. § 1677e, as is the case here, the statutory scheme seeks to compare cost of production to selling price. 19 U.S.C. § 1677b(b)(1); *Dillinger France*, 981 F.3d at 1321 n.1. Thus, using likely selling price as facts otherwise available under 19 U.S.C. § 1677e is an "unreasonable circular methodology" for the same reasons as is setting cost of production to likely selling price, as set forth in *Dillinger France* and *IPSCO*. *Dillinger France*, 981 F.3d at 1321–24; *IPSCO*, 965 F.2d at 1061. Under circumstances where there are other facts available, the selling price of non-prime plate cannot be the basis for measuring the fairness of the selling price of non-prime plate. *See IPSCO*, 965 F.2d at 1061.

To be clear, when relying on facts otherwise available, Commerce is not strictly constrained by the standards articulated in statutes governing the necessary but missing information. This is so because, if the administrative record contained all the information necessary to decide the issue under consideration, there would be no informational gap and thus no need for Commerce to resort to facts otherwise available, i.e., facts other than those dictated by statute. 19 U.S.C. § 1677e(a) (stating that Commerce shall use "facts *otherwise* available" (emphasis added)). But, when there is a gap to fill, there must be a reasonable relationship between the selected facts otherwise available and the gap to be filled. *Id.* (stating that Commerce may use "facts otherwise available *in reaching the applicable determination*," i.e., the gap to be filled (emphasis added)); SAA, H.R. Doc. No. 103-316, at 869, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4198 (stating that Commerce's selection of facts otherwise available must be "reasonable to use under the circumstances"). Here, 19 U.S.C. § 1677b(b)(3) is the relevant statute defining the necessary but missing

information.   So, while Commerce is not strictly con-
strained by 19 U.S.C. § 1677b(b)(3), this statute must in-
form whether Commerce's selection of facts otherwise
available is reasonable.   Considering the gap to be filled,
Commerce failed to meet the reasonableness requirement
in this case by using likely selling price as facts otherwise
available for cost of production, which, as far as the rele-
vant statute is concerned, are unrelated metrics. *Dillinger
France*, 981 F.3d at 1321–24; *cf. IPSCO*, 965 F.2d at 1059–
61 (concluding that 19 U.S.C. § 1677b(e) "expressly covers
actual production costs").

We therefore vacate the Trade Court's decision and re-
mand so that the Trade Court may instruct Commerce to
determine Dillinger's cost of production in a manner con-
sistent with this opinion.

## CONCLUSION

We have considered the parties' remaining arguments
and find them unpersuasive.   For the reasons stated, we
vacate and remand.

### VACATED AND REMANDED

## COSTS

No costs.